# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4   HEADWATER RESEARCH, LLC ,      )(

 5        PLAINTIFF,               )(    CIVIL ACTION NO.

 6                                  )(    2:22-CV-422-JRG-RSP

 7   VS.                            )(    MARSHALL, TEXAS

 8                                  )(

 9   SAMSUNG ELECTRONICS AMERICA, )(    APRIL 24, 2024

10   INC., ET AL.,                  )(

11        DEFENDANTS.              )(    9:06 A.M.

12                     MOTIONS HEARING

13           BEFORE THE HONORABLE ROY S. PAYNE

14           UNITED STATES MAGISTRATE JUDGE

15

16   FOR THE PLAINTIFF:    Mr. James S. Tsuei
                           Mr. Peter Tong
17                         Russ August & Kabat
                           12424 Wilshire Boulevard
18                         12th Floor
                           Los Angeles, CA 90025
19
                           Mr. R. Christopher Bunt
20                         Parker Bunt & Ainsworth
                           100 E. Ferguson
21                         Suite 418
                           Tyler, TX 75702
22
     FOR THE DEFENDANTS:   Mr. Noah C. Graubart
23                         Mr. Thad C. Kodish
                           Fish & Richardson PC
24                         1180 Peachtree Street NE
                           21st Floor
25                         Atlanta, GA 30309
```

```
 1   FOR THE DEFENDANTS:          Mr. Tom Gorham
                                  Gillam & Smith, LLP
 2                                102 N. College
                                  Suite 800
 3                                Tyler, TX 75702

 4                                Mr. Leonard Davis
                                  Fish & Richardson PC
 5                                1717 Main Street
                                  Suite 5000
 6                                Dallas, TX 75201

 7

     COURT REPORTER:              Ms. Shelly Holmes, CSR, TCRR
 8                                Official Court Reporter
                                  Honorable Robert W. Schroeder III
 9                                United States District Judge
                                  Eastern District of Texas
10                                Texarkana Division
                                  500 North State Line Avenue
11                                Texarkana, Texas 75501
                                  shelly_holmes@txed.uscourts.gov
12

13   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
14

15

16

17

18

19

20

21

22

23

24

25
```

09:06:35
09:06:35

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 09:06:36 | 1  | COURT SECURITY OFFICER:  All rise.                             |
| 09:06:36 | 2  | THE COURT:  Good morning.  Please be seated.                  |
| 09:06:37 | 3  | For the record, we're here for the motion hearings            |
| 09:06:48 | 4  | in Headwater Research versus Samsung Electronics, et al.,     |
| 09:06:53 | 5  | Case No. 2:22-422 on our docket.                              |
| 09:06:57 | 6  | Would counsel state their appearances for the                 |
| 09:06:59 | 7  | record?                                                         |
| 09:07:01 | 8  | MR. BUNT:  Good morning, Your Honor.  Chris Bunt               |
| 09:07:05 | 9  | here on behalf of the Plaintiff, Headwater.  With me is        |
| 09:07:10 | 10 | Mr. James Tsuei and Mr. Peter Tong, and we're ready to        |
| 09:07:15 | 11 | proceed.                                                       |
| 09:07:15 | 12 | THE COURT:  All right.  Thank you, Mr. Bunt.                   |
| 09:07:18 | 13 | MR. GORHAM:  Good morning, Your Honor.  Tom Gorham            |
| 09:07:20 | 14 | on behalf of the Samsung Defendants.  With me here this       |
| 09:07:24 | 15 | morning is Leonard Davis, Thad Kodish, and Noah Graubart.     |
| 09:07:29 | 16 | We are ready to proceed, Your Honor.                          |
| 09:07:30 | 17 | THE COURT:  All right.  Thank you, Mr. Gorham.                 |
| 09:07:32 | 18 | I understand we have a number of motions on the               |
| 09:07:42 | 19 | docket, and I understand further that counsel filed a joint   |
| 09:07:46 | 20 | report last night, which I have had some opportunity to       |
| 09:07:52 | 21 | look at.                                                        |
| 09:07:57 | 22 | But I guess my preference is to start with the                |
| 09:08:01 | 23 | motion regarding the privilege issue and review.  And I       |
| 09:08:09 | 24 | would like to hear from Samsung first on that as to what      |
| 09:08:18 | 25 | items on the privilege log, as it exists now, they are        |

| | | |
|---|---|---|
| 09:08:23 | 1 | disputing. |
| 09:08:24 | 2 | MR. GRAUBART:  Good morning, Your Honor. |
| 09:08:34 | 3 | Noah Graubart with Fish & Richardson for Samsung. |
| 09:08:37 | 4 | So I'm assuming Your Honor is referring to the |
| 09:08:39 | 5 | issue about which we had a hearing in March concerning a |
| 09:08:45 | 6 | third party, Krista Jacobsen, and her privilege log? |
| 09:08:48 | 7 | THE COURT:  As far as I know, that's the only |
| 09:08:51 | 8 | privilege log at issue. |
| 09:08:52 | 9 | Are there others? |
| 09:08:53 | 10 | MR. GRAUBART:  There are other motions that do |
| 09:08:55 | 11 | involve some privilege log issues. |
| 09:08:55 | 12 | THE COURT:  All right. |
| 09:08:57 | 13 | MR. GRAUBART:  But I assume that's what we're |
| 09:08:59 | 14 | talking about, and so I can briefly address that. |
| 09:09:03 | 15 | As we left it from the hearing on March 14th, |
| 09:09:06 | 16 | there were four categories remaining of documents on the |
| 09:09:12 | 17 | privilege log that Headwater had identified these buckets |
| 09:09:16 | 18 | that they contended the documents all fell within. |
| 09:09:21 | 19 | And -- and what Your Honor stated a willingness |
| 09:09:27 | 20 | to do at the time was to review in camera, perhaps here in |
| 09:09:30 | 21 | the courtroom, just outside of Samsung's eyeshot, a |
| 09:09:33 | 22 | sampling of documents from each of those four buckets.  And |
| 09:09:38 | 23 | Headwater had proposed that they would select a few.  And |
| 09:09:41 | 24 | then Your Honor said, well, they can select a few, and we |
| 09:09:43 | 25 | can select a few. |

| | |
|---|---|
| 09:09:45 | 1 |
| 09:09:47 | 2 |
| 09:09:51 | 3 |
| 09:09:53 | 4 |
| 09:09:55 | 5 |
| 09:09:59 | 6 |
| 09:10:01 | 7 |
| 09:10:05 | 8 |
| 09:10:10 | 9 |
| 09:10:11 | 10 |

So each side has selected five documents from each of those four categories.  So each side selected 20 documents each for a total of 40.

THE COURT:  I don't see a particular reason to start with Headwater's.

MR. GRAUBART:  We're fine with that, Your Honor.

So I understood that Headwater's local counsel had delivered to the Court yesterday paper copies of both sides' selections.

THE COURT:  That is my understanding as well.

MR. GRAUBART:  Okay.  And I understand from Mr. Tsuei this morning that there was -- there were two of Samsung's selections that were very large, so they brought with them today an electronic copy.

But -- so I can -- I can read to Your Honor the numbers of the documents we've selected.  I'll just say that, you know, based on the content or the descriptions on the privilege log, we're very much in the dark as to really what these documents are.  I'm not really able to provide any -- any context or -- or commentary on them, frankly.

You know, for example, in the first bucket, I think all of the descriptions say something like attorney work product analyzing patent family prosecution issues.

According to Headwater, the description of the bucket is Internal Headwater Memoranda Addressing Validity

6

| | | |
|---|---|---|
| 09:11:02 | 1 | and Materiality of Prior Art After Allowance.  I can't say |
| 09:11:07 | 2 | whether that's accurate or not. |
| 09:11:08 | 3 | THE COURT:  Does it represent who the author of |
| 09:11:10 | 4 | the document was? |
| 09:11:11 | 5 | MR. GRAUBART:  Each of these, Your Honor, |
| 09:11:13 | 6 | references Ms. Jacobsen on the log and no other person. |
| 09:11:17 | 7 | THE COURT:  And so are you disputing that |
| 09:11:23 | 8 | Ms. Jacobsen prepared these as a way to communicate her |
| 09:11:31 | 9 | advice to Headwater? |
| 09:11:32 | 10 | MR. GRAUBART:  There's nothing indicating from the |
| 09:11:37 | 11 | face of the log that that's the case.  That may be that -- |
| 09:11:42 | 12 | you know, all of the documents that a patent prosecutor |
| 09:11:46 | 13 | creates are not privileged, right?  They're not all created |
| 09:11:50 | 14 | reflecting attorney advice to be communicated to the client |
| 09:11:52 | 15 | or vice versa.  Some presumably are.  But there's not -- |
| 09:11:57 | 16 | wasn't a basis on the log to determine it. |
| 09:12:00 | 17 | THE COURT:  Show me the log entry that you're |
| 09:12:03 | 18 | referring to. |
| 09:12:04 | 19 | MR. GRAUBART:  So on the -- I believe -- |
| 09:12:07 | 20 | Mr. Tsuei, did the cover sheet get delivered to the Court |
| 09:12:10 | 21 | yesterday? |
| 09:12:10 | 22 | MR. TSUEI:  I don't believe so since that was not |
| 09:12:14 | 23 | finalized. |
| 09:12:15 | 24 | MR. GRAUBART:  So the -- I can tell you the |
| 09:12:18 | 25 | control number on the log, but I don't have with me that |

09:12:21    1   entire log from Ms. Jacobsen.  It's -- the first entry that

09:12:25    2   Samsung had collected is Control No. 586932, and it gives a

09:12:34    3   date of June 24th, 2013.  It says that the author is Krista

09:12:40    4   Jacobsen.  It says that it's attorney work product

09:12:43    5   analyzing patent family prosecution issues.  And it says

09:12:46    6   that the basis for withholding it is attorney-client

09:12:49    7   privilege and attorney work product.

09:12:54    8        THE COURT:  And so tell me what causes you to be

09:12:57    9   skeptical about whether or not she prepared this as a means

09:13:03   10   of advising her client.

09:13:05   11        MR. GRAUBART:  Well, if Your Honor remembers the

09:13:08   12   history, there were almost 600 documents withheld on the

09:13:11   13   basis of privilege.  Originally, on work product, which

09:13:16   14   then after forcing Samsung to file a motion to compel,

09:13:19   15   Headwater or Ms. Jacobsen did a 180 and said, no, no, I

09:13:23   16   mean attorney-client privilege.

09:13:24   17        But there was no detail provided to explain how

09:13:28   18   every single document from -- that Ms. Jacobsen created

09:13:32   19   would be actually an attorney-client communication.

09:13:35   20        And at the last hearing, Mr. Fenster, for

09:13:38   21   Headwater, described eight categories of documents to

09:13:42   22   Your Honor, and even on their face, Your Honor found that

09:13:45   23   three of them weren't privileged.

09:13:48   24        And with respect to the other four, if, in fact,

09:13:50   25   they were all -- everything in the category met the

8

09:13:54    1    description that Mr. Fenster give -- gave, then, in fact,

09:13:57    2    it sounds like they might be privileged.  But we don't

09:14:01    3    know.  And the history suggests that there was a very fast

09:14:04    4    and loose application of asserted privilege here, and the

09:14:07    5    log itself just simply doesn't provide the basis on which

09:14:10    6    one can determine.

09:14:10    7        THE COURT:  What in the history indicates a fast

09:14:12    8    and loose application of the privilege?

09:14:15    9        MR. GRAUBART:  Most -- primarily, the fact that

09:14:18   10    for months and months, Headwater asserted that all of the

09:14:22   11    documents were protected only by the attorney work product

09:14:25   12    doctrine.

09:14:25   13        THE COURT:  I thought that was Ms. Jacobsen

09:14:27   14    asserting that.

09:14:28   15        MR. GRAUBART:  I apologize.  They're the same

09:14:31   16    counsel, Your Honor, so I -- in my head, I frequently

09:14:34   17    interchange them.

09:14:35   18        THE COURT:  I mean, that's a very big difference.

09:14:37   19        I think the reason that at the last hearing I

09:14:41   20    determined that the privilege hadn't been waived was that

09:14:45   21    you were seeking the discovery from counsel -- former

09:14:51   22    counsel, and former counsel can't waive the client's

09:14:55   23    privilege.

09:14:55   24        MR. GRAUBART:  Understood, Your Honor.  And so

09:14:57   25    when I say Headwater has been fast and loose with it, I can

09:15:00   1   replace that as to say Ms. Jacobsen was fast and loose with

09:15:04   2   it.

09:15:04   3          THE COURT:  And it's not a small matter.  It's a

09:15:08   4   question of being accurate.

09:15:10   5          MR. GRAUBART:  Understood, Your Honor.

09:15:11   6          THE COURT:  Go ahead.

09:15:11   7          MR. GRAUBART:  Okay.  So -- well, I can say

09:15:15   8   Ms. Jacobsen's counsel, who was Headwater's counsel, has

09:15:21   9   been inconsistent in their positions and changes the

09:15:25  10   positions after we're forced to seek relief from the Court.

09:15:30  11          And even the descriptions that were provided

09:15:33  12   verbally to Your Honor at the last hearing for the first

09:15:36  13   time, Your Honor found several of them did not support

09:15:39  14   privilege.

09:15:40  15          And so as I say, if -- if Ms. -- if, in fact, a --

09:15:44  16   Your Honor reviews a handful of documents from these

09:15:48  17   remaining four categories and determines that they do match

09:15:50  18   the description that Mr. Fenster gave for the first time at

09:15:55  19   that hearing, then -- then presumably that's a -- then

09:16:00  20   those documents in that category are, in fact, privileged.

09:16:02  21          THE COURT:  I'm trying to figure out at this point

09:16:05  22   what it is about the privilege log that is causing you to

09:16:11  23   select certain documents for in camera review.

09:16:14  24          MR. GRAUBART:  And -- and it's a fair question,

09:16:17  25   Your Honor.  We were -- are completely in the dark as to

09:16:20  1  what these documents are.  As I say, the log description

09:16:22  2  doesn't match what the category Ms. Jacobsen's counsel has

09:16:28  3  bucketed them into.  And so it was largely a -- throwing a

09:16:35  4  dart board -- dart at the wall to identify these -- the

09:16:40  5  five from each category.

09:16:41  6       THE COURT:  Is there something about the privilege

09:16:43  7  log that you think makes it difficult for you to determine

09:16:49  8  whether these should be privileged or not?

09:16:53  9       MR. GRAUBART:  Sure.  For example, if we're now --

09:16:55  10  now Ms. Jacobsen is asserting attorney-client privilege,

09:16:58  11  not work product.  But none of the entries identify a

09:17:03  12  client.  There is no recipient other than it just describes

09:17:08  13  Ms. Jacobsen as the author.

09:17:09  14       And we know from the result of the last hearing

09:17:13  15  that there were around a hundred documents of a similar

09:17:16  16  nature that were listed as only having Ms. Jacobsen that

09:17:19  17  Your Honor ordered produced because they were not

09:17:21  18  privileged.  And they match similar descriptions on the log

09:17:24  19  of things describing draft filings for prosecution, but

09:17:27  20  they weren't, in fact, communications from counsel or to --

09:17:32  21  to a client.  They were just in -- the attorney's notes.

09:17:36  22       THE COURT:  Well, that -- that was a fairly easy

09:17:39  23  determination because the log demonstrated that they

09:17:43  24  weren't communications.  These --

09:17:48  25       MR. GRAUBART:  I guess what I would say, Judge, is

09:17:50  1  that the only assertion -- the only basis for finding that

09:17:52  2  these four categories remaining would be protected by

09:17:55  3  privilege are the verbal representation of Ms. Jacobsen's

09:17:59  4  counsel at the last hearing offered for the first time

09:18:02  5  after briefing was closed.  The log doesn't support it.

09:18:05  6  There's no evidentiary record from -- that is sufficient to

09:18:10  7  support it.  But it may very well be that upon review that

09:18:14  8  they are supported.  But normally, the way that this would

09:18:17  9  occur is that the log would on its face demonstrate the

09:18:20  10  applicability.

09:18:20  11       THE COURT:  I agree.  And if the log doesn't --

09:18:23  12  and, of course, I've never seen the log, and you don't have

09:18:25  13  the log today for me to look at.  But if the log doesn't

09:18:28  14  show what a log is supposed to show, typically the party

09:18:34  15  seeking production would raise the issue of whether the log

09:18:37  16  is insufficient.

09:18:39  17       MR. GRAUBART:  And, Your Honor, as a bit of

09:18:43  18  history, if you -- when we first moved to compel, there was

09:18:47  19  a different log that only asserted work product.

09:18:50  20       After we filed our motion, Ms. Jacobsen created a

09:18:54  21  new log and said, ah-ha, this is actually attorney-client

09:18:58  22  privilege.

09:18:58  23       But then when they filed their opposition to

09:19:01  24  the -- to the motion, they didn't attach that log.  So the

09:19:05  25  log that supports allegedly privilege here has never been

09:19:08    1    put in the record.

09:19:10    2         At the -- before the last hearing, I identified

09:19:12    3    that problem to Ms. Jacobsen's counsel, and they

09:19:16    4    represented the night before that they would file it with

09:19:18    5    the Court. They never did. So I showed up here last time

09:19:22    6    with a paper copy for Your Honor to review, but the party

09:19:26    7    asserting privilege has never actually put the log before

09:19:29    8    the Court. So that's, again, my point about the fast and

09:19:31    9    loose nature here.

09:19:33   10         This whole assertion is really not -- not

09:19:37   11    protected by anything -- excuse me, not supported by

09:19:40   12    anything in the record.

09:19:41   13         THE COURT: You know, it's normally the party who

09:19:43   14    is seeking production who demonstrates to the Court the

09:19:47   15    insufficiency of the privilege log.

09:19:49   16         MR. GRAUBART: The log we put into the record with

09:19:51   17    our motion, Your Honor --

09:19:53   18         THE COURT: Is there a log in the record?

09:19:55   19         MR. GRAUBART: They were -- so this original

09:19:57   20    motion was filed with the Northern District of California.

09:20:01   21    It was transferred to this district. And I don't have

09:20:06   22    the -- the docket number handy, and it doesn't match a

09:20:10   23    docket number on this case's docket because of that

09:20:14   24    procedural history.

09:20:14   25         But according to Ms. Jacobsen's counsel, that log

09:20:17    1    is no longer operative.  They supplement -- they superseded

09:20:21    2    it later, but they never provided the new one to the Court.

09:20:26    3         THE COURT:  And you're representing that you filed

09:20:28    4    the old log before the motion was transferred?

09:20:32    5         MR. GRAUBART:  That's -- was the only log that

09:20:35    6    existed at the time we filed our motion.  Ms. Jacobsen, in

09:20:40    7    response to our motion, created a new log.  They did serve

09:20:43    8    it, but they filed the wrong one in opposition to our

09:20:47    9    motion.

09:20:47    10        THE COURT:  What I'm asking is:  Are you

09:20:49    11   representing that you filed the earlier privilege log into

09:20:53    12   the record in California?

09:20:55    13        MR. GRAUBART:  That's my memory, Your Honor.

09:21:00    14        THE COURT:  Well, let's see if that's available.

09:21:18    15        The reason for this inquiry, Mr. Graubart, is I am

09:21:24    16   trying to figure out a way to resolve this motion, and I

09:21:32    17   don't have any problem in looking at a handful of documents

09:21:37    18   that you select.  It seems very random.  But if -- if

09:21:44    19   you're willing to go with the idea that what you're

09:21:48    20   offering up is representative and that will resolve it,

09:21:51    21   then we can do that.

09:21:54    22        But I'm -- it is just odd to me that there is what

09:22:00    23   seems to be from your point of view an insufficiency in the

09:22:05    24   privilege log, and that hasn't been addressed with the

09:22:09    25   Court.

09:22:11  1        MR. GRAUBART:  Well, if the only log in the record

09:22:14  2   is the original one asserted -- I mean, attached to our

09:22:17  3   motion, the only basis that Ms. Jacobsen is asserting is

09:22:21  4   work product, which they -- which there is no legal basis

09:22:24  5   to assert.  The only argument in their -- in their

09:22:27  6   opposition papers was a new assertion of attorney-client

09:22:31  7   privilege that was only offered in the revised log that was

09:22:34  8   never filed with the Court.

09:22:36  9        So if we want to stick with the only log that's

09:22:39  10  before the Court, it's the one that asserts work product,

09:22:42  11  and this will be an easy call for Your Honor, none of them

09:22:45  12  are protected by work product, and we can produce all of

09:22:48  13  them.

09:22:48  14       I don't think that's probably the most --

09:22:50  15       THE COURT:  That's also been rejected at the last

09:22:53  16  hearing.

09:22:53  17       MR. GRAUBART:  Well, you rejected a waiver, Your

09:22:56  18  Honor, but you didn't address the -- the merits argument.

09:23:00  19  There were no merits arguments offered to support work

09:23:04  20  product for these documents.  No one has articulated a

09:23:07  21  viable basis that the work product doctrine could support

09:23:10  22  withholding these documents that were created years before

09:23:13  23  there's any evidence that Headwater has put forward of an

09:23:18  24  anticipation of litigation.

09:23:19  25       MR. TSUEI:  Mr. Graubart...

09:23:21   1          And, Your Honor, if I may, just to quickly

09:23:24   2   interject with a very narrow point to assist the Court's

09:23:27   3   discussion and colloquy, the revised privilege log that

09:23:30   4   Mr. Graubart is referring to was, in fact, filed with the

09:23:33   5   Court on March 13.  That's Docket No. 14 in this

09:23:40   6   miscellaneous matter.

09:23:40   7          And, you know, without desiring to cut into

09:23:46   8   Mr. Graubart's time, I'll offer that fact for the Court.

09:23:48   9          MR. GRAUBART:  I appreciate that.  That may be why

09:23:50  10   I was not aware of it because the -- of the -- having been

09:23:53  11   filed in the miscellaneous matter.

09:23:54  12          I think Your Honor's order setting that last

09:23:56  13   hearing had ordered that all proceedings on that motion

09:24:00  14   be -- be docketed under the main case docket number.  And

09:24:05  15   I'm not, you know, casting blame, but that would explain

09:24:09  16   why -- why I wasn't aware it had ever been filed.

09:24:11  17          THE COURT:  Well, why don't we pull that log up,

09:24:19  18   and we can address your issues with that log then?

09:24:25  19          And, Mr. Tsuei, you said that was in what docket

09:24:28  20   entry?

09:24:29  21          MR. TSUEI:  Yes, sir.  It's Docket Entry 14 in

09:24:34  22   Case No. 24-MC-3-RSP.

09:24:40  23          THE COURT:  All right.  Mr. Graubart, are you able

09:25:21  24   to access that?

09:25:22  25          MR. GRAUBART:  Not standing here.  I can see my

09:25:25  1   colleague, Mr. Gorham, is working diligently to try to pull

09:25:29  2   that up.

09:25:30  3         I do have in front of me excerpts that I -- that I

09:25:35  4   had pasted of the particular entries that we had selected

09:25:39  5   from that one.

09:25:40  6         THE COURT:  Well, that may work.  It's a 274-page

09:25:43  7   document, but if you can tell me what page you are looking

09:25:48  8   at or some other way to find the entry, then I'll -- I will

09:25:54  9   find it.

09:25:54  10        MR. GRAUBART:  Okay.  So the -- the -- what I

09:25:58  11  don't know is whether the log is arranged in sequence of

09:26:02  12  control numbers.  But Mr. Gorham is going to hand that to

09:26:08  13  me right now.

09:26:08  14        THE COURT:  It is not -- the control numbers are

09:26:11  15  not sequential.

09:26:12  16        MR. GRAUBART:  Okay.  Well, the first one on

09:26:14  17  the -- on -- that we had selected is -- is 586932.  And

09:26:29  18  that is on Page 69 of the log.

09:26:33  19        THE COURT:  All right.

09:26:52  20        MR. GRAUBART:  I believe it's Page 70 of the ECF

09:26:55  21  filing because of the cover sheet, but at the bottom of the

09:27:04  22  page, it says Page 69 of 273.

09:27:12  23        THE COURT:  Let's agree we're going to use the ECF

09:27:19  24  page number, then, just so the record will be clear.

09:27:23  25        And you said that is Page 69?

09:27:26    1            MR. GRAUBART:  The ECF page number is Page 70 of

09:27:31    2    Page 274.

09:27:32    3            THE COURT:  All right.

09:27:32    4            MR. GRAUBART:  Excuse me.

09:27:36    5            THE COURT:  I am on that page.

09:27:37    6            And what is the other reference?

09:27:41    7            MR. GRAUBART:  It is the -- it's 586932.  It's the

09:27:45    8    one that has no entry in the third column.

09:27:51    9            THE COURT:  All right.  All right.  I have that

09:28:16   10    document in front of me now.

09:28:19   11            And let me turn it over to counsel for Plaintiff

09:28:24   12    to identify for me why they deem that document to be

09:28:29   13    privileged.

09:28:29   14            MR. TSUEI:  Good morning, Your Honor.  James Tsuei

09:28:44   15    from Russ August & Kabat for Ms. Jacobsen.

09:28:50   16            THE COURT:  Good morning, Mr. Tsuei.

09:28:50   17            MR. TSUEI:  I represent Headwater, too, in the

09:28:55   18    related motions involving Headwater, as well, today.

09:28:56   19            So Your Honor is now looking at Docket No. --

09:28:59   20    rather, Control No. 586932.  The control number, if

09:29:03   21    Your Honor can see it, is at the bottom right-hand corner

09:29:07   22    of the document starting on each page.

09:29:09   23            The document, broadly speaking, as my colleague,

09:29:14   24    Mr. Fenster, represented to the Court during the last

09:29:16   25    hearing, is a memorandum prepared by Ms. Jacobsen

09:29:19   1   specifically in accordance with Headwater's policy for its

09:29:23   2   counsel to review certain prior art at certain stages

09:29:28   3   during patent prosecution for families that were pending at

09:29:32   4   the time and being managed by Headwater's house counsel,

09:29:35   5   Ms. Jacobsen.

09:29:36   6           Without intending to reveal privileged

09:29:39   7   communications or information, I can direct your Court's

09:29:44   8   attention to the very first paragraph that's on the first

09:29:46   9   page, establishing that the document is, in fact, a

09:29:49  10   memorandum represent -- or reflecting the review of certain

09:29:53  11   prior art identified to Ms. Jacobsen and Headwater in the

09:29:58  12   course of prosecution of the patent.

09:30:00  13           And you'll also see, Your Honor, that the

09:30:04  14   paragraph there contains text indicating that the memo is

09:30:08  15   prepared in accordance with company policy.

09:30:09  16           So, you know, to put it quite simply, the

09:30:14  17   memorandum is requested by the client here, Headwater, and

09:30:17  18   the memorandum is prepared by house counsel, Ms. Jacobsen.

09:30:22  19           THE COURT:  It looks to me that it covers some

09:30:29  20   40-some references, and each -- there's one section on each

09:30:37  21   reference.  The section starts with the description of the

09:30:40  22   reference and then has a conclusion that appears to

09:30:47  23   constitute the author's recommendations about the effect of

09:30:53  24   this art on the application that is being considered for

09:31:02  25   submission to the PTO.

09:31:05  1          MR. TSUEI:  Yes, sir.  Ms. Jacobsen would not

09:31:07  2     disagree with that characterization of the contents of the

09:31:11  3     document.

09:31:11  4          I will only note, in addition, that the analysis

09:31:15  5     that the attorney performed to support the conclusion is

09:31:19  6     not only contained in the section that's labeled

09:31:23  7     "Conclusion," there's, in fact, analysis about the prior

09:31:26  8     art and certain limitations in the sections that discuss

09:31:28  9     the reference, as well, above the sections that are labeled

09:31:32  10    "Conclusion."

09:31:32  11         THE COURT:  All right.  I think that is a fair

09:31:38  12    understanding.

09:31:39  13         And I'm looking at the way you have logged this.

09:31:49  14    It does not, as some of the entries do, refer to this as a

09:31:54  15    communication.  Why is that?

09:31:56  16         MR. TSUEI:  Yes, sir.  It's because -- as

09:31:59  17    Mr. Fenster indicated during the last hearing, these

09:32:01  18    documents are not, in fact, emails or attachments to

09:32:04  19    emails.  And so in the course of our collection and review

09:32:07  20    of the documents, we're not aware, just based on the

09:32:11  21    collection process and the nature of the loose electronic

09:32:14  22    files, that they were, in fact, communications.

09:32:16  23         But upon further review, and specifically I think

09:32:20  24    a day or two prior to the last hearing, we conducted an

09:32:24  25    additional review of the documents, and during the hearing

09:32:26    1    represented to the Court that these were loose electronic

09:32:29    2    files.  So these were for the most part Word documents that

09:32:32    3    had not been attached but ultimately we understand were

09:32:37    4    attached in other communications to the client.

09:32:38    5         So that's the reason why, Your Honor, that for the

09:32:41    6    privilege log here, at least in the first version and the

09:32:46    7    amended version, we didn't identify it as a communication,

09:32:49    8    but in the course of the parties' colloquy and during the

09:32:53    9    discussion during the last hearing, we did, in fact,

09:32:55    10   represent to both Your Honor and Samsung that these were

09:32:58    11   communications.

09:32:59    12        So we apologize if there's any, I guess, ambiguity

09:33:03    13   as to the nature of these documents.  But, you know, at the

09:33:06    14   end of the day, we understand the content of the documents

09:33:08    15   also speak for themselves.

09:33:09    16        THE COURT:  All right.  Thank you, Mr. Tsuei.

09:33:13    17        MR. TSUEI:  Thank you, Your Honor.

09:33:18    18        THE COURT:  Mr. Graubart, if you want to offer any

09:33:21    19   argument about it, it is clear to me that the document is

09:33:27    20   prepared as a communication.  And I guess the issue that

09:33:32    21   Mr. Tsuei just raised is whether or not it was actually

09:33:39    22   ultimately communicated as opposed to somehow just left in

09:33:45    23   a file.

09:33:47    24        But other than that, it certainly has all the

09:33:51    25   earmarks of a privileged communication.

09:33:54   1           MR. GRAUBART:  Your Honor, of course, we'll defer

09:33:56   2   to Your Honor's impressions of it from having seen it, and

09:34:00   3   if it appears that this was prepared as a communication,

09:34:03   4   then that -- if it was, in fact, a communication to a

09:34:06   5   client, then that would be privileged.

09:34:08   6           All I can say is that, you know, this -- there

09:34:12   7   wasn't evidence in the record until this very moment when

09:34:15   8   Your Honor is looking at this to support that it had --

09:34:18   9   that any of these were communications to a client.

09:34:20   10          Mr. Raleigh from Headwater -- by the way, there's

09:34:24   11  no evidence from Ms. Jacobsen.  She didn't offer any

09:34:24   12  declaration or anything.

09:34:29   13          Mr. Raleigh, who doesn't say he's ever looked at

09:34:31   14  any of these documents, gave a general declaration saying,

09:34:33   15  you know, my lawyers did things internally at Headwater,

09:34:36   16  and it was intended to be privileged.

09:34:38   17          So it's -- it's -- I can take Mr. Tsuei at his

09:34:41   18  word and what Your Honor sees, but you can understand from

09:34:45   19  Samsung's perspective, until this moment, there was

09:34:48   20  nothing -- there still wasn't record evidence for us to go

09:34:52   21  on concluding that this was communication.

09:34:54   22          THE COURT:  So you're just saying this is an entry

09:34:57   23  that doesn't use the word "communication."

09:35:00   24          Did you raise that issue with Plaintiff's counsel

09:35:02   25  that there are entries in the log that don't describe the

09:35:09  1  document as a communication?

09:35:10  2       MR. GRAUBART:  We raised that the log itself was

09:35:15  3  very unhelpful, very vague descriptions, doesn't identify a

09:35:19  4  recipient or, you know, a client, that at the time of the

09:35:23  5  briefing, there was, in fact, no assertion of even

09:35:26  6  attorney-client privilege.

09:35:27  7       And the first time we heard about these buckets

09:35:30  8  and the fact that these were allegedly memoranda was, you

09:35:34  9  know, as Mr. Tsuei said, a day or two before the last

09:35:37  10  hearing, and none of it was supported by evidence in the

09:35:40  11  record.

09:35:41  12       And -- and so if -- if -- to the extent that they,

09:35:46  13  in fact, do reflect that, then -- then that's the result.

09:35:50  14  But, you know, Samsung had not been in a position to

09:35:54  15  evaluate that, and it wasn't supported by anything

09:35:56  16  Headwater had provided to us --

09:36:01  17       THE COURT:  You --

09:36:02  18       MR. GRAUBART:  -- or Ms. Jacobsen --

09:36:04  19       THE COURT:  -- received the privilege log that

09:36:06  20  we're looking at now -- the one that was filed in the

09:36:09  21  miscellaneous action, you received that when it was filed

09:36:12  22  on March 13th?

09:36:13  23       MR. GRAUBART:  I think we even received it by

09:36:15  24  service a little earlier than that when Headwater -- or

09:36:18  25  when Ms. Jacobsen filed her opposition in California.

09:36:21   1       THE COURT: All right. And have you raised with

09:36:26   2  Plaintiff any insufficiencies in that log?

09:36:30   3       MR. GRAUBART: Yes. We raised that -- up until

09:36:33   4  that point, there had never been an assertion of

09:36:37   5  attorney-client privilege and that even the assertion --

09:36:39   6  the new assertion --

09:36:41   7       THE COURT: I'm sorry. Maybe I sound impatient,

09:36:43   8  but I asked a specific question.

09:36:45   9       Have you raised insufficiencies in the log, not

09:36:49  10  whether up until then there had been an assertion of work

09:36:53  11  product or privilege?

09:36:54  12       MR. GRAUBART: I believe so, Your Honor. I -- my

09:36:58  13  memory is -- to the best of my memory, we articulated that

09:37:02  14  the revised log still did not demonstrate the -- the --

09:37:09  15  that any of these were communications to or from a client.

09:37:12  16       THE COURT: Well, there are lots of entries on

09:37:17  17  this 270-page log that I'm looking at that say

09:37:22  18  communication.

09:37:29  19       MR. GRAUBART: The ones that were at issue in this

09:37:34  20  motion, Your Honor, are -- there are 580 of them, and they

09:37:38  21  all are ones in which there is no -- there's only one

09:37:44  22  person reflected in either the author or recipient column.

09:37:49  23  And I don't believe, if you find those entries, any of them

09:37:54  24  say communication.

09:37:55  25       So you're right, Your Honor, that there are ones

09:37:57  1   that have an email from so-and-so to so-and-so, and it says

09:38:03  2   communication.  Those we weren't challenging.

09:38:05  3          THE COURT:  So this is all about the fact that as

09:38:07  4   to those entries, which you've described as 580, there is

09:38:13  5   no indication in the log that it's a communication?

09:38:18  6          MR. GRAUBART:  That's right.  That is a fair

09:38:22  7   description of those entries.

09:38:25  8          THE COURT:  All right.  Thank you, Mr. Graubart.

09:38:27  9          Let me hear from Mr. Tsuei.

09:38:36  10         Mr. Tsuei, are you now indicating that after

09:38:39  11  further review, those -- I'm assuming the Defendant's

09:38:44  12  correct -- 580 entries actually are communications?

09:38:48  13         MR. TSUEI:  Unfortunately, Your Honor, the answer

09:38:53  14  is probably more complex than I can fit in one sentence.

09:38:56  15  So just a quick couple of parameters to scope the

09:39:01  16  discussion here.

09:39:01  17         It's not 580 entries that are at issue here.  That

09:39:06  18  was the number of entries that were initially implicated by

09:39:09  19  Samsung's request for relief in its opening motion.

09:39:11  20         That number of entries has since been dramatically

09:39:16  21  cut because for one reason or another, entries have been

09:39:19  22  produced, whether through agreement or by order of the

09:39:22  23  Court, and so the number of entries, although I don't have

09:39:24  24  the exact number, is significantly smaller.

09:39:27  25         So to answer the meat of Your Honor's question,

09:39:31    1    that is whether or not we can represent that the remaining

09:39:33    2    entries are all communications, the answer to that is also

09:39:38    3    unfortunately complicated.

09:39:39    4         Many of the entries are, in fact, formal

09:39:42    5    communications and along the lines of the memoranda to the

09:39:45    6    company that Your Honor reviewed.  Some, however, are Word,

09:39:51    7    I guess, document copies of instructions to counsel,

09:39:55    8    outside counsel, as opposed to the company, and other

09:39:57    9    documents are attachments that Ms. Jacobsen prepared to

09:40:01    10   send to outside counsel, typically in preparation of

09:40:05    11   prosecuting this or that patent family.

09:40:08    12        So it's that last category of documents which from

09:40:12    13   the face of them don't appear to immediately be

09:40:15    14   communications, but there are indicia in many of the

09:40:19    15   documents suggesting that they, in fact, are.

09:40:21    16        So, for instance, the Word documents that contain

09:40:24    17   draft claims with redlines and track changes may also have

09:40:29    18   comments in many of them that have the initials of this or

09:40:32    19   that attorney.  And it's those documents, which although

09:40:36    20   strictly speaking are not emails or I guess notes from one

09:40:38    21   person to another, they constitute in our view also

09:40:41    22   communications and at minimum the disclosure of which would

09:40:47    23   reveal the content of privileged communications.

09:40:49    24        THE COURT:  If they constitute, in your view,

09:40:51    25   communications, why haven't you logged them as

09:40:53    1    communications?

09:40:54    2         MR. TSUEI:  That's a fair question, Your Honor.

09:40:56    3         It's because we understood that -- through our

09:41:00    4    representations to both Samsung and the Court during the

09:41:03    5    last hearing that that I suppose obligation had been

09:41:07    6    satisfied.

09:41:08    7         But if Your Honor is suggesting that we, in fact,

09:41:11    8    amend the privilege log to specifically identify them as

09:41:14    9    either communications or information reflecting

09:41:17   10    communications, that's something we, of course, can easily

09:41:20   11    do.  And we understood that, you know, if that's what

09:41:23   12    Samsung was wanting, that we would, in fact, do that.

09:41:26   13         To address, I think, a related point that

09:41:29   14    Your Honor asked Mr. Graubart, which was whether or not

09:41:32   15    Samsung had specifically raised any deficiencies with the

09:41:37   16    amended privilege log, you know, I know that Mr. Graubart

09:41:40   17    represented that his understanding was that it had, I

09:41:43   18    believe the answer is, in fact, no, that it has not.  But

09:41:47   19    at the end of the day if what they're asking for is an

09:41:49   20    updated description of the entries as, in fact, being

09:41:53   21    communications, we don't have a problem with that.

09:41:54   22         THE COURT:  Well, what I just heard from

09:41:57   23    Mr. Graubart was that the entries that they are challenging

09:42:01   24    today are the ones that don't indicate in the log that they

09:42:07   25    are communications.

09:42:09     1          MR. TSUEI:  That's right.

09:42:11     2          THE COURT:  Which sounds to me like they are

09:42:14     3     relying upon a deficiency in the log.

09:42:18     4          MR. TSUEI:  Yeah.  I think that's a fair

09:42:21     5     characterization of what Samsung's position is currently as

09:42:24     6     it's fleshed out in today's hearing.

09:42:26     7          My point, Your Honor, was merely that in response

09:42:29     8     to a question that you posed to Mr. Graubart, if the

09:42:31     9     parties had specifically discussed the deficiency in this

09:42:35    10     amended privilege log, I believe the answer was no.

09:42:38    11          But since we're here today and having that

09:42:40    12     discussion, you know, again, I think Ms. Jacobsen can quite

09:42:45    13     easily, very quickly provide a second amended log with that

09:42:47    14     description.

09:42:48    15          THE COURT:  It's remarkable to me that only in

09:42:50    16     this room in Marshall, Texas, are counsel able to

09:42:54    17     communicate about this issue.

09:42:59    18          I'll go through a few more of these, but I'm going

09:43:10    19     to require that you amend your privilege log in order to

09:43:17    20     take a position on whether or not these are communications.

09:43:21    21     If you do not have sufficient information to take the

09:43:25    22     position that it's a communication, then you're going to

09:43:28    23     have to produce it.  You can't withhold it from production

09:43:36    24     because it might be privileged.  You have to take a

09:43:40    25     position on whether or not it is privileged.

| | | |
|---|---|---|
| 09:43:43 | 1 | And the log needs to reflect the basis for that |
| 09:43:49 | 2 | assertion.  And I would agree that if it is a |
| 09:43:57 | 3 | communication, it should say who the author is or at least |
| 09:44:02 | 4 | one of the authors and who the recipient is, at least one |
| 09:44:07 | 5 | of the recipients, sufficient to show that there is a |
| 09:44:12 | 6 | communication of information between attorney and client. |
| 09:44:17 | 7 | And certainly you can rely upon information from |
| 09:44:22 | 8 | Ms. Jacobsen or from your client in making that |
| 09:44:27 | 9 | determination.  And it sounds to me like you're being |
| 09:44:32 | 10 | careful about it, which is certainly appropriate.  But you |
| 09:44:38 | 11 | still ultimately have to take a position and reflect that |
| 09:44:43 | 12 | in your log. |
| 09:44:44 | 13 | MR. TSUEI:  Yes, sir.  We understand. |
| 09:44:46 | 14 | We apologize for not having served an amended log |
| 09:44:50 | 15 | containing that information.  We will note, though, that |
| 09:44:55 | 16 | Samsung knows that our position has been all along that |
| 09:44:58 | 17 | these were communications since that was, in fact, one of |
| 09:45:00 | 18 | the points that we discussed at length during the last |
| 09:45:03 | 19 | hearing. |
| 09:45:03 | 20 | But we appreciate and understand Your Honor's |
| 09:45:06 | 21 | concern, and we're willing to serve an amended privilege |
| 09:45:09 | 22 | log containing that information. |
| 09:45:10 | 23 | THE COURT:  All right.  Well, thank you, |
| 09:45:14 | 24 | Mr. Tsuei. |
| 09:45:14 | 25 | Let me give Mr. Graubart the opportunity to have a |

| | | |
|---|---|---|
| 09:45:22 | 1 | few more of these examined. |
| 09:45:26 | 2 | What else do you want the Court to look at, |
| 09:45:29 | 3 | Mr. Graubart? |
| 09:45:29 | 4 | MR. GRAUBART:  What I'm wrestling with, Your |
| 09:45:44 | 5 | Honor, is whether to ask you to look at any more in that |
| 09:45:47 | 6 | category.  I think in the interest of time what I'd do is |
| 09:45:50 | 7 | select one from one of the other buckets, and if we move |
| 09:45:55 | 8 | to -- |
| 09:45:55 | 9 | THE COURT:  I can tell you that the -- the ones |
| 09:45:59 | 10 | that are in this notebook that I've been provided for in |
| 09:46:05 | 11 | camera review, all of the ones I'm looking at that are |
| 09:46:11 | 12 | similar documents, analysis of prior art, are materially |
| 09:46:18 | 13 | the same as what I described before.  They are certainly |
| 09:46:28 | 14 | the attorneys' analysis and recommendations to someone who |
| 09:46:33 | 15 | I assume is the client. |
| 09:46:36 | 16 | But go ahead.  What's your next -- |
| 09:46:38 | 17 | MR. GRAUBART:  Okay.  So I turn to Category No. 4, |
| 09:46:42 | 18 | there is a -- an entry of 589737, which is on ECF Page 261. |
| 09:48:02 | 19 | THE COURT:  I'm attempting to locate it in the |
| 09:48:04 | 20 | notebook here. |
| 09:48:05 | 21 | MR. GRAUBART:  Mr. Tsuei, perhaps -- is this |
| 09:48:08 | 22 | perhaps one that you only brought electronically? |
| 09:48:11 | 23 | MR. TSUEI:  Yeah, we can show it to the Court |
| 09:48:14 | 24 | electronically.  This should be printed as far as I |
| 09:48:16 | 25 | understand. |

| | | |
|---|---|---|
| 09:48:16 | 1 | But it is an Excel spreadsheet, Your Honor, so if |
| 09:48:19 | 2 | there's an explanation for why it's not included, that may |
| 09:48:22 | 3 | be the case.  It may have been too long or too big to |
| 09:48:27 | 4 | include in printed copy. |

09:48:16　1　　　　　　But it is an Excel spreadsheet, Your Honor, so if

09:48:19　2　there's an explanation for why it's not included, that may

09:48:22　3　be the case.  It may have been too long or too big to

09:48:27　4　include in printed copy.

09:48:28　5　　　　　　THE COURT:  All right.  No, I have found 589737,

09:48:38　6　and let me see, it says:  Native document placeholder.  But

09:48:42　7　there is a copy of, I guess, one page of it that is in the

09:48:48　8　notebook.

09:48:48　9　　　　　　But let me see -- and that one page does not have

09:48:57　10　a separate Bates number or other indication on it.

09:49:05　11　　　　　　But, Mr. Tsuei, is the Court to understand that

09:49:11　12　the rest of the Excel spreadsheet would be pages similar to

09:49:17　13　the one that is contained behind the placeholder sheet?

09:49:21　14　　　　　　MR. TSUEI:  Unfortunately, Your Honor, I've not

09:49:24　15　had a chance to physically inspect the binder since it was

09:49:29　16　delivered to the Court yesterday when we were still in

09:49:31　17　transit.

09:49:32　18　　　　　　THE COURT:  Let me pass this down to you, then,

09:49:34　19　and ask you to tell me if this reflects what the rest of

09:49:40　20　the document would show.

09:50:03　21　　　　　　MR. TSUEI:  Your Honor, just looking at my native

09:50:06　22　copy here, it looks like the one-page printout is an

09:50:09　23　accurate printout.  However, it does not appear to contain,

09:50:14　24　it looks like, all the columns that are in the spreadsheet.

09:50:19　25　　　　　　THE COURT:  All right.  Then if you can bring it

09:50:21    1    up electronically or however else you can show it to me.

09:50:47    2         MR. TSUEI:  Yeah.  You know what, let me -- well,

09:50:48    3    actually since Samsung's counsel are in the room, at least

09:50:51    4    for in camera review purposes, if we wanted to put it on

09:50:55    5    the board, we'd ask Samsung to step out.

09:50:57    6         THE COURT:  Well, I'll tell you what, we'll take a

09:50:59    7    break and get IT to get me a device that I can look at this

09:51:06    8    with.

09:51:09    9         MR. GRAUBART:  I wouldn't object to just handing

09:51:12    10   up your own laptop, if you're comfortable.

09:51:14    11        MR. TSUEI:  Yeah, I think that's fine.  Let me

09:51:16    12   just set up the view for the Court.

09:51:19    13        THE COURT:  Well, all right.

09:51:25    14        MR. TSUEI:  Well, okay.  And we're off the record.

09:51:32    15        Permission to approach?

09:51:32    16        THE COURT:  Yes.

09:51:33    17        We'll go off the record while we do this.  Go

09:51:35    18   ahead.

09:51:42    19        (Recess.)

09:52:39    20        THE COURT:  All right.  Mr. Tsuei has handed me

09:52:42    21   his laptop which has the selected document on the display,

09:52:55    22   and that's Entry No. 589737 of the privilege log.

09:53:02    23        And go ahead and explain to me, if you would,

09:53:07    24   Mr. Tsuei, the features of the document that show it is

09:53:17    25   privileged.

| | | |
|---|---|---|
| 09:53:17 | 1 | MR. TSUEI:  Yes, sir. |
| 09:53:18 | 2 | So I believe this is Bucket 4, and we've |
| 09:53:23 | 3 | previously represented to the Court that these are internal |
| 09:53:27 | 4 | spreadsheets maintained by in-house counsel with respect to |
| 09:53:30 | 5 | the status of and the strategy for pending patent |
| 09:53:34 | 6 | prosecutions. |
| 09:53:35 | 7 | I regret to say that this particular spreadsheet |
| 09:53:40 | 8 | probably is not completely representative of the kinds of |
| 09:53:44 | 9 | information that are contained in the documents in this |
| 09:53:46 | 10 | category, but it is sufficiently similar enough that it can |
| 09:53:49 | 11 | be used as a good starting point for the discussion. |
| 09:53:52 | 12 | So the document in question -- I apologize, Your |
| 09:53:57 | 13 | Honor.  Without having the document in front of me, I may |
| 09:54:00 | 14 | misspeak about the contents, and so to the extent that |
| 09:54:03 | 15 | there are any inaccuracies, I hope to correct them in due |
| 09:54:06 | 16 | course. |
| 09:54:06 | 17 | So the spreadsheet Your Honor is looking at is a |
| 09:54:11 | 18 | compilation of the status of the patent prosecutions of |
| 09:54:15 | 19 | several patent families, and it contains the attorney's |
| 09:54:18 | 20 | notes about the current status of this or that patent |
| 09:54:22 | 21 | prosecution and I believe also contains certain notes about |
| 09:54:27 | 22 | the priority claims for each of them that they'd like to |
| 09:54:30 | 23 | maintain with the Patent Office as well. |
| 09:54:32 | 24 | THE COURT:  So you're representing that the fields |
| 09:54:36 | 25 | within this spreadsheet are maintained or populated by |

09:54:44  1  Ms. Jacobson?

09:54:44  2        MR. TSUEI:  Yes, Your Honor.  That's, in fact,

09:54:46  3  what we're representing.  And we've confirmed that

09:54:49  4  separately with both representatives of Headwater who are

09:54:54  5  percipient witnesses to the creation of these spreadsheets,

09:54:57  6  as well as Ms. Jacobson herself.

09:55:01  7        THE COURT:  And how are they communicated to the

09:55:03  8  client?

09:55:04  9        MR. TSUEI:  So as Your Honor may have seen from

09:55:06  10  the declaration of Dr. Raleigh that was attached to the

09:55:08  11  briefing for this particular motion, documents such as

09:55:11  12  these, including, in fact, I believe the one that you're

09:55:13  13  looking at, were the subject of discussions in person at

09:55:17  14  the office -- that is, the Headwater's office in Redwood

09:55:22  15  Shores, California -- on a regular basis for a number of

09:55:24  16  years.

09:55:24  17        And we can represent that it's documents such as

09:55:27  18  these which both Dr. Raleigh and Ms. Jacobson looked at

09:55:32  19  while determining the strategy for how to proceed with

09:55:36  20  certain patent prosecutions.

09:55:37  21        Now, Your Honor is actually quite correct to suss

09:55:40  22  out, you know, the real issue.  Is there an indicia of this

09:55:44  23  being communicated or containing or reflecting a

09:55:48  24  communication?  And, unfortunately, it does not because

09:55:50  25  there's no column that says attorney-client, you know,

09:55:53   1   communications or comments here.

09:55:54   2         But our position has and has always been that the

09:55:59   3   subject of the information in this spreadsheet was the

09:56:01   4   subject of the communications between the client and the

09:56:04   5   counsel.

09:56:05   6         And since we're on this same bucket, Your Honor,

09:56:09   7   there are, in fact, other spreadsheets of a similar nature

09:56:13   8   selected by Samsung which do, in fact, have columns

09:56:16   9   containing the attorney's comments -- that is, the

09:56:21  10   communication -- communications from the attorney to the

09:56:23  11   client.  And if Your Honor would so please can quite easily

09:56:27  12   look at them and confirm for itself that there are, in

09:56:30  13   fact, such communications.

09:56:34  14         THE COURT:  And are you representing that counsel

09:56:39  15   and the client, Headwater, were the only ones who had

09:56:46  16   regular access to these spreadsheets?

09:56:49  17         MR. TSUEI:  Yes, sir.  That's what we can

09:56:52  18   represent, I think, with certainty.

09:56:56  19         THE COURT:  All right.  I am not as adept as you

09:57:22  20   are at causing this document to scroll.

09:57:26  21         But, all right, let me hear what counsel for

09:57:30  22   Defendant has to say about the assertion.

09:57:33  23         MR. GRAUBART:  So as I understand it, Your Honor,

09:57:38  24   that there's nothing on these -- this document that

09:57:40  25   provides an indicia that it was, in fact, communicated to

09:57:43   1   or from a client.  It sounds like there are -- that this

09:57:47   2   particular document, the first one selected, didn't even

09:57:49   3   have the attorney's notes.

09:57:51   4        Mr. Tsuei is representing that there are others in

09:57:54   5   this category that do have the attorney's notes.

09:57:56   6        THE COURT:  Well, it is my understanding that many

09:58:01   7   of these columns are the attorney's notes.  There are notes

09:58:06   8   about the status of the applications here, what -- that

09:58:13   9   they're awaiting certain things, that certain filings were

09:58:17   10  made as of certain dates, that -- whether an examiner has

09:58:22   11  been assigned yet and other things of that nature about the

09:58:31   12  various patent applications that are described.

09:58:35   13       MR. GRAUBART:  What it sounds to me like, Your

09:58:38   14  Honor, is a description of a patent prosecutor's own

09:58:44   15  created documentation of her own notes for herself, that

09:58:49   16  the only indication that there may have been -- that this

09:58:52   17  would have reflected a communication to a client for the

09:58:56   18  purpose of legal advice is counsel's representation that

09:58:58   19  Mr. Raleigh says they discussed these at meetings.

09:59:02   20       But his declaration is very general.  It doesn't

09:59:04   21  even indicate that he looked at any of these documents

09:59:07   22  before creating them -- before creating that declaration.

09:59:10   23  He just says that the lawyers in-house did create things

09:59:14   24  that they discussed.

09:59:15   25       And while Mr. Tsuei is now saying that

09:59:18    1    Ms. Jacobson confirmed that, there's nothing in the record

09:59:21    2    from Ms. Jacobson.  And, in fact, during our meet and

09:59:23    3    confer prior to the previous hearing, Mr. Fenster

09:59:25    4    represented that they didn't have, quote, full access to

09:59:30    5    Ms. Jacobson.  And so it's -- it's -- you know, what we

09:59:34    6    have is a record that seems to reflect notes.  And, yes,

09:59:37    7    it's possible these were communicated to a client.  We

09:59:40    8    don't have any evidence of that.

09:59:46    9         THE COURT:  Did you take the deposition of

09:59:47   10    Ms. Jacobson?

09:59:48   11         MR. GRAUBART:  No, we've been waiting to have this

09:59:50   12    issue resolved, Your Honor, so we'd have the documents for

09:59:52   13    that deposition.

09:59:53   14         THE COURT:  All right.  Well, I don't have any

10:00:25   15    basis to conclude that the representation that these

10:00:34   16    spreadsheets were made available to the client when --

10:00:40   17    Ms. Jacobson was employed by Headwater at the time she made

10:00:42   18    these, right?

10:00:43   19         MR. GRAUBART:  She worked both in-house and then

10:00:45   20    as an outside counsel.  This particular one was 2015.  I

10:00:51   21    believe by that point, she was outside counsel, but I -- I

10:00:54   22    am not a hundred percent positive.

10:00:56   23         THE COURT:  Okay.  Well, I'm going to find that

10:01:12   24    there is a sufficient basis for the assertion of the

10:01:14   25    privilege on this.

| | | |
|---|---|---|
| 10:01:15 | 1 | If you, during the deposition of Ms. Jacobson, |
| 10:01:19 | 2 | determine that, in fact, this information on these |
| 10:01:25 | 3 | spreadsheets was not something communicated to the client, |
| 10:01:32 | 4 | then you can come back. |
| 10:01:35 | 5 | But, frankly, it's unusual to me to see discovery |
| 10:01:45 | 6 | of the sort we're dealing with here directed at in-house |
| 10:01:52 | 7 | counsel.  And so it's easy for me to make the assumption |
| 10:02:01 | 8 | that the representation being made by the Plaintiff is |
| 10:02:04 | 9 | accurate. |
| 10:02:10 | 10 | What else do you have? |
| 10:02:11 | 11 | MR. GRAUBART:  Your Honor, if I understand |
| 10:02:21 | 12 | Your Honor correctly that the documents that on their face |
| 10:02:24 | 13 | don't have an indicia of them being communications but |
| 10:02:28 | 14 | Your Honor's accepting counsel's representation for all of |
| 10:02:33 | 15 | them that they -- that they were communicated to clients, |
| 10:02:35 | 16 | then I think that that may resolve all of the documents on |
| 10:02:39 | 17 | the log because that was the -- the issue in dispute that, |
| 10:02:44 | 18 | in fact, the question was whether these documents, in fact, |
| 10:02:47 | 19 | bear that indicia. |
| 10:02:48 | 20 | THE COURT:  Well, what I'll do is order that |
| 10:02:55 | 21 | Plaintiff file an amended log that makes the representation |
| 10:03:02 | 22 | that the documents are communications as long as the |
| 10:03:07 | 23 | Plaintiff has a basis for that.  And if the Plaintiff |
| 10:03:11 | 24 | determines that there are documents on the log that it has |
| 10:03:16 | 25 | no basis to represent are communications with the client, |

| 10:03:25 | 1 | then those -- the Plaintiff will be ordered to produce or |
|----------|---|

10:03:25    1    then those -- the Plaintiff will be ordered to produce or

10:03:33    2    establish the basis why they wouldn't be.  But...

10:03:44    3         MR. GRAUBART:  Understood.  Thank you, Your Honor.

10:03:45    4         THE COURT:  All right.  Mr. Tsuei, I will tender

10:03:47    5    you back your laptop.

10:03:51    6         MR. BUNT:  May I approach, Your Honor?

10:03:52    7         THE COURT:  Yes.

10:04:15    8         How much time do you need, Mr. Tsuei, to file your

10:04:19    9    amended privilege log?

10:04:21   10         MR. TSUEI:  Well, having thought about it for just

10:04:28   11    a brief moment, Your Honor, I would expect us to be able to

10:04:31   12    do that likely within two weeks.  We'd like a chance to do

10:04:37   13    our due diligence, revisit with Ms. Jacobson, and also with

10:04:40   14    our client, Headwater, to confirm that we do have a

10:04:43   15    good-faith basis to maintain an assertion.

10:04:47   16         And we -- we'll also say that to the extent that

10:04:49   17    we're not able to determine after investigating with our

10:04:51   18    clients that there is not a good-faith basis, we do intend

10:04:55   19    to produce those documents to Samsung with the

10:04:58   20    understanding that they not be used against either

10:05:02   21    Ms. Jacobson or Headwater as evidence of a waiver of

10:05:04   22    privilege.

10:05:06   23         THE COURT:  Well, as I pointed out a couple of

10:05:11   24    times, Ms. Jacobson can't waive Headwater's privilege.  But

10:05:20   25    certainly if you produce them, it'll be a waiver of the

10:05:23   1   privilege as to those documents, but it will not be a

10:05:27   2   subject matter waiver.

10:05:28   3            MR. TSUEI:  Yes, sir.

10:05:29   4            THE COURT:  All right.  Is two weeks soon enough

10:05:33   5   to make sure that it is done before the deposition of

10:05:38   6   Ms. Jacobson?

10:05:38   7            MR. TSUEI:  I think that's feasible, Your Honor,

10:05:43   8   although I suppose Samsung's counsel will have to speak to

10:05:45   9   how much time they need to prepare for the depo.

10:05:48  10            MR. GRAUBART:  I believe counsel -- we've already

10:05:50  11   been engaged in discussing scheduling that deposition in

10:05:54  12   anticipation of having these rulings today.  My best

10:05:58  13   recollection is that the dates being discussed were in

10:06:00  14   early May.  So I guess what I would say is to the extent

10:06:02  15   that counsel needs more time to prepare it, then we would

10:06:06  16   just work with them to schedule the deposition at a time

10:06:10  17   after having the log.

10:06:12  18            THE COURT:  All right.  Well, I'll order that the

10:06:13  19   amended log be filed within two weeks from today and that

10:06:18  20   the -- any additional production of items that are not

10:06:24  21   properly logged on the amended log also be made within two

10:06:27  22   weeks and that Ms. Jacobsen be presented for deposition

10:06:34  23   after that period.

10:06:36  24            MR. TSUEI:  Yes, Your Honor.

10:06:37  25            THE COURT:  All right.  What's the next motion

| | | |
|---|---|---|
| 10:06:45 | 1 | that we need to address? |
| 10:06:55 | 2 | MR. GRAUBART:  Your Honor, if I may, sequentially, |
| 10:07:00 | 3 | the first motion on the hearing -- the notice of hearing |
| 10:07:03 | 4 | that was set is Docket No. 88.  That's Samsung's motion to |
| 10:07:09 | 5 | compel concerning Headwater's patent portfolio sale |
| 10:07:13 | 6 | negotiations. |
| 10:07:13 | 7 | If it's -- if it's all right with Your Honor, if |
| 10:07:17 | 8 | there's no objection from Headwater, what I'd propose that |
| 10:07:21 | 9 | we do is address Docket No. 88, a portion of Docket |
| 10:07:26 | 10 | No. 100, as well as Docket No. 137 because they |
| 10:07:31 | 11 | collectively relate to -- they present the same dispute. |
| 10:07:34 | 12 | THE COURT:  That's the common interest doctrine |
| 10:07:37 | 13 | issue? |
| 10:07:37 | 14 | MR. GRAUBART:  It is.  And more particularly, |
| 10:07:40 | 15 | Judge, it's the application of the common interest doctrine |
| 10:07:42 | 16 | with respect to communications concern -- with |
| 10:07:46 | 17 | InterDigital.  So that -- this would be the InterDigital |
| 10:07:49 | 18 | subject matter encompassed by Docket 88, Docket 137, and |
| 10:07:55 | 19 | aspects of Docket 100. |
| 10:07:56 | 20 | THE COURT:  All right.  Go ahead. |
| 10:07:59 | 21 | MR. GRAUBART:  Ms. Andrews, would it be possible |
| 10:08:06 | 22 | to switch the feed?  Yes.  Thank you. |
| 10:08:08 | 23 | So what is this all about?  Your Honor may be |
| 10:08:11 | 24 | familiar with a company called InterDigital.  They're a |
| 10:08:14 | 25 | large patent monetization business. |

| | | |
|---|---|---|
| 10:08:17 | 1 | In 2019, Headwater and InterDigital began |
| 10:08:20 | 2 | negotiating the sale of Headwater to InterDigital. |
| 10:08:23 | 3 | They negotiated for a few months, and eventually |
| 10:08:27 | 4 | they signed a letter of intent in early 2020 for Headwater |
| 10:08:31 | 5 | to sell the whole company to InterDigital for $60 million, |
| 10:08:35 | 6 | as well as the ability for Headwater to buy some additional |
| 10:08:39 | 7 | stock in InterDigital. |
| 10:08:40 | 8 | So Headwater was willing to sell its entire |
| 10:08:43 | 9 | company, including its patents, for $60 million. It agreed |
| 10:08:46 | 10 | to do that. However, after InterDigital did some more due |
| 10:08:49 | 11 | diligence, including learning about some prior art that -- |
| 10:08:53 | 12 | that Samsung contends Headwater withheld from the Patent |
| 10:08:56 | 13 | Office, InterDigital ultimately backed out of the deal. |
| 10:09:02 | 14 | They said: Headwater, you might be willing to accept $60 |
| 10:09:05 | 15 | million for this, but we're not willing to pay that much. |
| 10:09:08 | 16 | And so throughout this negotiation, Headwater and |
| 10:09:10 | 17 | InterDigital exchanged communications and other materials. |
| 10:09:12 | 18 | Initially, Headwater didn't disclose any of this to |
| 10:09:15 | 19 | Samsung. We learned about it by taking the deposition of a |
| 10:09:20 | 20 | third-party, Mr. James Harris. He used to be the general |
| 10:09:23 | 21 | counsel of Headwater after Ms. Jacobson. He also served as |
| 10:09:26 | 22 | the acting CEO of Headwater. |
| 10:09:28 | 23 | And what Mr. Harris revealed, he explained that |
| 10:09:32 | 24 | this -- this story about InterDigital. So Samsung |
| 10:09:35 | 25 | immediately requested that Headwater provide documentation |

10:09:38  1  about it.  Initially, they didn't provide anything.

10:09:41  2      Eventually, after Samsung moved to compel --

10:09:44  3  that's Docket No. 88 -- Headwater produced some documents

10:09:48  4  about it -- about this history, but not everything.  They

10:09:51  5  are still withholding, I think, approximately a hundred

10:09:55  6  entries on its privilege log that reflect communications

10:09:57  7  with InterDigital.

10:09:59  8      Headwater says these are protected by the common

10:10:02  9  legal interest exception to waiver, and that's the heart of

10:10:06 10  this dispute, whether that common interest exception

10:10:08 11  applies.

10:10:08 12      So why does this matter to the case?  Two -- two

10:10:12 13  reasons.  One, most obviously, it's relevant to the issue

10:10:16 14  of damages.  Samsung's -- you know, Headwater valued its

10:10:20 15  whole company, including its patents, at $60 million.

10:10:25 16      Its damages expert now says that Samsung would

10:10:28 17  have sat down at the hypothetical negotiation with

10:10:31 18  Headwater.  Instead of paying $60 million for a

10:10:36 19  non-exclusive license to a small subset of the patents,

10:10:38 20  would have paid over $3 billion.

10:10:42 21      So, obviously, there's a disconnect there.  And

10:10:44 22  it's one that Samsung's --

10:10:46 23      THE COURT:  When was this negotiation between

10:10:49 24  Headwater and InterDigital with respect to when these

10:10:55 25  patents were asserted against Samsung?

| | | |
|---|---|---|
| 10:10:58 | 1 | MR. GRAUBART:  With respect to when they were |
| 10:10:59 | 2 | asserted, I think it was with -- well, so the negotiations |
| 10:11:03 | 3 | were like in early 2020.  The lawsuit was filed in 2022.  I |
| 10:11:10 | 4 | expect Your Honor's interested in the question of a |
| 10:11:12 | 5 | hypothetical negotiation, which I believe the parties agree |
| 10:11:16 | 6 | would have been around 2016. |
| 10:11:17 | 7 | But importantly, as the experts opined, the -- |
| 10:11:22 | 8 | when Headwater approached InterDigital in 2020, they had |
| 10:11:25 | 9 | previously spoken, and they said:  Guess what, our |
| 10:11:29 | 10 | portfolio is much more mature now.  It's -- basically it's |
| 10:11:33 | 11 | worth more now in 2020 than it was back when we talked in |
| 10:11:37 | 12 | 2016.  So we think, if anything, this 60 million -- yes, |
| 10:11:41 | 13 | it's a few years removed from the hypothetical negotiation |
| 10:11:41 | 14 | but that the evidence shows that, in fact, back at the |
| 10:11:44 | 15 | hypothetical negotiation, it would have been even lower. |
| 10:11:47 | 16 | THE COURT:  Uh-huh. |
| 10:11:47 | 17 | MR. GRAUBART:  So Samsung's expert, Dr. Ugone -- |
| 10:11:52 | 18 | this is on Slide 3 -- shows -- oh, and, Your Honor, we |
| 10:11:55 | 19 | believe -- before Your Honor entered the courtroom handed |
| 10:12:00 | 20 | up a copy of these slides. |
| 10:12:01 | 21 | On Slide 3, Dr. Ugone, Samsung's expert, explains |
| 10:12:06 | 22 | that he views this $60 million agreement from Headwater to |
| 10:12:09 | 23 | be a conservative upper bound. |
| 10:12:11 | 24 | But what does Headwater's expert say?  Not |
| 10:12:15 | 25 | surprised to learn they disagree.  Mr. Kennedy, from |

10:12:18    1    Headwater, says:  I don't find this letter of intent

10:12:21    2    relevant at all.  And -- and one reason he says that is

10:12:24    3    that he says Dr. Raleigh, the CEO of Headwater, testified

10:12:28    4    that he believed the downstream value of the stock options

10:12:31    5    would have been worth hundreds of millions of dollars.

10:12:34    6         Now, that -- that particular testimony is at the

10:12:37    7    heart of Docket No. 137 that we believe Headwater -- excuse

10:12:42    8    me, Dr. Raleigh waived privilege regarding that because he

10:12:45    9    explained that that was based on analysis from attorneys.

10:12:49    10        But putting that aside for a moment, this is why

10:12:52    11   this matters.  We have this -- this central dispute between

10:12:55    12   the two damages experts that one says this evidence is --

10:12:58    13   the whole portfolio was worth no more than 60 million, the

10:13:01    14   other says it's irrelevant because there -- it was actually

10:13:05    15   worth more than that to Headwater.

10:13:06    16        And so we want -- we think we're entitled to all

10:13:10    17   the -- the communications that would bear on figuring out,

10:13:14    18   well, how much was it really worth?  Did Sam -- did

10:13:17    19   Headwater and InterDigital actually discuss the value of

10:13:20    20   these stock options?  Is there evidence to support

10:13:23    21   Dr. Raleigh's self-serving testimony that, oh, no, this is

10:13:27    22   not 60 million, it's really hundreds of millions.

10:13:30    23        So in addition to damages, though, it also -- this

10:13:33    24   bears on the inequitable conduct defense that Samsung has.

10:13:36    25   We know that one of the things that was exchanged between

10:13:39  1    Sam -- excuse me, Headwater and InterDigital was a piece of

10:13:42  2    prior art.  And it's the same piece of prior art that is at

10:13:45  3    the center of Samsung's inequitable conduct defense.

10:13:49  4    It's -- it's a presentation that relates to an early

10:13:52  5    version of Android.

10:13:53  6          And after that was exchanged between InterDigital

10:13:57  7    and Headwater, InterDigital backed out of the deal.

10:14:00  8          Now, we don't know if that was the reason they

10:14:02  9    backed out, we don't know if it was the only reason, but we

10:14:06  10   know that Headwater's validity expert, Dr. de la Iglesia,

10:14:12  11   says:  Oh, this prior art isn't material.  There's no

10:14:13  12   evidence that Dr. Raleigh knew of it, that he knew it was

10:14:15  13   material, or that he intended to withhold it.  Well --

10:14:19  14          THE COURT:  Now, who is Dr. Raleigh?

10:14:20  15          MR. GRAUBART:  He is the CEO of Headwater, Your

10:14:23  16   Honor, and the founder.

10:14:23  17          THE COURT:  All right.

10:14:24  18          MR. GRAUBART:  The -- there is -- so the

10:14:29  19   communications between InterDigital and Headwater,

10:14:31  20   particularly around this prior art reference, that's going

10:14:35  21   to bear on whether that's accurate what Dr. de la Iglesia

10:14:41  22   opines that, in fact, Mr. -- Dr. Raleigh didn't know

10:14:46  23   anything about this presentation, it's not material, he

10:14:49  24   didn't withhold it.

10:14:50  25          Is that what he told them, or did he say, I'm

10:14:55  1  aware of this and I -- and here's what happened.  Who

10:14:57  2  knows?  But -- but this was a communication with a third

10:14:59  3  party that we don't believe is privileged and -- but that's

10:15:03  4  why it's relevant, as well, in addition to damages.

10:15:05  5        So Headwater claims these are privileged, even

10:15:07  6  though they were disclosed to a third party, InterDigital.

10:15:10  7  That third party had an adverse interest to Headwater.

10:15:15  8  They were negotiating the potential purchase of the whole

10:15:17  9  company and ultimately backed out.

10:15:19  10        This is not like a patent owner and an exclusive

10:15:22  11  licensee coordinating on patent prosecution strategy.

10:15:24  12  There is case law saying that could be protected by common

10:15:28  13  legal interest.

10:15:29  14        This was a buyer and seller negotiating the sale

10:15:33  15  of assets.  It's not even a common commercial interest.

10:15:37  16  They were negotiating across the table.

10:15:39  17        To support -- though, despite that, the claim of

10:15:42  18  common legal interest, Headwater points primarily to this

10:15:47  19  paragraph from the letter of intent with InterDigital.  And

10:15:52  20  I think the first thing that jumps out to us about this,

10:15:55  21  Your Honor, is that on its face, it only applies to -- to

10:16:02  22  the information Headwater shares with InterDigital.  It

10:16:06  23  doesn't just talk about communications from InterDigital to

10:16:11  24  Headwater.

10:16:11  25        But I think even if it were a bilateral agreement,

10:16:16   1   the agreement alone can't thwart discovery.  You know, two

10:16:23   2   private parties can agree to whatever they want, but that

10:16:25   3   doesn't make their documents and their information immune

10:16:29   4   from discovery, just like parties can agree to

10:16:32   5   nondisclosure agreements, but the Court's ability to have

10:16:32   6   every man's evidence trumps that.

10:16:34   7         And so once you put aside this private agreement,

10:16:37   8   the law is pretty uniform, particularly in this district,

10:16:42   9   that materials exchanged in the context of a purchase and

10:16:43   10   sale of patents or a company are not covered by a common

10:16:47   11   legal interest.

10:16:48   12         Headwater bears the burden to establish the

10:16:50   13   applicability of privilege here.  They cite a handful of

10:16:53   14   cases from outside this district.  But we start with the

10:16:58   15   Mondis versus LG case in 2011 from Judge Ward.  He said:

10:17:03   16   The documents about negotiating a potential sale of patents

10:17:05   17   involve a situation where the parties' interests are,

10:17:09   18   quote, adverse rather than common.

10:17:11   19         THE COURT:  I don't think you need to cite further

10:17:15   20   authority on that.  I, at this point, would agree with you

10:17:18   21   on whether there is, as far as the attorney-client

10:17:25   22   privilege goes, a common legal interest between the

10:17:27   23   potential buyer and the potential seller.

10:17:29   24         But talk to me a little more about what you need

10:17:36   25   in order to make your point beyond the fact that -- that

| | | |
|---|---|---|
| 10:17:42 | 1 | Headwater was willing to sell for -- for the price that |
| 10:17:47 | 2 | you're aware of, the 60 million. |
| 10:17:49 | 3 | MR. GRAUBART: Sure. Well, and just so I |
| 10:17:51 | 4 | understood what Your Honor said there a moment ago that -- |
| 10:17:53 | 5 | you're saying you do agree that the common legal interest |
| 10:17:55 | 6 | does not apply here? |
| 10:17:57 | 7 | THE COURT: I'll give the Plaintiff an opportunity |
| 10:17:59 | 8 | to make their argument, but at this point, I think that is |
| 10:18:04 | 9 | correct. |
| 10:18:04 | 10 | MR. GRAUBART: Okay. So here is -- so, first of |
| 10:18:07 | 11 | all, I think that all that means -- it means all the |
| 10:18:11 | 12 | communications between InterDigital and Headwater are not |
| 10:18:14 | 13 | privileged. The most pointed example I can give |
| 10:18:18 | 14 | Your Honor -- and, you know, those would include those |
| 10:18:21 | 15 | about that prior art reference, but to your question about |
| 10:18:23 | 16 | the $60 million, this goes to the heart of, I think, what's |
| 10:18:27 | 17 | at Docket No. 137. |
| 10:18:29 | 18 | So as -- as we discussed, what Dr. -- excuse me, |
| 10:18:34 | 19 | what Mr. Kennedy, their -- Headwater's damages expert says |
| 10:18:38 | 20 | is it's not the 60 million. Don't look at the 60 million. |
| 10:18:41 | 21 | You should instead credit Mr. -- Dr. Raleigh's testimony |
| 10:18:46 | 22 | that he thought that there were these stock options really |
| 10:18:49 | 23 | worth hundreds of millions of dollars. |
| 10:18:51 | 24 | And we believe we're entitled to discovery as to |
| 10:18:55 | 25 | what's the basis of this hundreds of millions of dollars. |

10:18:57  1        THE COURT:  All right.  I understand that theory

10:19:01  2   as well.  That wouldn't necessarily make all the rest of

10:19:05  3   the communications back and forth between Headwater and

10:19:08  4   InterDigital relevant, but to the extent there are

10:19:14  5   communications that bear on the downstream value of stock

10:19:18  6   options, I understand that argument.

10:19:21  7        MR. GRAUBART:  And it -- and it goes one step

10:19:23  8   further, as well, Your Honor, that apart from the common

10:19:27  9   legal interest, Dr. Raleigh then testified that the basis

10:19:30  10  of that hundreds of millions was Headwater's own

10:19:33  11  discussions with its attorneys.  He put into issue that the

10:19:38  12  attorneys told him that the damages that -- excuse me, that

10:19:43  13  the -- that -- let me just show you the testimony, Your

10:19:48  14  Honor.

10:19:48  15       So he says:  There was a lot of internal

10:19:50  16  conversations.  We felt it was worth hundreds of millions.

10:19:54  17       And he said:  There were scenario analyses

10:19:57  18  considered.  A portion of the payment was subject to future

10:20:00  19  gains, and so we considered all of it.

10:20:02  20       And then he adds, unsolicited:  Those were based

10:20:05  21  on attorneys' analysis of what damages awards would look

10:20:10  22  like, the damages awards that InterDigital would have

10:20:13  23  collected using these patents.

10:20:14  24       So he -- this is the -- it's a classic sword and

10:20:18  25  shield scenario.  Mr. Raleigh is going to get on the stand

10:20:20  1   and say:  Ladies and gentlemen of the jury, don't look at

10:20:23  2   that 60 million, it's worth hundreds of millions because

10:20:25  3   our attorneys told us it's worth hundreds of millions.

10:20:28  4           THE COURT:  Well, what -- what that would tend to

10:20:32  5   waive privilege on would be an analysis of damage awards

10:20:38  6   and whether or not that exists.  That's not something that

10:20:45  7   would -- I would expect to find in the back and forth

10:20:48  8   between InterDigital and Headwater?

10:20:50  9           MR. GRAUBART:  That's fair, Your Honor.  And

10:20:52  10  that's why Docket 137 goes to the waiver of privilege

10:20:55  11  between Inter -- excuse me, Headwater and its own counsel

10:21:00  12  concerning the subject matter of the InterDigital purchase

10:21:04  13  and this value -- this alleged valuation of hundreds of

10:21:07  14  millions of dollars.

10:21:07  15          THE COURT:  So I am back to the question of what

10:21:10  16  is there in this back and forth, these hundred or more

10:21:15  17  documents that you have a relevant need for beyond the $60

10:21:23  18  million figure that you've already gotten?

10:21:26  19          MR. GRAUBART:  Well, it could be something that

10:21:27  20  completely undercuts this self-serving statement about

10:21:32  21  hundreds of millions.  There could be a statement that says

10:21:33  22  here are the stock option offers that we value at something

10:21:35  23  much less.  It could be a complete silence on that point,

10:21:39  24  which would undercut Mr. Raleigh's later testament --

10:21:44  25  test -- testimony that it's allegedly worth hundreds of

10:21:47    1    millions.  There could be lots of other statements about

10:21:50    2    the valuation of the company that could further undermine

10:21:54    3    the suggestion that it was really worth hundreds of

10:21:56    4    millions of dollars.  There could also be lots of

10:22:00    5    discussion about this prior art reference that -- that

10:22:02    6    Samsung contends was withheld that would contradict Sam --

10:22:06    7    Headwater's expert's testimony that there's no evidence of

10:22:09    8    materiality or knowledge.  We don't know what Mr. Raleigh

10:22:12    9    may have said completely contrary to the story that

10:22:16    10   Headwater's putting forth in opposition to the inequitable

10:22:18    11   conduct.

10:22:18    12        THE COURT:  If there are certain subjects that you

10:22:23    13   believe are relevant and might be in these communications,

10:22:28    14   then I think the appropriate way to get there is to request

10:22:32    15   communications that relate to those subjects as opposed to

10:22:36    16   I just want to look through all your communications to see

10:22:40    17   for myself.

10:22:40    18        MR. GRAUBART:  Well, respectfully, Your Honor, if

10:22:44    19   they're not privileged and they relate to a subject matter

10:22:48    20   that's at a -- at a point of dispute between the two

10:22:51    21   experts, which is this sale, I think that Headwater had an

10:22:56    22   obligation in the discovery order to produce them.

10:22:58    23        But I hear Your Honor's caution, and I -- at a

10:23:01    24   minimum, we think that -- we request at least that much, at

10:23:05    25   least the things that bear on those two things.

10:23:08  1          THE COURT:  All right.  And so the things that

10:23:09  2  bear on those two statements, those would be anything that

10:23:14  3  relates to stock options and what else?

10:23:20  4          MR. GRAUBART:  Well, I would couch that a little

10:23:23  5  more broadly, Your Honor, as anything that relates to a

10:23:26  6  characterization of the total value to be received, whether

10:23:30  7  it was the 60 million, the stock options, something that --

10:23:33  8  anything about the characterization of the value to be

10:23:35  9  received by Headwater.

10:23:37  10         THE COURT:  All right.

10:23:38  11         MR. GRAUBART:  And anything about the -- the prior

10:23:43  12  art, in particular the Android prior art that's at the

10:23:46  13  basis of Samsung's inequitable conduct claim.

10:23:50  14         THE COURT:  There -- as I understand it now,

10:23:56  15  there's a difference between what the -- what Dr. Raleigh

10:24:01  16  was apparently referring to that the owner of the patents,

10:24:06  17  be it Headwater or InterDigital, would receive from future

10:24:11  18  damage awards versus this issue about what Headwater would

10:24:18  19  receive in stock options in addition to the purchase price

10:24:23  20  that they were seeking from InterDigital.

10:24:26  21         MR. GRAUBART:  So the way it ties together, as I

10:24:28  22  understand it, is Headwater was to receive $60 million as

10:24:32  23  well as the opportunity to purchase stock options in

10:24:36  24  InterDigital.

10:24:37  25         And so Dr. Raleigh says, you take this -- you

| | | |
|---|---|---|
| 10:24:42 | 1 | know, follow the steps forward and say, okay, Headwater |
| 10:24:45 | 2 | sells the patents to InterDigital, InterDigital goes and |
| 10:24:49 | 3 | asserts them, InterDigital makes all kinds of money, the |
| 10:24:52 | 4 | stock goes up, and now the stock options that Headwater had |
| 10:24:56 | 5 | purchased are now worth lots of money, and voila, that is |
| 10:25:00 | 6 | how he gets to hundreds of millions.  That's how I |
| 10:25:02 | 7 | understand the -- the chain of events there. |
| 10:25:05 | 8 | THE COURT:  All right. |
| 10:25:07 | 9 | MR. GRAUBART:  But we haven't seen any |
| 10:25:08 | 10 | documentation to support it, and we know there's a lot of |
| 10:25:13 | 11 | things held -- withheld as privilege communicated with |
| 10:25:17 | 12 | InterDigital. |
| 10:25:17 | 13 | THE COURT:  All right. |
| 10:25:17 | 14 | MR. GRAUBART:  And that is everything with respect |
| 10:25:19 | 15 | to InterDigital on those three motions, Your Honor. |
| 10:25:22 | 16 | THE COURT:  Thank you, Mr. Graubart. |
| 10:25:31 | 17 | MR. TSUEI:  James Tsuei for Headwater. |
| 10:25:35 | 18 | Do you mind taking down that slide?  Thank you. |
| 10:25:42 | 19 | All right.  So, Your Honor, I'll address the |
| 10:25:49 | 20 | issues in what I consider to be a logical order and |
| 10:25:55 | 21 | fashion.  But if Your Honor has any specific questions to |
| 10:25:58 | 22 | address before I begin, I'd be happy to hear them. |
| 10:26:01 | 23 | THE COURT:  Start with the privilege issue. |
| 10:26:02 | 24 | MR. TSUEI:  Sure.  I hear what Your Honor is |
| 10:26:05 | 25 | saying, and I'd like to try to turn Your Honor around about |

10:26:09  1  the common interest exception issue.

10:26:11  2          So, you know, I don't want to say Your Honor is

10:26:12  3  wrong, but I think there are --

10:26:14  4          THE COURT:  You can say it.

10:26:15  5          MR. TSUEI:  I think finding a no common interest

10:26:21  6  exception to the waiver rule would apply here would be

10:26:24  7  inconsistent with what the Federal Circuit found in the

10:26:26  8  In re Regents case, as well as, as Mr. Graubart

10:26:30  9  characterized, out-of-circuit cases, finding common

10:26:32  10  interest exceptions to waiver to exist.

10:26:35  11          And, unfortunately, you know, there's no bright

10:26:37  12  line easy cookie cutter approach to finding whether or not

10:26:40  13  the exception applies, right?  It requires looking at the

10:26:43  14  facts in question and assessing whether or not the

10:26:46  15  interests -- or rather the legal interests of the putative

10:26:51  16  parties is sufficiently congruent such that the common

10:26:54  17  interest exception should be found to apply.

10:26:56  18          That's typically, as we understand it, how the

10:27:00  19  Courts apply the rule.

10:27:03  20          THE COURT:  You know, one big difference is there

10:27:04  21  are times when a privileged document is going to be shared

10:27:12  22  with someone you're negotiating with.  And the issue is, is

10:27:16  23  the privilege on that document waived?

10:27:19  24          As I understand it, you're asserting that all the

10:27:21  25  communications between the proposed seller and the proposed

```
10:27:25    1    buyer would be privileged.  That's a very different thing
10:27:28    2    than whether you waive the privilege on what was clearly a
10:27:33    3    privileged document by showing it to someone you're
10:27:37    4    negotiating with.
10:27:38    5            MR. TSUEI:  Yes, sir.  The point you make is
10:27:41    6    actually the right one and an astute one.
10:27:43    7            We are not asserting privilege over all
10:27:47    8    communications between Headwater and InterDigital.  As
10:27:50    9    Your Honor may have seen in the briefing, we, in fact, have
10:27:52   10    produced the majority of the communications between
10:27:55   11    Headwater and InterDigital as they relate to the
10:27:59   12    negotiation of the economic terms of the deal after the
10:28:02   13    letter of intent was signed.
10:28:02   14            And so I'm not quite sure why Mr. Graubart didn't
10:28:05   15    mention that, instead characterizing our withholding as a
10:28:09   16    complete one when, in fact, it is not.
10:28:11   17            So, Your Honor, what Headwater has actually done
10:28:14   18    is much more narrow.  We've withheld communications as well
10:28:19   19    as materials exchanged between the parties specifically
10:28:21   20    relating to the parties' discussions about whether the
10:28:25   21    patents were valid and enforceable.
10:28:27   22            The reason why the parties were doing this was
10:28:29   23    because they intended to have a future cooperative
10:28:32   24    relationship to essentially create enforcement campaigns
10:28:37   25    against prospective defendants.
```

10:28:38    1          It's those specific materials that we've withheld

10:28:42    2    under the common interest exception to waiver.  And so I'd

10:28:45    3    just like to make that point to clarify for the Court.

10:28:48    4          THE COURT:  So these are documents that were

10:28:52    5    prepared internally by Headwater before the negotiations or

10:28:57    6    during the negotiations, and you're asserting that those

10:29:01    7    were privileged at the time, and the question is:  Did

10:29:05    8    showing those documents to InterDigital constitute a

10:29:09    9    waiver?

10:29:09   10          MR. TSUEI:  I think the answer is partially yes.

10:29:12   11          In addition to documents that Headwater created

10:29:15   12    and which were shared with InterDigital specifically

10:29:18   13    relating to the validity of the patents and enforcement of

10:29:21   14    the patents, for instance, against prospective defendants,

10:29:24   15    we've also withheld communications from InterDigital to

10:29:29   16    Headwater about that subject matter.

10:29:30   17          So, for instance, if there was an email from

10:29:33   18    McKool Smith representing InterDigital about this or that

10:29:37   19    piece of prior art, we've withheld that under the common

10:29:40   20    interest exception as it's been at minimum scoped out in

10:29:45   21    the written agreement between the parties.

10:29:45   22          THE COURT:  That -- so that would not be

10:29:49   23    Headwater's privilege.

10:29:50   24          MR. TSUEI:  It would, in fact, be I think both.

10:29:54   25    In other words, the parties at that time those

10:29:55   1   communications were exchanged had attorneys on that chain

10:29:58   2   communicating with one another.

10:29:59   3        So, for instance, coming back to the McKool

10:30:03   4   attorney example representing InterDigital, there are

10:30:06   5   communications we've withheld where they specifically had

10:30:08   6   communicated with in-house counsel at Headwater

10:30:11   7   specifically discussing the validity of patents, as well

10:30:14   8   as, you know, whether or not this or that piece of prior

10:30:17   9   art was relevant for consideration in the diligence period.

10:30:21   10       And so -- and we have maintained that the

10:30:24   11   privilege of those discussions belongs to both parties.

10:30:28   12       And I'm not quite sure that this is pertinent to

10:30:30   13   the Court's consideration, but what Samsung has also done

10:30:33   14   is subpoena InterDigital to ask for those same

10:30:36   15   communications, and InterDigital, for their part, have

10:30:40   16   also, as far as I understand, withheld all communications

10:30:41   17   as privileged as well.

10:30:46   18       So to the extent that there are multiple parties

10:30:49   19   holding the privilege, my understanding is that all parties

10:30:51   20   have asserted the privilege as well.

10:30:55   21       THE COURT:  And where have you logged the

10:31:01   22   documents that pertain to InterDigital that you are

10:31:05   23   asserting are privileged?

10:31:05   24       MR. TSUEI:  I'm not sure I could off the top of my

10:31:09   25   head point Your Honor to a specific page in the privilege

10:31:12    1    log, but where there are communications withheld for that

10:31:15    2    reason, I understand that we've produced a privilege log to

10:31:20    3    Samsung specifically identifying, you know, those

10:31:22    4    communications and describing them as communications

10:31:24    5    relating to the enforcement and the validity of the patents

10:31:28    6    being discussed.

10:31:29    7           I understand that we also have attached, I guess,

10:31:34    8    a privilege log in response to their motion, I think,

10:31:38    9    showing that that's what we did.

10:31:39   10           THE COURT:  All right.  Tell -- if you're going to

10:31:42   11    contend that communications between Headwater and

10:31:48   12    InterDigital in the process of these negotiations are

10:31:54   13    subject to the attorney-client privilege, you'll need to

10:31:57   14    give me the authority for that.

10:31:58   15           If what you're dealing with is whether or not a

10:32:04   16    document that was already a communication between

10:32:13   17    Headwater's attorneys and Headwater, whether the sharing of

10:32:17   18    that with InterDigital waived that privilege, I see that as

10:32:22   19    a different issue.

10:32:23   20           MR. TSUEI:  Okay, Your Honor.

10:32:27   21           So I'd say the authority is the authority that was

10:32:30   22    cited to the Court in our briefing.

10:32:32   23           THE COURT:  All right.  Tell me where I'll find

10:32:34   24    that.

10:32:34   25           MR. TSUEI:  So I'd say that the most persuasive

| | | |
|---|---|---|
| 10:32:40 | 1 | authority is the Federal Circuit's opinion in |
| 10:32:42 | 2 | In re Regents, which although dealing with, I believe, |
| 10:32:44 | 3 | Seventh Circuit law on the common interest doctrine, I |
| 10:32:47 | 4 | think, is analysis that we'd say is persuasive for the |
| 10:32:51 | 5 | Court to resolve the issue here today. |
| 10:32:52 | 6 | So let me just find a specific page where we've |
| 10:32:56 | 7 | discussed that case just so that we're all on the same |
| 10:32:59 | 8 | page. |
| 10:32:59 | 9 | THE COURT:  And is that in Docket No. 120?  I see |
| 10:33:05 | 10 | that that brief discusses the In re Regents decision. |
| 10:33:15 | 11 | MR. TSUEI:  Yes, that's correct, Your Honor. |
| 10:33:16 | 12 | So on Page 14 of our opposition brief, among other |
| 10:33:20 | 13 | places, we've talked about the In re Regents decision. |
| 10:33:24 | 14 | So my understanding of the facts there is that the |
| 10:33:26 | 15 | Federal Circuit found that there was a sufficiently sort of |
| 10:33:32 | 16 | congruent community of interest between a patentee and a |
| 10:33:35 | 17 | prospective licensee discussing the enforceability of the |
| 10:33:38 | 18 | patents in the context of determining whether or not to, in |
| 10:33:41 | 19 | fact, do a deal between the two parties. |
| 10:33:42 | 20 | I would say that's directly on point, Your Honor. |
| 10:33:47 | 21 | Like in that situation, both parties were -- you know, as |
| 10:33:51 | 22 | Samsung says, arguably adverse to one another, right, |
| 10:33:55 | 23 | because they're looking at a set of assets to determine |
| 10:33:58 | 24 | whether or not a deal can be done.  That's true in a sense, |
| 10:34:00 | 25 | but at the same time, there are also legal interests which |

10:34:03    1    are identical that both parties share, which is to ensure

10:34:05    2    that the patents are, in fact, valid and later enforceable.

10:34:08    3        Now, the fact that the parties may have adverse

10:34:11    4    economic interests, I think, doesn't derogate the fact

10:34:15    5    that they have a sufficiently congruent legal interest.

10:34:19    6    And, you know, I think the Federal Circuit agreed in

10:34:22    7    In re Regents, and I think that logic should be applied

10:34:26    8    here.

10:34:27    9        THE COURT:  Your brief is talking about the

10:34:32    10    interaction between ItsOn and Headwater?

10:34:33    11        MR. TSUEI:  That's the section in which the

10:34:35    12    discussion of In re Regents appears, because the

10:34:39    13    In re Regents case is topical and relevant to that separate

10:34:43    14    issue between ItsOn and Headwater.  But it's also relevant

10:34:47    15    to whether or not there's a common interest between

10:34:49    16    InterDigital and Headwater as well.

10:34:52    17        THE COURT:  All right.

10:34:52    18        MR. TSUEI:  And my colleague, Mr. Bunt, just

10:34:55    19    helpfully reminded me that there's also a discussion of

10:35:00    20    In re Regents on Page 11, which is not exclusive to the

10:35:03    21    ItsOn/Headwater common interest issue.

10:35:07    22        THE COURT:  All right.  I see that as well.

10:35:23    23        Well, that is an issue I'll have to look at those

10:35:26    24    authorities further to decide.

10:35:28    25        Do you agree that that issue underlies several of

10:35:35    1    these motions?

10:35:36    2         MR. TSUEI:  I would say it underlies but does not

10:35:40    3    dictate the outcome of the different requests for relief

10:35:43    4    across the different motions, each of which has anything

10:35:47    5    ranging from slightly different requests for relief to what

10:35:50    6    we'd consider to be completely new requests for relief.

10:35:53    7         But we do agree that a resolution of the common

10:35:56    8    interest issue between Headwater and InterDigital is

10:35:59    9    relevant to the disposition of all those questions.

10:36:01   10         THE COURT:  All right.  Then that was the motion

10:36:06   11    to compel at Docket 88, also the motion at Docket 100, I

10:36:22   12    believe?

10:36:22   13         MR. TSUEI:  Yes, sir.  And the last docket number

10:36:25   14    Mr. Graubart mentioned was Docket 137.

10:36:36   15         THE COURT:  What other -- what other interests --

10:36:37   16    I mean, what other issues do you believe the Court has to

10:36:40   17    consider in connection with those motions besides this

10:36:45   18    common interest?

10:36:46   19         MR. TSUEI:  Well, Your Honor, the next sort of

10:36:49   20    discrete issue, which is one that I think requires an

10:36:55   21    analytically distinct approach, is the request for relief

10:36:57   22    in Docket 137, which is outlined in IX.B of the joint

10:37:04   23    status report.

10:37:05   24         This issue is one where Samsung's alleged that

10:37:16   25    Headwater has waived as a subject matter -- on a subject

| | | |
|---|---|---|
| 10:37:21 | 1 | matter basis all privilege relating to -- I don't want to |
| 10:37:27 | 2 | misquote them, but they say it's -- |
| 10:37:30 | 3 | THE COURT:  So this is -- you're moving to a new |
| 10:37:33 | 4 | issue? |
| 10:37:33 | 5 | MR. TSUEI:  Yes, sir. |
| 10:37:34 | 6 | THE COURT:  Okay.  Well, let's go ahead and take |
| 10:37:38 | 7 | the morning recess then so that I don't further abuse the |
| 10:37:43 | 8 | court reporter.  And we'll come back and move to that new |
| 10:37:45 | 9 | issue. |
| 10:37:46 | 10 | COURT SECURITY OFFICER:  All rise. |
| 10:37:51 | 11 | THE COURT:  15 minutes. |
| 10:37:52 | 12 | (Recess.) |
| 10:51:53 | 13 | COURT SECURITY OFFICER:  All rise. |
| 10:51:59 | 14 | THE COURT:  Thank you.  Please be seated. |
| 10:52:01 | 15 | All right.  Mr. Tsuei, I think I interrupted you |
| 10:52:04 | 16 | when you were moving on to the next -- or what -- and, I |
| 10:52:12 | 17 | guess, frankly, before you move on to the next topic, let |
| 10:52:15 | 18 | me ask Mr. Graubart whether you have anything else that we |
| 10:52:20 | 19 | need to hear about on the motions that deal with this |
| 10:52:26 | 20 | common interest?  I'm going to look at the authorities that |
| 10:52:31 | 21 | both sides have offered on that in the briefing and issue |
| 10:52:37 | 22 | something on that. |
| 10:52:38 | 23 | Is there something else you think I need to look |
| 10:52:41 | 24 | at on those motions, Mr. Graubart? |
| 10:52:43 | 25 | MR. GRAUBART:  So with respect to Docket 88 and |

10:52:45  1   the aspects of Docket 100 pertaining to InterDigital, I

10:52:50  2   think two points.  One is to say that factually I think

10:52:53  3   you'll find that the In re Regents case is very distinct

10:52:57  4   here.

10:52:57  5         That was a -- it was the University of California

10:52:58  6   at Berkeley and Eli Lilly forging an exclusive licensee

10:53:04  7   relationship and having communications about the

10:53:06  8   prosecution of the patents in furtherance of that.  It was

10:53:08  9   not a negotiation of a purchase and sale in an adverse

10:53:11  10  context.

10:53:12  11        And the cases from this district that have held

10:53:15  12  the opposite are -- you know, post-date In re Regents, and

10:53:19  13  that's -- and I think the reason that they reach a

10:53:22  14  different conclusion is because these facts are very

10:53:24  15  different.

10:53:25  16        There's also a Federal Circuit decision from 2011

10:53:27  17  in In re IPCom, and that's 428 F.Appx. 984 at Page 986.

10:53:37  18  And there the Court denied mandamus relief after a District

10:53:42  19  Court had ordered produced documents like these that were

10:53:45  20  exchanged in the context of the purchase and sale of the

10:53:48  21  patents.  So if In re Regents somehow governed in this

10:53:52  22  context that that -- IPCom would have come out a different

10:53:54  23  way.

10:53:54  24        I think that's all I have on those two issues,

10:53:58  25  Your Honor.

| | | |
|---|---|---|
| 10:53:58 | 1 | THE COURT:  All right.  Thank you. |
| 10:54:00 | 2 | MR. GRAUBART:  Thank you. |
| 10:54:01 | 3 | MR. TSUEI:  Your Honor, before turning to the next |
| 10:54:15 | 4 | issue implicated by Docket No. 137, just one quick note in |
| 10:54:21 | 5 | response to Mr. Graubart about In re Regents. |
| 10:54:26 | 6 | You're right that one point that the Federal |
| 10:54:29 | 7 | Circuit, let's say, noted as one of the reasons why it |
| 10:54:30 | 8 | found that there would be a common interest in those facts |
| 10:54:33 | 9 | was the fact that the relationship being contemplated by |
| 10:54:37 | 10 | the parties there, Eli Lilly and UC Berkeley, was going to |
| 10:54:43 | 11 | be one of an exclusive licensee and a patentee. |
| 10:54:46 | 12 | Now, I'm not aware of any law saying that the -- I |
| 10:54:51 | 13 | guess the relationship between one party or another must be |
| 10:54:54 | 14 | one of a patentee and an exclusive licensee in order for |
| 10:54:57 | 15 | the common interest exception to -- waiver to apply. |
| 10:55:01 | 16 | And as Your Honor looks through the cases cited to |
| 10:55:05 | 17 | the Court in the parties' respective briefing, I think |
| 10:55:09 | 18 | you'll find that courts, for instance, in the District of |
| 10:55:12 | 19 | Ohio, as well as elsewhere, have found that the exclusive |
| 10:55:15 | 20 | or non-exclusive nature of the license between one party |
| 10:55:18 | 21 | and the other does not dictate the outcome of whether or |
| 10:55:21 | 22 | not there would be a common interest but is instead just |
| 10:55:24 | 23 | one fact that the Court has to apply in the factual |
| 10:55:27 | 24 | analysis to determine whether or not the legal interests |
| 10:55:29 | 25 | are sufficiently congruent. |

10:55:34    1          So with that, I'll turn to the next issue which is

10:55:38    2    the one involving whether or not Headwater has waived the

10:55:42    3    subject matter of the -- I think what Samsung has described

10:55:46    4    as the internal valuation Headwater performed regarding the

10:55:51    5    InterDigital deal and the bases for, I guess, relief and

10:55:55    6    equity among other things.

10:55:57    7          So I'll start just by saying quite generally that

10:56:02    8    for Samsung to argue that there's a subject matter waiver

10:56:05    9    about this topic is, in our view, completely unjustified

10:56:08   10    given that there is no disclosure whatsoever within this

10:56:13   11    privileged information that they've been able to identify

10:56:15   12    that they could characterize as an intentional, knowing,

10:56:19   13    and strategic disclosure of privileged communications

10:56:22   14    information.

10:56:22   15          Now, I'm sure Your Honor is familiar now with the

10:56:25   16    testimony in question, a portion of which was shown to the

10:56:28   17    Court in the slides.  The portion in question is

10:56:32   18    Dr. Raleigh talking about what he and Headwater believed

10:56:35   19    the deal was worth.

10:56:36   20          Now, Dr. Raleigh, to be fair, said that he

10:56:40   21    believed it was worth far more than the paper value

10:56:44   22    reflected on the agreement, the letter of intent, 60

10:56:47   23    million.  And not totally unprompted but specifically in

10:56:52   24    response to exactly this line of questioning from Samsung's

10:56:54   25    counsel said that one of the bases for his belief was that

10:56:59   1   at that time, I think it should not be unexpected that

10:57:05   2   attorneys for the parties looked at the value of the deal

10:57:09   3   by examining the assets.  And one of the things that

10:57:11   4   lawyers typically do in a deal like this is to determine

10:57:15   5   whether or not the patents can generate, you know, a good

10:57:18   6   ROI in the future.

10:57:19   7           Now, that's all true.  You know, the testimony

10:57:23   8   speaks for itself.  But Dr. Raleigh didn't disclose the

10:57:26   9   analyses, neither did he rely on them or put them at issue

10:57:30   10  in any way.  It was simply a response to Samsung counsel's

10:57:34   11  questions about why he thought the deal was worth more than

10:57:37   12  $60 million.

10:57:37   13          THE COURT:  Well, didn't he say that he thought it

10:57:40   14  was worth hundreds of millions more?

10:57:45   15          MR. TSUEI:  Yes, that's right.

10:57:46   16          THE COURT:  And he said that he thought that

10:57:49   17  because of what his lawyers told him?

10:57:52   18          MR. TSUEI:  Well, no, he -- he said part of the

10:57:55   19  analysis that supported his belief and the company's belief

10:57:59   20  in the true value of the deal included the analysis that

10:58:03   21  every company's lawyers will do when doing diligence in a

10:58:07   22  deal like this.

10:58:08   23          THE COURT:  What does it matter whether everybody

10:58:10   24  does it?  The only question here is did he reveal and rely

10:58:15   25  upon information provided to him by his lawyers?

| | | |
|---|---|---|
| 10:58:20 | 1 | MR. TSUEI:  As far as I know, no, because he |
| 10:58:23 | 2 | didn't talk about, you know, what some lawyer told him |
| 10:58:25 | 3 | about the value of the portfolio.  Neither did he reveal |
| 10:58:28 | 4 | any of the analyses that he was referencing when he gave |
| 10:58:31 | 5 | that testimony. |
| 10:58:31 | 6 | Now, I would, you know, invite Your Honor to |
| 10:58:35 | 7 | consider the converse question that I think illustrates the |
| 10:58:39 | 8 | lack of actual disclosure of a privileged communication, |
| 10:58:42 | 9 | which is they could have asked Dr. Raleigh:  Why did you |
| 10:58:46 | 10 | sue us in 2022? |
| 10:58:48 | 11 | Dr. Raleigh could have said, I think quite |
| 10:58:50 | 12 | rightly:  We consulted with our attorneys and arrived at a |
| 10:58:53 | 13 | decision that, you know, we believe Samsung infringed the |
| 10:58:56 | 14 | patents, and that's why we filed the suit. |
| 10:58:57 | 15 | Along the same lines, you know, a witness, |
| 10:59:00 | 16 | including a corporate witness like Dr. Raleigh, is entitled |
| 10:59:04 | 17 | to disclose non-privileged facts like those. |
| 10:59:06 | 18 | Now, if he were to say, my attorneys at |
| 10:59:09 | 19 | Fish & Richardson, for instance, told me that this or that |
| 10:59:13 | 20 | element were met and that we should file suit against |
| 10:59:15 | 21 | Samsung, that'd be a different story because that would be, |
| 10:59:19 | 22 | in fact, a disclosure of a communication. |
| 10:59:21 | 23 | Here on this record there is no evidence of any |
| 10:59:23 | 24 | such disclosure of a communication, and that's why we think |
| 10:59:25 | 25 | that, you know, at a minimum, there can't be a finding that |

| | | |
|---|---|---|
| 10:59:28 | 1 | there was a subject matter waiver. |
| 10:59:32 | 2 | And, you know, along the same lines -- |
| 10:59:35 | 3 | THE COURT:  I'm not sure you're understanding this |
| 10:59:39 | 4 | testimony the same way I do. |
| 10:59:42 | 5 | And show me the -- the back and forth that led to |
| 10:59:48 | 6 | the part that was up on the screen a little earlier where |
| 10:59:54 | 7 | Dr. Raleigh made reference to the basis for his belief that |
| 10:59:59 | 8 | the value of the deal with InterDigital would have been |
| 11:00:04 | 9 | hundreds of millions more than the $60 million price. |
| 11:00:08 | 10 | MR. TSUEI:  So I think the relevant portion of the |
| 11:00:11 | 11 | testimony about that statement of belief about the deal |
| 11:00:16 | 12 | being worth hundreds of millions of dollars is excerpted on |
| 11:00:22 | 13 | Page 3 to 4 of Docket No. 137. |
| 11:00:25 | 14 | And, you know, giving Your Honor a chance to turn |
| 11:00:30 | 15 | to that testimony, I understand that it's also been |
| 11:00:33 | 16 | attached to Samsung's motion as Exhibit E.  And directing |
| 11:00:40 | 17 | your Court's attention exclusively to this section about |
| 11:00:44 | 18 | the hundreds of millions of dollars assertion, you'll see |
| 11:00:47 | 19 | that there is no disclosure of an attorney-client |
| 11:00:50 | 20 | privileged communication.  There's no reference to any |
| 11:00:52 | 21 | attorneys at all. |
| 11:01:23 | 22 | THE COURT:  All right.  The expert, Mr. Kennedy, |
| 11:01:28 | 23 | is relying upon testimony by Dr. Raleigh about the |
| 11:01:34 | 24 | downstream value of the stock options.  And that testimony |
| 11:01:43 | 25 | you're suggesting does not reveal that the basis was |

| | | |
|---|---|---|
| 11:01:53 | 1 | communications from counsel? |
| 11:01:54 | 2 | MR. TSUEI:  Well, a brief correction, Your Honor. |
| 11:01:57 | 3 | I don't believe Mr. Kennedy is, in fact, relying |
| 11:01:59 | 4 | on Dr. Raleigh's testimony here about, you know, |
| 11:02:03 | 5 | Headwater's belief that the value of the deal was worth |
| 11:02:06 | 6 | hundreds of millions of dollars. |
| 11:02:07 | 7 | As I understand the damages opinions in this case |
| 11:02:12 | 8 | to have been presented, what Dr. Kennedy is actually saying |
| 11:02:15 | 9 | is that $60 million is the true value, and that should be a |
| 11:02:19 | 10 | cap on all damages in the case. |
| 11:02:20 | 11 | I believe Samsung's position, and Mr. Graubart can |
| 11:02:25 | 12 | correct me if I'm wrong, is that Mr. -- sorry, |
| 11:02:28 | 13 | Dr. Raleigh's assertion of his and the company's belief in |
| 11:02:34 | 14 | the value is irrelevant to the damages issues in this case. |
| 11:02:37 | 15 | And as long as we're discussing the damages |
| 11:02:40 | 16 | issues, which, you know, we agree are implicated by this |
| 11:02:43 | 17 | discussion, Headwater believes that the InterDigital deal |
| 11:02:45 | 18 | is not relevant at all to the damages issues, which is why |
| 11:02:49 | 19 | at most we simply responded to Dr. Kennedy's opinions and |
| 11:02:53 | 20 | also noted without actually relying on Dr. Raleigh's |
| 11:02:57 | 21 | testimony that discusses what the company thought the deal |
| 11:03:01 | 22 | was worth. |
| 11:03:02 | 23 | We'd be fine if no party in the case discussed the |
| 11:03:07 | 24 | InterDigital deal at all.  So, unfortunately, we're left |
| 11:03:10 | 25 | with this set of circumstances where Samsung wants to rely |

11:03:14    1    on this letter of intent that is relating to an

11:03:18    2    unconsummated patent purchase and equity exchange, and then

11:03:22    3    wanting privileged communications from Headwater about what

11:03:25    4    Headwater thought the deal was worth, when in reality, if

11:03:30    5    it were up to Headwater, we'd say that none of this is

11:03:33    6    relevant at all.

11:03:34    7             THE COURT:  You know, I am sympathetic with your

11:03:39    8    position that this should not be relevant because I believe

11:03:44    9    that there's marginal relevance to sales of the company to

11:03:54   10    the question of what's a reasonable royalty for

11:03:58   11    infringement of a patent.

11:03:59   12             But I think that ship has sailed.  There -- the

11:04:05   13    Federal Circuit has indicated in numerous cases that this

11:04:12   14    kind of evidence has some relevance to the damages

11:04:16   15    analysis.  And that's especially true when it consists of

11:04:21   16    an offer from the patent owner to sell as opposed to just

11:04:28   17    negotiations with someone else, some third party.

11:04:35   18             So I think that that is relevant.

11:04:42   19             And then it's my understanding from just what I've

11:04:45   20    seen that Dr. Raleigh's response to that was to say:  Well,

11:04:52   21    the 60 million wasn't even the real value that the

11:04:59   22    InterDigital deal involved.  It also involved this greater

11:05:09   23    amount, and that in dealing with that greater amount, he

11:05:16   24    indicated that his knowledge of that came from counsel.

11:05:21   25             So tell me what I'm missing there.

| | | |
|---|---|---|
| 11:05:24 | 1 | MR. TSUEI:  Yes, Your Honor. |
| 11:05:26 | 2 | So a quick correction.  I'm not sure the letter of |
| 11:05:30 | 3 | intent in question here that served as the bedrock for the |
| 11:05:34 | 4 | negotiations between Headwater and InterDigital can be |
| 11:05:38 | 5 | fairly characterized as an offer from the patentee to a |
| 11:05:41 | 6 | prospective purchaser.  What actually is -- the document |
| 11:05:44 | 7 | is, it's a letter of intent provided by the prospective |
| 11:05:47 | 8 | purchaser to the patentee, which the patentee signed in |
| 11:05:51 | 9 | order to start the diligence period. |
| 11:05:53 | 10 | And so to the extent that Your Honor continues to |
| 11:05:55 | 11 | believe that the -- you know, the fact that, you know, the |
| 11:05:59 | 12 | InterDigital deal may have involved an offer by the |
| 11:06:04 | 13 | patentee, we'd respectfully note that that's likely an |
| 11:06:04 | 14 | inaccurate understanding of the evidence. |
| 11:06:06 | 15 | So instead, what's actually happening here is |
| 11:06:09 | 16 | there was an offer from the prospective purchaser which the |
| 11:06:11 | 17 | patentee tentatively agreed to, just to do the due |
| 11:06:15 | 18 | diligence in the negotiations that are at issue here. |
| 11:06:19 | 19 | THE COURT:  But the patentee was agreeing to a |
| 11:06:24 | 20 | sale for $60 million subject to whatever the internal |
| 11:06:31 | 21 | requirements of that letter were? |
| 11:06:33 | 22 | MR. TSUEI:  I believe that's right, Your Honor. |
| 11:06:36 | 23 | Among other things, there was an expectation that there be |
| 11:06:40 | 24 | a transfer of equity from InterDigital to Headwater.  And |
| 11:06:42 | 25 | so, you know, in that respect, at least, that's a |

11:06:45  1  distinguishing fact that makes this agreement different

11:06:49  2  from, as I understand, most of the other cases that have,

11:06:52  3  in fact, been cited to the Court where, you know, the facts

11:06:54  4  of those cases involved, you know, where they were, a

11:06:56  5  straight patent purchase.

11:07:01  6      THE COURT:  Well, Dr. Raleigh did testify that he

11:07:09  7  had a belief that the actual value of this sale would have

11:07:15  8  been in the hundreds of millions?

11:07:17  9      MR. TSUEI:  Yes, that's what he testified to, as

11:07:22  10  you can see on Page 4 at the top of Docket 137.

11:07:26  11      THE COURT:  And are you saying that he never

11:07:31  12  indicated that the source of his belief was counsel?

11:07:35  13      MR. TSUEI:  Well, certainly not in that portion of

11:07:38  14  the deposition, Your Honor.

11:07:39  15      So the alleged waiver, according to Samsung,

11:07:43  16  occurs much later in the depo -- or I don't want to

11:07:48  17  characterize it as much later but later in the deposition.

11:07:50  18  And the testimony in question is also excerpted by Samsung

11:07:53  19  on Page 5 of Docket 137.

11:08:00  20      THE COURT:  All right.

11:08:00  21      MR. TSUEI:  So my understanding is this testimony

11:08:06  22  comes something like 35 pages after Dr. Raleigh's assertion

11:08:10  23  about -- you know, his belief in what the deal was actually

11:08:14  24  worth.

11:08:15  25      THE COURT:  And I'm seeing on Page 5 that

| | |
|---|---|
| 11:08:19 | 1 |
| 11:08:25 | 2 |
| 11:08:30 | 3 |

Dr. Raleigh testified:  And if I can just add, those were
based on attorneys' analysis of what damage awards would
look like.

11:08:31    4          MR. TSUEI:  Yes, sir.

11:08:32    5          THE COURT:  How is that not revealing in some
11:08:41    6  manner the communication with counsel?

11:08:43    7          MR. TSUEI:  Well, I'd say that it's a statement of
11:08:47    8  belief from Dr. Raleigh giving context to why he believed a
11:08:53    9  certain thing was true.

11:08:55   10          Now, as I said earlier, I think witnesses in
11:08:58   11  depositions can say and attest to non-privileged facts that
11:09:02   12  are relevant to their statements of belief.  So Dr. Raleigh
11:09:05   13  could have said, my attorneys thought Samsung infringed,
11:09:08   14  that's why we filed a lawsuit.

11:09:09   15          Now, of course, that topic will have been the
11:09:13   16  source and subject of discussion between counsel and the
11:09:17   17  client, but that testimony by itself without more we don't
11:09:20   18  believe is a disclosure of the communication itself.

11:09:28   19          THE COURT:  I don't see how a client can be
11:09:31   20  allowed to say a conclusion -- in this case, the hundreds
11:09:38   21  of millions -- and cite counsel as the source for that
11:09:47   22  conclusion and not be waiving some measure of the
11:09:54   23  privilege.

11:09:54   24          MR. TSUEI:  Understood, Your Honor.  I think we'll
11:09:57   25  have to respectfully disagree.

| | | |
|---|---|---|
| 11:09:59 | 1 | And then I'll address, Your Honor, if -- if you'll |
| 11:10:02 | 2 | allow me, what the outcome should be if there was, in fact, |
| 11:10:05 | 3 | some sort of waiver. |
| 11:10:06 | 4 | THE COURT: All right. Go ahead. |
| 11:10:07 | 5 | MR. TSUEI: So if Dr. Raleigh did, in fact, waive |
| 11:10:10 | 6 | something with this testimony on Page 5, it's limited to |
| 11:10:13 | 7 | what he said there. |
| 11:10:15 | 8 | Now, obviously, that's not what Samsung is asking |
| 11:10:18 | 9 | for. They're asking for a complete subject matter waiver, |
| 11:10:21 | 10 | and I just don't think that they've shown that. |
| 11:10:23 | 11 | Now, if your Court -- if Your Honor finds that |
| 11:10:26 | 12 | this testimony constitutes a waiver but finds that there is |
| 11:10:29 | 13 | no broader subject matter waiver, that's an outcome that is |
| 11:10:33 | 14 | fine with us as well. And I think the subject matter |
| 11:10:38 | 15 | waiver argument is really what's been presented to the |
| 11:10:41 | 16 | Court. |
| 11:10:42 | 17 | THE COURT: The waiver that I would expect to |
| 11:10:46 | 18 | find, and I'm -- and I say expect because I'll give the |
| 11:10:50 | 19 | Defendant a chance to try and change my mind on it, but |
| 11:10:53 | 20 | would be a waiver as to the attorneys' analysis of what |
| 11:11:01 | 21 | damage awards would look like that Dr. Raleigh was |
| 11:11:04 | 22 | referring to. |
| 11:11:05 | 23 | And if there is no such thing, then that would be |
| 11:11:10 | 24 | a separate issue that the Defendant would be entitled to |
| 11:11:19 | 25 | use. But if there is such an analysis, I think that -- |

| | | |
|---|---|---|
| 11:11:27 | 1 | it's hard for me to see how that does not waive it, because |
| 11:11:33 | 2 | this is not just something that I think Dr. Raleigh was |
| 11:11:36 | 3 | kind of trapped into.  Dr. Raleigh wanted to explain why |
| 11:11:41 | 4 | this deal was worth more than the face of it.  So I think |
| 11:11:46 | 5 | he was intending to -- to use it. |
| 11:11:53 | 6 | And in any event, that's what I think the waiver |
| 11:11:59 | 7 | would be. |
| 11:11:59 | 8 | And I don't know, perhaps it would be helpful now |
| 11:12:02 | 9 | to hear from Samsung and see if they're arguing for more |
| 11:12:05 | 10 | than that and then give you a chance to respond. |
| 11:12:09 | 11 | MR. GRAUBART:  Thank you, Your Honor. |
| 11:12:13 | 12 | I think what we would request is very similar to |
| 11:12:17 | 13 | what was just discussed, that Dr. Raleigh put into issue |
| 11:12:24 | 14 | and the expert will testify at trial presumably that the |
| 11:12:29 | 15 | value to be received from InterDigital was not 60 million, |
| 11:12:32 | 16 | it was this hundreds of millions, and that the basis of |
| 11:12:36 | 17 | that hundreds of millions was advice of counsel. |
| 11:12:39 | 18 | And so I think we're entitled to everything about |
| 11:12:42 | 19 | this alleged hundreds of millions of dollars valuation even |
| 11:12:48 | 20 | if it is from the advice of counsel, including anticipated |
| 11:12:51 | 21 | damages awards. |
| 11:12:52 | 22 | But if there's some other document from counsel |
| 11:12:54 | 23 | that says it includes anticipated damage awards and it |
| 11:12:58 | 24 | includes this other thing and it leads to a calculation of |
| 11:13:01 | 25 | hundreds of millions, I think we're entitled to that, too, |

11:13:04   1   because they are relying on it and putting it at issue.

11:13:08   2          THE COURT:  Well, did Dr. Raleigh also talk

11:13:09   3   separately about stock options, or is this the same thing?

11:13:20   4          MR. GRAUBART:  It's the same thing, Judge.

11:13:22   5          So what happens is -- and if I can put this on the

11:13:25   6   ELMO, I can give a little more context.

11:13:29   7          So this is the earlier -- the part that was

11:13:35   8   attached to -- the part that was attached to the brief was

11:13:48   9   from the rough transcript.  This is the final transcript.

11:13:52  10   And this is the earlier part of the testimony where

11:13:55  11   Dr. Raleigh talks about the letter of intent and the

11:13:55  12   purchase price.

11:13:56  13          And in this bottom section that's highlighted, he

11:13:59  14   says:  We had an interest in the enhanced value of

11:14:03  15   InterDigital that would result from the prosecution of the

11:14:06  16   patent portfolio.

11:14:06  17          And I'll move this to get to the other end of the

11:14:08  18   page.

11:14:08  19          He said:  That's larger than the acquisition

11:14:12  20   price.

11:14:13  21          Question:  What was the value you put on that?

11:14:16  22          And he said:  We felt it was hundreds of millions

11:14:18  23   of dollars.

11:14:19  24          So then a few minutes goes by of other

11:14:21  25   questioning, and then on Page 351 of the final transcript,

11:14:24  1   counsel comes back to this and says:  You mentioned earlier

11:14:27  2   there were, I believe, internal discussions about the value

11:14:30  3   of consideration that Headwater was going to receive from

11:14:33  4   InterDigital.

11:14:34  5        I said something to that effect.

11:14:36  6        And those internal discussions valued the

11:14:39  7   consideration in excess of $60 million?

11:14:41  8        Yeah, I don't think 60 million in closing is

11:14:45  9   correct.  It would have been the total consideration that

11:14:49  10  was contemplated.

11:14:50  11       And were there internal discussions about that

11:14:52  12  total value that Headwater would have received from

11:14:55  13  InterDigital; is that correct?

11:14:56  14       There were scenario analyses considered.

11:14:58  15  Obviously, a portion of the payment, subject to future

11:15:06  16  gains, and so we considered, like I said, the net present

11:15:10  17  value risk adjusted based a variety of scenarios and wealth

11:15:14  18  of those scenarios and so forth, as one would normally do

11:15:17  19  in this kind of discussion.

11:15:18  20       And then there's a colloquy between counsel saying

11:15:22  21  we want production of this material.

11:15:24  22       And that's when Mr. Raleigh volunteers and

11:15:27  23  interjects:  If I can add, those -- and when he saying

11:15:31  24  those, it's those internal discussions that supposedly led

11:15:32  25  to his hundreds of millions of dollar conclusion -- those

11:15:35   1   were based on attorneys' analyses of what damages awards

11:15:42   2   would look like.

11:15:42   3          So he's putting at issue the content -- the sub --

11:15:45   4   of the attorney advice about these -- that led to this

11:15:49   5   internal analysis that under -- that supposedly led to his

11:15:53   6   conclusion of hundreds of millions of dollars valuation.

11:15:59   7          And it's just manifestly unfair for Samsung to be

11:16:03   8   faced at trial with this -- this assertion that there was a

11:16:08   9   value of hundreds of millions of dollars and then be told

11:16:11  10   that the basis for it we can't see because it was based on

11:16:15  11   attorneys' analysis of damages awards that no one is

11:16:18  12   allowed to see.

11:16:18  13          THE COURT:  All right.  Well, what I think the

11:16:23  14   scope of the waiver would be is the attorneys' analysis of

11:16:30  15   what damage awards would look like that is specifically

11:16:34  16   referenced and any discussion of the downstream value of

11:16:46  17   the stock options.

11:16:51  18          MR. GRAUBART:  And, Your Honor, to the extent that

11:16:52  19   Headwater reports that they're unable to locate any of

11:16:55  20   that, can I suggest that Samsung would be entitled to a

11:16:58  21   verified response to that effect stating Headwater does not

11:17:01  22   have in its possession any such materials?

11:17:05  23          THE COURT:  I think that's --

11:17:06  24          MR. GRAUBART:  Or a continued deposition of

11:17:09  25   Mr. Raleigh on it, either one or the other?

| | | |
|---|---|---|
| 11:17:11 | 1 | THE COURT:  I think that's a fair request. |
| 11:17:12 | 2 | MR. GRAUBART:  Thank you, Your Honor. |
| 11:17:18 | 3 | THE COURT:  And, Mr. Tsuei, if you want to speak |
| 11:17:20 | 4 | to that, I'm happy to hear it.  I would like to get a time |
| 11:17:25 | 5 | frame for the production of this or the production of a |
| 11:17:32 | 6 | declaration that after looking for it, you've not been able |
| 11:17:36 | 7 | to find it. |
| 11:17:37 | 8 | MR. TSUEI:  Sure. |
| 11:17:38 | 9 | Optimistically, we could likely provide that |
| 11:17:43 | 10 | within a week.  And just to preview for the Court what |
| 11:17:47 | 11 | we've already told Samsung on this issue, we haven't been |
| 11:17:49 | 12 | able to find, I guess, valuation analyses conducted by |
| 11:17:54 | 13 | attorneys relating to prospective damages awards in the |
| 11:17:58 | 14 | future, but we're willing to testify to that in a sworn |
| 11:18:01 | 15 | statement, or at least Dr. Raleigh, I assume, would be. |
| 11:18:04 | 16 | And to the extent that it sounds like your |
| 11:18:07 | 17 | Court -- Your Honor, you know, would like a verified |
| 11:18:09 | 18 | response, we can provide that as well. |
| 11:18:11 | 19 | THE COURT:  All right.  Then I'll note that that |
| 11:18:14 | 20 | should be provided within a week.  If you need more time, |
| 11:18:18 | 21 | you can see whether you can confer and get that.  If not, |
| 11:18:23 | 22 | file a motion. |
| 11:18:24 | 23 | MR. TSUEI:  Yes, Your Honor. |
| 11:18:25 | 24 | THE COURT:  All right.  What's next? |
| 11:18:38 | 25 | MR. GRAUBART:  Your Honor, two -- two options for |

11:18:43  1  you.  One will be we can go back sequentially in time to

11:18:46  2  Docket No. 96, I believe, or we could finish out the other

11:18:49  3  aspects of Docket 100 that don't relate to InterDigital.

11:18:54  4       THE COURT:  Why don't you go ahead and finish out

11:18:57  5  the motion at Docket 100.

11:18:59  6       MR. GRAUBART:  Okay.  Thank you.

11:19:00  7       Ms. Andrews, could we turn the HDMI source back

11:19:08  8  on, please?  Thank you.

11:19:09  9       So, Your Honor, the other aspects of Docket No.

11:19:12  10 100 pertain to other communications that Headwater had with

11:19:18  11 third parties besides InterDigital, and these are ItsOn and

11:19:23  12 Verizon, and that Headwater is withholding as privileged,

11:19:28  13 including under the application of the common legal

11:19:32  14 interest exception to waiver.

11:19:34  15      So a little bit of -- of history here.  When we

11:19:40  16 filed this motion, as the Court could see from I believe

11:19:45  17 it's Exhibit K to Docket 100, the only basis for

11:19:50  18 Headwater -- I'm focusing now on the ItsOn aspect.  I'll

11:19:53  19 put Verizon to the side for a moment.

11:19:55  20      The only basis that Headwater provided for

11:19:57  21 withholding these communications with ItsOn was the fact

11:20:00  22 that ItsOn had a licensor/licensee relationship with

11:20:04  23 Headwater, and they cited three cases, including that

11:20:07  24 In re Regents case.  I think that In re Regents case is the

11:20:11  25 only one that deals with actually applying the common

11:20:14    1    interest exception, and it dealt, as we talked about, with

11:20:16    2    this exclusive licensee, which is not what Headwater and

11:20:20    3    ItsOn's relationship was.

11:20:21    4         And so we didn't believe that supported it, and we

11:20:25    5    filed the motion.

11:20:26    6         In response, and after the briefing, Headwater

11:20:29    7    presented the declaration on March 14th of Dr. Raleigh

11:20:33    8    painting a much fuller picture, one that hadn't been laid

11:20:37    9    out previously in their interrogatory responses about

11:20:41    10   Headwater's history but that newly paints this picture that

11:20:44    11   if taken alone and taken in isolation, might support

11:20:48    12   Headwater's position.

11:20:50    13        And that picture is saying that Headwater and

11:20:53    14   ItsOn, that they were these two companies that Dr. Raleigh

11:20:56    15   both founded -- he founded them both.  They shared the same

11:21:00    16   physical office space.  They shared computer systems.  They

11:21:03    17   shared key employees and consultants.  They shared boards

11:21:06    18   of directors members.  They shared the same in-house

11:21:10    19   counsel, Krista Jacobsen and James Harris.  He said they --

11:21:13    20   when it came to the -- to using the different companies'

11:21:16    21   email addresses, he said:  Oh, Headwater and email --

11:21:19    22   Headwater and ItsOn email domains were flexibly used by

11:21:25    23   participants.

11:21:26    24        So as I say, standing alone, those broad claims of

11:21:29    25   privilege, that might support it.  But we can't take that

11:21:31    1    declaration standing alone.  We need to look at the full

11:21:33    2    evidentiary record here.

11:21:34    3        And when you do that, you see, Your Honor, that

11:21:36    4    Headwater has been all over the map in this case about the

11:21:40    5    relationship between Headwater and ItsOn.  When it suits

11:21:46    6    Headwater -- like for purposes of this motion, the two

11:21:47    7    companies, you know, operated basically hand in glove,

11:21:49    8    attached at the hip in this common pursuit.  But when

11:21:52    9    they -- when it suits them in another context, they sing a

11:21:55    10   different tune.

11:21:56    11       So what do I mean by this?  So this is Docket 136,

11:21:59    12   the declaration from Dr. Raleigh on March 14th where he

11:22:02    13   says, among other things:  The composition of the board of

11:22:05    14   both companies also largely overlapped.

11:22:07    15       But then on Monday evening, 36 hours ago, Your

11:22:14    16   Honor, Headwater filed a brief in opposition to a motion

11:22:17    17   that Samsung filed seeking sanctions for the spoliation of

11:22:21    18   certain evidence that we say Headwater could have preserved

11:22:25    19   from ItsOn.

11:22:25    20       And what did Headwater say in response?  Oh,

11:22:28    21   these -- these were two legally separate entities with no

11:22:31    22   common ownership, different shareholders and board members.

11:22:34    23       So we now have an inconsistency about whether they

11:22:37    24   had the same board.

11:22:39    25       What about Mr. Raleigh's contention that they had

|  |  |
|---|---|
| 11:22:42 | 1 |

the same in-house counsel, Mr. Harris and Ms. Jacobson?  In

his declaration, he said that Mr. Harris served as in-house

counsel and also -- that they both served as in-house

counsel, and they both performed legal services for ItsOn.

     Well, what did Mr. Harris have to say about that?

He said:  I was not an employee of ItsOn.  And other than

discussing some patents with inventors, he never did any

work for ItsOn.  And he said the same thing is true for his

predecessor Ms. Jacobson, that he doesn't believe she ever

did any work for ItsOn.

     Okay.  Well, what about this discussion about

emails?  Oh, we were -- it was very flexibly used, he said

in his declaration.  But that's not what he said at his

deposition before he knew that it -- that this was an

issue.

     He said:  Oh, I tried -- I didn't do it at all.  I

never did Headwater business on ItsOn email.  Then he

qualified it and said:  Well, I tried very hard.  I did the

best I could to -- to keep them separate.

     And I understand that.  That's a reasonable thing

for a business executive to say, but it's not the same

thing as what he came up with four months later when trying

to establish a common interest privilege assertion.

     And what about the notion of whether they were

pursuing a common interest and when those interests may

11:23:56  1  have diverged?

11:23:57  2      So in his declaration, he says:  Headwater and

11:24:00  3  ItsOn shared the pursuit of innovating, patenting, and

11:24:04  4  commercializing.  At all relevant times, they had a

11:24:07  5  licensor/licensee relationship until ItsOn wound up.  And

11:24:11  6  in his declaration, he says that wind-up took place in

11:24:16  7  2018.

11:24:16  8      He said:  The only time their interest diverged

11:24:17  9  was a specific occasion when the license agreement had to

11:24:19  10  be -- between the two parties had to be negotiated -- had

11:24:22  11  to be renegotiated.

11:24:23  12      Okay.  Well, on Monday, Headwater said something

11:24:26  13  else.  It said:  Well, from 2017 until the dissolution,

11:24:30  14  their interests completely diverged.  They had different

11:24:34  15  CEOs.  They had adverse legal interests.  And why was this

11:24:38  16  adverse interest -- this is important -- it's because

11:24:43  17  ItsOn's continuing failure to pay royalties owed to

11:24:46  18  Headwater.

11:24:48  19      So while this brief says that it was from 2017, if

11:24:48  20  we go back to Mr. Harris's testimony -- again, he was the

11:24:50  21  acting CEO of Headwater, as well as the general counsel --

11:24:54  22  he says that the time when there was no royalties being

11:24:57  23  paid, that was back in 2015 to 2016.

11:25:01  24      So taking Headwater at its word that they did not

11:25:04  25  have a common interest during the time when they were not

11:25:07   1   getting paid by -- from this royalty under this license

11:25:10   2   agreement, that went back all the way to 2015.

11:25:13   3          And yet when we look at the privilege log, there

11:25:18   4   are scores of emails from Mr. Raleigh on his ItsOn email

11:25:22   5   address to third parties, some of whom may or may not be

11:25:26   6   attorneys, that are from 2017.

11:25:30   7          So there's just no consistency to the story.  You

11:25:33   8   cannot take the March 14th declaration on its face as the,

11:25:37   9   you know, Rosetta Stone to the relationship between

11:25:40  10   Headwater and ItsOn.

11:25:41  11          So where does that leave us?  The supposed common

11:25:52  12   interest covers -- allegedly covers every single email

11:25:56  13   regarding legal issues that involve both Headwater and

11:25:59  14   ItsOn personnel for the entire duration through this

11:26:03  15   2017 -- at least through 2017 is the dates we see on the

11:26:06  16   privilege log.

11:26:06  17          And the burden is on Headwater to prove that for

11:26:09  18   the -- for that entire time, they had a substantially

11:26:12  19   identical interest, that that interest was legal, not just

11:26:16  20   commercial, and that they have to establish -- they have to

11:26:19  21   prove the time frame during which that existed.  And this

11:26:22  22   record just doesn't -- just doesn't establish that, Your

11:26:25  23   Honor.

11:26:25  24          And so we ask the Court to -- to overrule the

11:26:28  25   common interest privilege assertion with respect to

11:26:31  1  communications either between Headwater and ItsOn or

11:26:34  2  between ItsOn and third parties and order Headwater to

11:26:39  3  produce those communications.

11:26:41  4       THE COURT:  How would there be communications

11:26:51  5  produced here between ItsOn and third parties that don't

11:26:54  6  involve Headwater?

11:26:54  7       MR. GRAUBART:  Well, I think that goes back to the

11:26:56  8  flexibly used email issue, Your Honor.  That was our

11:26:58  9  question, as well, and I believe the answer provided for

11:27:01  10  Headwater is to say he just used whatever email he wanted.

11:27:04  11  And so he's really conducting Headwater business here and

11:27:09  12  doing Headwater -- engaging in Headwater privileged

11:27:14  13  communications.

11:27:14  14       THE COURT:  So all of those emails you're talking

11:27:16  15  about would be involving Mr. -- or Dr. Raleigh?

11:27:22  16       MR. GRAUBART:  I think most of them do, Your

11:27:23  17  Honor.  There are some, I believe, on their log that are

11:27:27  18  between other individuals that -- either at Headwater or at

11:27:32  19  ItsOn that are communicating with a -- with -- so either

11:27:36  20  someone at Headwater communicating with someone at ItsOn

11:27:39  21  that are being withheld as privileged, or someone at

11:27:42  22  ItsOn's email address computing -- communicating outside of

11:27:47  23  ItsOn and being withheld as privileged.

11:27:50  24       THE COURT:  All right.  Thank you, Mr. Graubart.

11:27:56  25       MR. GRAUBART:  Thank you, Judge.

11:27:57    1              MR. TSUEI:  Thank you.  Good afternoon, Your

11:28:16    2    Honor.  James Tsuei again for Headwater.

11:28:17    3              So I suppose there are a number of issues I can

11:28:20    4    begin by addressing, but if Your Honor won't mind, I'll

11:28:23    5    start with the first principles, which is has Headwater met

11:28:27    6    its burden to show that there is a privilege and should it

11:28:30    7    not be found to be waived?

11:28:32    8              So the common interest exception to waiver here

11:28:36    9    being asserted by Headwater specifically arises out of a

11:28:40    10   licensee and licensor relationship that persisted from

11:28:44    11   approximately 2009 to approximately 2017 or 2018.

11:28:47    12             Throughout this entire period, the legal interest

11:28:52    13   between ItsOn and Headwater, in our view, did not

11:28:56    14   substantially change.

11:28:57    15             Now, certainly there may be different economic

11:29:00    16   interests between the two entities, but that's not really

11:29:02    17   the question here that must be answered.  The question is

11:29:04    18   whether or not the legal interests persisted such that the

11:29:08    19   common interest exception to waiver should apply.

11:29:10    20             And on that note, I'm not sure I heard a good

11:29:13    21   argument from Mr. Graubart, which was to say they had

11:29:15    22   different interests because there was a lack of royalty

11:29:17    23   payments, for instance.

11:29:18    24             But, again, that's not what the case law requires.

11:29:20    25   The case law requires an analysis of the legal interest

| | | |
|---|---|---|
| 11:29:24 | 1 | being asserted.  And as far as I know, I don't think that |
| 11:29:26 | 2 | Samsung has demonstrated that the legal interest did |
| 11:29:29 | 3 | substantially change throughout the time period justifying |
| 11:29:32 | 4 | a piercing of privilege here. |
| 11:29:36 | 5 | So turning to a couple of issues that Mr. Graubart |
| 11:29:38 | 6 | indicated.  Now, thematically, I'm sure your Court will |
| 11:29:43 | 7 | note -- Your Honor will note that the -- the argument, |
| 11:29:45 | 8 | generally speaking, from Samsung is that the assertions of |
| 11:29:48 | 9 | privilege by Headwater have been inconsistent. |
| 11:29:51 | 10 | Now, we can address those one-by-one and explain |
| 11:29:53 | 11 | to you why Mr. Graubart is incorrect or why the |
| 11:29:57 | 12 | representations made by Samsung are misleading or otherwise |
| 11:30:00 | 13 | untrue.  So I'm happy to do that if Your Honor would like |
| 11:30:03 | 14 | to do so.  Although at the end of the day, I'm not sure it |
| 11:30:06 | 15 | is relevant to whether or not there was a common interest |
| 11:30:08 | 16 | exception that should be applied. |
| 11:30:11 | 17 | So starting with the issues that Mr. Graubart |
| 11:30:14 | 18 | raised.  First, he says that there is an inconsistency |
| 11:30:19 | 19 | between what Headwater said about ItsOn in Dr. Raleigh's |
| 11:30:23 | 20 | March 14 declaration vis-à-vis what Headwater said in its |
| 11:30:27 | 21 | brief filed I think it was on Monday. |
| 11:30:29 | 22 | THE COURT:  Maybe you can help me on that issue by |
| 11:30:33 | 23 | telling me are you saying that the common interest doctrine |
| 11:30:42 | 24 | in this case relies upon the licensor/licensee |
| 11:30:45 | 25 | relationship, not on other aspects of the relationship |

11:30:53  1  between ItsOn and Headwater?

11:30:54  2       MR. TSUEI:  I would say the qualified answer is

11:30:57  3  yes but not exclusively.

11:30:59  4       As Your Honor I'm sure is aware, most of the cases

11:31:02  5  addressing factual situations involving licensees and

11:31:05  6  licensors have involved essentially what have been

11:31:07  7  described as bare licensee/licensor relationships.  And in

11:31:11  8  those circumstances, some courts have found that there's

11:31:14  9  not a sufficiently congruent community of interest

11:31:16  10  justifying the application of the non-waiver rule.

11:31:18  11       Other cases have found that where there is not a,

11:31:24  12  quote, unquote, bare relationship between a licensee and a

11:31:26  13  licensor, those facts would justify an application of a

11:31:31  14  non-waiver rule.

11:31:32  15       And we'd submit to Your Honor respectfully that's

11:31:35  16  exactly the set of facts we have here in this case.  Here,

11:31:38  17  we've got Headwater --

11:31:39  18       THE COURT:  Which cases -- which cases would you

11:31:42  19  say are the best cases in that group?

11:31:44  20       MR. TSUEI:  So, first, I'll direct your Court --

11:31:50  21  Your Honor's attention to the MPT case coming out of the

11:31:54  22  Northern District of Ohio.  That's been cited on Page 14 of

11:31:58  23  Docket 120.

11:31:59  24       And if I'm recalling correctly, there was a

11:32:09  25  similar line of argumentation addressed by the Federal

11:32:13    1    Circuit in the In re Regents case and found to have not

11:32:19    2    justified piercing the privilege.

11:32:30    3            THE COURT:  All right.  The MPT versus Marathon

11:32:34    4    Labels?

11:32:35    5            MR. TSUEI:  Yes, Your Honor.

11:32:35    6            THE COURT:  All right.  Go ahead.

11:32:43    7            MR. TSUEI:  So just starting from MPT in

11:32:46    8    attempting to analogize those facts to this case, we'd say

11:32:49    9    the facts are materially indistinguishable.

11:32:53    10           Here, there's a close relationship between

11:32:54    11   Headwater and ItsOn.  As Mr. Graubart helpfully pointed

11:32:58    12   out, they were founded by the same person, shared a lot of

11:33:00    13   the same staff, shared overlapping board members, although

11:33:03    14   not all of the same board members.  And throughout the life

11:33:06    15   of the companies shared the same office space and often had

11:33:10    16   access to the same computer systems.

11:33:12    17           And as a matter of fact, this isn't, you know,

11:33:15    18   what I would describe as an ex post facto justification for

11:33:19    19   protecting privilege.  I would say that there's plenty of

11:33:23    20   evidence here just from the evidence that's been presented

11:33:25    21   in the briefs that the parties had much more than a bare

11:33:29    22   relationship of that -- between a licensor and a

11:33:33    23   non-exclusive licensee.

11:33:34    24           Here, we've got ItsOn personnel actively helping

11:33:38    25   Headwater and speaking to Headwater's attorneys, assisting

11:33:41   1    Headwater's attorneys in prosecuting patent applications.

11:33:45   2    That fact, as we've pointed out in our briefing, is just

11:33:50   3    borne out by the privilege log where we've got folks with

11:33:53   4    ItsOn email addresses directly communicating with

11:33:55   5    Headwater's patent counsel.

11:33:56   6         And, in fact, this was the expectation of how the

11:33:59   7    companies would operate, that Headwater would be the

11:34:01   8    invention entity and the entity holding the IP and ItsOn

11:34:06   9    personnel actually developing the technology and

11:34:08   10   commercializing it.

11:34:08   11        And in the course of that very close relationship,

11:34:11   12   protected by a licensee/licensor relationship, the ItsOn

11:34:15   13   personnel worked directly for obtaining valid and

11:34:21   14   enforceable patents that were ultimately -- were they

11:34:23   15   issued assigned to Headwater.

11:34:25   16        In our view, that is a sufficiently congruent

11:34:28   17   community of interest between the parties justifying the

11:34:32   18   application of the common interest doctrine.

11:34:35   19        THE COURT:  All right.

11:34:37   20        MR. TSUEI:  So, you know, I -- I'm remiss to leave

11:34:41   21   some of the -- what I would say, inaccurate descriptions of

11:34:44   22   the record here left unrebutted, but I'll keep it short.

11:34:50   23        We never said that ItsOn and Headwater did not

11:34:56   24   share common legal interest.  Now, it's true that two

11:34:59   25   entities can be separately owned, have different

11:35:02  1  shareholders, have no common ownership, have different

11:35:05  2  board members, but overlapping board members, but still

11:35:08  3  share a sufficiently congruent legal interest such that

11:35:11  4  they should be considered to be a part of the same

11:35:12  5  privileged community or community of privilege.

11:35:14  6      So, in fact, ultimately what I heard from

11:35:19  7  Mr. Graubart was a rather reductive application of some

11:35:22  8  arguments about how, well, if they didn't share all board

11:35:25  9  members, then perhaps the privilege doesn't apply.

11:35:28  10      Respectfully, Your Honor, that's not really an

11:35:31  11  analysis that the case law calls for, and the analysis that

11:35:34  12  the case law calls for is what we've presented in our

11:35:38  13  briefing and in the argument today.

11:35:38  14      Now, if Your Honor has any particular questions

11:35:41  15  about the alleged, let's call it discrepancies in the

11:35:44  16  record and representations here, some of which Mr. Graubart

11:35:46  17  put on the screen for the Court, I'm happy to address them.

11:35:50  18      THE COURT:  No.  If more than just a bare

11:35:56  19  licensor/licensee relationship is all that's needed, I

11:36:01  20  think clearly -- despite all of the inconsistencies in the

11:36:08  21  record, there is more than that bare arm's length

11:36:14  22  licensor/licensee relationship here.  But I'll just have to

11:36:17  23  look at the cases that you have cited and see.

11:36:24  24      MR. TSUEI:  Yes, Your Honor.

11:36:27  25      THE COURT:  All right.

11:36:31    1          MR. GRAUBART:  Your Honor, if I can make a couple

11:36:33    2    quick points?

11:36:34    3          THE COURT:  You certainly may.

11:36:35    4          MR. GRAUBART:  Ms. Andrews, can we put the

11:36:37    5    presentation back up?  Thank you.

11:36:38    6          So most importantly, Your Honor, Mr. Tsuei just

11:36:42    7    said that they're -- that they always had the same legal

11:36:44    8    interest and there was never an adverse legal interest.

11:36:48    9          These are Headwater's own words to the Court 36

11:36:51   10    hours ago.  They had different CEOs and had adverse legal

11:36:55   11    interests due to ItsOn's continuing failure to pay

11:36:57   12    royalties to Headwater.

11:36:59   13          And the testimony is that that went back to 2015,

11:37:05   14    and yet they're withholding things as late as 2017.

11:37:08   15          So that -- their -- by their own admission, there

11:37:12   16    was not a common legal interest during that period.  That's

11:37:15   17    number one.

11:37:15   18          Number two, the MPT case from Ohio does say that

11:37:20   19    more than a bare non-exclusive licensor/licensee

11:37:24   20    relationship can support a common legal interest.  That's

11:37:27   21    the only case of which we're aware.

11:37:29   22          The only authority from the Federal Circuit that

11:37:31   23    deals with this issue is In re Regents, which was the

11:37:36   24    exclusive licensee relationship between UC Berkeley and

11:37:39   25    Eli Lilly.  So it's -- there is no controlling authority

| | |
|---|---|
| 11:37:43 | 1 | on -- for this Court on this -- on this issue. |
| 11:37:46 | 2 |         I respectfully disagree with the MPT court's |
| 11:37:50 | 3 | decision because I don't see how they -- when they're, you |
| 11:37:55 | 4 | know, working adversely to one another -- you know, |
| 11:37:58 | 5 | Headwater was free to go license its patents to others. |
| 11:38:02 | 6 | They allegedly didn't have this complete alignment with |
| 11:38:06 | 7 | ItsOn. |
| 11:38:07 | 8 |         In any event, I don't think the case law compels |
| 11:38:09 | 9 | that. |
| 11:38:10 | 10 |         THE COURT:  All right. |
| 11:38:10 | 11 |         MR. GRAUBART:  And then thirdly, there's this |
| 11:38:12 | 12 | question about the third parties, right? |
| 11:38:14 | 13 |         As Your Honor asked, how is it that there's a |
| 11:38:17 | 14 | common legal interest with respect to communications |
| 11:38:19 | 15 | between ItsOn and a third party?  And the only answer to |
| 11:38:22 | 16 | that is like ignore the emails.  It's really just Headwater |
| 11:38:26 | 17 | communicating.  And I don't think the testimony supports |
| 11:38:28 | 18 | that. |
| 11:38:31 | 19 |         THE COURT:  All right.  I'll look at that further. |
| 11:38:34 | 20 |         MR. GRAUBART:  Thank you, Your Honor. |
| 11:38:35 | 21 |         THE COURT:  And what about Verizon? |
| 11:38:37 | 22 |         MR. GRAUBART:  Oh, thank you, Judge.  And this |
| 11:38:39 | 23 | will be faster. |
| 11:38:40 | 24 |         So it really boils down to this question.  Was |
| 11:38:46 | 25 | Verizon -- did Verizon have any board members on ItsOn -- |

| | | |
|---|---|---|
| 11:38:49 | 1 | on ItsOn's board? |
| 11:38:50 | 2 | Headwater says all the communications between |
| 11:38:53 | 3 | either Headwater and a Verizon representative or ItsOn and |
| 11:38:57 | 4 | a Verizon representative were -- are privileged because |
| 11:39:01 | 5 | they were seeking or providing legal advice for both |
| 11:39:04 | 6 | Headwater and for ItsOn. |
| 11:39:06 | 7 | But -- and it says Verizon was a board member of |
| 11:39:10 | 8 | both Headwater and ItsOn. |
| 11:39:12 | 9 | After this, we twice wrote to Headwater saying: |
| 11:39:16 | 10 | Can you please provide us any evidence that Verizon was on |
| 11:39:19 | 11 | the board of ItsOn?  We understand there's documentation |
| 11:39:22 | 12 | saying they were on the board of Headwater.  We never got |
| 11:39:25 | 13 | any response. |
| 11:39:26 | 14 | And then Dr. Raleigh's deposition -- excuse me, |
| 11:39:30 | 15 | declaration on March 14th, I think, kind of condemns this |
| 11:39:33 | 16 | by silence.  All it says is that Verizon was members of |
| 11:39:37 | 17 | Headwater's board.  There's no evidence in the record that |
| 11:39:39 | 18 | Verizon was a -- had any representatives on ItsOn's board. |
| 11:39:43 | 19 | And yet we have these communications between ItsOn and |
| 11:39:45 | 20 | Verizon being withheld as allegedly privileged. |
| 11:39:48 | 21 | THE COURT:  All right. |
| 11:39:51 | 22 | MR. GRAUBART:  And that's it for Docket 100, Your |
| 11:39:53 | 23 | Honor. |
| 11:39:53 | 24 | THE COURT:  Thank you. |
| 11:40:02 | 25 | MR. TSUEI:  Hello again, Your Honor.  James Tsuei |

| | | |
|---|---|---|
| 11:40:04 | 1 | for Headwater. |
| 11:40:05 | 2 | So if -- thankfully, I think this issue is fairly |
| 11:40:10 | 3 | brief.  The issue is whether or not there is sufficient |
| 11:40:11 | 4 | evidence showing that Verizon was a board member of |
| 11:40:14 | 5 | Headwater and ItsOn. |
| 11:40:15 | 6 | So despite Mr. Graubart's representations, we did, |
| 11:40:19 | 7 | in fact, identify documents to Samsung, including |
| 11:40:22 | 8 | specifically in our briefing for this motion showing, among |
| 11:40:25 | 9 | other things, that Headwater granted board observer rights |
| 11:40:30 | 10 | to Verizon in exchange for Verizon's investment in both |
| 11:40:34 | 11 | Headwater and ItsOn. |
| 11:40:35 | 12 | Now, I'm not sure where that leaves us because it |
| 11:40:37 | 13 | seems like perhaps the parties are not looking at the same |
| 11:40:40 | 14 | evidence.  But in -- the reality of honestly the |
| 11:40:44 | 15 | communications is attorneys for Headwater and ItsOn were |
| 11:40:47 | 16 | often the same people, for example, at the Wilson Sonsini |
| 11:40:52 | 17 | firm, communicated with the board about company business, |
| 11:40:54 | 18 | and specifically also involving oftentimes legal issues |
| 11:40:57 | 19 | relating to the companies in emails to not only members of |
| 11:41:01 | 20 | the board at (unintelligible) Horoson with (unintelligible) |
| 11:41:05 | 21 | Horowitz's email address, but also to those same investors |
| 11:41:07 | 22 | with their Verizon email addresses. |
| 11:41:10 | 23 | And as I understand it, at all times, the |
| 11:41:13 | 24 | attorneys, you know, representing the companies understood |
| 11:41:15 | 25 | that what they were saying when they were emailing the |

| | | |
|---|---|---|
| 11:41:17 | 1 | board, including Verizon's representatives on the board, |
| 11:41:20 | 2 | that those communications would be privileged. |
| 11:41:23 | 3 | Now, we're happy, of course, to -- in fact, just |
| 11:41:25 | 4 | to show an example of such a communication to the Court if |
| 11:41:28 | 5 | the Court deems it appropriate but, you know -- |
| 11:41:31 | 6 | THE COURT:  What is the evidence you're saying |
| 11:41:33 | 7 | that you have produced now that shows that Verizon was |
| 11:41:41 | 8 | either a board member or investor in ItsOn? |
| 11:41:44 | 9 | MR. TSUEI:  So two examples are cited by Bates |
| 11:41:48 | 10 | number in the -- if I recall correctly, the March 14 |
| 11:41:53 | 11 | declaration of Dr. Raleigh that was submitted to the Court. |
| 11:41:58 | 12 | THE COURT:  And -- |
| 11:41:59 | 13 | MR. TSUEI:  It, among other things, I believe |
| 11:42:01 | 14 | includes I think a document I think describing the |
| 11:42:05 | 15 | corporate rules of Headwater, and it references, among |
| 11:42:08 | 16 | other things, the existence of -- and the application and I |
| 11:42:13 | 17 | guess the continuing effect of a board observer rights |
| 11:42:17 | 18 | letter granting board observer rights and board membership |
| 11:42:21 | 19 | to Verizon, and I believe that may have been also produced |
| 11:42:25 | 20 | in the case. |
| 11:42:25 | 21 | THE COURT:  And that declaration, I'm sure, has a |
| 11:42:31 | 22 | CM/ECF number attached to it.  Can you help me out with |
| 11:42:37 | 23 | that? |
| 11:42:38 | 24 | MR. TSUEI:  Yes, sir.  That would be the ECF No. |
| 11:42:45 | 25 | 134. |

| | | |
|---|---|---|
| 11:42:46 | 1 | THE COURT:  134-something, huh?  In other words, |
| 11:42:54 | 2 | it's an exhibit to 134? |
| 11:42:55 | 3 | MR. TSUEI:  Yes, sir.  It's specifically 134-1 |
| 11:43:00 | 4 | and -2 would be the evidence that we've cited or at least |
| 11:43:05 | 5 | provided to Samsung with respect to this particular Verizon |
| 11:43:08 | 6 | issue. |
| 11:43:12 | 7 | THE COURT:  All right.  I'll -- I will look at |
| 11:43:13 | 8 | that in this connection. |
| 11:43:14 | 9 | MR. TSUEI:  All right.  As long as we're looking |
| 11:43:16 | 10 | at the same document, the observer rights letter being |
| 11:43:20 | 11 | referenced here in the colloquy on the record is, I think, |
| 11:43:23 | 12 | referenced and discussed at Page 4 of Docket Number 134-2. |
| 11:43:28 | 13 | THE COURT:  All right.  Thank you, Mr. Tsuei. |
| 11:43:37 | 14 | MR. GRAUBART:  Your Honor, I'm a little confused |
| 11:43:38 | 15 | by the reference to 134 because the docket number here for |
| 11:43:43 | 16 | Dr. Raleigh's declaration is Docket 136.  And so I don't |
| 11:43:47 | 17 | have 134 or any attachments with me. |
| 11:43:49 | 18 | But I think it was very apparent in Mr. Tsuei's |
| 11:43:54 | 19 | choice of language to say that Headwater granted Verizon |
| 11:43:58 | 20 | representatives observer rights to the board.  You never |
| 11:44:01 | 21 | heard him attest that -- that ItsOn had Verizon members on |
| 11:44:06 | 22 | its board.  If it does and if there's evidence of that, |
| 11:44:09 | 23 | then I am satisfied.  But I still haven't heard it, and I |
| 11:44:12 | 24 | don't have these two documents in front of me, nor did I |
| 11:44:15 | 25 | hear Mr. Tsuei represent that they, in fact, say that |

| | | |
|---|---|---|
| 11:44:18 | 1 | ItsOn -- that ItsOn had Verizon representatives on its |
| 11:44:22 | 2 | board.  And if it did not, then I don't know what the basis |
| 11:44:25 | 3 | is of privilege when you're just communicating with an |
| 11:44:29 | 4 | investor.  That doesn't -- isn't protected by |
| 11:44:32 | 5 | attorney-client privilege. |
| 11:44:33 | 6 | THE COURT:  All right. |
| 11:44:34 | 7 | MR. GRAUBART:  Thank you. |
| 11:44:34 | 8 | THE COURT:  I will look at the evidence on that. |
| 11:44:36 | 9 | Thank you. |
| 11:44:40 | 10 | Are there other motions that either side needs to |
| 11:44:44 | 11 | address? |
| 11:44:46 | 12 | MR. GRAUBART:  There are a couple remaining |
| 11:44:50 | 13 | motions, Your Honor, that my partner, Mr. Kodish, will |
| 11:44:52 | 14 | address. |
| 11:44:53 | 15 | THE COURT:  All right. |
| 11:45:01 | 16 | MR. KODISH:  Good afternoon -- well, still |
| 11:45:03 | 17 | morning, Your Honor.  Thad Kodish for Samsung. |
| 11:45:06 | 18 | And just for your planning purposes in case the |
| 11:45:08 | 19 | message hadn't been received, counsel and I had -- we had |
| 11:45:13 | 20 | made progress and, in fact, resolved this morning Docket |
| 11:45:18 | 21 | Nos. 99 and 113. |
| 11:45:25 | 22 | THE COURT:  All right. |
| 11:45:26 | 23 | MR. KODISH:  So what I'd like to discuss now is |
| 11:45:28 | 24 | Docket 96.  That's Samsung's motion that Headwater has |
| 11:45:34 | 25 | employed an improper use of an ESI relevance screen. |

11:45:39  1    Through negotiations, the -- the focus of the

11:45:44  2  motion is really narrowed significantly from what

11:45:48  3  Your Honor has from the briefing.  We've really narrowed it

11:45:55  4  down to two representations that Samsung has proposed about

11:45:57  5  the documents Headwater is withholding as irrelevant.  But

11:46:02  6  if you give me -- allow me a brief summary of the motion's

11:46:04  7  context, I think that will help assess that dispute.

11:46:07  8    Headwater is withholding certain documents as

11:46:12  9  irrelevant, and we have reason to believe that it's a

11:46:14  10 substantial number of documents and that they are actually

11:46:17  11 relevant.

11:46:18  12    Samsung served its ESI terms on July -- in July of

11:46:22  13 2023.  Headwater objected to a single of those terms which

11:46:28  14 Headwater later agreed to Samsung's narrowing of that term,

11:46:33  15 which was provided on October 4th of 2023.

11:46:35  16    Headwater otherwise never advised of any issue

11:46:39  17 about a large number of irrelevant hits causing problems

11:46:42  18 with the review, and so we were led to believe there was no

11:46:45  19 issues, and the documents would be coming in a reasonably,

11:46:49  20 timely course.

11:46:50  21    But as time passed and the Headwater ESI

11:46:56  22 production slowly rolled in, we became suspicious that

11:47:00  23 Headwater was withholding relevant documents.  As our

11:47:04  24 motion describes, Headwater largely ignored our

11:47:07  25 correspondence, requiring follow-up after follow-up.  And

| 11:47:10 | 1 | it wasn't until we started filing motions in January and |
| 11:47:13 | 2 | February of this year that they started producing many key |
| 11:47:17 | 3 | ESI documents that hit our July 28th, 2023 search terms. |
| 11:47:24 | 4 | Like, for example, the documents about the InterDigital |
| 11:47:27 | 5 | executive term sheet -- executed term sheet.  That was not |
| 11:47:31 | 6 | produced until we filed the Docket 88 motion that you have |
| 11:47:37 | 7 | heard argument on today on January 26th of 2024.  Documents |
| 11:47:43 | 8 | about problems with ItsOn's software. |
| 11:47:47 | 9 | Now, you've heard a fair amount about ItsOn today. |
| 11:47:50 | 10 | Mr. Tsuei talked about this close relationship, this |
| 11:47:55 | 11 | symmetry between the two, one as the patent holder, one as |
| 11:47:59 | 12 | the purported maker of technology to practice that IP. |
| 11:48:04 | 13 | But what has evolved in the course of discovery in |
| 11:48:08 | 14 | this case is a lot of focus on the infirmities and |
| 11:48:15 | 15 | technical failures of this ItsOn technology.  And that has |
| 11:48:18 | 16 | become important because of Headwater's plain thematic |
| 11:48:25 | 17 | thrust of their entire case, which is that this is a |
| 11:48:29 | 18 | copying case, that Samsung worked together with ItsOn for |
| 11:48:33 | 19 | some amount of time, got some glimpse of the technology, |
| 11:48:38 | 20 | and then proceeded to copy it, that they won't dispute |
| 11:48:43 | 21 | that.  They definitely are pushing that story every which |
| 11:48:46 | 22 | way. |
| 11:48:46 | 23 | A counter narrative in this case is why on earth |
| 11:48:52 | 24 | would somebody copy something that was a complete technical |
| 11:48:55 | 25 | failure?  Makes sense.  And so a lot of discovery was |

| | | |
|---|---|---|
| 11:49:00 | 1 | targeted at what we had learned from our side that -- that |
| 11:49:07 | 2 | there were huge problems with the technology.  So |
| 11:49:10 | 3 | naturally, we began pressing Headwater for its evidence |
| 11:49:13 | 4 | relating to problems with the ItsOn software. |
| 11:49:16 | 5 | It wasn't until we filed our February 5th, 2024 |
| 11:49:23 | 6 | motion -- this is dating back to discovery opening in |
| 11:49:26 | 7 | spring of last year -- that the very next day, we got a |
| 11:49:31 | 8 | 22,000-page production from Headwater having all this |
| 11:49:35 | 9 | information.  We had already taken many depositions by this |
| 11:49:38 | 10 | time, but -- but 22,000 documents flowed through. |
| 11:49:43 | 11 | Next, as a final example, talks about Headwater's |
| 11:49:46 | 12 | patent portfolio sales negotiations, many of which we |
| 11:49:49 | 13 | didn't receive until the night before Headwater's 30(b)(6) |
| 11:49:53 | 14 | deposition on March 6th, 2024, just last month. |
| 11:49:57 | 15 | So to compromise and avoid this motion practice, |
| 11:50:02 | 16 | we did ask Headwater for -- just to make certain |
| 11:50:05 | 17 | confirmations that it wasn't holding back certain documents |
| 11:50:08 | 18 | based on relevance.  And we gave descriptions of those. |
| 11:50:12 | 19 | But Headwater would not agree to -- to confirm that.  And |
| 11:50:17 | 20 | so we ultimately were forced to move to compel, citing |
| 11:50:20 | 21 | these discovery concerns and making clear in our motion |
| 11:50:23 | 22 | that we are okay with Headwater withholding wholly |
| 11:50:28 | 23 | irrelevant material, like medical docs, marriage issues, |
| 11:50:32 | 24 | and the like. |
| 11:50:33 | 25 | In its response, Headwater says that it has |

11:50:36  1  produced all the relevant material, but ultimately, as a

11:50:41  2  practical matter, this motion now has boiled down to

11:50:44  3  Headwater confirming that it is not withholding what

11:50:47  4  Samsung sees as relevant material narrowed to just a couple

11:50:50  5  of descriptions.

11:50:53  6        And so I've already handed it to -- to counsel.

11:50:57  7  It's just I have here a copy of a communication that just

11:51:01  8  reflects exactly what we have distilled it down to, asking

11:51:06  9  Headwater to represent they're not withholding these types

11:51:09  10  of documents.  I can provide you --

11:51:11  11        THE COURT:  Please do.

11:51:12  12        MR. KODISH:  Okay.  May I approach?

11:51:13  13        THE COURT:  Yes.

11:51:29  14        MR. KODISH:  So this is -- what you're looking at

11:51:33  15  here, Your Honor, is, you know, the latest email between us

11:51:35  16  on this issue.  This is -- this is my writing.  Your

11:51:39  17  responsive email below is appreciated.  They had just

11:51:43  18  agreed to Term No. 3 here that you see below.  However,

11:51:49  19  issues remain, I explained.

11:51:51  20        As a further compromise, Samsung is willing to

11:51:54  21  narrow its request to the below three criteria, the third

11:51:58  22  of which Headwater has now agreed to, per your below email.

11:51:59  23  If Headwater refuses to agree to Criteria 1 and 2, please

11:52:03  24  explain why that is so we can focus on either potential

11:52:06  25  resolution or being able to explain the issue to the Court.

11:52:09  1    And we have not received a response to that, but

11:52:13  2    I'll go ahead and just take the opportunity to tell you our

11:52:17  3    position on why Categories 1 and 2 are relevant.

11:52:21  4    So -- and it helps the context.  They've agreed to

11:52:25  5    confirm they are not withholding as irrelevant emails about

11:52:31  6    ItsOn and Headwater patents or problems with ItsOn's

11:52:33  7    software.  So that's good.  That's along the lines of what

11:52:35  8    I was talking about.

11:52:37  9    But for some reason, they are unwilling to agree

11:52:41  10   to No. 1.  Let's start with that.  Headwater is not

11:52:44  11   withholding any ESI that both hit on our term -- we're not

11:52:48  12   asking for new search, we're just within the initial corpus

11:52:52  13   that hit and should have hit, you know, middle of last

11:52:55  14   year -- but that also includes any of the following terms,

11:52:59  15   "patent" or "kernel" or "crash" or "remov*" or "fail*" or

11:53:05  16   "probl*" with the wildcard or "bug."  Right?

11:53:07  17   There is -- has been a theme that's coming out

11:53:13  18   from Headwater in this case that they take issue as to

11:53:18  19   whether ItsOn technology actually caused problems in the

11:53:22  20   phones in which it was installed.  They often suggest the

11:53:25  21   position that the problems experienced by the phones were

11:53:28  22   caused not by ItsOn but were problems caused by something

11:53:32  23   else or that those were not actual problems, they were mere

11:53:37  24   routine issues that all products experienced.

11:53:40  25   On the current record of how hard Samsung has had

11:53:44   1   to fight to simply get the docs hit by its terms and that

11:53:48   2   are indisputably relevant, we do not believe it is proper

11:53:51   3   for Headwater to be making unilateral calls on this issue,

11:53:54   4   and that's why we give them this additional -- these search

11:53:58   5   terms.

11:53:58   6        From our perspective, all they need to do is run

11:54:01   7   these seven terms against the existing corpus of hits and

11:54:04   8   produce the docs they've withheld, if any, and confirm

11:54:07   9   they've done it.

11:54:09  10        Moving quickly to No. 2, yeah, it probably just

11:54:16  11   helps to read through it briefly.  You know, so it's --

11:54:21  12   confirms that ESI that was hit by Samsung's search terms,

11:54:24  13   so same search, and that meet one of the following

11:54:28  14   Conditions A or B.

11:54:30  15        A, that the ESI contains sensitive, personal, or

11:54:34  16   secure financial information that has no relation to the

11:54:37  17   case, which we're willing to take them on their word on

11:54:40  18   that, and does not satisfy No. 1 above.  So No. 1 above is

11:54:46  19   what we think is -- half of the depositions have focused on

11:54:50  20   No. 1 above.

11:54:51  21        And -- or, B, the ESI was hit by the ESI terms due

11:54:57  22   solely to the phrase "Samsung" being present in the footer,

11:55:00  23   and that's one of the points that they've made that there

11:55:03  24   were ultimately hits where Sam -- you know, sent from a

11:55:07  25   Samsung Galaxy phone was the reason for a hit.  And so

11:55:10  1  we're hearing them on that and not the body of the email,

11:55:13  2  and the email does not satisfy 1 above, again, harkening

11:55:18  3  back to, you know, these kinds of documents that -- that we

11:55:23  4  worry are being withheld and want confirmation that they

11:55:28  5  aren't.  So that is -- that is the argument here.

11:55:29  6          THE COURT:  Mr. Kodish, why can't you describe the

11:55:33  7  subject matters that you want to make sure are not being

11:55:38  8  withheld as irrelevant as opposed to insisting on search

11:55:47  9  terms?

11:55:47  10         MR. KODISH:  I'm not certain I understood the

11:55:55  11 question.

11:55:55  12         THE COURT:  Well, I can tell you.

11:55:56  13         MR. KODISH:  Sure.

11:55:57  14         THE COURT:  I do not understand that the purpose

11:55:59  15 of the protocol that we use for searching ESI is to prevent

11:56:06  16 a relevance review by the producing party.  And I don't

11:56:14  17 know if -- if that is what underlies all of this.

11:56:20  18         Obviously, the intent of that ESI order is to try

11:56:26  19 and make more manageable the production, and there are

11:56:32  20 times when the producing party may choose not to review the

11:56:38  21 documents for relevance, but I don't know anything that

11:56:43  22 would prevent the party from doing that.

11:56:48  23         And I think that the way you've approached this in

11:56:51  24 No. 3 makes sense and is something that the Court can

11:56:57  25 supervise, in other words, a determination that a certain

```
11:57:02   1   category is relevant, and therefore, documents that fall

11:57:07   2   within that category should not be withheld as irrelevant.

11:57:11   3         But --

11:57:15   4         MR. KODISH:  Sure.

11:57:17   5         THE COURT:  -- in the first two you are asking the

11:57:19   6   Court to require that there be no relevance review of the

11:57:22   7   production if it hits certain terms.

11:57:24   8         MR. KODISH:  The converse on No. 1, for example,

11:57:29   9   is simply the position that of the docs that were hit by

11:57:35   10  our terms, if they were also hit by the word "kernel" or

11:57:42   11  "crash" or these other terms, that they cannot be

11:57:46   12  irrelevant, that -- that --

11:57:50   13        THE COURT:  Then describe for me what the subject

11:57:53   14  of those documents would be --

11:57:59   15        MR. KODISH:  Yes.

11:58:02   16        THE COURT:  -- that makes it necessarily relevant.

11:58:05   17        MR. KODISH:  Sure.  So the -- one of the main

11:58:08   18  complaints about the ItsOn software is that it caused

11:58:12   19  "kernel panic."  So that's the -- the term of art.  "Kernel

11:58:17   20  panic" is a technical failure of the phones that cause them

11:58:20   21  to blue screen and/or shut down.

11:58:23   22        And so --

11:58:26   23        THE COURT:  Why isn't that covered by your

11:58:29   24  Category 3(b)?

11:58:32   25        MR. KODISH:  It isn't covered -- it isn't
```

11:58:35   1   necessary -- necessarily covered by Category 3(b) because

11:58:39   2   of what has bubbled up in the position taken by both sides,

11:58:43   3   which is that Headwater has repeatedly in its testimony

11:58:48   4   tried to impart its message that, oh, a kernel panic that

11:58:53   5   happened on this phone, that really wasn't caused by ItsOn

11:58:57   6   technology.  It was caused by something else.  Or a bug

11:59:00   7   that happened on that phone, though it may have been a

11:59:04   8   function of ItsOn technology, it's completely mundane,

11:59:09   9   routine, and unremarkable.

11:59:11   10        And so they -- they have, you know, messaged to us

11:59:15   11   how they have a different view of what a problem is caused

11:59:19   12   by ItsOn software.  And we think that given the low bar of

11:59:24   13   relevance, we're talking about a technology, it is the

11:59:27   14   thrust of their -- of their case.  The first 45 paragraphs

11:59:31   15   of every complaint they filed against every Defendant is

11:59:37   16   inextricably intertwined with championing this ItsOn

11:59:41   17   technology that they say was so --

11:59:42   18        THE COURT:  So why can't you either make that

11:59:45   19   Category 3(c) or put an addition to 3(b) that says:

11:59:51   20   Including kernels or crashes or --

11:59:54   21        MR. KODISH:  We can absolutely -- so I certainly

11:59:57   22   confess there's opportunity to improve the verbiage.  We

12:00:04   23   could absolutely make -- add one as to a Part C and add

12:00:11   24   those subterms.

12:00:12   25        And, again, this is not a new search.  This is

| | | |
|---|---|---|
| 12:00:14 | 1 | just documents within their existing corpus. |
| 12:00:16 | 2 | THE COURT:  All -- all I would be doing -- I can |
| 12:00:19 | 3 | rule on whether or not documents that hit on these search |
| 12:00:25 | 4 | terms and are within a certain subject matter are relevant |
| 12:00:29 | 5 | or not.  And I don't mind making that determination, but |
| 12:00:34 | 6 | I'm not going to say that they can't do a relevance |
| 12:00:40 | 7 | evaluation if certain search terms are hit. |
| 12:00:54 | 8 | MR. KODISH:  Well, so did I sufficiently explain |
| 12:00:57 | 9 | the basis with the word "kernel," the word "crash," if |
| 12:00:59 | 10 | that's where you're at, the word "fail"?  It's all driven |
| 12:01:04 | 11 | by that -- that major theme in this case about -- |
| 12:01:07 | 12 | THE COURT:  Well, what I'm -- would like to do is |
| 12:01:11 | 13 | allow you to see if you can negotiate a subject matter that |
| 12:01:18 | 14 | is agreeable to the other side and that covers the concerns |
| 12:01:23 | 15 | that you have.  And if this is the last thing, then we can |
| 12:01:29 | 16 | just take a short break, give you a chance to do that, come |
| 12:01:32 | 17 | back, and resolve this.  If there is more, then we can just |
| 12:01:37 | 18 | break for lunch. |
| 12:01:40 | 19 | Are there other motions that need to be addressed |
| 12:01:43 | 20 | besides what we're dealing with now? |
| 12:01:47 | 21 | MR. KODISH:  Yeah, there -- there are two -- two |
| 12:01:49 | 22 | more, and they're -- well, yeah, they're kind of subparts |
| 12:01:51 | 23 | of motions at this point. |
| 12:01:53 | 24 | THE COURT:  Well, then we'll go ahead and take the |
| 12:01:57 | 25 | lunch recess until 1:15 and ask you during that recess to |

| | | |
|---|---|---|
| 12:02:02 | 1 | see if you can reach an agreement on that. |
| 12:02:05 | 2 | And even if you don't reach an agreement, I need |
| 12:02:08 | 3 | you to describe it in a way that I can then hear argument |
| 12:02:12 | 4 | on and rule up or down as to whether it's relevant. |
| 12:02:15 | 5 | MR. KODISH:  Understood.  Thank you, Your Honor. |
| 12:02:16 | 6 | THE COURT:  Okay.  All right.  We'll be in recess |
| 12:02:20 | 7 | until 1:15. |
| 12:02:22 | 8 | COURT SECURITY OFFICER:  All rise. |
| 12:02:22 | 9 | (Recess.) |
| 12:02:23 | 10 | COURT SECURITY OFFICER:  All rise. |
| 01:13:27 | 11 | THE COURT:  Good afternoon.  Please be seated. |
| 01:17:13 | 12 | Let me see, and I think -- was it -- Mr. Kodish, |
| 01:17:23 | 13 | you're up. |
| 01:17:24 | 14 | MR. KODISH:  Thank you, Your Honor.  Again, Thad |
| 01:17:28 | 15 | Kodish for Samsung. |
| 01:17:29 | 16 | And we're talking about the ESI motion, which is |
| 01:17:33 | 17 | Docket 96.  Per your request, we did have a discussion -- a |
| 01:17:41 | 18 | meet and confer at the beginning of the break trying to |
| 01:17:45 | 19 | hone in on what really seems to be a disconnect about the |
| 01:17:50 | 20 | parties' perspective on the relevance review. |
| 01:17:56 | 21 | You know, just to reset, what happened in this |
| 01:18:00 | 22 | discussion is essentially Mr. Tsuei representing they've |
| 01:18:02 | 23 | produced all the problems about the phones -- you know, the |
| 01:18:09 | 24 | phone's kernel, that's --- at least that's what we're |
| 01:18:11 | 25 | taking them as having -- as having done, but yet they won't |

01:18:18   1   represent that they produced all the docs that hit on our

01:18:22   2   terms and that have the word "kernel," right, as our

01:18:27   3   Category 1 request, you know, would -- would address.

01:18:32   4        And so we're trying to figure out, well, you know,

01:18:36   5   why is that?  And they -- they really lead with you are --

01:18:43   6   you, Samsung, are asking us to run an entire new search, an

01:18:50   7   entire new relevance review.

01:18:52   8        THE COURT:  Mr. Kodish --

01:18:53   9        MR. KODISH:  Yes.

01:18:54   10        THE COURT:  -- I hate to interrupt you.

01:18:54   11        MR. KODISH:  Sure.

01:18:56   12        THE COURT:  But I asked you to do something fairly

01:18:59   13   specific over the break, and that is to come up with a

01:19:01   14   description of the category of documents that you want to

01:19:04   15   make sure are not being withheld as irrelevant.

01:19:08   16        MR. KODISH:  So we did that.

01:19:09   17        THE COURT:  Okay.

01:19:10   18        MR. KODISH:  We did that.

01:19:12   19        THE COURT:  Tell me.

01:19:13   20        MR. KODISH:  And, yeah, we used the lunch break

01:19:14   21   after we talked to do that, and just we've been sitting

01:19:18   22   here in the room, and we've provided just a few minutes

01:19:21   23   ago -- I don't -- I doubt they've had a chance to fully

01:19:23   24   digest it, but we've identified six requests.

01:19:29   25        You know, this is probably not really knowing what

01:19:31    1    it is that's being withheld as relevant --

01:19:34    2            THE COURT:  Do you have those written down

01:19:35    3    somewhere?

01:19:36    4            MR. KODISH:  I have it in email form.  I can read

01:19:39    5    it into the record.

01:19:41    6            What would be best?

01:19:43    7            THE COURT:  Why don't you email it to

01:19:48    8    Mr. Scheufler here, and he can print it, and we'll have it.

01:20:01    9            MR. KODISH:  Okay.

01:20:02    10           THE COURT:  And I tell you what, while we're

01:20:06    11    waiting for that, I will -- we'll take a break so we can

01:20:11    12    print that out, and I would ask that if you haven't already

01:20:15    13    done so, that you email it to Plaintiff's counsel as well.

01:20:18    14           MR. KODISH:  We did.

01:20:19    15           THE COURT:  Good.  Then we can all be looking at

01:20:22    16    it together, and I won't have to take it down.

01:20:26    17           All right.  We'll take a short recess.  Thank you.

01:20:28    18           COURT SECURITY OFFICER:  All rise.

01:20:29    19           (Recess.)

01:20:30    20           COURT SECURITY OFFICER:  All rise.

01:20:30    21           THE COURT:  Thank you.  Please be seated.

01:25:50    22           All right.  Mr. Kodish, thank you.  I have your

01:25:54    23    six-part email in front of me.

01:25:56    24           MR. KODISH:  Great.  So would you like me just to

01:25:58    25    address some context of each one, or how would you prefer

01:26:03   1   we proceed?

01:26:03   2        THE COURT:  Let me hear first any objections to

01:26:06   3   that, and then you can focus your arguments where there may

01:26:10   4   be an objection.

01:26:12   5        MR. TSUEI:  I'm not sure I would quite -- sorry,

01:26:15   6   James Tsuei for Headwater.

01:26:16   7        I'm not sure I'd quite put this as an objection,

01:26:20   8   but I'll note that the requests that Samsung counsel sent

01:26:22   9   over and which we received recently don't appear to be

01:26:26   10  tied, strictly speaking, to the motion that I think we've

01:26:30   11  been discussing on the record, that is --

01:26:34   12       THE COURT:  Well, why don't -- if you would go to

01:26:36   13  the podium.

01:26:38   14       And what I really want to hear is if you object to

01:26:41   15  any of these.  If you don't, then I will just go with them.

01:26:46   16  If you object to them, let me hear your objection.

01:26:50   17       MR. TSUEI:  Okay.  So, Your Honor, if I'm

01:27:01   18  understanding the assignment correctly, we're to treat

01:27:05   19  these six requests as, let's say, additional or new

01:27:09   20  requests for documents, and then you want Headwater's

01:27:11   21  position on whether or not production should be made?

01:27:13   22       THE COURT:  No.  The treatment of these six

01:27:18   23  categories would be as additions to Paragraph 3 of the

01:27:28   24  document we were dealing with as the resolution of this

01:27:35   25  motion.  And it's my understanding that what we're talking

01:27:38  1   about here is that the Plaintiff would confirm that it is

01:27:42  2   not withholding as irrelevant any emails that hit on the

01:27:51  3   search terms but are reviewed for relevance.

01:27:56  4        So this -- these would just be subsets of

01:28:02  5   documents that hit on the search terms and just a

01:28:07  6   representation that none of those that fall within these

01:28:12  7   categories are being withheld from production on the basis

01:28:17  8   of relevance.

01:28:18  9        MR. TSUEI:  Thank you, Your Honor.  I think

01:28:21  10  that -- that clears up my -- my misunderstanding of the

01:28:24  11  assignment.

01:28:24  12       So, yeah, happy to go through these six things and

01:28:27  13  treat them as if they are potential -- I guess additional

01:28:34  14  conditions on the agreement that is set forth in Subpoint 3

01:28:37  15  of Samsung's email stipulating to conditions that they want

01:28:42  16  us to make.

01:28:42  17       THE COURT:  That's correct.

01:28:42  18       MR. TSUEI:  Okay.  So the first category is

01:28:44  19  Documents Concerning the ItsOn's Technology Referenced in

01:28:48  20  Headwater's Complaint.

01:28:50  21       I think I would object.  I think we would object

01:28:53  22  to that given the overbreadth of I guess what it means for

01:28:56  23  documents to concern the ItsOn technology referenced in

01:28:59  24  Headwater's complaint.  But it may be a moot point because

01:29:03  25  it's our understanding that we've already produced all

01:29:05   1   documents relating to ItsOn's technology that's discussed

01:29:08   2   in the complaint.

01:29:10   3        So to get to the sort of $64,000 question, is

01:29:15   4   Headwater willing to agree to in writing that it's searched

01:29:19   5   for documents fitting this category based on the hits from

01:29:25   6   the search terms proposed by Samsung --

01:29:27   7        THE COURT:  Well, it's a little different than

01:29:29   8   that.  It's that you're not withholding from production

01:29:33   9   documents that hit on those terms and that fall within this

01:29:38   10  category.

01:29:39   11       MR. TSUEI:  Yes, Your Honor.  I think we can do

01:29:41   12  that.  It's my understanding that we, in fact, have done

01:29:43   13  that already throughout the life of the case.

01:29:47   14       THE COURT:  All right.  Take a look at the others

01:29:52   15  and see if you feel the same way about them.

01:29:54   16       MR. TSUEI:  Of course, Your Honor.

01:29:55   17       So going to No. 2 in Mr. Graubart's email,

01:29:59   18  Documents Concerning ItsOn's Relationship With Samsung.

01:30:03   19       We can confidently say on the record that we have,

01:30:06   20  to our understanding, produced all non-privileged documents

01:30:08   21  and communications and emails that we've seen from the ESI

01:30:11   22  searches relating to ItsOn's relationship with Samsung.

01:30:16   23       THE COURT:  All right.

01:30:19   24       MR. TSUEI:  Going to No. 3, Documents Concerning

01:30:22   25  Valuations of Headwater Patents.

01:30:26   1     Without saying whether or not we object, I think
01:30:28   2     one ambiguity that causes some pause on us to take a
01:30:32   3     position on this is what it means for something to concern
01:30:35   4     a valuation of Headwater's patents.  And just with full
01:30:39   5     candor, Your Honor, this is an issue that the parties have
01:30:42   6     discussed in the past, that is, specifically what it means
01:30:44   7     for a document to be a valuation of the patents.
01:30:48   8         THE COURT:  I would interpret concerning in this
01:30:50   9     context to mean discussing.  In other words, not that
01:30:55   10    there's some tangential argument that this could affect the
01:31:00   11    valuation but that there are documents that discuss the
01:31:06   12    valuation.
01:31:06   13        MR. TSUEI:  Sure.  Okay.  So let's take that as a
01:31:09   14    first step, documents discussing valuations of the patents
01:31:12   15    or the patent portfolio or something similar to that
01:31:15   16    effect.
01:31:15   17         I think the answer is yes.  And we've put this in
01:31:21   18    our briefing at least several times now.  We have produced,
01:31:24   19    as far as we can tell, all non-privileged documents
01:31:27   20    concerning the valuations of Headwater's patents.
01:31:30   21         There is an additional wrinkle, Your Honor, caused
01:31:33   22    by some of the events that have transpired today, namely
01:31:38   23    your Court's finding -- Your Honor's finding that there's
01:31:39   24    been a waiver as to the -- let's call it the Headwater
01:31:44   25    valuation of the InterDigital deal.  And that, of course,

01:31:48    1    can also encompass a value of the patent or some set of

01:31:51    2    patents or the patent family writ large.

01:31:54    3         You know, as I said on the record, Your Honor,

01:31:57    4    earlier today, you know, we understand what Dr. Raleigh

01:31:59    5    said, but we looked for specifically and are not aware of

01:32:03    6    any documents even fitting that description.  If, you know,

01:32:07    7    they want to ask Dr. Raleigh about it during trial and say,

01:32:10    8    did you ever discuss this with attorneys, and they can

01:32:14    9    probably learn the answer, which was there's nothing

01:32:17    10   written, but it was a discussion with attorneys.

01:32:23    11        THE COURT:  All right.  So --

01:32:27    12        MR. TSUEI:  With those caveats then, Your Honor, I

01:32:29    13   think Headwater would be willing to agree to represent that

01:32:32    14   they've produced all documents -- non-privileged documents

01:32:36    15   concerning valuations of Headwater patents.

01:32:38    16        THE COURT:  And the caveat is that you're going to

01:32:40    17   look and see if there are any others in view of the ruling

01:32:46    18   as to privilege?

01:32:47    19        MR. TSUEI:  I think that's fair to say, Your

01:32:50    20   Honor.  We'll relook to see if there are any -- let's call

01:32:54    21   them attorney analyses of the value of the portfolio with

01:32:58    22   respect to the InterDigital deal, whether or not it relates

01:33:01    23   to the equity, and we can find if any exist.  And if they

01:33:06    24   exist and fall under the waiver the Court -- Your Honor has

01:33:08    25   found, then we'll produce them.

01:33:10   1          THE COURT:  All right.

01:33:21   2          MR. TSUEI:  So if there's nothing else on No. 3,

01:33:23   3   we can turn to No. 4, which is documents concerning the

01:33:27   4   accused features in Headwater's infringement contentions.

01:33:30   5          Sitting here today, I'm not aware that any

01:33:40   6   documents have been withheld fitting this description on

01:33:42   7   the basis of relevance or non-relevance.  I'm not sure if

01:33:46   8   there is a basis for Samsung to believe otherwise, and, you

01:33:50   9   know, if they do, I'd invite them to explain why.

01:33:56  10          THE COURT:  Well, the important thing for the

01:34:00  11   present discussion is whether you can agree that you will

01:34:05  12   not withhold such documents from production if they

01:34:16  13   otherwise hit the terms in the ESI order.

01:34:24  14          MR. TSUEI:  If there are non-privileged hits, Your

01:34:27  15   Honor, yes, we can represent that.  We would not withhold

01:34:31  16   them as irrelevant.  And, again, just to clarify, it's our

01:34:34  17   belief that we have, in fact, produced all such documents

01:34:37  18   in the case.

01:34:38  19          THE COURT:  My understanding of the next one is

01:35:05  20   that there is some settlement license with Sprint.

01:35:09  21          MR. TSUEI:  Negative, Your Honor.  That's not

01:35:11  22   quite right.

01:35:12  23          So maybe a little bit of background would be

01:35:16  24   helpful, just for the record.

01:35:17  25          Sprint was one of ItsOn's, I guess, biggest

01:35:21    1    accounts in terms of telco partners they were working with,

01:35:25    2    with the ultimate goal to get ItsOn applications preloaded

01:35:30    3    onto phones that were being retailed through Sprint, either

01:35:34    4    through its website or the brick-and-mortar stores that

01:35:39    5    they were, you know, operating at the time.

01:35:40    6            And as a part of this process, both ItsOn and

01:35:44    7    Headwater were involved in trying to make sure that such

01:35:47    8    Sprint's phones that did come preloaded with ItsOn's

01:35:51    9    software were properly marked with, you know, this or that

01:35:54   10    patent number or contained a link to a virtual marking

01:35:58   11    page.  And I believe that's what Samsung is looking for.

01:36:00   12    And if so, then I'm happy to talk about that.

01:36:03   13            THE COURT:  Well, I guess the question is, is --

01:36:05   14    are such documents, documents that the Plaintiff believes

01:36:14   15    would be irrelevant and, therefore, withheld from

01:36:17   16    production on that ground?

01:36:18   17            MR. TSUEI:  No, Your Honor.  We don't believe that

01:36:20   18    documents in this category would be not relevant to any

01:36:23   19    claim or issue in the case.  And that's why we've produced

01:36:27   20    all of them already.

01:36:28   21            THE COURT:  All right.  So that one is not

01:36:31   22    problematic.

01:36:31   23            What about the last one?

01:36:33   24            MR. TSUEI:  The last one does require some

01:36:35   25    unpacking, Your Honor.  So, unfortunately, I respectfully

01:36:39    1    ask that the parties and your Court bear with me.

01:36:42    2          So Qualcomm is, as the Court knows, a very large

01:36:47    3    technology firm.  They've had discussions and dealings

01:36:51    4    with, you know, the parties in this case, both Samsung,

01:36:54    5    ItsOn, and Headwater throughout the past 10, 15 years.

01:36:57    6          Some communications between Headwater and Qualcomm

01:37:02    7    have been produced in this case.  Others have not.  And I

01:37:06    8    think I can divide that set of documents into two

01:37:12    9    categories.

01:37:12    10          The first category will be quick, which is in

01:37:16    11    2022, there was a very brief discussion between Headwater

01:37:19    12    and Qualcomm concerning whether or not Qualcomm, you know,

01:37:23    13    could buy the patents.  And there was an offer letter sent

01:37:27    14    from Qualcomm to Headwater.  It was not accepted.  But

01:37:29    15    there were emails back and forth between, you know,

01:37:32    16    Headwater and Qualcomm about this offer, all of which we've

01:37:36    17    produced.

01:37:37    18          The second set of documents that, you know, quote,

01:37:42    19    unquote, concern Qualcomm would be documents and

01:37:46    20    communications between Headwater and Qualcomm in a much

01:37:49    21    earlier time frame, in 2017 when Qualcomm and Headwater

01:37:53    22    were in -- you know, if I can say, a deep discussion about

01:37:57    23    the potentially setting up a partnership or joint venture

01:38:01    24    or even an acquisition with some sort of backend relating

01:38:05    25    to the enforcement of the patents going forward once the

01:38:08    1    deal had been done.

01:38:09    2         So as you might imagine, there were communications

01:38:11    3    back and forth regarding claim charts, infringement reads,

01:38:15    4    and so on.  And those documents have been withheld in this

01:38:18    5    case and have been properly logged as far as I understand.

01:38:21    6         THE COURT:  They've been withheld as privileged or

01:38:25    7    irrelevant?

01:38:26    8         MR. TSUEI:  Withheld as privileged, and we've

01:38:28    9    identified those documents in Headwater's privilege log.

01:38:35    10        THE COURT:  All right.  So it would be fair to

01:38:37    11   say, then, that you're not withholding any of those

01:38:42    12   documents as irrelevant?

01:38:44    13        MR. TSUEI:  I think that's right, Your Honor.  And

01:38:47    14   if I could just add one more thing, it's come to my

01:38:50    15   attention -- someone has quite helpfully reminded me we've

01:38:55    16   produced also a number of communications between Qualcomm

01:38:58    17   and Headwater from a much earlier time frame -- in the

01:39:02    18   2009/2010 time frame.  If I recall correctly, it was about

01:39:09    19   a potential business deal between the companies.  We've

01:39:11    20   produced those as well.

01:39:12    21        But to answer Your Honor's ultimate question, if

01:39:15    22   we're withholding anything as irrelevant, I believe the

01:39:18    23   answer is no.  And we can make that representation in

01:39:20    24   writing.

01:39:23    25        THE COURT:  All right.  So then my takeaway from

01:39:29  1  this discussion, Mr. Tsuei, is that you do not object to

01:39:36  2  including those Categories 1 through 6 in the -- to the

01:39:45  3  3(a) and (b) that were agreed to previously?

01:39:47  4      MR. TSUEI:  Certainly we are not saying that we're

01:39:51  5  withholding documents in these categories as irrelevant.  I

01:39:55  6  think -- pursuant to our discussion, I think that's right.

01:39:58  7      THE COURT:  Okay.  Well, I think that should work,

01:40:04  8  but I will give Mr. Kodish a chance to explain any issues

01:40:09  9  he sees that remain.

01:40:10  10      MR. KODISH:  No, that sounded -- that sounded like

01:40:14  11  good progress.

01:40:14  12      The only thing that I heard at least once was

01:40:17  13  sitting here today, he doesn't believe -- Headwater doesn't

01:40:22  14  believe that it's withholding.  So I would ask that we

01:40:25  15  receive a written confirmation that no docs, in fact, of

01:40:29  16  the withheld population waft into the -- these six request

01:40:35  17  areas.

01:40:35  18      THE COURT:  Well, I'm -- I'm going to put it in

01:40:38  19  the order that in the resolution of this motion, Headwater

01:40:44  20  confirmed that it was not withholding as irrelevant any of

01:40:50  21  these eight categories, the 3(a) and (b), and then the six

01:40:56  22  that we've just gone through.

01:40:59  23      MR. KODISH:  Sure.  It's a question that we've

01:41:03  24  been asking for months, which is we would like to know how

01:41:08  25  many docs are being withheld, so that would be an

01:41:12  1  additional ask of our hit document population.

01:41:17  2         THE COURT:  And what would be the theory by which

01:41:22  3  they'd have that obligation?

01:41:25  4         MR. KODISH:  To be able to assess the degree of

01:41:30  5  relevant withholding that's ongoing.  You know, when we

01:41:37  6  receive -- we received search terms from them, many of

01:41:42  7  which triggered hundreds of thousands if not millions of

01:41:45  8  hits, we got on the phone with them, we wrote them, we told

01:41:49  9  them here's a problem.  It has -- you know, we have all

01:41:52  10  these hits as it's generating irrelevant stuff.  You don't

01:41:54  11  want this -- and we -- and we can't review two million

01:41:59  12  hits, you know, that have this.  And we've just never

01:42:01  13  gotten any feedback like that --

01:42:05  14         THE COURT:  Of course, you did that because you

01:42:07  15  were trying to get them to change the search terms.

01:42:11  16         MR. KODISH:  Yes, correct.

01:42:12  17         THE COURT:  If you had accepted their search

01:42:15  18  terms, you wouldn't have had to have had that discussion.

01:42:19  19         But anyway...

01:42:20  20         MR. KODISH:  That's fair, Your Honor.  So much of

01:42:23  21  this is wound up in the burden that -- that is purportedly

01:42:29  22  being undertaken to obtain relevant documents.  But we just

01:42:34  23  want to respond to that and understand what the burden is.

01:42:36  24         There are three more cases coming from -- that

01:42:39  25  they filed.  We're going to be here again trying to figure

01:42:43  1  that out.  It just doesn't feel like an onerous thing to

01:42:47  2  express.  But that's our request humbly.  We understand...

01:42:53  3      THE COURT:  All right.  I understand that.  I am

01:42:55  4  not going to include that in the order, however.

01:42:57  5      MR. KODISH:  Understood, Your Honor.

01:42:58  6      THE COURT:  What's next?

01:42:59  7      MR. KODISH:  All right.  Two left.

01:43:06  8      We are pivoting to Docket 116, and that is a

01:43:21  9  privilege motion.

01:43:23  10      And from our status report, we provided the

01:43:26  11  Court -- you understand that this is a two-issue motion.

01:43:30  12  The first issue has been resolved by virtue of Headwater

01:43:35  13  agreeing ultimately to reproduce the document that it

01:43:41  14  clawed back at the Dave Johnson deposition.  So that is

01:43:46  15  resolved to that extent.

01:43:46  16      The second issue remains, which concerns the

01:43:52  17  waiver as to pre-suit communications regarding suing or

01:43:57  18  approaching Samsung.

01:43:59  19      Do you have it in front of you?

01:44:04  20      THE COURT:  I do.

01:44:06  21      MR. KODISH:  I don't want to be presumptive.

01:44:06  22      All right.  So the context.  What's this about?

01:44:10  23      Dr. Raleigh at his November 15th, 2023 deposition

01:44:15  24  put at issue and waived the privilege concerning advice

01:44:18  25  that counsel gave Headwater in 2016 through 2018 about

01:44:24  1  litigation strategy as to Samsung, specifically strategic

01:44:30  2  decisions as to when to sue Samsung and why it

01:44:34  3  intentionally chose not to inform Samsung of any alleged

01:44:38  4  patent infringement prior to its filing of the 2022

01:44:42  5  complaint.

01:44:44  6      For several reasons, we asked the Court to order

01:44:47  7  that Headwater waive the privilege over its pre-filing

01:44:51  8  communications about that subject matter.

01:44:57  9      First reason, as argued in Headwater's brief,

01:45:01  10  Paragraph 1 on this subject, their lead argument is that

01:45:05  11  Dr. Raleigh was a 30(b)(1) witness, and that somehow he,

01:45:10  12  the long-time CEO of Headwater, could not waive the

01:45:15  13  company's privilege.

01:45:16  14      That is undermined even further by the fact that

01:45:23  15  Headwater later agreed with Samsung to designate the

01:45:26  16  testimony from that very day as 30(b)(6) testimony of

01:45:30  17  Headwater.

01:45:36  18      Second, Dr. Raleigh's quoted deposition testimony

01:45:40  19  in Pages 2 to 3 of Samsung's opening brief speaks for

01:45:43  20  itself.  And I don't have a handy slide on it, but if you

01:45:50  21  have the briefing, it's there.  It's not too long.  It's

01:45:54  22  about a little over a page total.  That testimony is about

01:45:57  23  the advice that Headwater received concerning the risks of

01:46:01  24  confronting or suing Samsung, and it is the divulging of

01:46:09  25  privileged communications.

01:46:10    1          Dr. Raleigh explained that Headwater wanted to

01:46:14    2    avoid IPRs, they wanted to avoid declaratory judgment

01:46:18    3    actions, and try to secure a safe harbor channel for

01:46:23    4    communications, and to secure litigation funding.  And he

01:46:28    5    explained that throughout 2016 and -- to 2018, Headwater

01:46:33    6    had discussions with counsel about suing Samsung.  And he

01:46:39    7    lists the counsel that he had these discussions with on the

01:46:46    8    top of Page 3, and they were Irell & Manella, Tensegrity,

01:46:54    9    Caldwell Cassady.

01:46:57    10         Now, it's no help to Headwater that they cite some

01:47:04    11   Raleigh qualifying testimony stating the purported

01:47:08    12   intention not to waive the privilege because from what he

01:47:12    13   said, he went ahead and did it.  No different than when a

01:47:16    14   person says, I don't mean any offense, but insert the

01:47:22    15   offensive comment.

01:47:23    16         It happens.  His counsel was even more on notice

01:47:28    17   of the possibility that a waiver was about to occur.

01:47:32    18   Rather than taking a break to discuss or stopping

01:47:36    19   Dr. Raleigh mid-sentence, he let him give the testimony.

01:47:40    20         Headwater's argument that this level of detail is

01:47:46    21   mere privilege log level of detail, that fails.  The Court

01:47:50    22   has seen today Headwater's privilege log.  We would welcome

01:47:53    23   a privilege log that had this level of detail.  Of course,

01:47:58    24   that -- that's not the case at all.  It doesn't disclose

01:48:02    25   anything resembling the level of detail that Dr. Raleigh

01:48:05  1  provided on the issue of whether and when Headwater was

01:48:09  2  going to sue Samsung back in 2016 to 2018.

01:48:17  3       Third, Headwater is employing, again, classic

01:48:22  4  sword/shield tactics with this privileged assertion.  As

01:48:26  5  we've discussed in earlier motion context today and as

01:48:30  6  their complaint makes plain, they're trying to tell an

01:48:33  7  infringement story with a willfulness component by Samsung.

01:48:40  8       Because Headwater's infringement read in that

01:48:43  9  complaint was based on Android source code that's been

01:48:47  10  publicly available information since 2016 and earlier, we

01:48:51  11  naturally didn't want to be surprised with some explanation

01:48:54  12  at trial on why Headwater waited six years.

01:48:59  13       So we asked Headwater about it.  And Headwater

01:49:04  14  right then and there had a choice to make.  They could have

01:49:09  15  answered that the answer to this question is bound up with

01:49:14  16  discussions with lawyers and, therefore, privileged, and

01:49:19  17  that may well have been the end of the discussion.

01:49:21  18       But they didn't handle it that way.  They decided

01:49:25  19  to try and strengthen their case asking for willful

01:49:29  20  infringement.

01:49:31  21       Dr. Raleigh saw it as an opportunity to draw -- to

01:49:35  22  try and inject sword-like testimony, creating a David

01:49:40  23  versus Goliath narrative that Samsung is one of these big

01:49:43  24  companies that if you take action construed as threatening

01:49:45  25  your patents, that Samsung would put a little company like

| | | |
|---|---|---|
| 01:49:48 | 1 | Headwater out of business with DJ -- declaratory judgment |
| 01:49:53 | 2 | actions and IPRs. |
| 01:49:54 | 3 | THE COURT:  So tell me what you think the most |
| 01:49:58 | 4 | direct testimony from Dr. Raleigh was that is revealing |
| 01:50:06 | 5 | advice of counsel. |
| 01:50:09 | 6 | MR. KODISH:  Sure.  So the -- we know from Page 3. |
| 01:50:12 | 7 | We set the table.  We're in the subject matter of |
| 01:50:18 | 8 | discussions about suing Samsung.  That is -- that is the |
| 01:50:22 | 9 | context. |
| 01:50:23 | 10 | Did you have discussions about suing Samsung? |
| 01:50:26 | 11 | Yes, we had those with lawyers, Irell, Tensegrity, |
| 01:50:34 | 12 | Caldwell Cassady. |
| 01:50:35 | 13 | And at the bottom, he says:  We had them |
| 01:50:36 | 14 | throughout the interim period you're asking about.  We had |
| 01:50:36 | 15 | these discussions. |
| 01:50:37 | 16 | So then we got to -- |
| 01:50:41 | 17 | THE COURT:  You know, where you asked about the |
| 01:50:43 | 18 | lawyers, at least what I'm seeing on Page 3 of Document |
| 01:50:48 | 19 | 116 -- |
| 01:50:48 | 20 | MR. KODISH:  Uh-huh. |
| 01:50:50 | 21 | THE COURT:  -- that was -- the question to him |
| 01:50:52 | 22 | identifies law firms, and his answer is:  I don't know. |
| 01:50:56 | 23 | MR. KODISH:  He's -- he first says:  I don't know. |
| 01:50:59 | 24 | We weren't sure what was going to happen in 2016, so I |
| 01:51:05 | 25 | don't really recall. |

| | | |
|---|---|---|
| 01:51:06 | 1 | And then the question is:  Did you have such |
| 01:51:06 | 2 | discussions in 2017? |
| 01:51:10 | 3 | Answer:  Likely. |
| 01:51:11 | 4 | What about 2018? |
| 01:51:12 | 5 | Answer:  I mean, throughout the interim period |
| 01:51:15 | 6 | you're asking about, we had these discussions. |
| 01:51:19 | 7 | We take this fairly to relate to -- yeah, these |
| 01:51:24 | 8 | three questions and answers, they are all related. |
| 01:51:28 | 9 | THE COURT:  And all of these are asking:  Did you |
| 01:51:30 | 10 | have discussions about suing Samsung? |
| 01:51:33 | 11 | MR. KODISH:  That's right.  Did you have |
| 01:51:34 | 12 | discussions about suing Samsung in 2016 through 2018 with |
| 01:51:40 | 13 | Irell, Tensegrity, or Caldwell Cassady? |
| 01:51:45 | 14 | THE COURT:  And where is the advice of counsel |
| 01:51:47 | 15 | that is being revealed? |
| 01:51:50 | 16 | MR. KODISH:  Right.  So then if we back up to |
| 01:51:52 | 17 | Paragraph -- Page 2 of the brief, so there's a question |
| 01:51:58 | 18 | about a meeting that we won't get into right now with a |
| 01:52:03 | 19 | Mr. Park.  But in response to this question, Dr. Raleigh |
| 01:52:07 | 20 | takes it upon himself to elaborate in additional |
| 01:52:12 | 21 | directions.  You know, did you or anyone else at Headwater |
| 01:52:14 | 22 | reach out to Samsung about potential infringement is the |
| 01:52:17 | 23 | question. |
| 01:52:18 | 24 | Answer:  So I recall discussions, some of which |
| 01:52:21 | 25 | are privileged, discussing trying to establish a safe |

01:52:24    1    harbor of discussion with Samsung where there wouldn't be a

01:52:27    2    threat of a DJ on Headwater.

01:52:29    3        He -- he continues on, and I'm kind of tracking an

01:52:36    4    emphasis to the bold language:  It was risky for us to just

01:52:39    5    say, hey, we think you might be infringing.  That would

01:52:43    6    have been based on the threat of a DJ that would have put

01:52:46    7    the company out of business because we didn't have the

01:52:48    8    funding to handle all the IPRs.

01:52:51    9        THE COURT:  I don't see anything that says that

01:52:54    10    conversation was with counsel.

01:52:56    11        MR. KODISH:  Well, we are making a connection,

01:53:01    12    Your Honor, and we think fairly that the subject matter --

01:53:04    13    if you continue through this, is all about 2016 through

01:53:10    14    2018, considering whether to approach Samsung, threaten

01:53:15    15    patents, or sue them.

01:53:17    16        He explains that it concerned -- that lawyers were

01:53:20    17    involved, right?  He says that some of these discussions,

01:53:26    18    some of which are privileged, and then on what we fairly

01:53:30    19    understand as the same subject matter -- that is continuing

01:53:32    20    on Page 3 -- where he specifically identifies that these

01:53:37    21    privileged discussions that were integrated within this

01:53:40    22    larger discussion were with Irell, Tensegrity, and Caldwell

01:53:46    23    Cassady.  And these concepts that he's discussing, these

01:53:49    24    are legal concepts.  These are legal analyses about

01:53:53    25    strategizing.  Do I file a lawsuit or not?

01:53:56   1         Here are the implications of threatening, right?

01:54:01   2    When you're talking about declaratory judgment, you're

01:54:03   3    talking about a -- kind of a nuanced legal concept that,

01:54:09   4    you know, isn't just common knowledge at a cocktail party.

01:54:11   5    You're talking about, you know, the law that puts you

01:54:15   6    across the threshold of having opened yourself up to

01:54:18   7    getting a declaratory judgment action brought against you.

01:54:21   8         Likewise, when you're talking about IPRs and the

01:54:25   9    prospect that if you bring suit, all your patents will be

01:54:29   10   thrown into these patent proceedings, back in 2016, people

01:54:34   11   are digging in on legal strategy here, and he is revealing

01:54:38   12   it.

01:54:40   13        He's -- he took the opportunity to use that legal

01:54:45   14   advice and that legal strategy to excuse their laying

01:54:50   15   behind the log on public information that is the subject of

01:54:53   16   their infringement case for six years and to also create

01:54:59   17   this visual, as he does in his second answer, you know,

01:55:03   18   what is a DJ?  It's declaratory judgment.  It would be an

01:55:06   19   IPR text.  There's a lot of ways a big company can put a

01:55:10   20   little company that's insufficiently funded out of

01:55:12   21   business, and when they're approached to license patents, a

01:55:14   22   little company believes they are infringed.

01:55:16   23        So now he has, you know, in his mind helped

01:55:19   24   himself to be able to tell this story about why he

01:55:24   25   waited -- entered into discussions with counsel during --

01:55:27    1          THE COURT:  Mr. Kodish, I think what you lack here

01:55:30    2    is anything that makes clear that any part of this came

01:55:35    3    specifically from a discussion with counsel.  The most

01:55:41    4    direct thing you have is the question that is in the middle

01:55:48    5    portion of Page 3:  Did you have any discussions with these

01:55:54    6    identified law firms about suing Samsung?

01:55:57    7          And so he has revealed that he had discussions

01:56:00    8    about suing Samsung.  The rest of that that has all the

01:56:05    9    detail you're talking about, I don't see that as clearly

01:56:10    10   linked to a communication with counsel.  There are lots of

01:56:15    11   people in the business world who have knowledge about all

01:56:19    12   of the things you've pointed to.  And I -- I don't think

01:56:24    13   there's an adequate basis there to find a waiver of the

01:56:29    14   privilege.

01:56:30    15         MR. KODISH:  Thank you, Your Honor.  And I

01:56:32    16   understand that -- I understand that description.

01:56:35    17         If I could, you know --

01:56:40    18         THE COURT:  Go ahead.

01:56:40    19         MR. KODISH:  -- there's another interesting fact

01:56:44    20   that, you know, bears on this, and it relates to the patent

01:56:48    21   marking defense that Samsung has in this case.  And, you

01:56:55    22   know, in a nutshell, Headwater is -- is in part trying to

01:57:02    23   make a marking -- save their marking problems by describing

01:57:06    24   a conversation that took place between Dr. Raleigh and a

01:57:13    25   retired engineer at Samsung in 2016.  And that's this

| | | |
|---|---|---|
| 01:57:16 | 1 | Mr. Park you see in the first question. |
| 01:57:19 | 2 | And they have hit it very hard that there is -- |
| 01:57:26 | 3 | there was a verbal conversation that put Headwater -- |
| 01:57:30 | 4 | excuse me, Samsung on notice of patents, on notice of the |
| 01:57:33 | 5 | ItsOn website that had patents.  This whole discussion |
| 01:57:37 | 6 | about how Dr. Raleigh told Samsung all about the patents, |
| 01:57:44 | 7 | which is directly at odds with what's being described here. |
| 01:57:50 | 8 | Apparently, Dr. Raleigh had no understanding of |
| 01:57:53 | 9 | this -- of these perils because just in 2016 himself, as |
| 01:58:00 | 10 | he's made plain in this case, and they will not deny it, |
| 01:58:05 | 11 | their position in interrogs and testimony is that he went |
| 01:58:08 | 12 | and told Mr. Park all about the patents and enough for them |
| 01:58:13 | 13 | to be on notice of it and where the marking was and all |
| 01:58:15 | 14 | that. |
| 01:58:15 | 15 | So he didn't know.  He did not know based on that |
| 01:58:20 | 16 | or did -- and it looks like this legal advice that he's |
| 01:58:24 | 17 | reporting here on Page 2 was, I suppose, a new course of |
| 01:58:31 | 18 | conduct.  But he didn't -- he didn't know it as he rolled |
| 01:58:38 | 19 | into the discussion of this communication. |
| 01:58:39 | 20 | THE COURT:  What does this have to do with waiver |
| 01:58:41 | 21 | of privilege? |
| 01:58:42 | 22 | MR. KODISH:  Well, it certainly has to do with -- |
| 01:58:44 | 23 | it has to do with fairness and the believability that he |
| 01:58:48 | 24 | came into this exactly as you supposed, Your Honor, that |
| 01:58:51 | 25 | this was just business people, non-lawyer know-how, as |

01:58:56  1  opposed to lawyers telling him these legal concepts to

01:59:02  2  inform his strategy.

01:59:03  3       THE COURT:  You know, the fact that a lawyer may

01:59:04  4  have educated his client doesn't mean that when the client

01:59:10  5  later demonstrates the familiarity with what the lawyer has

01:59:16  6  been telling him, that that waives the privilege.

01:59:22  7       Are you suggesting that because Dr. Raleigh was

01:59:28  8  first introduced to what a DJ is by a lawyer, that he is

01:59:33  9  waiving the privilege when he later talks about DJs?

01:59:36  10      MR. KODISH:  I'm -- I'm not suggesting that.  I'm

01:59:40  11  suggesting that the combination of these two passages, you

01:59:46  12  know, we read as reasonably understood to be related, that

01:59:50  13  he's revealing the communications with these firms, but I

01:59:55  14  understand Your Honor is not seeing it that way.

01:59:57  15      So I don't know if I have anything new to say that

02:00:00  16  would be interesting to you.

02:00:01  17      THE COURT:  You understand correctly.  And I'll --

02:00:04  18  I'll deny the portion of the motion in Document 116 that

02:00:14  19  claims a waiver of privilege.

02:00:17  20      MR. KODISH:  All right.  We have one issue left,

02:00:22  21  Your Honor, and that is Docket 136.

02:00:24  22      And as we informed in the status report, this one

02:00:37  23  has been trimmed a decent amount, which is great.  But

02:00:42  24  there are 10 interrogatories that we still have a complaint

02:00:51  25  about that we're asking for essentially a narrative

02:00:56  1    response.

02:00:58  2          So, you know, I can put it pretty succinctly, and

02:01:04  3    then I can take them one-by-one, but --

02:01:10  4          THE COURT:  Where would I find the

02:01:12  5    interrogatories?

02:01:12  6          MR. KODISH:  Oh, oh, sure.  So there's an exhibit

02:01:16  7    to the -- to the brief, but based on page limits, you know,

02:01:21  8    we couldn't -- we couldn't fit them all in.

02:01:23  9          I have the interrogatories that are at issue with

02:01:30  10   the responses.

02:01:38  11         Thank you.

02:01:49  12         So the summary discussion is this.  For these

02:01:53  13   interrogatories, the response in general that Headwater

02:02:00  14   gave was to point to old depositions, as many as eight or

02:02:09  15   nine depositions, and say look there.  No page numbers, no

02:02:17  16   specifics.  In a few of the instances, they pointed to

02:02:22  17   other interrogatory responses which although those two or

02:02:27  18   three interrogatory responses had some narrative, to be

02:02:35  19   sure, minimally overlapping with what was asked in the rogs

02:02:40  20   here at issue.

02:02:41  21         So the request is that we get a narrative response

02:02:46  22   or, you know, if they're resting on 33(d), they do it with

02:02:50  23   the specificity that the rule requires.  You know, we think

02:02:52  24   the law is pretty clear in this district and beyond that

02:02:55  25   pointing to 10 deposition transcripts for an interrogatory

02:03:02    1    is -- is not acceptable.

02:03:05    2         THE COURT:  Pick out the one of these

02:03:07    3    interrogatories that you think is the most obvious abuse of

02:03:13    4    Rule 33(d) or --

02:03:16    5         MR. KODISH:  Sure.  I haven't really ranked them,

02:03:20    6    but, you know, ItsOn document preservation, No. 19.  We'd

02:03:29    7    like to know what their -- what Headwater knows, and we

02:03:32    8    know those -- we've heard today those companies were pretty

02:03:35    9    tight -- what was -- what is Headwater's knowledge of the

02:03:40    10   ItsOn document preservation.

02:03:42    11        And, you know, we have just -- they said:  They

02:03:47    12   incorporate the entirety of deposition of Dr. Gregory

02:03:51    13   Raleigh -- that's three days of deposition -- of James

02:03:54    14   Harris, who is a person who testified that he never worked

02:03:56    15   for ItsOn.  They then pointed to the full depositions of

02:04:00    16   Jeff Green, James Fitzgerald, and James Lavine, all former

02:04:06    17   employees.

02:04:08    18        And his examples of what happens here, when you go

02:04:09    19   to look at Raleigh's testimony, he testified that when he

02:04:13    20   was in charge of ItsOn, they had a general policy of not

02:04:15    21   destroying stuff.  But others testified that there was no

02:04:19    22   policy to retain things, that they used something called

02:04:22    23   G Suite, Google Docs that could be overwritten.

02:04:26    24        Headwater supplemented this -- this response on

02:04:29    25   April 2nd, citing the exact language in the Raleigh

02:04:35   1   declaration that they submitted regarding Headwater

02:04:37   2   privilege log saying ItsOn's docs went to an ABC company in

02:04:42   3   2018 when it went out of business.  But that -- picking --

02:04:46   4   cherry picking one day at the very end of the lifespan as

02:04:50   5   to what happened to the docs in 2018 is -- is not answering

02:04:54   6   this question, which is for the duration of this company,

02:04:58   7   what was their document retention policy?  There are huge

02:05:02   8   issues in this case about missing documents, specifically

02:05:04   9   from ItsOn.  There are motions pending in regards to that.

02:05:07   10          And, you know, we certainly know from Greg

02:05:07   11  Raleigh's March 14th declaration, he is capable of putting

02:05:14   12  pen to paper and putting a very comprehensive explanation

02:05:19   13  down on something as straightforward as this, but he hasn't

02:05:23   14  done it.

02:05:24   15          So that would be an example.

02:05:26   16          THE COURT:  This interrogatory is directed to

02:05:28   17  Headwater?

02:05:29   18          MR. KODISH:  That's right.

02:05:30   19          THE COURT:  But it's about ItsOn, and you --

02:05:33   20  you're making the interrogatory to Headwater because ItsOn

02:05:37   21  is no longer --

02:05:40   22          MR. KODISH:  Yeah, ItsOn is no -- we subpoenaed

02:05:43   23  them, ItsOn, who -- you know, the Russ August firm accepted

02:05:51   24  a subpoena, and then later said, no, they're defunct, and

02:05:54   25  they -- there's nothing that -- there's no company here to

02:05:55   1   respond to this subpoena.

02:05:56   2          And so, you know, we're directing this at

02:05:59   3   Headwater because of all you've heard about, the fact that

02:06:02   4   ItsOn is center stage in Headwater's case, that for all the

02:06:05   5   reasons that Headwater says that they were intermingled, we

02:06:10   6   want to find out what Headwater's knowledge is.

02:06:12   7          And if Headwater comes back and says, you know, we

02:06:15   8   have no idea what ItsOn's document retention policy is,

02:06:19   9   that will be their answer.  That will be interesting --

02:06:21   10  that would be an interesting answer based on what they've

02:06:23   11  described about the two interrelationship, but we just --

02:06:24   12  we want their answer.  We don't want to be pointed to 10

02:06:29   13  depositions that spanned thousands of pages.

02:06:31   14         THE COURT:  All right.  Let me hear the response

02:06:48   15  to that.

02:06:48   16         MR. TSUEI:  Good afternoon, Your Honor.  James

02:06:49   17  Tsuei for Headwater.

02:06:49   18         So I confess that these issues relating to ItsOn's

02:06:55   19  document retention policy and ItsOn code and ESI and emails

02:06:58   20  is a fresh one because it's central to one of the motions

02:07:01   21  that are currently pending but not set for hearing today

02:07:08   22  and for which Headwater filed an opposition this Monday of

02:07:11   23  this week.

02:07:11   24         So to the extent the Court thinks it would be

02:07:14   25  helpful, it can refer to the parties' papers on that motion

| | | |
|---|---|---|
| 02:07:19 | 1 | as well, for additional factual context to the extent that |
| 02:07:22 | 2 | we don't suss out that context today. |
| 02:07:24 | 3 | So there are a couple of issues with, I think, |
| 02:07:30 | 4 | Mr. Kodish's arguments about Headwater's response to Rog |
| 02:07:35 | 5 | 19.  The first is Headwater is not ItsOn.  And Headwater, |
| 02:07:39 | 6 | as far as I know, I think can't fairly be pegged to have |
| 02:07:43 | 7 | corporate knowledge about ItsOn's document retention |
| 02:07:46 | 8 | policy. |
| 02:07:47 | 9 | Now, as a factual matter, as is borne out in the |
| 02:07:50 | 10 | depo testimony in the case, our understanding is documents |
| 02:07:53 | 11 | just were not destroyed by ItsOn throughout I think the |
| 02:07:56 | 12 | relevant time period.  And when all of the ItsOn assets, |
| 02:08:00 | 13 | including emails and the source code and the compiled code |
| 02:08:02 | 14 | were sold to Sherwood Partners and transferred to Sherwood |
| 02:08:08 | 15 | Partners' -- let's call it the ABC vehicle -- everything |
| 02:08:10 | 16 | was sent over, including physical servers, hard drives, |
| 02:08:13 | 17 | their paper documents, as well as email repositories. |
| 02:08:17 | 18 | THE COURT:  And is that reflected in the |
| 02:08:19 | 19 | depositions that you have mentioned in your response? |
| 02:08:24 | 20 | MR. TSUEI:  I think so, Your Honor.  And this is |
| 02:08:27 | 21 | why I referred the Court to the additional factual context |
| 02:08:30 | 22 | the parties have set out in the currently pending motion |
| 02:08:36 | 23 | for sanctions. |
| 02:08:37 | 24 | THE COURT:  Is there any reason why your response |
| 02:08:41 | 25 | cannot indicate the portions of the depositions that you |

| | | |
|---|---|---|
| 02:08:46 | 1 | contend constitute the knowledge of Headwater on this |
| 02:08:50 | 2 | issue? |
| 02:08:50 | 3 | MR. TSUEI:  Well, we certainly can, although, |
| 02:08:55 | 4 | again, the issue of corporate formalities, I think, should |
| 02:09:00 | 5 | be observed. |
| 02:09:00 | 6 | Now, these individuals who we've identified under |
| 02:09:03 | 7 | 33(d), gave testimony not only in their corporate capacity |
| 02:09:05 | 8 | as representatives of Headwater, but I think in most cases |
| 02:09:07 | 9 | gave their testimony in their capacity as 30(b)(1) |
| 02:09:12 | 10 | witnesses. |
| 02:09:12 | 11 | Now, certainly, I guess Headwater's attorneys can |
| 02:09:15 | 12 | look at that testimony, even if it was given under |
| 02:09:18 | 13 | 30(b)(1), and say this, this, and this is sort of the |
| 02:09:21 | 14 | accurate understanding that Headwater as the corporate |
| 02:09:24 | 15 | entity has about this topic.  And I don't think there's |
| 02:09:26 | 16 | anything preventing us from doing that if that's what the |
| 02:09:30 | 17 | Court thinks is necessary. |
| 02:09:32 | 18 | THE COURT:  I do think that that is appropriate. |
| 02:09:34 | 19 | I think that it is easier for you to know which portions of |
| 02:09:39 | 20 | those depositions you think constitute the knowledge of |
| 02:09:44 | 21 | Headwater about this issue. |
| 02:09:49 | 22 | I understand your point that Headwater, as an |
| 02:09:54 | 23 | entity, may not have much knowledge, but given the overlap |
| 02:10:00 | 24 | in these two entities and the fact that several of these |
| 02:10:04 | 25 | deponents have experience with both, I think that the |

| | | |
|---|---|---|
| 02:10:09 | 1 | appropriate answer is not 33(d), it's to provide a more |
| 02:10:18 | 2 | precise cite to that deposition testimony. |
| 02:10:22 | 3 | Because of the nature of it, I'm -- I would be |
| 02:10:27 | 4 | tempted to order the narrative response that's being asked, |
| 02:10:32 | 5 | but given the fact that it is a different legal entity, I |
| 02:10:39 | 6 | think citing to the depositions is a reasonable response, |
| 02:10:48 | 7 | but I do think you need to cite to page and line that is |
| 02:10:53 | 8 | relevant as opposed to just all of the deposition |
| 02:10:58 | 9 | testimony. |
| 02:10:58 | 10 | MR. TSUEI:  Headwater has got no problem with |
| 02:11:02 | 11 | that, Your Honor.  Fortunately, I think the parties both |
| 02:11:05 | 12 | know what parts of the depositions are relevant since |
| 02:11:09 | 13 | they're in the briefing.  But we'll endeavor to provide an |
| 02:11:12 | 14 | admitted response to Rog 19 along those lines as well. |
| 02:11:17 | 15 | THE COURT:  All right.  Let me turn it back over |
| 02:11:26 | 16 | to Mr. Kodish. |
| 02:11:26 | 17 | MR. KODISH:  Sure.  And rounding out 19, I just -- |
| 02:11:35 | 18 | I'm anticipating them pointing to two completely |
| 02:11:39 | 19 | contradictory pieces of discussion that I wonder how I'm to |
| 02:11:43 | 20 | take that without a narrative to say what actual -- |
| 02:11:47 | 21 | Headwater's understanding is, but... |
| 02:11:49 | 22 | THE COURT:  You can take it as a -- the gift of |
| 02:11:53 | 23 | impeachment. |
| 02:11:53 | 24 | MR. KODISH:  Yeah, yeah, all right.  We like |
| 02:11:57 | 25 | those. |

02:11:57    1          All right.  So ItsOn history and formation was Rog

02:12:05    2    18.  That was the first one.  Headwater cited 30 -- 33(d)

02:12:11    3    of three docs, all of which essentially look the same that

02:12:14    4    are Headwater terminating the license with ItsOn in 2018.

02:12:19    5    And then they incorporate the deposition -- the entire

02:12:22    6    deposition testimony of six people, including people that

02:12:26    7    no longer work for Headwater and a Samsung employee.

02:12:29    8          You know, we -- we want Headwater's position for

02:12:33    9    exactly the reason you stated, Your Honor, that this case

02:12:36   10    is special.  They are taking the position of this

02:12:40   11    interrelationship was critical to the overall case, that it

02:12:45   12    is the -- you know, the centerpiece of their willfulness of

02:12:49   13    some copying story.  And, you know, we want their answers.

02:12:55   14          Greg Raleigh, he knows how to answer this.  He

02:12:58   15    knows how to write the declaration of the interrelationship

02:13:02   16    between Headwater and ItsOn.  He wrote it in that March

02:13:04   17    14th declaration that Mr. Graubart went through in detail.

02:13:07   18          So we would like the ItsOn history and formation

02:13:11   19    to the extent he -- and essentially, he's the only material

02:13:14   20    employee at Headwater -- to the extent he knows it.

02:13:23   21          I could just march through these kind of quickly,

02:13:26   22    or we can go back and forth, whatever you prefer, Your

02:13:29   23    Honor.

02:13:29   24          THE COURT:  I'm looking at 18.

02:13:33   25          MR. KODISH:  Sure.

02:13:34    1        THE COURT:  And what I'm trying to do is figure

02:13:37    2    out whether I think you've done a reasonable job in

02:13:40    3    focusing it on what is relevant to your dispute.

02:13:52    4        Why is the, quote, the nature of ItsOn's

02:13:56    5    businesses since foundation to present day, why is that

02:14:02    6    something that Headwater should have to produce or

02:14:08    7    describe?

02:14:08    8        MR. KODISH:  Well, a number of reasons.  But, you

02:14:16    9    know, one of the things that we, you know, really hit on

02:14:21   10    early, continuously, and have never really gotten a

02:14:24   11    satisfactory understanding of is you read the ItsOn -- the

02:14:28   12    Headwater complaint, you see all of these descriptions,

02:14:31   13    vague descriptions of ItsOn technology, ItsOn IP, ItsOn

02:14:37   14    software, ItsOn proprietary stuff, and you try and nail

02:14:42   15    down, you know, what are they referring to, who came up

02:14:45   16    with it, which one are they saying is practiced by patents,

02:14:51   17    and, you know, it's been extremely difficult to suss out

02:14:55   18    what exactly ItsOn did.

02:14:59   19        In our motion for sanctions, we explained how they

02:15:01   20    never were able to produce the ItsOn source code that is we

02:15:07   21    think their responsibility on the marking defense.  And

02:15:10   22    then, you know, ultimately, so many questions -- you know,

02:15:15   23    we're trying to figure out whether Dr. Raleigh was wearing

02:15:18   24    his ItsOn hat or his Headwater hat.

02:15:21   25        You know, he talks about how he met with Dr. Park

| | | |
|---|---|---|
| 02:15:25 | 1 | in 2016, but he was -- he was there with a group of ItsOn |
| 02:15:29 | 2 | people, but he was also talking about Headwater.  And, you |
| 02:15:33 | 3 | know, all these issues of notice are bound up in -- and |
| 02:15:36 | 4 | just the confusion about what is the delineation between |
| 02:15:40 | 5 | these companies, what was the history of its formation. |
| 02:15:44 | 6 | And, you know, in -- in a reasonably described, not, you |
| 02:15:49 | 7 | know, we did this on Monday, we did this on Wednesday, but |
| 02:15:51 | 8 | a reasonably described understanding of Headwater to meet |
| 02:15:54 | 9 | what's asked in Rog 18. |
| 02:15:58 | 10 | They just simply punted on it.  They just point to |
| 02:16:01 | 11 | six people.  You know, Dan Durig, a Samsung employee, you |
| 02:16:05 | 12 | know, he doesn't have Headwater's knowledge of the |
| 02:16:07 | 13 | formation and history of ItsOn.  They just -- you know, we |
| 02:16:14 | 14 | just take this as them assuming that we wouldn't press |
| 02:16:18 | 15 | this, but we would like something that conforms with the |
| 02:16:23 | 16 | rules.  We think it's understandable. |
| 02:16:25 | 17 | THE COURT:  What you described as coming from |
| 02:16:27 | 18 | Headwater's complaint is meaningful.  I think that if |
| 02:16:32 | 19 | Headwater is going to refer to something as ItsOn |
| 02:16:35 | 20 | technology, that they have an obligation to explain what |
| 02:16:41 | 21 | technology they're referring to. |
| 02:16:43 | 22 | I don't know that a lot of what's in this |
| 02:16:50 | 23 | interrogatory really falls into that.  The structure and |
| 02:16:57 | 24 | evolution and individuals involved in ItsOn seems to me to |
| 02:17:02 | 25 | go well beyond what Headwater would have any obligation to |

| | |
|---|---|
| 02:17:09 | 1 | know.
| 02:17:12 | 2 | MR. KODISH:  You know, I come back to we're
| 02:17:13 | 3 | comfortable with them telling us they don't know the
| 02:17:17 | 4 | answer, and that will be interesting.  And it may waft into
| 02:17:22 | 5 | exactly what you described as the gift of impeachment.
| 02:17:24 | 6 | There's a lot of record that's been made where they ebb and
| 02:17:28 | 7 | flow about knowing a lot and knowing very little.

02:17:31    8        But they had -- these aren't two companies that
02:17:35    9  inhabited different spaces who were attached by occasional
02:17:38   10  phone calls.  They had the same -- they had a common
02:17:41   11  founder, a common CEO, a common CFO, they worked in the
02:17:45   12  same space, they used the same lawyers.  You know, it --
02:17:49   13  you've seen the arguments they've made to protect their
02:17:52   14  communications here today.  And, you know, we think that
02:17:56   15  this is a special relationship, and Headwater should be
02:17:58   16  able to describe what it knows in response to this -- this
02:18:01   17  rog.

02:18:08   18        THE COURT:  All right.  Thank you, Mr. Kodish.

02:18:19   19        MR. TSUEI:  Good afternoon, Your Honor.  James
02:18:20   20  Tsuei for Headwater.

02:18:21   21        Before I go into the specifics of Rog No. 18, I
02:18:26   22  will note, you know, with some concern that the bulk of the
02:18:30   23  interrogatory responses that concern the rogs that Samsung
02:18:34   24  believes are still at issue in this case were not attached
02:18:37   25  to their discovery motion.  And to this date, our

02:18:41    1    understanding is the discovery requests and responses --

02:18:44    2    the responses have not been provided to the Court, at least

02:18:48    3    up until just now when Mr. Kodish handed the Court and

02:18:51    4    opposing counsel what looks like a copy of a document that

02:18:55    5    has copied and pasted portions of responses served in the

02:18:59    6    case.

02:19:00    7         So, you know, with that note and without

02:19:03    8    necessarily saying that Samsung failed to meet their

02:19:06    9    initial burden, which I think they have, we're happy to

02:19:08   10    talk about the merits, though.  So that's what I'll do now.

02:19:11   11         THE COURT:  Well, one thing that I would

02:19:13   12    appreciate your talking about is the extent to which

02:19:16   13    Headwater has referred to this ItsOn entity in its

02:19:24   14    pleadings.

02:19:26   15         MR. TSUEI:  Your Honor's question is why Headwater

02:19:29   16    has referred to ItsOn?

02:19:30   17         THE COURT:  The extent to which you have, and I --

02:19:34   18    I think that if you are referring to ItsOn in your

02:19:38   19    complaint and/or other pleadings, that you have a greater

02:19:45   20    obligation to respond to discovery about it.

02:19:49   21         MR. TSUEI:  I think as a -- as a general matter,

02:19:52   22    that's right, and we would agree with that.  The problem

02:19:55   23    is, as we saw it, you know, when we were discussing this

02:19:58   24    issue with Samsung before the motion was filed is that the

02:20:02   25    interrogatory was just too broad.

02:20:03  1        And so, you know, I think we in good faith tried

02:20:05  2   to figure out exactly what they were looking for, and what

02:20:09  3   we thought that they were looking for is in the middle of

02:20:11  4   the rog, which is the reason ItsOn failed to pay royalties

02:20:15  5   required by the license agreement between ItsOn and

02:20:18  6   Headwater.

02:20:18  7        And we saw the rest of the rog basically from the

02:20:22  8   beginning to the middle portion as clearly overbroad,

02:20:26  9   calling for a description of the history of a company that

02:20:30  10  is not Headwater.  And so, you know, we tried to meet and

02:20:35  11  confer about it and ask them what they were looking for.

02:20:38  12  As far as I understand, before the motion was filed, they

02:20:41  13  did not agree to narrow any portion of the rog, and so

02:20:45  14  that's why we're here.

02:20:46  15       You'll see that our response does, in fact,

02:20:49  16  address the reason ItsOn failed to pay royalties as

02:20:52  17  required by the license agreement between ItsOn and

02:20:54  18  Headwater.  Fortunately, this is one of the rogs whose

02:20:59  19  responses were provided to the Court by Samsung, I think

02:21:03  20  out of luck, and it's one that we've addressed in the

02:21:05  21  papers, as well, where we've described the documents -- and

02:21:08  22  I'll do it now again -- as the communications between

02:21:11  23  Headwater and ItsOn relating to ItsOn's failure to pay

02:21:15  24  royalties.  And I think there are some email chains, as

02:21:18  25  well, cited in those 33(d) documents.

02:21:21  1    So I confess we're probably at a standstill still

02:21:28  2  unless the Court believes that the full scope of the rog is

02:21:31  3  appropriate to be responded to.  But, otherwise, we -- we

02:21:35  4  don't think that the full scope of the rog is appropriate.

02:21:37  5    And, again, we invite Samsung to explain with

02:21:41  6  specificity exactly what they're looking for.

02:21:44  7    THE COURT:  You know, Mr. Tsuei, I'm looking at

02:21:46  8  your complaint now, and I see that the complaint alleges

02:21:54  9  that Dr. Raleigh founded ItsOn in 2008 and goes on to

02:21:58  10  follow the progress of ItsOn through the years.  There are

02:22:08  11  pages of allegations regarding ItsOn and its business.  And

02:22:16  12  given those allegations, I'm going to grant the motion and

02:22:21  13  order that the -- that Headwater provide a narrative

02:22:27  14  response to Interrogatory No. 18.  I think Headwater has

02:22:32  15  made that relevant by its reliance on ItsOn in its

02:22:38  16  complaint.

02:22:42  17    MR. TSUEI:  Thank you, Your Honor.

02:22:43  18    MR. KODISH:  Continuing on, Interrogatory No. 20.

02:22:51  19  I think this one may fall into a similar conclusion.  This

02:22:58  20  is the market and demand for the ItsOn software, which

02:23:02  21  allegedly practiced the claims of the asserted patents.

02:23:06  22    So as you're now familiarizing yourself with the

02:23:12  23  complaint, that's the showpiece of their story.  And we

02:23:20  24  would like a narrative response to -- to the rog

02:23:26  25  explaining -- you know, responding to it.

| 02:23:27 | 1 | They just -- they point us to a single doc that |

They just -- they point us to a single doc that
shows the sales of some ItsOn product, and then they
incorporate the entire depositions of Greg Raleigh --
that's three days of depositions -- Jeff Green, James
Fitzgerald, James Lavine, and Dan Durig who's not a
Headwater employee, he's a Samsung employee.  And then they
point to their answers to these three rogs that I mentioned
at the outset, which have some small overlap but certainly
do not answer in their entirety.  They are not even close
to identical as to what they are asking for.

Rog 20, as to -- as compared to Rog 4, 9, and 11.
They don't provide competitors, the competitive products.
They don't explain what, if any, demand there is for ItsOn
software.  They point to a lot of irrelevant material.
They seem to be answering a question about whether Samsung,
quote, unquote, wanted the -- the product.  This is about
what is the market?  What do the end users, you know, find
valuable about the ItsOn product that is the centerpiece of
their complaint?

THE COURT:  I see that Interrogatories 20 and 21
are about ItsOn, and then it looks like 28 --

MR. KODISH:  Yeah.

THE COURT:  -- is different.

Are there others about ItsOn that you're seeking?

MR. KODISH:  Yeah, you've nailed it exactly.

02:24:54    1        21 is just the R&D perspective, but they're asking

02:24:58    2    for $3.1 billion.  We'd like the narrative response on --

02:25:01    3    to understand what they invested in this technology that

02:25:03    4    they say is worth that much.

02:25:17    5        THE COURT:  Well, I'll ask Mr. Tsuei to tell me

02:25:19    6    what objections he has to the contents of 20 and 21 then.

02:25:43    7        MR. TSUEI:  Hello, Your Honor.  Again, James Tsuei

02:25:45    8    for Headwater.

02:25:45    9        So just sticking with the Court's preference to

02:25:49   10    stay with Rogs 20 and 21 --

02:25:51   11        THE COURT:  Yes.

02:25:51   12        MR. TSUEI:   -- I think our view is that, again,

02:25:55   13    these rogs are -- without actually narrowing by, you know,

02:25:59   14    meetings of the minds between the parties -- overbroad.

02:26:03   15        This is unfortunately an issue that's occurred

02:26:06   16    frequently in this case where we've sought sort of a

02:26:08   17    narrowing proposal from Samsung as to what we believe were

02:26:11   18    overbroad interrogatory requests.  These were, as I

02:26:14   19    understand it, ones where there was no compromise offered,

02:26:17   20    so I'll start with that.

02:26:18   21        THE COURT:  So tell me what changes you're seeking

02:26:22   22    in the scope of 20 and 21.

02:26:24   23        MR. TSUEI:  Well, to the extent that I think what

02:26:28   24    they're looking for is contained in deposition testimony,

02:26:31   25    that is, testimony that discusses the ItsOn software, as

| | |
|---|---|
| 02:26:35 | 1 |
| 02:26:39 | 2 |
| 02:26:42 | 3 |

well as the -- the business that ItsOn did with customers

and prospective customers, that's all set forth in the

deposition testimony of many witnesses in the case.

        And the reason why we identify Samsung's witness

as well, Mr. Durig, is because Samsung was, in fact, one of

those customers.  So Samsung already knows, in fact, what

the ItsOn software is.  Samsung installed the software on

its own phones.

        So at the end of the day, I'm at a loss to sort of

understand exactly what they're looking for that they

consider is not already in the evidence of this case.

        So with that said, we can put all of that in

writing, but it's information that's already set forth not

only in declarations in the case but in the pleadings and

the depositions in the case as well.

        THE COURT:  Well, I think that you have made these

issues relevant by the way you have relied upon ItsOn in

your complaint, and I'll grant the motion to require a

narrative response not reliant upon Rule 33(d) for

Interrogatory 20 and 21.

        MR. TSUEI:  Your Honor, if I may.

        THE COURT:  You may.

        MR. TSUEI:  So Interrogatory 21 is materially

different, though it's related.

        It's seeking, by its terms, the total amount of

02:27:55  1  investment in the research and development of the ItsOn

02:27:57  2  software.  So using that as a starting point, I'm not quite

02:28:02  3  sure it would be possible or feasible for Headwater to

02:28:05  4  offer a narrative response describing that.

02:28:07  5          THE COURT:  Well, you can -- that certainly can be

02:28:09  6  your narrative response that you do not know.

02:28:12  7          MR. TSUEI:  Okay.  In that case, then, we're happy

02:28:14  8  to actually say that.

02:28:19  9          THE COURT:  That's fine.  It doesn't call on you

02:28:21  10  to provide any facts that you don't know.

02:28:25  11          MR. TSUEI:  Understood, Your Honor.

02:28:43  12          MR. GRAUBART:  Your Honor, Noah Graubart for

02:28:45  13  Samsung.

02:28:46  14          If I could briefly address Interrogatories 28 and

02:28:49  15  30, which I believe are the next two at issue in the

02:28:52  16  motion.

02:28:52  17          THE COURT:  All right.

02:28:54  18          MR. GRAUBART:  Hopefully this will be a very quick

02:28:56  19  discussion, because in our view, these are bound up in the

02:29:00  20  privilege disputes that Your Honor heard this morning.

02:29:03  21          And so -- because Headwater did supplement their

02:29:07  22  responses to these interrogatories after our motion, and

02:29:10  23  the only issue then left from our perspective was whether

02:29:14  24  it included the information being withheld as privileged.

02:29:17  25          So No. 30 goes specifically to the issue that

| | | |
|---|---|---|
| 02:29:20 | 1 | Your Honor ruled upon in Docket No. 137 concerning the |
| 02:29:25 | 2 | waiver of privilege surrounding the supposed hundreds of |
| 02:29:29 | 3 | millions of dollars and the value that was going to be |
| 02:29:32 | 4 | received from InterDigital.  So we would understand that |
| 02:29:35 | 5 | based on Your Honor's ruling on 137, that we would ask that |
| 02:29:39 | 6 | this Interrogatory No. 30, the response be supplemented to |
| 02:29:43 | 7 | include that -- the same information that Your Honor has |
| 02:29:46 | 8 | found is not covered by privilege or is waived as to |
| 02:29:49 | 9 | privilege. |
| 02:29:49 | 10 | And then relatedly, No. 28 relates to the |
| 02:29:55 | 11 | circumstances under which InterDigital chose not to follow |
| 02:30:00 | 12 | through with the transaction to purchase Headwater.  And |
| 02:30:03 | 13 | that, I think, is bound up in the aspects of Docket No. 88 |
| 02:30:08 | 14 | and 100 that Your Honor took under advisement as to whether |
| 02:30:11 | 15 | the communication between InterDigital and Headwater are, |
| 02:30:15 | 16 | in fact, protected by common interest privilege.  And if |
| 02:30:18 | 17 | they're not, then we ask that the responses to this be |
| 02:30:22 | 18 | supplemented with that material that's been withheld as |
| 02:30:26 | 19 | privileged. |
| 02:30:27 | 20 | THE COURT:  All right. |
| 02:30:27 | 21 | MR. GRAUBART:  Thank you. |
| 02:30:38 | 22 | MR. TSUEI:  James Tsuei for Headwater. |
| 02:30:38 | 23 | I'd like to address 28 and 30 separately because I |
| 02:30:45 | 24 | do think that they are different, materially speaking. |
| 02:30:47 | 25 | So starting with 28, I think the -- the answer is |

| | | |
|---|---|---|
| 02:30:52 | 1 | Headwater has provided a narrative response describing why |
| 02:30:55 | 2 | the InterDigital deal ultimately was not closed. |
| 02:30:59 | 3 | You'll see that narrative response -- I'm not |
| 02:31:04 | 4 | quite sure what page this is, but under the heading:  First |
| 02:31:08 | 5 | Supplemental Response to Interrogatory No. 28. |
| 02:31:13 | 6 | So perhaps it sounds like Samsung is seeking a |
| 02:31:18 | 7 | more detailed narrative response, but at the end of the |
| 02:31:21 | 8 | day, the reason is the parties could not agree to the |
| 02:31:27 | 9 | terms.  And we've cited documents establishing reasons why |
| 02:31:31 | 10 | the deal didn't close, as well as specific deposition |
| 02:31:36 | 11 | testimony speaking to the same issue. |
| 02:31:48 | 12 | THE COURT:  Well, if the answer to 38 is not |
| 02:31:53 | 13 | changed as a result of the ruling that has been carried, |
| 02:31:59 | 14 | then I find it is sufficient.  And depending on how that |
| 02:32:06 | 15 | goes, you may need to supplement, but I don't think that |
| 02:32:11 | 16 | there's a further ruling that I can make on 28 at this |
| 02:32:15 | 17 | time. |
| 02:32:17 | 18 | On 30, I would think that you should supplement |
| 02:32:24 | 19 | your response to Interrogatory 30 in view of the waiver |
| 02:32:32 | 20 | finding earlier today. |
| 02:32:33 | 21 | MR. TSUEI:  If Your Honor is willing to hear some |
| 02:32:36 | 22 | argument about that, I think I can speak to this issue, |
| 02:32:38 | 23 | which leads us to believe -- |
| 02:32:40 | 24 | THE COURT:  Go ahead. |
| 02:32:41 | 25 | MR. TSUEI:  So the interrogatory doesn't say and |

02:32:44    1    doesn't ask for, as far as we know, information that, you

02:32:48    2    know, would be describing Headwater's belief or rather

02:32:51    3    Dr. Raleigh's belief that the deal was worth anywhere from,

02:32:56    4    you know, more than 60 million to hundreds of millions of

02:32:59    5    dollars.

02:32:59    6            The interrogatory is actually worded quite

02:33:04    7    directly and expressly, seeking the total value or benefit

02:33:07    8    Headwater anticipated receiving from InterDigital.  I think

02:33:12    9    a fair answer is, it's what's on the paper.  It's what

02:33:15    10   Headwater actually expected to get, and we've described in

02:33:19    11   our supplemental response exactly that.  We expected to get

02:33:24    12   $60 million as part of the closing of the deal.

02:33:29    13           Now, if the interrogatory were worded more

02:33:32    14   broadly --

02:33:32    15           THE COURT:  Do you say that in your answer?

02:33:34    16           MR. TSUEI:  Yes, sir.  It would be --

02:33:36    17           THE COURT:  Oh, that's the supplemental answer?

02:33:38    18           MR. TSUEI:  Correct, Your Honor.

02:33:46    19           So my issue with Your Honor's initial inclination

02:33:50    20   of accepting Mr. Graubart's representation that the waiver

02:33:54    21   issue is bound up with Rog 30 I think is incorrect because

02:33:55    22   the rog is not so worded.

02:33:56    23           If the rog were worded differently, something to

02:34:00    24   the effect of state the basis and explain, you know, why

02:34:02    25   you believe that the InterDigital deal was worth more than

| 02:34:05 | 1 | $60 million, the face value of the agreement, please |
| 02:34:09 | 2 | explain why.  But that's not what the rog says. |
| 02:34:12 | 3 | THE COURT:  It says to identify the total value |
| 02:34:16 | 4 | and/or benefit Headwater anticipated receiving. |
| 02:34:22 | 5 | And how is that not more than the 60 million in |
| 02:34:27 | 6 | view of the testimony of Dr. Raleigh? |
| 02:34:30 | 7 | MR. TSUEI:  Well, I don't think it's more than 60 |
| 02:34:33 | 8 | million.  What Headwater expected to receive at the close |
| 02:34:35 | 9 | of the deal was $60 million. |
| 02:34:37 | 10 | THE COURT:  Nothing says at the close of the deal, |
| 02:34:41 | 11 | does it? |
| 02:34:41 | 12 | MR. TSUEI:  I think that's right.  But the |
| 02:34:45 | 13 | language here, and I don't want to be unnecessarily |
| 02:34:50 | 14 | nit-picky, it says:  Pursuant to the acquisition described |
| 02:34:53 | 15 | in the 2020 letter of intent.  And that's why we, Your |
| 02:34:56 | 16 | Honor, I think reasonably focused on the letter of intent, |
| 02:34:58 | 17 | to explain to Samsung what we thought the letter of intent |
| 02:35:03 | 18 | indicated would be the value received by Headwater. |
| 02:35:07 | 19 | THE COURT:  Pursuant to the potential acquisition, |
| 02:35:11 | 20 | that's the acquisition by InterDigital of the Headwater |
| 02:35:19 | 21 | patents? |
| 02:35:20 | 22 | MR. TSUEI:  Yes, Your Honor, that's right. |
| 02:35:21 | 23 | THE COURT:  And isn't that what Dr. Raleigh |
| 02:35:25 | 24 | testified was in his opinion going to produce hundreds of |
| 02:35:31 | 25 | millions? |

02:35:31    1        MR. TSUEI:  I wouldn't say produce, but his

02:35:35    2   testimony was if the deal actually closed and Headwater got

02:35:37    3   some equity in InterDigital, then based on some, you know,

02:35:42    4   distant forward-looking projection of value based on, among

02:35:46    5   other things, seems like attorney analysis of projected

02:35:50    6   judgments, then, yes, the total value at the end of the

02:35:52    7   day, at some point in the future, might be hundreds of

02:35:55    8   millions of dollars, that's right.

02:35:56    9        THE COURT:  And why is that not within the scope

02:35:58   10   of Interrogatory No. 30?

02:36:01   11        MR. TSUEI:  Because the interrogatory, Your Honor,

02:36:03   12   says -- the total value or benefit Headwater anticipated

02:36:09   13   receiving pursuant to the letter of intent.

02:36:13   14        Now, maybe we're just overly narrow in our reading

02:36:16   15   of the interrogatory, but that was our natural read of the

02:36:21   16   interrogatory.

02:36:22   17        THE COURT:  All right.

02:36:22   18        MR. GRAUBART:  Your Honor, if I may, I think I can

02:36:24   19   resolve this.

02:36:24   20        THE COURT:  All right.

02:36:25   21        MR. GRAUBART:  Noah Graubart for Samsung.

02:36:25   22        I think we'll take Your Honor's words to heart of

02:36:28   23   taking the gift of impeachment, and discovery is closed.

02:36:29   24   If Headwater doesn't believe that this interrogatory is --

02:36:33   25   needs any more information, we're good with it.  They'll

| | | |
|---|---|---|
| 02:36:36 | 1 | stick with this at trial, and Mr. Raleigh can try to |
| 02:36:39 | 2 | explain how this comports with his belief that it was |
| 02:36:43 | 3 | actually worth hundreds of millions. |
| 02:36:45 | 4 | THE COURT:  Well, I'll take that as Samsung |
| 02:36:49 | 5 | withdrawing the motion as to Interrogatory No. 30. |
| 02:36:52 | 6 | MR. GRAUBART:  Yes, Your Honor. |
| 02:36:54 | 7 | THE COURT:  All right. |
| 02:37:17 | 8 | MR. KODISH:  Three left, two of which I believe |
| 02:37:21 | 9 | are very similar, Rogs 31 and 32 pertaining, in general, to |
| 02:37:28 | 10 | the benefits, improvements, advantages, or other unique |
| 02:37:32 | 11 | attributes allegedly provided by the asserted patents over |
| 02:37:35 | 12 | the prior art, including Android prior art. |
| 02:37:41 | 13 | They cite to some other rogs which don't ask the |
| 02:37:44 | 14 | same question.  And then they seem to know that the answer |
| 02:37:46 | 15 | to this question is within one, two, three, four, five, |
| 02:37:51 | 16 | six -- eight or nine deposition transcripts, as well as |
| 02:37:56 | 17 | infringement expert reports and an invalidity expert report |
| 02:38:00 | 18 | that was recently served.  We would like a narrative |
| 02:38:04 | 19 | response or something that comports with 33(d). |
| 02:38:06 | 20 | THE COURT:  Why doesn't the expert report of |
| 02:38:12 | 21 | Dr. Wesel cover this? |
| 02:38:14 | 22 | MR. KODISH:  No doubt there's overlapping |
| 02:38:16 | 23 | perspective of what Dr. Wesel's opinion is, but as to |
| 02:38:21 | 24 | whether -- what Headwater's specific perspective is on this |
| 02:38:26 | 25 | rog, I can't say that they'd read the verbatim information |

| 02:38:33 | 1 | and response. |
| 02:38:40 | 2 | THE COURT:  This appears to me to be more of a |
| 02:38:42 | 3 | contention interrogatory than seeking a matter of fact. |
| 02:38:49 | 4 | And I think it is not unfair to refer to the expert's |
| 02:38:52 | 5 | report. |
| 02:38:53 | 6 | I'll deny the motion with respect to Interrogatory |
| 02:38:57 | 7 | 30 -- oh, 31, I'm sorry. |
| 02:39:02 | 8 | MR. KODISH:  All right.  I suspect that you |
| 02:39:05 | 9 | probably will reach the same conclusion, then, with 32 and |
| 02:39:09 | 10 | will not belabor it. |
| 02:39:12 | 11 | THE COURT:  All right. |
| 02:39:13 | 12 | MR. KODISH:  Unless you want to disabuse me of |
| 02:39:16 | 13 | that notion. |
| 02:39:17 | 14 | THE COURT:  I would hate to do that. |
| 02:39:23 | 15 | MR. KODISH:  All right.  Let's see, 38 -- oh, my |
| 02:39:26 | 16 | gosh, I've miscounted.  Yes, we have two left, 38 and 39. |
| 02:39:31 | 17 | So 38 asks for the individuals with access to |
| 02:39:34 | 18 | Headwater's bank accounts in 2012 through 2016 time frame |
| 02:39:39 | 19 | and other circumstances surrounding an internal financial |
| 02:39:43 | 20 | audit that revealed to Headwater that Dave Johnson, their |
| 02:39:48 | 21 | then CFO, was embezzling money from Headwater; the decision |
| 02:39:53 | 22 | to terminate him from Headwater after that was discovered; |
| 02:39:57 | 23 | and the decision to keep him on as CFO of ItsOn after the |
| 02:40:01 | 24 | embezzlement was discovered. |
| 02:40:03 | 25 | And the -- |

| | | |
|---|---|---|
| 02:40:06 | 1 | THE COURT:  Do you also want to know if he was |
| 02:40:09 | 2 | faithful to his wife? |
| 02:40:10 | 3 | MR. KODISH:  Well, so -- so I take from that the |
| 02:40:12 | 4 | suggestion is what does this have to do with the price of |
| 02:40:15 | 5 | tea in China? |
| 02:40:16 | 6 | THE COURT:  That's a very good read of the room. |
| 02:40:24 | 7 | MR. KODISH:  Yeah. |
| 02:40:25 | 8 | So it's an important fact in this case.  It's one |
| 02:40:25 | 9 | we stumbled onto not because Headwater brought it to our |
| 02:40:30 | 10 | attention, but because another witness, the former acting |
| 02:40:34 | 11 | CEO, James Harris, did. |
| 02:40:39 | 12 | And in the end, it turns out to be very relevant |
| 02:40:41 | 13 | to Headwater's financial position leading up to and |
| 02:40:44 | 14 | including the hypothetical negotiation date.  The |
| 02:40:47 | 15 | embezzlement led to a settlement agreement with |
| 02:40:52 | 16 | David Johnson which included terms that are informative of |
| 02:40:57 | 17 | a valuation of a company at the time via the stake that |
| 02:41:02 | 18 | they described to him as having once upon a time and that |
| 02:41:08 | 19 | which was being provoked as a result of his embezzlement. |
| 02:41:12 | 20 | So, you know, we think it's relevant.  It's also |
| 02:41:14 | 21 | relevant as to the -- you know, the financial strength of |
| 02:41:16 | 22 | this couplet of companies at the time of the hypothetical |
| 02:41:21 | 23 | negotiation.  They were having some real problems. |
| 02:41:23 | 24 | THE COURT:  And what does who else had access to |
| 02:41:27 | 25 | Headwater's bank accounts have to do with that? |

| | | |
|---|---|---|
| 02:41:30 | 1 | MR. KODISH:  Well, it has to do with -- there was |
| 02:41:40 | 2 | contradictory testimony in this case.  There was some -- |
| 02:41:42 | 3 | Dave Johnson said that Greg Raleigh didn't have access. |
| 02:41:47 | 4 | There was other testimony that James Harris said |
| 02:41:50 | 5 | Greg Raleigh did have access.  There was an issue of |
| 02:41:52 | 6 | whether Headwater was fully aware of this embezzlement |
| 02:41:57 | 7 | ongoing during the time of it, and kind of evidencing the |
| 02:42:01 | 8 | overall financial dire straits that this company was in, |
| 02:42:05 | 9 | the very weak bargaining position that it would have been |
| 02:42:08 | 10 | in at the hypothetical negotiation, and that it wasn't |
| 02:42:11 | 11 | just an ItsOn issue, that it was also potentially a |
| 02:42:14 | 12 | Headwater issue because the CEO, who for some reason as a |
| 02:42:18 | 13 | consequence of this determination, gave the CFO a brand new |
| 02:42:24 | 14 | job at the sister company as his reward for being caught |
| 02:42:29 | 15 | red-handed. |
| 02:42:30 | 16 | And so we would like to know the extent to which |
| 02:42:32 | 17 | Headwater was aware of this and knew the kind of financial, |
| 02:42:37 | 18 | you know, tough spot that the collective companies were in |
| 02:42:39 | 19 | at the hypothetical negotiation. |
| 02:42:41 | 20 | THE COURT:  All right.  I'm going to deny the |
| 02:42:44 | 21 | motion regarding Interrogatory No. 38. |
| 02:42:46 | 22 | And you can expect that there will be a similar |
| 02:42:52 | 23 | reaction to motions in limine regarding this issue when we |
| 02:42:58 | 24 | get to trial.  But... |
| 02:43:00 | 25 | MR. KODISH:  Thank you, Your Honor. |

02:43:01  1      The last interrogatory, No. 39, that is how any of

02:43:08  2  the asserted claims cover, relate to, or involve MIMO

02:43:12  3  technology.  That's multiple input/multiple output antenna

02:43:18  4  technology in telecommunications.

02:43:19  5      The reason that we pose this question is that

02:43:23  6  there's a healthy portion of the complaint that talks about

02:43:27  7  Greg Raleigh's successes in MIMO.  It's plainly previewed

02:43:33  8  that he intends to make that an important point about the

02:43:40  9  kind of person that is to be believed.  He did really great

02:43:44  10  things in the technology at issue in this case.

02:43:46  11      THE COURT:  Cite me to the part of the complaint

02:43:47  12  that you're referring to.

02:43:48  13      MR. KODISH:  Sure.  Let's see if we can bring that

02:43:54  14  up.

02:43:55  15      If you were searching before for ItsOn and were

02:43:57  16  using that same maybe Control-F method, it would be M-I-M-O

02:44:03  17  or multiple input/multiple output.

02:44:06  18      So I've got a paragraph --

02:44:06  19      THE COURT:  You so overestimate my search

02:44:09  20  capabilities.

02:44:09  21      MR. KODISH:  Well, you looked pretty on top of it

02:44:09  22  before in that context.

02:44:10  23      Paragraph 4 in the second amended complaint which

02:44:17  24  was filed March 13th of 2023, it's Docket 42, so

02:44:28  25  Paragraph 4, Paragraph 5, Paragraph 6, Paragraph 7 --

02:44:35    1    Paragraphs 4 through 7 explaining, you know, essentially

02:44:40    2    that he's a hotshot in what we think is an unrelated

02:44:43    3    technology.

02:44:44    4         So we just want the narrative response of what

02:44:46    5    does this have to do with the claims that you're asserting

02:44:48    6    in this case because you're talking all about it featured

02:44:52    7    upfront in the lawsuit against us.

02:45:13    8         THE COURT:  And the standards that you cite at the

02:45:15    9    end of Interrogatory 39 are also referred to in those same

02:45:21    10   paragraphs; is that right?

02:45:29    11        MR. KODISH:  Let's see, the standards that we

02:45:31    12   cite, sure.  Yes, LTE, WiMAX...

02:45:33    13        THE COURT:  All right.  I see Paragraph 8 has

02:45:35    14   those.

02:45:35    15        MR. KODISH:  Yeah.

02:45:36    16        THE COURT:  All right.  Well, then, thank you,

02:45:39    17   Mr. Kodish.

02:45:40    18        MR. KODISH:  Yes.

02:45:42    19        THE COURT:  Let me hear from Mr. Tsuei.

02:45:44    20        MR. TSUEI:  James Tsuei, Your Honor, for

02:45:52    21   Headwater.

02:45:52    22        Interrogatory No. 39 just doesn't call for any

02:45:57    23   information that's relevant to any claim or defense in the

02:45:59    24   case.  The allegations that Samsung has directed the

02:46:04    25   Court's attention to from the second amended complaint are

02:46:07    1    averments about the background of one of the named

02:46:10    2    inventors.  I think it's probably fair and not a subject

02:46:14    3    for a limine to prevent a named inventor of a patent to

02:46:19    4    discuss his prior work history and what else he's worked

02:46:22    5    on.

02:46:23    6         THE COURT:  Okay.

02:46:25    7         MR. TSUEI:  Now, if there were some discrete legal

02:46:27    8    issue that Samsung could point out for the Court and for

02:46:30    9    us, we would consider an interrogatory explaining in

02:46:33    10   complete detail how the asserted claims relate to a number

02:46:36    11   of technologies in a different field that Dr. Raleigh

02:46:39    12   worked on before starting Headwater.

02:46:41    13        But without that initial showing of relevance,

02:46:44    14   Your Honor, we don't think compelling an answer to this rog

02:46:46    15   is appropriate.

02:46:47    16        THE COURT:  Was it your position that these

02:46:52    17   technologies that are described in the interrogatory simply

02:46:57    18   reflect on Dr. Raleigh's background and don't have a direct

02:47:04    19   relationship to the asserted patents?

02:47:07    20        MR. TSUEI:  Yeah, I think that's right, with the

02:47:10    21   qualifier that there is no direct relationship between the

02:47:13    22   asserted patents and the prior work that Dr. Raleigh worked

02:47:15    23   on.

02:47:16    24        Of course, there is technological overlap.  For

02:47:19    25   instance, like the asserted patents may cover WiFi

| 02:47:23 | 1 | technology or at least communications transmitted over |

02:47:23   1   technology or at least communications transmitted over

02:47:25   2   wireless -- some wireless protocol.  But they're not

02:47:28   3   related, I think, in any way to the specific standards that

02:47:31   4   are being mentioned in the interrogatory as an example.

02:47:34   5        THE COURT:  All right.  Thank you, Mr. Tsuei.

02:47:38   6        Mr. Kodish, it -- I would assume that this

02:47:45   7   interrogatory was asked just to protect you from surprise?

02:47:49   8        MR. KODISH:  That's exactly right.  Yeah, we

02:47:51   9   certainly understand the unremarkable expectation that

02:47:56   10  Dr. Raleigh would cite some portions of his LinkedIn bio

02:47:59   11  that he worked at a company, he did a thing.

02:48:02   12       This doesn't ask about that.  We're asking for a

02:48:07   13  commitment to know that we're not going to be surprised by

02:48:10   14  how -- what he deems to be some pioneering parts of his

02:48:11   15  past also relate to these asserted patents and these

02:48:15   16  asserted claims.

02:48:16   17       So it sounds like I've heard that they do know the

02:48:19   18  answer and that it doesn't relate to it, but, you know,

02:48:22   19  we're asking for the narrative response to make that clear

02:48:24   20  so we're not surprised.

02:48:26   21       THE COURT:  Given the -- the fact that this is

02:48:31   22  mentioned somewhat prominently in the complaint, I will

02:48:37   23  grant the motion that there be a narrative response,

02:48:41   24  although I would expect it to be something along the lines

02:48:44   25  of what Mr. Tsuei just announced.

02:48:46    1              MR. KODISH:  Thank you, Your Honor.

02:48:48    2              THE COURT:  What else?

02:49:00    3              MR. KODISH:  That's it.

02:49:04    4              THE COURT:  Does the Plaintiff have any further

02:49:09    5    motions or issues that we need to take up?

02:49:12    6              MR. TSUEI:  Not at this time, Your Honor.  Thank

02:49:15    7    you for your time.

02:49:16    8              THE COURT:  All right.  Then I will get out

02:49:21    9    something in writing on the issue that we carried with

02:49:24   10    respect to InterDigital, I believe it was.

02:49:29   11          But other than that, we are done.  And it's been a

02:49:34   12    pleasure.

02:49:35   13              COURT SECURITY OFFICER:  All rise.

02:49:37   14          (Hearing concluded 2:49 a.m.)

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

<u>CERTIFICATION</u>

1

2

3        I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes            4/26/2024
    SHELLY HOLMES, CSR, TCRR         Date
10   CERTIFIED SHORTHAND REPORTER
    State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25