# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4   HEADWATER RESEARCH, LLC,     )(

 5        PLAINTIFF,              )(    CIVIL ACTION NO.

 6                                )(    2:23-CV-103-JRG-RSP

 7   VS.                          )(    MARSHALL, TEXAS

 8                                )(

 9   SAMSUNG ELECTRONICS AMERICA, )(    FEBRUARY 20, 2025

10   INC., ET AL.,               )(

11        DEFENDANTS.             )(    9:00 A.M.

12                     EVIDENTIARY HEARING

13            BEFORE THE HONORABLE ROY S. PAYNE

14             UNITED STATES MAGISTRATE JUDGE

15

16   FOR THE PLAINTIFF:     Mr. Kristopher R. Davis
                            Mr. Marc Fenster
17                          Mr. Reza Mirzaie
                            Mr. Jason Wietholter
18                          Russ August & Kabat
                            12424 Wilshire Boulevard
19                          12th Floor
                            Los Angeles, CA 90025
20
                            Ms. Andrea L. Fair
21                          Miller Fair Henry PLLC
                            1507 Bill Owens Parkway
22                          Longview, TX 75604

23   FOR THE DEFENDANTS:    Mr. Michael J. McKeon
                            Fish & Richardson PC
24                          1000 Maine Ave., SW
                            Suite 1000
25                          Washington, DC 20024
```

```
 1   FOR THE DEFENDANTS:         Mr. John W. Thornburgh
                                 Fish & Richardson PC
 2                               12860 El Camino Real
                                 Suite 400
 3                               San Diego, CA 92130

 4                               Mr. Thad C. Kodish
                                 Mr. Jonathan B. Bright
 5                               Fish & Richardson PC
                                 1180 Peachtree Street NE
 6                               21st Floor
                                 Atlanta, GA 30309
 7
                                 Mr. Lance L. Yang
 8                               Quinn Emanuel Urquhart & Sullivan
                                 865 S. Figueroa Street
 9                               10th Floor
                                 Los Angeles, CA 90017
10
                                 Mr. Leonard Davis
11                               Fish & Richardson PC
                                 1717 Main Street
12                               Suite 5000
                                 Dallas, TX 75201
13
                                 Ms. Melissa Smith
14                               Gillam & Smith, LLP
                                 303 South Washington Avenue
15                               Marshall, TX 75670

16
     COURT REPORTER:             Ms. Shelly Holmes, CSR, TCRR
17                               Official Court Reporter
                                 Honorable Robert W. Schroeder III
18                               United States District Judge
                                 Eastern District of Texas
19                               Texarkana Division
                                 500 North State Line Avenue
20                               Texarkana, Texas 75501
                                 shelly_holmes@txed.uscourts.gov
21

22   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
23

24

25
```

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Good morning.  Please be seated.

 3              For the record, we're here for the evidentiary

 4    hearing on the standing issue, which was ordered in

 5    conjunction with the cross motions filed by each side on

 6    the standing issue.

 7              This is in Headwater Research versus Samsung

 8    Electronics, Case No. 2:23-103.

 9              Would counsel state their appearances?

10              MS. FAIR:  Good morning, Your Honor.  Andrea Fair

11    on behalf of Headwater.  I'm joined today by Mr. Marc

12    Fenster, Mr. Reza Mirzaie, Mr. Jason Wietholter,

13    Mr. Kristopher Davis, and Dr. Greg Raleigh is with us, as

14    well.

15              THE COURT:  All right.

16              MS. FAIR:  We're ready to proceed.

17              THE COURT:  Thank you, Ms. Fair.

18              MS. SMITH:  Good morning, Your Honor.  Melissa

19    Smith on behalf of Samsung.  I'm joined by Mr. Mike McKeon,

20    Mr. Thad Kodish, Mr. John Thornburgh, Mr. Leonard Davis.

21              THE COURT:  Good morning.

22              MS. SMITH:  Mr. Jonathan Bright.

23              MR. BRIGHT:  Good morning, Your Honor.

24              THE COURT:  Good morning.

25              MS. SMITH:  Also joined from Quinn Emanuel,
```

1    Mr. Lance Yang.

2         And Samsung has a client representative this

3    morning, Mr. John Choi.

4         And then Qualcomm outside counsel, Mr. Charles

5    Walker, is also with us this morning.

6         And, Your Honor, we're ready to proceed.

7         THE COURT:  All right.  Thank you, Ms. Smith.

8         I believe that the parties have agreed on a format

9    for this hearing with the understanding that the Plaintiff

10   will start off with examination of Dr. Raleigh, followed by

11   the cross-examination, and I guess any redirect and recross

12   thereafter, followed by arguments from both sides at the

13   end.

14        So without further adieu, you may call your first

15   witness, Mr. Davis.

16        MR. KRIS DAVIS:  Thank you, Your Honor.  Kris

17   Davis for Headwater, and we call Dr. Greg Raleigh.

18        THE COURT:  All right.  Dr. Raleigh, if you would

19   come forward and be sworn, please.

20        MR. KRIS DAVIS:  Your Honor, we have some binders

21   to distribute, as well.

22        THE COURT:  All right.

23        (Witness sworn.)

24        THE COURT:  Go ahead, Mr. Davis.

25        MR. DAVIS:  All right.

1          <u>GREGORY RALEIGH, PLAINTIFF'S WITNESS, SWORN</u>

2                    <u>DIRECT EXAMINATION</u>

3   BY MR. KRIS DAVIS:

4   Q.  Good morning, Dr. Raleigh.  Could you please introduce

5   yourself to the Court, including what your role is in this

6   case?

7   A.  Good morning.  My name is Greg Raleigh.  I'm the

8   principal inventor at Headwater Research, the Plaintiff,

9   and I'm the founder of the company.

10  Q.  All right.  As you know, we're here because Samsung

11  alleges that Qualcomm has an ownership interest in

12  Headwater's patents.

13          Were any of the claimed inventions in Headwater's

14  patents conceived while you worked at Qualcomm?

15  A.  No, sir, not at all.

16  Q.  Now, Dr. Raleigh, you previously testified here at an

17  evidentiary hearing in the earlier 422 case between

18  Headwater and Samsung.  Do you recall that?

19  A.  I do, sir.

20  Q.  And at that hearing, you testified about your invention

21  timeline for the patents at issue in that case.  Do you

22  recall that, as well?

23  A.  I did.

24  Q.  Where do the claimed inventions at issue in this case

25  fit into the invention timeline that you described at that

6

1    earlier hearing?

2    A.  Yes.  So at the 422 hearing, we discussed many things,

3    and one of the key elements was that I had attended a Best

4    Buy meeting shortly after I left Qualcomm.  And at that

5    meeting, a variety of network equipment vendors had pitched

6    solutions for Best Buy for a mobile value added network

7    operator that they wanted to build.

8         And one of the principal things that came out in

9    that hearing was that on the way home from that meeting, I

10   realized those technologies were not going to work well.

11   And I had this ah-ha, if you will, that maybe I can move

12   some of that network technology onto the device.

13        And in the particular case that we had in 422,

14   many things followed from that where I implemented

15   technology on the device to do things that were

16   traditionally done in the network, and that eventually led

17   later to -- in 2010 or so to -- to those patents in that

18   case.

19        In this case, the key ah-ha was a second notion

20   that came later than the first ah-ha, because as I began

21   implementing the notion of moving network equipment

22   technology to the device, I ran across a new problem in

23   that that -- the original approach I had for doing that

24   caused chatter or, you know, excess communication between

25   the agents on the device that I was creating and network

1    servers.  And that was actually defeating the purpose of

2    what I referred to in the last hearing as device-assisted

3    services.  And I realized that was going to be an

4    impediment to success of the technology.

5            So I had to come up with new technology in order

6    to resolve that problem, and that's -- that new technology

7    essentially was an aggregated, you know, messaging channel,

8    and that's the subject of the patents in this case.

9            So there was the ah-ha moment we talked about at

10   the last hearing, and then that was followed later by a new

11   ah-ha that I had created a problem, and then these patents

12   solved that problem.

13   Q.  All right.  Now, are there any documents supporting the

14   timeline of when you conceived the claims -- inventions at

15   issue here?

16   A.  Yes, sir.  During my deposition, Samsung reviewed a

17   number of documents with me, and several of those documents

18   clearly show the timeline as to where this came up.

19   Q.  What sort of documents are you referring to?

20   A.  Well, there are many documents.  There are three in

21   particular.  There were -- there was a document in

22   September of '08, there was another document that came up

23   in the 422 trial in October of '08, and then there was a

24   third document that came up in January of '09.  And this

25   technology is not mentioned at all.  It clearly wasn't

1  evident in my thinking in the September and the October

2  presentations, and these are presentations I gave to Best

3  Buy because they were interested in investing, and I was

4  keeping them apprised as to what we were doing.

5          And then there's embodiments in a figure that show

6  up in January of 2009 that are very close, if not almost

7  identical, to what shows up in the patent later.  So that

8  shows that by January I had the idea, and in October I did

9  not.

10  Q.  All right.  And does Qualcomm's conduct over the years

11  support Samsung's argument?

12  A.  Not at all, sir.

13  Q.  And why do you say that?

14  A.  Well, when somebody inside of Qualcomm made some sort

15  of vague insinuation that maybe I invented something while

16  I was at Qualcomm, we had already shown Qualcomm the

17  patents and the technology.  I explained the timeline, just

18  as I'm doing here.  We had many, many meetings, so it would

19  have been clear that, you know, there was nothing conceived

20  while I was at Qualcomm.  I believe I proved that.

21          And then Qualcomm never made any claim.  We asked

22  them again and again repeatedly, you know, if you think you

23  have something, show us what it is.  We know it's

24  impossible for you to have anything because it didn't

25  happen.

1           And then they told us they consciously let the
2    statute of limitations to expire.  They made no claim.  And
3    there just was nothing to it.
4           And then after that, they repeatedly offered to
5    pay millions of dollars for the patents.  Someone who
6    thought they owned something wouldn't offer to pay tens of
7    millions of dollars.
8           And in addition, I was told verbally by the people
9    who wanted to work with us at Qualcomm that they felt the
10   whole episode was a giant nuisance, that they really wanted
11   to work with us, that they were aware of, you know, what
12   the internal, you know, insinuations were, and they thought
13   they were baseless.
14   Q.  All right.  Now, over the course of your career, just
15   focusing on your background for a moment, about how many
16   patents or patent applications name you as an inventor?
17   A.  Roughly 600, I believe -- over 600.
18   Q.  And can you tell us what your educational background
19   is?
20   A.  I have an electrical engineering bachelor's degree from
21   California Polytechnic San Luis Obispo, and a master's and
22   a Ph.D. in electrical engineering from Stanford University.
23   Q.  And what did you do after you finished at Stanford?
24   A.  I created a company called Clarity Wireless.
25   Q.  Did you invent anything during your time at Clarity?

1  A.  Yes.  At Clarity, we patented, you know, roughly three

2  dozen patents.  It became the seminal patents for a

3  technology called MIMO Wireless that changed a hundred

4  years of thinking about radio science and ended up changing

5  cellular, 4G, 5G, 6G, and WiFi.

6  Q.  And was Clarity ever acquired?

7  A.  Yes, Clarity was acquired by Cisco Systems.

8  Q.  Okay.  And after your time at Clarity and Cisco, what

9  did you do?

10  A.  I decided to revolutionize WiFi, and I started another

11  company called Airgo Networks.

12  Q.  And were you inventing anything at Airgo?

13  A.  Yes.  We invented new technologies that -- that ended

14  up being in -- you know, the new standards of today,

15  starting with 802.11.  And we had several patents, nowhere

16  near as many as we had at Clarity or here at Headwater, but

17  we had several patents that became important.

18  Q.  All right.  Was Airgo acquired?

19  A.  Yes, Airgo was acquired by Qualcomm.

20  Q.  And did you stay on at Qualcomm after the acquisition?

21  A.  I did.  I worked at Qualcomm for a couple of years.

22  Q.  All right.  And did you invent anything while you were

23  at Qualcomm?

24  A.  No.

25  Q.  Why not?

1    A.   They decided to take the engineering team from Airgo,

2    and they moved it -- Qualcomm had an engineering group, and

3    then they had a business and strategy group, and they

4    decided the best use of my talents for Qualcomm was to put

5    me in the business and strategy group.  And so my role was

6    really strategy and business and marketing to -- to try to

7    get their chipsets into new markets.  And I also helped

8    them with their 4G strategy.  And that's how they wanted to

9    use my -- my talent, and it just didn't have anything to do

10   with invention really.

11   Q.   Uh-huh.  Now, while you were at Qualcomm, did you work

12   on anything involving the technology of the claimed

13   inventions here?

14   A.   No, sir, not at all.

15   Q.   All right.  And about how many patents or patent

16   applications does Headwater have?

17   A.   Roughly 500, I believe, sir.

18   Q.   Do you have a sense of how many of those name you as an

19   inventor?

20   A.   All or most.

21   Q.   Okay.  And did you begin working on Headwater and ItsOn

22   after you left Qualcomm?

23   A.   Yes, sir.

24   Q.   And that's what you do today at Headwater?

25   A.   Yes, sir.

1  Q.  Okay.  All right.  Now, the patents at issue in this

2  case are U.S. Patent Nos. 9,198,117, 9,615,192, and

3  8,406,733; is that right?

4  A.  Yes, sir.

5  Q.  Okay.  Are there any assignment records identifying

6  Headwater Research as the owner of the asserted patents?

7  A.  Yes, sir.  We were careful and meticulous about our

8  assignments and our title -- maintaining our title.  It's

9  very important to us.

10        MR. KRIS DAVIS:  Let's pull up Exhibit 1 in your

11  binder.

12  Q.  (By Mr. Kris Davis)  And do you see near the top of the

13  first page a reference to U.S. Patent No. 9,198,117?

14  A.  Yes, sir.

15  Q.  Can you explain what this exhibit shows?

16  A.  This is the assignment abstract for the '117 patent,

17  showing the chain of title.

18  Q.  And I see there are two assignments shown in this

19  record.  Can you explain the first assignment in time?

20  A.  Yes, sir.  That's the assignment from me, as the sole

21  inventor, to Headwater Partners I LLC.

22  Q.  And what is the second assignment in time?

23  A.  We eventually merged Headwater Partners I LLC with

24  another entity called Headwater Management LLC, and that's

25  how we formed Headwater Research.  So Headwater Research

```
 1  was the surviving entity of Headwater Partners I, and this

 2  assignment just conveys the title from Headwater Partners I

 3  to the surviving entity, Headwater Research.

 4  Q.  And Headwater Research is the Plaintiff here?

 5  A.  Yes, sir.

 6  Q.  Okay.  Let's turn to Exhibit 2.

 7           Do you see near the top of the first page here a

 8  reference to U.S. Patent No. 9,615,192?

 9  A.  Yes, sir.

10  Q.  And what does this exhibit show?

11  A.  This is the assignment abstract for the '192 patent at

12  issue in this case.  And it's the exact same set of

13  assignments, first from me to Headwater Partners I, and

14  then Headwater Partners I to the surviving entity,

15  Headwater Research.

16  Q.  Okay.  And now let's turn to Exhibit 3.

17           Do you see near the top of that first page a

18  reference to U.S. Patent No. 8,406,733?

19  A.  Yes, sir.

20  Q.  And what does this exhibit show?

21  A.  It's the exact same set of assignments for the '733

22  patent.

23  Q.  Okay.  Now, going back to your time at Qualcomm, were

24  any of the claimed inventions here conceived or reduced to

25  practice while at Qualcomm?
```

1  A.  Not at all, sir.

2  Q.  Did you use any Qualcomm resources or equipment to

3  conceive or reduce to practice any Headwater inventions?

4  A.  No, sir.  As the timeline clearly shows, I had left

5  Qualcomm before this was conceived or reduced to practice

6  and I had -- I no longer had any access to Qualcomm

7  resources.

8  Q.  And when specifically did you leave Qualcomm?

9  A.  I left Qualcomm on September 19 of 2008.

10 Q.  What prompted you to leave Qualcomm?

11 A.  The main driver for leaving Qualcomm was that my

12 daughter was going to graduate.  It was her -- the

13 beginning of her senior year in high school.  She was going

14 to go away to college.  I had been gone for two years

15 during the week, and I was a weekend dad.  And I told

16 Qualcomm I just couldn't do that anymore and that I

17 promised my family I'd be home.

18 Q.  And when you were thinking about leaving Qualcomm, did

19 you discuss that with anyone at the company?

20 A.  Yes, sir.

21 Q.  Who did you talk about that with?

22 A.  Most of the conversations were with the CEO, Paul

23 Jacobs.  I had done a couple of small projects for him.  He

24 liked my work.  He liked what I did for their 4G strategy,

25 and he wanted me to stay and move into a more technical

1  role.

2  Q.  And did you talk about potentially staying?

3  A.  Yes, we spent roughly four months talking about a

4  variety of projects.  He said that I could have a -- an

5  office in the San Francisco Bay area near Woodside where I

6  was living at the time.  And, you know, I -- we went over

7  many projects to see if there was something of mutual

8  interest that I could work on.

9  Q.  And has your conversation with Dr. Jacobs back in 2008

10 come up in the context of Samsung's allegations here?

11 A.  Yes, sir.  Samsung has made some false allegations

12 about what I talked to Dr. Jacobs about.

13 Q.  What do you mean by that?

14 A.  Well, they took a passing comment that was necessarily

15 very brief and abbreviated and turned it into something

16 that just wasn't at all, trying to say that I had admitted

17 something.

18 Q.  Where was that passing comment made?

19 A.  I was on a panel session that was discussing the

20 importance of U.S. invention, mainly the importance of

21 maintaining incentives for inventors like me so that we

22 take risks and do things that larger companies won't do

23 generally and that -- we were discussing the fact that

24 those incentives are under attack in a variety of ways

25 that -- with legislation and rulings and so on.

1          And then as an inventor, I was explaining how that

2    reduces the incentives for someone like me.

3    Q.  And did your remarks in that panel capture your full

4    conversation with Dr. Jacobs?

5    A.  Not even close.  There was many things I had to leave

6    out.  It was, you know, many conversations over four

7    months.  And I was making an overall point, and there's --

8    you know, it would have been impossible to include all the

9    details that we're going to -- we go over in a setting like

10   this, because number one, it was irrelevant to the panel

11   and the point and the audience; and, number two, there's no

12   way I had time to go through all of that.

13   Q.  All right.  Now, if we go back to the topic of when you

14   left Qualcomm, was there anything besides wanting to be at

15   home and those conversations with Dr. Jacobs that drove the

16   specific timing of when you left Qualcomm?

17   A.  Yes, sir.

18   Q.  And what was that?

19   A.  Well, Best Buy -- I had been working with Best Buy on a

20   project at Qualcomm.  They came to know me through that.

21   And they found out that I was thinking about leaving, and

22   so because they knew my background and my talents, they

23   wanted me to help them with a project to build a mobile

24   value added network operator network that they wanted to

25   build, and they were trying to recruit me to help them do

1    that.

2           And there was this one meeting that they were

3    going to have where all these very accomplished equipment

4    vendors were going to come in and present their solutions

5    for Best Buy's business needs.  And this was just a great

6    opportunity for me to -- I didn't know very much about

7    mobile value added network operators at the time, and this

8    was a great opportunity for me to learn quickly from the

9    best minds in the industry.  And so that was a really

10   important event that I wanted to attend.

11          So when it became clear that, you know, after four

12   months we hadn't found a project, I told Paul, you know, I

13   really want to go to this meeting with Best Buy, and I'm

14   going to need to leave now.  And so I left with about a

15   week to spare to get to that meeting and try to learn

16   something about this field.

17   Q.  And,  I'm sorry, when did the meeting with Best Buy

18   take place?

19   A.  September 24th of 2008, so about a week after I left

20   Qualcomm, and that -- that's really what drove my exit

21   timing.

22   Q.  I see.

23          And so you mentioned that there were vendors

24   presenting during this meeting with Best Buy.  After you

25   saw those presentations, what did that lead you to?

1   A.   Yes.  So as I testified in the 422 evidentiary hearing,

2   I spent a couple days on Best Buy's side of the table

3   listening to these network equipment vendors pitch, you

4   know, how they wanted to solve Best Buy's business needs,

5   and I recognized that that really wasn't going to work very

6   well.  I asked a lot of pointed questions on behalf of Best

7   Buy, and they did not have good answers for those

8   questions.

9        So I became excited because, you know, I like

10  finding problems people haven't solved that are important,

11  and I realized that if I could come up with something new,

12  then it could be quite valuable.  And so that got me very

13  interested to try to find something new.

14       And that's -- you know, as I testified at the last

15  hearing, on the way home, I came up with this -- I thought,

16  okay, what's the white space?  You know, what is it that I

17  can do to turn this problem upside down and solve it in a

18  different way that's going to be much better?  And then

19  that's when I came up with the idea that -- move some of

20  these network functions that weren't working well in the

21  network, it was too late, the technology just didn't work

22  because you don't know what's happening on the device, so

23  move those functions onto the device.

24       And that was the inkling that led to many of --

25  many of Headwater's inventions.  And at that point, it was

1   just an idea like, hey, maybe I could do this and what

2   would it mean?

3   Q.   And so if we focus back on the patents asserted here,

4   at what point did you conceive of those inventions that are

5   in the patents asserted here?

6   A.   Yes.   So as I mentioned a little bit ago -- so the

7   first step in attempting to implement the inkling that I

8   got on the way home, is, okay, how would I go about moving

9   network functions into a device?   You know, I worked at it

10  for a month or two, and eventually came to the conclusion

11  that I would have a series of agents, applications, if you

12  will, software elements on the device that would do a

13  variety of functions that are described in the patent.

14         And so I started working on the embodiments for

15  these agents -- for each of these agents and how they would

16  function.   Each agent had a counterpart server, so the

17  agent talks to its server.

18         And in my first embodiments attempting to make

19  this work, I had an agent to a server, another agent to a

20  server.   So there were many agents or applications talking

21  to many servers.

22         And so as I started solving the problem of what

23  those agents did, I stepped back, and I said, wait a

24  minute, I've created a whole new problem because now I have

25  all these apps talking to the servers which is one of the

1   things I wanted to control.  And I was actually aggravating

2   one of the problems that I was trying to fix.  And so I

3   said, okay, well, that's not going to work.  That's going

4   to actually prevent device-assisted services from being

5   effective.  So I said, okay, how do I solve that problem?

6           So around November or so, I had recognized that,

7   okay, I have to do something else in order to make the

8   first idea work at all.  A lot of times when you invent,

9   you solve a problem, that creates another problem, and then

10  you have to solve that problem.  And that's precisely what

11  happened in this case.

12          So the first notion I had was, okay, I need to

13  aggregate those communications from those agents to their

14  servers into a common messaging channel -- I called it a

15  control link -- in a variety of embodiments, and so that

16  was part of the solution.

17          But then as I continued to develop that, I started

18  understanding that, well, it's not just putting it into a

19  common link because that could still keep the modem alive,

20  that could still burn battery, that could still clog the

21  network if they're constantly chattering even if it's a

22  common link.  So then I said, okay, now I have to control

23  the way those communications take place.

24          And then finally later on, more toward where the

25  patent was filed, I realized that needs to be secure, and

1    I'm going to need some kind of interagent -- an

2    interprocess communication service on the device, which I

3    refer to in various ways, including an agent communication

4    bus.

5           So that was a series of discoveries and

6    embodiments and developments that started around November

7    and then became fairly mature by -- by early January.

8    Q.  And so had you conceived of the claimed inventions as

9    of November 2008?

10   A.  No.  November was when I first started realizing I

11   needed some kind of common aggregated channel with some

12   kind of a bus to address the agents or applications on the

13   device.  And then I -- you know, over time I came up with

14   the other embodiments.

15   Q.  All right.  So let's turn to the next exhibit in your

16   binder.  That's Exhibit 4.

17          If you look at the top left corner, do you see

18   Application No. 61206354?

19   A.  Yes, sir.

20   Q.  And do you see next to that a filing date of January

21   28th, 2009?

22   A.  Yes.

23   Q.  Dr. Raleigh, did you have any co-inventors on this '354

24   application?

25   A.  No, sir.  At this point, I was just working on my own.

1    Q.  Do you understand this '354 provisional application is

2    the application to which the asserted patents claim

3    priority here?

4    A.  Yes, sir.

5    Q.  Are you aware of Samsung ever disputing that the

6    priority date of the asserted patents is January 28th,

7    2009, which is the filing date of this provisional?

8    A.  No, sir.  I don't think that's ever been disputed.

9    Q.  All right.  Let's turn to Exhibit 5.

10           Do you see this is the '117 patent -- U.S. Patent

11   No. 9,198,117?

12   A.  Yes, sir.

13   Q.  Let's turn to the end of the document so that we can

14   take a look at Claim 1 of the '117 patent.

15           I see a reference to device messaging agents.  Did

16   you work on or think about anything like that while you

17   were at Qualcomm?

18   A.  No, sir, I had no need to.

19   Q.  I also saw network message servers referred to in '117,

20   Claim 1.  Did you work on or think about anything like that

21   at Qualcomm?

22   A.  No, sir.

23   Q.  And then at the end of '117, Claim 1, there is a

24   reference to a secure interprocess communication service.

25   Did you work on or think about anything like that while you

1    were at Qualcomm?

2    A.  No, I knew nothing about this.  Something I had to

3    learn about in order to solve the problem I mentioned

4    earlier.

5    Q.  Let's turn to Exhibit 6.

6           Do you see this is U.S. Patent No. 9,615,192?

7    A.  Yes, sir.

8    Q.  And, again, let's go to the end of the patent, and

9    we'll take a look at Claim 1.

10          So in '192, Claim 1, I see a reference to a

11   message link server.  Do you see that?

12   A.  Yes, sir.

13   Q.  Did you work on or think about anything like that while

14   you were at Qualcomm?

15   A.  Not at all, sir.

16   Q.  There's also a reference to message delivery triggers

17   in '192, Claim 1.  Did you work on or think about anything

18   like that while at Qualcomm?

19   A.  No, sir.

20   Q.  And then about halfway through '192, Claim 1, there's a

21   reference to a message buffer system.  Did you work on or

22   think about anything like that at Qualcomm?

23   A.  No, sir.

24   Q.  All right.  And then let's turn to Exhibit 7.

25          You see this one is U.S. Patent No. 8,406,733, the

1  '733 patent here?

2  A.  Yes, sir.

3  Q.  So again, let's turn to the end of the patent, and

4  we'll look at Claim 1 of the '733 patent.

5        There's a reference to a service control link

6  here.  Did you work on or think about anything like that

7  while you were at Qualcomm?

8  A.  No, sir.

9  Q.  And then about halfway through '733, Claim 1, there's a

10  reference to agent identifiers.  Did you work on or think

11  about anything like that while at Qualcomm?

12  A.  No, sir.  Again, these are all limitations that came up

13  after I had to solve this second ah-ha problem.

14  Q.  So we've looked at a number of different features in

15  the asserted patent claims here.  Are those described in

16  the '354 provisional application we saw?

17  A.  Yes, sir, there's many embodiments in the '354

18  provisional that support these claim limitations.

19  Q.  And the '354 application was filed on January 28th,

20  2009, right?

21  A.  Yes, sir.

22  Q.  And when, again, did you leave Qualcomm?

23  A.  September 19th of 2008.

24  Q.  Okay.  So that was about four and a half months before

25  the filing of this '354 provisional application, right?

1    A.  Yes, sir.

2    Q.  Okay.  Now, after you left Qualcomm, I believe you

3    mentioned earlier some presentations about technology.  Can

4    you tell me more about that?

5    A.  Yes.  Best Buy was interested in investing, and we

6    needed a, you know, corporate partner to invest and provide

7    capital and to provide -- you know, it's always good to

8    have a large corporate partner when you're starting a

9    company.

10           So we were providing them regular updates along

11   the way as to what our progress was, and there were a

12   variety of presentations that we made that Samsung asked me

13   about in my depositions.

14   Q.  Okay.  Let's take a look at those.

15           So let's turn to Exhibit 17 in your binder.

16           MR. KRIS DAVIS:  For the record, this is labeled

17   HW103_00015425.

18   Q.  (By Mr. Kris Davis)  And do you see that this is an

19   ItsOn presentation dated September 24, 2008?

20   A.  Yes, sir.  ItsOn was the product company that we

21   started to basically license and productize Headwater's

22   patented technology.  And this is a presentation for Best

23   Buy.

24   Q.  And the timing of this presentation, did this have

25   anything to do with the meeting that you described?

1  A.  Yes.  This was a calling card presentation, if you

2  will, that Best Buy asked us to prepare.  They had asked me

3  to, as I mentioned, help them, you know, figure out how to

4  build an MVNO.  And they had provided us with a variety of

5  things that they wanted to see in the presentation and what

6  they wanted us to do.  So this was a presentation that

7  basically allowed us to explain to the room what our

8  purpose was, why we were at the meeting.

9  Q.  And does this September 24, 2008 presentation describe

10 any of the claimed inventions we saw in the asserted

11 patents?

12 A.  No, sir, not at all.  There's really no technology that

13 was inventive or wasn't conventional wisdom and

14 well-understood at the time in this presentation.

15         MR. KRIS DAVIS:  All right.  Let's turn to Exhibit

16 18, which is labeled HW103_00014554.

17 Q.  (By Mr. Kris Davis)  Do you see this one is an ItsOn

18 presentation dated October 23rd, 2008?

19 A.  Yes, sir.

20 Q.  And who was this presentation for?

21 A.  Again, this is a presentation for Best Buy.

22 Q.  All right.  And if we turn to the page ending in 14557,

23 this is a slide titled "New: Device Implemented Network."

24         Can you explain that?

25 A.  Yes, sir.  So the previous Slide, 556, is either

```
 1    identical or very similar to, you know, the calling card
 2    presentation that Best Buy had asked us to present roughly
 3    a month earlier.  And then the 557 sheet is something we
 4    went over at the last evidentiary hearing and that
 5    Your Honor asked me about.
 6            And this is explaining to Best Buy that, hey, I
 7    have a new idea, and it involves moving network technology
 8    onto the device, and that's why it's called Device
 9    Implemented Network here.
10            And I wasn't very far along, but I had the idea at
11    this point, and this illustrates that -- you know, the
12    ah-ha had been conceived.  There weren't really any
13    embodiments here that one could patent, but it was starting
14    to explain where I was in my thinking and that I was
15    working on developing this kind of a -- of technology.  And
16    I eventually called it device-assisted services as opposed
17    to device implemented network.
18    Q.  And was the idea that you referred to there the idea
19    for the inventions of the asserted patents here?
20    A.  No, not at all.  This is really before I realized that
21    this approach was going to cause the other problem that I
22    mentioned.  And so sometime shortly -- this is, I believe,
23    October -- the end of October 2008.  Sometime shortly after
24    this, I recognized that, okay, I had created this chatter
25    problem that I've mentioned a couple of times now, and then
```

1   I had to do something else.  And that was roughly in the

2   November time frame.  So it was after this.  So this

3   presentation has nothing about the asserted patents here.

4   Q.  Now, let's turn to Exhibit 19.

5       That one is labeled HW103_00014134.

6       Do you see this is another ItsOn presentation

7   that's called Product Overview and is dated January 6th,

8   2009?

9   A.  Yes, sir.

10  Q.  Who was this presentation for?

11  A.  Again, for Best Buy.  It was, again, giving them an

12  update as to where we were and how we were coming along.

13  Q.  Let's turn to the page ending in 14159.

14      And this page seems to include a pretty detailed

15  drawing.

16      Does this show anything about the claimed

17  inventions of the patents here?

18  A.  Yes, sir.  By this time, my thinking was pretty mature

19  about the claimed inventions in this case, and that's

20  illustrated in a variety of ways in this figure.  And I can

21  go into some of them.

22  Q.  Sure.  Can you give me an example?

23  A.  Yeah, sure.  So, first of all, there's no one-to-one

24  connection between the applications on the device, what are

25  referred to agents -- for example, 494, 495, 491, 497,

1    et cetera.  And they're corresponding servers that here are

2    labeled, for example, 454, 452, 450, et cetera, et cetera.

3    And there's a single aggregated messaging link or messaging

4    channel between the device and the server, and that link is

5    serviced by what is referred to on the device as a service

6    control device link 491.  That's the messaging agent on the

7    device.

8           And then its corresponding server component or

9    network-side component is a service control link 438.

10   That's the messaging server.  So all of the communications

11   for the various apps/agents go through that aggregated

12   channel.

13          There's also an agent communication bus which in

14   this figure hasn't been labeled yet.  It's XXX.  And that

15   is referred to in various ways in the claims in a process

16   communication bus, you know, messaging bus, and so on,

17   depending on which particular patent that you're looking

18   at.  And this shows a pretty mature concept.  I likely

19   didn't have all the embodiments quite yet, but I had many

20   of them that would support the limitations in the claim --

21   claims.

22   Q.  Was this drawing in the January 6, 2009 presentation

23   included as a figure in any of the asserted patents here?

24   A.  At least a couple of figures that are very, very

25   similar, and in one case almost identical to this were

 1  included in the patent.

 2  Q.  Okay.  So keep that drawing open.

 3        Let's go back to your Exhibit 5.  That was the

 4  '117 patent.  And let's turn to Figure 16 when you're

 5  there.

 6        Do you see Figure 16, Dr. Raleigh?

 7  A.  Yes, sir.

 8  Q.  What does this show?

 9  A.  This is a very -- it's a slightly different drawing,

10  but it's very similar.  This is yet again even more mature

11  in terms of explaining what's going on in supporting the

12  embodiments that support the limitations in the claim.

13  You, again, can see those same elements, the service

14  control device link, which is the device messaging agent.

15  You can see the counterpart messaging server component

16  called service control server link.  There's the same

17  aggregated channel and the same agent communication bus.

18  So this has those same fundamental embodiments that support

19  many of the limitations in the claim.

20  Q.  So if we consider these two figures together, the one

21  from the January 6th, 2009 presentation and Figure 16 that

22  appears in the asserted patents, they trace back to January

23  28th, 2009, what does that tell you about when you

24  conceived and wrote down aspects of the claimed inventions?

25  A.  Yeah, so there was no concept illustrated in the

1    October -- late October presentation.  There is a pretty

2    mature, you know, concept illustrated in the January 6th.

3    So it says that by January 6th, I had something.

4            So it was in the inter -- intervening period

5    between -- like I say, I started in November, and then by

6    January 6th, I had a pretty mature concept.

7    Q.  And do the presentations we've seen show that you

8    conceived any of the claimed inventions while you were

9    working at Qualcomm?

10   A.  Not at all, sir.  It's very much the opposite.  It

11   demonstrates exactly the opposite.

12   Q.  Why do you say it's the opposite?

13   A.  Well, there was nothing in the presentations leading up

14   to October, there's nothing in the October presentation,

15   and then by January 6th, there is something.  So there's

16   the absence of technology and then the presence of

17   technology.

18   Q.  Now, I think you mentioned earlier, you previously

19   testified at an evidentiary hearing like this one in the

20   422 case between the parties, right?

21   A.  Yes, sir.

22   Q.  Let's turn to Exhibit 20.

23          And do you see this is the transcript of that

24   evidentiary hearing in the 422 case?

25   A.  Yes, sir.

1          MR. KRIS DAVIS:  Which for the record is Case No.

2     2:22-CV-00422.

3     Q.  (By Mr. Kris Davis)  And do you see this is dated July

4     25th, 2024?

5     A.  Yes, sir.

6     Q.  Where did the inventions at issue here fit along the

7     invention timeline that you described at that prior

8     hearing, just at a high level?

9     A.  Yeah, okay.  So as I mentioned now a couple of times,

10    this roughly hinged on the ah-ha moment on the flight back

11    from the vendor presentations in Minneapolis.  And then,

12    you know, the October presentation that showed that I was

13    thinking in a different direction, not yet having any

14    embodiments or inventions but that there was a new

15    direction I was going in.

16          And then after that, I realized I had created this

17    problem with the chatter between the agents and the

18    servers.  And so the ah-ha moment here happened later.  It

19    happened roughly in November.  And then from that ah-ha

20    moment over the intervening couple of months, I had

21    developed a fairly mature concept by January -- early

22    January.

23    Q.  All right.  So let's talk more about Qualcomm.

24          Since the time you left Qualcomm in September

25    2008, have you had any interactions with Qualcomm relating

1  to Headwater?

2  A.  Yes, sir, many.  I have good relationships with many

3  people at Qualcomm.  We've had many interactions.

4  Q.  And are you aware that some emails between you and

5  Qualcomm from the 2009 time frame have been produced in

6  litigation?

7  A.  Yes, sir.

8  Q.  Do any of those emails include any evidence that

9  Qualcomm has an ownership interest in Headwater patents?

10  A.  None whatsoever.

11  Q.  All right.  Let's turn to Exhibit 8 in your binder.

12       MR. KRIS DAVIS:  For the record, that is

13  HW_00092135.

14  Q.  (By Mr. Kris Davis)  Do you see this is an email chain

15  with the subject line Catch Up, that began on January 7th,

16  2009?

17  A.  Yes, sir.

18  Q.  I see that the first email on January 7th was sent from

19  your email address at mimoguy@mac.com to Paul Jacobs of

20  Qualcomm.  Can you remind me who that was again?

21  A.  Yes, sir.  Dr. Jacobs was the CEO of Qualcomm.

22  Q.  And why did you contact Dr. Jacobs?

23  A.  Well, we had, you know, been working together.  And as

24  I mentioned, we tried for about four months to find

25  something that I could do from the Bay Area that was

 1   mutually interesting.  We were both a little disappointed

 2   we couldn't find something.  And I had said, you know,

 3   Paul, I'm going to go do this project with Best Buy and see

 4   where it goes.  And whatever I do, if I come up with

 5   something I think would be interesting to Qualcomm, I'll

 6   bring it back and see if we can work together.  Because I

 7   liked working with him, and I think he liked working with

 8   me, and I wanted to see if there was a way for us to keep

 9   working together.

10   Q.  You recall earlier you talked about some remarks at a

11   panel where there was a reference to conversations with

12   Dr. Jacobs?

13   A.  Yes, sir.

14   Q.  Are you aware that Samsung asserts that your video

15   remarks or that panel statements admitted that you

16   conceived of Headwater's inventions while you were at

17   Qualcomm?

18   A.  I'm aware of that false assertion.

19   Q.  How do -- how does that assertion from Samsung square

20   with what happened in your 2008 and 2009 conversations with

21   Dr. Jacobs?

22   A.  Yeah, so in the panel session, I had, you know, a

23   minute or two, I don't know exactly how long, to describe

24   my experiences over a 25, 30-year period and three

25   different technologies that I invented that were -- became

35

1    very important to the world.

2          And the point I was trying to make is that, you

3    know -- in all those cases, there was an area I'd like to

4    go off and explore that was outside the company's, you

5    know, interest, and so they didn't want to explore it.

6          What I couldn't explain in those passing comments

7    is the actual detail of what the conversation with Paul

8    originally was in 2008.  And I think I testified in --

9    certainly in my depositions and probably in the 422

10   hearing, as well, that I -- I was interested in the area of

11   MVNOs, and I thought that maybe I could come up with

12   something in conventional network technology to improve

13   MVNOs and that there was a market need for that and that

14   would be interesting, and it involved, you know, network

15   operating systems for MVNOs.  That was what I discussed

16   with Paul.

17         Well, it turned out that, you know, Paul wasn't

18   interested.  I went off to talk to Best Buy.  And very

19   quickly I took a very hard right turn, if you will, and

20   started thinking about these device-assisted services, and

21   I've testified extensively about that.

22         And so the general direction I thought I would go

23   wasn't an idea, concept, an invention, it was just I'd like

24   to go explore this area.  I don't know a lot about it.  I'd

25   like to learn, and I think I can come up with something.

1   It was going this way.  It ended up going that way, and

2   that's -- you know, that would have been three times as

3   long as what I described, and it would have been irrelevant

4   to the audience.  It would have been boring, and I would

5   have gone way over my time.  I was already kind of over my

6   time.

7          It just didn't make any sense in that context to

8   bring all of that detail in.  In this context, of course,

9   it makes sense, given these allegations.  But I just could

10  not possibly go through all of that.  It was irrelevant to

11  the -- to the topic.

12  Q.  And now, what would have happened if, as Samsung

13  suggests, you had come back to Dr. Jacobs in 2009 after you

14  left Qualcomm and pitched him ideas for things that you had

15  already worked on at Qualcomm?

16  A.  Yeah, so this is where things really fall apart.

17         So, Paul Jacobs -- Dr. Jacobs is one of the most

18  sophisticated technologists in the wireless field.  And,

19  you know, he had his own patents, I think dozens, if not a

20  hundred patents.  If I would have told him about these

21  ideas before I left and he wasn't interested and then I

22  would have come back and explained the exact same ideas to

23  him, first of all, why would he be interested?  But more

24  importantly, given his degree of sophistication, he would

25  have said, wait a minute, this is what you pitched when you

1    were here, so we own this.  You know, why are you bringing

2    it back to me saying you own it?

3           I would also have to be, you know, unbelievably

4    ignorant of intellectual property and patent rights to do

5    something like that.  And, you know, given my background, I

6    don't think that's credible.  So it just does not hold any

7    water whatsoever.

8    Q.  And, Dr. Raleigh, do you recall who moderated the panel

9    that you were referring to?

10   A.  Yes, sir.

11   Q.  Who was that?

12   A.  That was Dr. Kirti Gupta, a senior executive at

13   Qualcomm.

14   Q.  And so the moderator was from Qualcomm, as well?

15   A.  Yes, sir.

16   Q.  So after you gave your remarks to the Qualcomm

17   executive moderating the panel about your experience at

18   Qualcomm, did Qualcomm take any action against you or

19   Headwater?

20   A.  No, sir.

21   Q.  Okay.  Now, turning back to the email chain we were

22   just reviewing, there's a January 14th, 2009 email where

23   you say:  Paul, thanks again for the chat.  Would you like

24   me to wait to hear from Dave Wise, or do you want me to

25   give him a call?

```
1              Do you see that?
2    A.  I'm sorry, which --
3    Q.  Oh, yes, so this is in Exhibit 8.
4    A.  8.
5    Q.  And in the email chain, there's a January 14th, 2009
6    email.
7    A.  Yes.
8    Q.  Okay.  And do you see where you said:  Paul, thanks
9    again for the chat.  Would you like me to wait to hear from
10   Dave Wise, or do you want me to give him a call?
11   A.  Yes, sir.
12   Q.  Who's Dave Wise?
13   A.  Dave Wise was a senior Qualcomm strategy and finance
14   executive that Paul assigned to get a deal done with us.
15   Q.  All right.  Let's turn to the next exhibit.  That's
16   Exhibit 9.  This is labeled HW_00092137.
17              Do you see this is an email chain with the subject
18   line Next Step --
19   A.  Yes, sir.
20   Q.  -- that runs from January 12 to January 16th, 2009?
21   A.  Yes, sir.
22   Q.  And focusing on the January 16th, 2009 email, that's
23   one that you sent to Dave Wise at Qualcomm, right?
24   A.  So the top?
25   Q.  Yes, that's right.
```

1    A.  Yes, I sent that to Mr. Wise.

2    Q.  Do you see the first paragraph of that January 16th

3    email refers to an NDA?

4    A.  Yes, sir.

5    Q.  Can you explain that?

6    A.  Well, we were going to disclose our non-public patent

7    filings, our technology, what we thought it could do for

8    the market, what we thought it could do for Qualcomm and

9    Qualcomm's customers, and so there's a huge amount of

10   confidential information they were going to be disclosing,

11   and we needed an NDA to protect us in that disclosure.

12   Q.  All right.  Let's turn to Exhibit 10.

13           That one is labeled HW_00092190.

14           Do you see this is an email with the subject line

15   OS Stack Issue, that's dated February 12, 2009?

16   A.  Yes, sir.

17   Q.  And does this email discuss any technical information

18   that you provided to Qualcomm?

19   A.  Yes, sir.  By this time, we had made several

20   disclosures.  They had looked at the patents -- patent, the

21   primary provisional, and we had discussed many, many

22   things.  And they were beginning to ask about -- questions,

23   concerns about how to go about implementing the technology.

24           And one of their concerns was, okay, how do we get

25   this technology into the operating systems, Android and iOS

```
 1   and so on and version control and things like that.  So I
 2   was explaining to them our view of how they could manage
 3   that process.
 4   Q.  All right.  Now, at the end of the first paragraph, you
 5   say:  They are all embodiments in the IP filings.
 6           Do you see that?
 7   A.  Yes, sir.
 8   Q.  And what IP filings are you referring to?
 9   A.  Yeah, those would be the -- the '354 that they had had
10   a chance to review by this time and other patents that we
11   had been working on that we were telling them about.  So
12   those would be the patent filings.
13   Q.  Let's turn to Exhibit 11, which is labeled HW_00092193.
14           Do you see this is an email chain with the subject
15   line "Opportunity" from February 17th, 2009?
16   A.  Yes, sir.
17   Q.  So I see a reference to HP here.  Can you just briefly
18   explain what that is?
19   A.  Yes, sir.  So Steve Manser was a senior executive at
20   Hewlett Packard, and in addition to disclosing to Qualcomm
21   under NDA, we were talking to others.  And Steve Manser was
22   over HP's mobile device product line, so mobile phones,
23   tablets, some of the laptops, and other things.  And he was
24   really excited, as was Qualcomm, about the approach and the
25   ideas.  And he wanted to be one of the first customers, so
```

1   he asked us if we were working with Qualcomm, and I said

2   yes.  And he knew Dr. Jacobs, so he contacted Dr. Jacobs

3   and said, you know, I'd like to be one of the first

4   customers.

5   Q.  All right.  So it seems like at this point in time your

6   discussions with Qualcomm are going well, but that sort of

7   changed at some point, right?

8   A.  Yes, sir.  They were going very well.  They began

9   talking about an acquisition.  They started floating

10  prices.  They eventually came to a verbal float of about

11  $80 million.  And we felt like that would be -- given where

12  we were in the process and that, you know, there were only

13  a few people involved and how quickly we could inject the

14  technology into the market, it would have accelerated this

15  technology going into operating systems by years, that

16  would be fair.  And it was going in a very good direction.

17  Paul was excited, the team was excited at Qualcomm, and we

18  were excited.

19          And then someone inside of the ranks at Qualcomm,

20  they never disclosed who, made some sort of vague

21  insinuation that, gee, it hasn't been very long since you

22  left, maybe you developed some of this at Qualcomm.  And

23  that really started causing friction in the relationship.

24  You know, we got offended.  You know, we ended up demanding

25  releases, and it really, really threw a wrench in the

1  works.

2  Q.  Did you ever give Mr. Wise or anyone else at Qualcomm

3  any information that you believed showed that that

4  insinuation was incorrect and you conceived your inventions

5  after you left Qualcomm?

6  A.  Yes, sir.  I -- you know, as we're doing here, I talked

7  about how I developed it, where it came up.  You know, I

8  discussed the Best Buy meeting.  We showed them the

9  patents.  We had many meetings where we brought hard copies

10  of the patents.  They reviewed the patents.  They

11  understood.  They understood them to the point where they

12  were ready to do prior art searches and, you know, sign

13  releases and all sorts of things.  And I felt like I had

14  proven, you know, conclusively that that could not have

15  been developed at Qualcomm.  I knew it could not be

16  developed at Qualcomm.  I told them as much.  I knew

17  exactly when these concepts came to my mind.

18         Given that, it was impossible for there to be

19  anything at Qualcomm.  And, you know, again, I was told by

20  people who wanted to get a deal done with us that they knew

21  that there was really nothing there within Qualcomm of

22  substance anyway to support the vague insinuations.

23         There was never any specific this is what you did,

24  this is when you did it, this is evidence.  It was just

25  insinuations.  We demanded, you know, show us what you

1  have.  If you think you have something, let's see it.  We

2  asked for meetings.  Never got anything.  So we felt we had

3  more than proven our end of it, and there was nothing on

4  the other end.  There could not be.  They didn't produce

5  anything.  And it was quite frustrating.

6  Q.  All right.  So let's turn to Exhibit 12.

7          This one is label HW_00104077.

8          Do you see this is an email chain with the subject

9  line "ItsOn" that began on April 21st, 2009?

10  A.  Yes, sir.

11  Q.  And this is an email chain that relates to this

12  insinuation that had happened, right?

13  A.  Part of it, yes.

14  Q.  Okay.  So let's take a look at the first email, all the

15  way at the bottom, from April 21st.  That came from Gina

16  Lombardi at Qualcomm.  Who was that?

17  A.  Gina was a senior business development executive that

18  was assigned by Paul to work with David Wise and get a deal

19  done with us.

20  Q.  And I saw this was directed to you and to Jim Straight.

21  Who is that?

22  A.  Jim Straight was a recently -- at that time was a

23  recently retired senior Verizon executive who had worked at

24  many wireless carriers, and he was helping me build the

25  company -- build Headwater and ItsOn.

1    Q.  And then Mr. Wise is also copied on the email?

2    A.  Yes, sir.

3    Q.  Okay.  So in the list of bullets here in the early

4    email from Ms. Lombardi, the fourth bullet says:

5    Resolution of IP ownership issue.

6          Does that refer to the insinuation that we've been

7    talking about?

8    A.  Yes, sir.

9    Q.  So now, if we scroll up to the April 22nd email where

10   Mr. Straight responds to Ms. Lombardi, do you see the

11   second sentence of Mr. Straight's email begins with "as we

12   discussed."  Do you see that?

13   A.  Yes, sir.

14   Q.  What does Mr. Straight say we discussed?

15   A.  He says:  We're positive we own all of this, and we

16   want to resolve this quickly, get it out of the way.

17   Q.  I see.  So Mr. Straight says, quote, as we discussed,

18   we are confident of our ownership of our intellectual

19   property?

20          Is that right?

21   A.  Yes, we'd -- as I mentioned, we had already discussed

22   timelines, we showed them the patents, and, you know, we

23   had done all those things to prove our ownership verbally

24   and in these meetings.  And he was saying, let's see what

25   you have, let's -- let's get this out of the way.

```
 1   Q.  I see.  I see in Item 4 in Mr. Straight's list, it

 2   says:  Qualcomm and ItsOn/Headwater will have a

 3   face-to-face meeting for Qualcomm to disclose to

 4   ItsOn/Headwater the facts, documents, and any other

 5   information that Qualcomm possesses that Qualcomm believes

 6   support the Qualcomm claim that it may own some portion of

 7   ItsOn's IP.

 8          Do you see that?

 9   A.  Yes, sir.

10   Q.  And did this meeting ever take place that Headwater

11   wanted to have?

12   A.  No, sir, never did.  We proved our side of it, and

13   there was nothing on the other side.

14   Q.  And do you have any sense as to why the meeting did not

15   take place?

16   A.  I do.  First of all, I know for sure there could not

17   have been anything on the other side, so if the meeting had

18   occurred, there would have been nothing there.  And

19   whatever leverage somebody inside of Qualcomm was trying to

20   gain would have been gone.

21          And second, I was told verbally that people who

22   are familiar with it, had looked at it and said we got

23   nothing.

24   Q.  All right.  Now, about -- I'm sorry, let's -- let's

25   turn to the next exhibit.
```

```
 1              This will be Exhibit 13.  It's labeled
 2    HW103_00082307.
 3              Do you see this is a May 7, 2009 email, with the
 4    subject line:  Moving Forward?
 5    A.  Yes, sir.
 6    Q.  And this email came from David Wise again, right?
 7    A.  Yes, sir.
 8    Q.  And about halfway through the paragraph, I see a
 9    sentence that says:  To resolve the IP concerns, we would
10    like to agree that Qualcomm get an additional 5 percent
11    ownership interest in ItsOn.
12              What was your reaction to that proposal?
13    A.  Yeah, we said no.
14    Q.  And why did you say no?
15    A.  We said, you know, you have nothing of value.  You have
16    this assertion.  We would like to clear the air and get a
17    release so that we can work together without this noise,
18    but you don't get paid for that because there's -- there's
19    no inherent value in any kind of release or waiver from you
20    because we know you have nothing.  And you don't get to use
21    this as leverage to get more from us than our other
22    investors have because that would be unfair.  They wanted
23    to invest a certain amount of money on similar terms that
24    our other investors had, but then they wanted this extra
25    percentage.
```

1        It eventually got down to 2 or 3 percent, but that

2   still to us was unfair because it was paying something for

3   nothing of value.

4   Q.  And let's turn to Exhibit 14, which is labeled

5   HW_00104071.

6        Do you see this is an email dated May 19, 2009,

7   with the subject line:  Release?

8   A.  Yes.

9   Q.  Can you explain what this document is?

10  A.  Yes.  We had -- Qualcomm continued to want to invest.

11  We wanted to work with Qualcomm.  Again, there was a large

12  team that was excited about working together.  And then

13  there was this problematic unnamed somebody inside the

14  organization.  So we said we can't have this person or

15  whoever it is keep raising these vague concerns and causing

16  friction, so we want you to sign a release.  That's the

17  only way we can work together because we're not going to

18  have the prospect of having this come up again in the

19  future.

20       It had kind of died down by this time, and they

21  wanted to go forward, and we were saying, no, you have to

22  sign a release.

23  Q.  And did Qualcomm agree to sign the release you sent?

24  A.  No, this was a first draft.  They agreed to sign a

25  different form.  You know, we started off with an

1  extreme -- our lawyers put together this draft, which was
2  very, very broad.  And, you know, probably rightly so,
3  Qualcomm said this would cover you for anything.  You could
4  come back in a year and, you know, patent something that
5  was part of our core chipset line that you saw while you
6  were here.  We needed to be specific to what you're doing
7  at Headwater.  And we said, okay, let's see what you have.
8  And there was some back and forth.  And eventually they
9  said here's a release we'll sign.
10 Q.  And was there ever a signed release ultimately?
11 A.  No.  They continued to ask for this extra percentage.
12 And like I said, I think it came down to 2 or 3 percent
13 extra, and we said you don't get anything extra because
14 this does not have value to us other than clearing the air
15 so that we have confidence this isn't going to come up
16 again because it's very problematic.  It causes -- you
17 know, obviously I was offended.  You know, it's -- it's
18 going at our integrity, and if you don't trust us, you
19 shouldn't work with us anyway.  We can't have these people
20 making these vague insinuations in the future.
21       So the release is in exchange for working with
22 you, not giving you more equity in our company.
23 Q.  So now, after the negotiation ended with Qualcomm in
24 2009, did Qualcomm ever bring a claim asserting ownership
25 over any Headwater patents?

1    A.  No, sir.  At no time did they ever make any specific

2    insinuation whatsoever.  It was just vague.  And at no time

3    did they make any sort of claim.

4    Q.  And do you know whether Qualcomm can bring a claim

5    against Headwater now asserting ownership of your patents?

6    A.  They cannot, and they made that clear to us in

7    subsequent discussions.

8    Q.  Let's talk about those subsequent discussions.

9         Were there any negotiations with Qualcomm after

10   things ended in 2009?

11   A.  Yes, sir, several.

12   Q.  Can you tell me about any substantive negotiations that

13   occurred?

14   A.  Yes.  There was a negotiation in 2017.  They were

15   interested in purchasing the company and our patents.

16   Q.  And was there any offer made by Qualcomm at that time

17   in 2017?

18   A.  Yes.  They spent, I believe, more than two months with

19   a very large team reviewing in great detail the patent

20   portfolio.  By that time we had, you know, hundreds of

21   filings of patents.  And they had a large team from their

22   intellectual property group called Qualcomm Technology and

23   Licensing.  We had many, many meetings with them.  They

24   reviewed everything in great detail.  And then they made an

25   offer.  They said they wanted to make the offer verbal

1  because they did not want to put it in writing if we were

2  not going to accept it.

3          They offered at first 25 million.

4          We said that was not nearly enough.

5          They said -- they floated the idea, well, what

6  if -- we can't say we could.  What if we could go up to 75

7  million?  That would be our limit.

8          And we said that wouldn't do it either.

9          And they said, okay.

10         And we broke off.

11         And during that conversation, before we entered

12  the discussion, we said we don't want any more nonsense

13  about, you know, vague insinuations of some sort of Greg

14  did something while he was at Qualcomm.  And they assured

15  us that, A, we didn't take any action on, you know, those

16  insinuations; B, we consciously allowed the statute of

17  limitations to expire; C, we understand we have absolutely

18  no ability to make such a claim.  You don't have to worry

19  about it anymore.

20         And under those conditions, we agreed to go

21  through the two or three-month diligence process I just

22  mentioned.

23  Q.  All right.  Now, after negotiations sort of concluded

24  in 2017, do you recall any later conversations with

25  Qualcomm?

1    A.  There were many.  There was one in particular where

2    they made another offer to acquire.

3    Q.  All right.  Let's turn to Exhibit -- I'm sorry,

4    Exhibit 15.  That is labeled HW_00092648.

5    A.  15?

6    Q.  That's right.

7            Do you see Exhibit 15, Dr. Raleigh?

8    A.  Yes, sir.

9    Q.  All right.  And this appears to be an email chain from

10   April 2022 with the subject line:  Letter of Interest.

11           If we focus on the bottom email in the chain, can

12   you explain what this shows?

13   A.  Yes, sir.  This is from Alex Rogers, the president at

14   that time of Qualcomm Technology and Licensing, their

15   licensing business.  And he's saying basically here's an

16   offer in the form of a letter of interest.

17   Q.  All right.  And let's pull up Exhibit 16, which is

18   labeled HW_00092649.

19           What is this document?

20   A.  This is that offer letter.

21   Q.  And does Qualcomm include a specific monetary offer?

22   A.  Yes, sir.

23   Q.  And what was that?

24   A.  It was 9 million.  And I asked Alex, you know, why

25   would the number be so much smaller?  We thought it might

1    go up.  It actually went down.

2            And he explained that at the time they had made

3    the other verbal offer and done all the diligence, they had

4    an issue in the market with their licensing business that

5    they no longer had.  And so even though the patents were

6    very valuable, they weren't all that valuable to Qualcomm

7    because they didn't need additional technology in their

8    portfolio by this time.

9    Q.  All right.  Now, focusing on the opening sentence and

10   Clause 1 under that, this offer letter says:  It is the

11   desire of Qualcomm to acquire the Headwater patents.

12           Why was Qualcomm referring to these as the

13   Headwater patents?

14   A.  Because they knew they belonged to us.

15   Q.  Would you have reengaged in negotiations with Qualcomm

16   in 2017 or 2022 if there was still an insinuation about

17   patent ownership being made?

18   A.  No, sir.  I was given very strong assurances that that

19   wouldn't happen, and that would have been a fool's errand

20   for us to engage and have the same episode of the vague

21   insinuations come up again.

22   Q.  So besides the initial discussions that Headwater had

23   with Qualcomm in 2009 where Mr. Wise told you about this

24   insinuation someone had made, has -- aside from that, has

25   Qualcomm ever suggested to you that Qualcomm may be the

1  owner of any Headwater patents or have an interest in

2  Headwater patents?

3  A.  No.  And -- not at all, and not even during the first

4  episode.  They said that maybe I invented something there

5  that might give them some sort of ownership, and that's as

6  far as it ever got.  There was never a "we believe we have

7  something" ever.

8  Q.  And so even in 2009, it was still at this insinuation

9  level, it was not a claim of ownership over the patents?

10  A.  None whatsoever.

11  Q.  All right.  Are you aware that Mr. Wise gave a

12  deposition on January 31st, 2025 in a Headwater case

13  against AT&T?

14  A.  Yes, sir.

15  Q.  Did you review his deposition transcript?

16  A.  Yes, sir.

17  Q.  Let's turn to Exhibit 21.  This is titled "Transcript

18  of David Wise," and it's dated January 31st, 2025.

19         Is this the transcript you reviewed?

20  A.  Yes, sir.

21  Q.  Did Mr. Wise have any recollection about any

22  intellectual property ownership dispute between yourself

23  and Qualcomm?

24  A.  No, sir.

25  Q.  Did Mr. Wise have any recollection about any facts,

1    documents, or any other information that Qualcomm possessed

2    suggesting that it may own some portion of your IP?

3    A.  No, sir.

4    Q.  Did Mr. Wise have any recollection about any

5    discussions internally at Qualcomm as to when you first

6    invented the IP that was at issue?

7    A.  No, sir.

8    Q.  Did Mr. Wise continue to work at Qualcomm after your

9    negotiations in 2009 ended?

10   A.  Yes, sir.  I believe he was there for roughly 12 years

11   after that.

12   Q.  About 12 years after 2009?

13   A.  Yes, sir.

14   Q.  Did Mr. Wise indicate in his deposition whether anyone

15   besides AT&T, such as Samsung, ever pursued discovery from

16   him?

17   A.  No, sir.  He specifically said no one else had.

18   Q.  Now, you're aware that Qualcomm produced some documents

19   in response to subpoenas from Samsung, right?

20   A.  Yes, sir.

21   Q.  All right.  Let's turn to Exhibit 24.

22       This is titled "Non-party Qualcomm Incorporated's

23   Objections and Responses to Defendants' Subpoena Duces

24   Tecum" in the earlier 422 case between Headwater and

25   Samsung, right?

1    A.  Yes, sir.

2    Q.  And if we turn to the last page, do you see that

3    Qualcomm's responses are dated January 23rd, 2024?

4    A.  Yes, sir.

5    Q.  So that's over a year ago, right?

6    A.  Yes, sir.

7    Q.  All right.  Now, let's turn to Exhibit 25.

8         This is titled "Non-party Qualcomm Incorporated's

9    Objections and Responses to Defendants' Subpoena Duces

10   Tecum" in the 103 case that we're here about today between

11   Headwater and Samsung.  Do you see that?

12   A.  Yes, sir.

13   Q.  Do you have an understanding of what Samsung asked

14   Qualcomm to produce under these subpoenas?

15   A.  Yes, I believe so.

16   Q.  And what is that?

17   A.  All of my employment records, my -- my assignment

18   agreement.  Anything and everything that I may have

19   invented at Qualcomm, anything and everything that may be

20   related to Headwater's patents that I did at Qualcomm.  I'm

21   not -- I'm paraphrasing as a layperson, but extremely broad

22   requests for information of anything that would support

23   their assertions.

24   Q.  And in response to the subpoenas, did Qualcomm produce

25   any documents showing work that you did while you were at

1    Qualcomm?

2    A.  No, sir, none whatsoever.

3    Q.  Did Qualcomm ever provide any deposition in response to

4    a Samsung subpoena?

5    A.  No, sir, Samsung -- I don't believe anyway that Samsung

6    ever asked for Qualcomm to give depositions.

7    Q.  All right.  Let's turn to Exhibit 22.  This is titled

8    "Invention Disclosure Confidentiality and Proprietary

9    Rights Agreement."

10           Do you see that?

11   A.  Yes, sir.

12   Q.  Do you understand this is a copy of the agreement that

13   Qualcomm produced in response to Samsung's subpoena?

14   A.  Yes, I understand that Qualcomm says this is something

15   that I clicked through when -- during the onboarding

16   process when they purchased Airgo.

17   Q.  Okay.  And given your invention timeline, does this

18   agreement give Qualcomm rights to any Headwater patents?

19   A.  No, sir, none whatsoever.

20   Q.  And why do you say that?

21   A.  Well, first of all, as I've testified, you know, we

22   showed Qualcomm what I invented, how it came about, when I

23   invented it.  We were very open.  We showed them all the

24   patents, and I think we proved our timeline conclusively.

25           And this requires that I would conceive of

1    something and reduce to -- you know, the legal definition

2    of conceive is, you know, for lawyers, but my understanding

3    was I'd have to conceive and reduce to practice while I was

4    at Qualcomm.

5            That's impossible to have happened.  I know

6    exactly where the ah-ha moments occurred for these, and

7    I've explained that here in court.

8            It's impossible that I did that while I was at

9    Qualcomm.  It just cannot have happened.

10   Q.  All right.  Now, let's take a look at Paragraph 1.4.

11   That reads:  I agree that an invention disclosed by me to a

12   third person or described in a patent application filed by

13   me or on my behalf within one year following termination of

14   my employment with the company shall be presumed to be an

15   Invention subject to the terms of this Agreement unless

16   proved by me to have been conceived and first reduced to

17   practice by me following the termination of my employment

18   with the Company.

19           Do you see that?

20   A.  Yes, sir.

21   Q.  Do you understand this Paragraph 1.4 to give Qualcomm

22   any rights to any Headwater patents?

23   A.  Yeah, no, sir, none whatsoever.

24   Q.  And why is that?

25   A.  Well, first of all, as I've testified maybe a couple of

1  times now, they had the evidence they need for me to prove

2  that I invented these things after I left Qualcomm.  I

3  explained it to them just as I've explained it to the Court

4  here today and just as I explained in the 422 case.  So I

5  think I met the burden under this provision.

6          Second, I've been involved in clauses like this,

7  both as an employee and as an employer, and I know that

8  this is completely unenforceable in California, as has been

9  advised to me by many attorneys.  So -- but even if it was

10  enforceable, I met the burden.

11  Q.  So let's turn to Exhibit 23.

12          What is the table that's shown here in Exhibit 23?

13  A.  Yeah.  Let's see.

14          Okay.  This is -- this is basically a Qualcomm

15  employment record of my time at Qualcomm.

16  Q.  And what does this employment record show was your job

17  title while you were at Qualcomm?

18  A.  So a little past the middle of the table, it shows

19  that, you know, my official title within the Qualcomm

20  system during this time was VP of product management, which

21  is, as I mentioned, a business and strategy role,

22  marketing, business, and strategy.

23  Q.  And did you invent anything while you were a VP for

24  product management at Qualcomm?

25  A.  No, sir, that was not at all my job.

 1   Q.  All right.  Now, you talked earlier about how different

 2   presentations you prepared over time showed that you

 3   conceived the inventions after you left Qualcomm.  Do you

 4   recall that?

 5   A.  Yes, sir.

 6   Q.  And so to help us wrap things up here, can you

 7   summarize that for us visually?

 8   A.  Yes, sir.

 9   Q.  Okay.  Do you have any slides prepared that illustrate

10   that?

11   A.  Yes.  I created a couple of -- I think three slides for

12   this.

13   Q.  Okay.  Let's take a look.

14        MR. KRIS DAVIS:  I wonder if we can advance to the

15   first slide?  Why don't we take a second to distribute

16   slides?

17        THE COURT:  All right.

18        THE WITNESS:  Thank you.

19        MR. KRIS DAVIS:  All right.  Thank you.

20   Q.  (By Mr. Kris Davis)  So we're looking now at the first

21   of your slides, Dr. Raleigh.  Can you explain what this

22   slide shows?

23   A.  Yes, this is a summary of my testimony.  It shows when

24   I left Qualcomm on September 19th.  It shows the calling

25   card presentation that Samsung asked me to discuss with

1    them during my depositions that was also discussed in the

2    422 hearing.  And this was the presentation that really

3    just had a calling card.  We were giving Best Buy what they

4    wanted to hear to see if we could work together.

5           And then on October 23rd, 2008, this is the slide

6    illustrating that I had had the ah-ha moment by this time

7    and saying, okay, I'm going to try to do something new

8    here.  It's going to involve moving network functionality

9    onto the device.  That was also something that Samsung

10   asked me to discuss in my depositions, and that was

11   discussed at the 422 hearing and again today.  And that

12   slide did not have anything whatsoever to support

13   embodiments and limitations in our claims here today.

14          And then the January 20 -- January 6, 2009 slide

15   that did have embodiments, as we discussed today, that

16   would support the claim limitations in the cases at hand

17   here.  And then the filing date of the '354 provisional on

18   January 28th, 2009.  So this is the timeline that we've

19   discussed today.

20   Q.  All right.  And let's advance to the next slide.

21          What does this slide show?

22   A.  Well, this is the specific figure we discussed today in

23   the January 6th, 2009 presentation that again was discussed

24   with Qualcomm's attorneys during my depositions.  And as I

25   detailed, it has embodiments, the aggregated control

1  channel, the device messaging agent, the device messaging

2  server, the agent communication bus, also known as an

3  interprocess bus, and other terms in the specification.

4  And showing that, you know, I had now conceived of, you

5  know, several of the embodiments, not all of them at this

6  point, but several of them that are required for the patent

7  claims.

8  Q.  And this is the January 6th, 2009 presentation?

9  A.  Yes, sir.

10  Q.  All right.  And then going on to your final slide, what

11  does this show?

12  A.  This is a one-to-one comparison of the January 6th

13  presentation, and then the more mature figure that's used

14  to describe many -- not all, but many of the embodiments

15  that are required to support the limitations in the claims

16  at stake in -- in this case.

17         And it just shows that, okay, I wasn't quite all

18  the way to Figure 16 in the patent, but I was getting there

19  as of January 6th.

20  Q.  All right.  And so this slide shows the side-by-side of

21  the January 6th, 2009 presentation and the patent figure

22  that dates back to January 28, 2009?

23  A.  Correct.  Figure 16 is right from the patent.  And

24  this, again, is a somewhat more mature figure used to

25  support the descriptive embodiments -- some of the

1  descriptive embodiments required to support the claim

2  limitations that are at stake in this case.  And you can

3  see that by January 6th, I was pretty close -- not all the

4  way there, but I was pretty close.

5  Q.  All right.  And final question for you.  At any point

6  in time have you ever been shown any evidence that a

7  Headwater invention was conceived while you were working at

8  Qualcomm?

9  A.  None whatsoever, sir.

10 Q.  All right.  Thank you, Dr. Raleigh.

11        MR. KRIS DAVIS:  We'll pass the witness.

12        Oh, and I'm sorry, Your Honor, I just wanted to

13 move to admit some exhibits.

14        Plaintiff moves --

15        THE COURT:  Is there any objection to the exhibits

16 that have been discussed with Dr. Raleigh?

17        MR. MCKEON:  Your Honor, the transcript of

18 Mr. Wise, who is a former Qualcomm employee, that's a

19 transcript from a case that we're not involved in.  We

20 didn't attend -- attend that deposition.  And we didn't --

21        THE COURT:  Do you object to it?

22        MR. MCKEON:  Yeah, we object on that basis.  It's

23 hearsay, but --

24        THE COURT:  All right.  I'll sustain the objection

25 to the Wise deposition transcript.  I understand that you

1   may have some use for the witnesses, Dr. Raleigh's

2   impression of it, but the transcript itself is not

3   admissible against Samsung.

4           So I'll sustain that objection.

5           Otherwise, the exhibits are admitted.

6           MR. KRIS DAVIS:  Thank you, Your Honor.

7           THE COURT:  And we will take a 15-minute recess

8   before we come back for the cross.

9           COURT SECURITY OFFICER:  All rise.

10          (Recess.)

11          COURT SECURITY OFFICER:  All rise.

12          THE COURT:  Good morning.  Please be seated.

13          Mr. McKeon, go ahead.

14          MR. MCKEON:  Thank you, Your Honor.  And just --

15   we passed binders around, Your Honor, and I left one right

16   up there in front of you and also to your clerk.

17          THE COURT:  All right.  Thank you.

18                      CROSS-EXAMINATION

19   BY MR. MCKEON:

20   Q.  All right.  Well, good morning, Dr. Raleigh.  Nice to

21   see you again.

22          I left a binder right in front of you.  I'm going

23   to be talking about some of those documents this morning,

24   okay?

25          Now, you understand that Headwater has filed five

1    different cases against Samsung asserting different patents

2    in each case; isn't that right?

3    A.   That sounds about right, sir.

4    Q.   And you also understand that Headwater's filed multiple

5    cases against cell phone carriers, including Verizon, AT&T,

6    and T-Mobile; isn't that right?

7    A.   Yes, sir.

8    Q.   And if I today -- if I call the first case that you

9    filed against Samsung Headwater 1 and this case that we're

10   here today about Headwater 2, will you understand what I'm

11   talking about?

12   A.   I suppose.

13   Q.   I want to keep it -- keep it simple.  So Headwater 1

14   and Headwater 2.  You got that?

15   A.   Sure.

16   Q.   Okay.  And, of course, you were here last summer, as

17   you testified earlier today, to give testimony regarding

18   the standing issue for the Headwater 1 case; isn't that

19   right?

20   A.   In your vernacular, yes.

21   Q.   Okay.  And I think you previously said something to the

22   effect that the Headwater technology is used in every -- in

23   every smartphone in the world.  Do you recall saying

24   something to that effect?

25   A.   I'm not sure what you're referring to there.

1   Q.   Well, haven't you made the claim previously that your

2   technology would be used in every -- in every cell phone in

3   the world?

4   A.   Can you refer me to a specific instance?

5   Q.   Well, what we do know is that you previously said

6   that -- in Headwater 1 that the Headwater technology was

7   used in every smartphone that Samsung sold; isn't that

8   right?

9   A.   You mean in the case?

10  Q.   Yeah.

11  A.   I'm just trying to understand --

12  Q.   In the litigation --

13  A.   -- what you're asking me about.

14  Q.   In the Headwater 1 litigation, you asserted that the

15  Headwater technology you invented was used in the Samsung

16  phones in the Headwater 1 case; isn't that right?

17  A.   That's true, yes.

18  Q.   And you know that was millions and millions and

19  millions and millions of phones, correct?

20  A.   It was a lot of phones, sir.

21  Q.   And, of course, you testified in the jury trial that

22  was on January 1 in Headwater 1; isn't that right?

23  A.   Yes, sir.

24  Q.   And the Texas jury here disagreed that your Headwater

25  technology was used in the millions and millions and

 1  millions of Samsung phones; isn't that right?

 2  A.  They found non-infringement, sir.

 3  Q.  Now, in terms of your work at Qualcomm, you joined in

 4  December of 2006; isn't that right?

 5  A.  I'm not sure of the exact date.  It sounds about right.

 6  I joined when they bought my company Airgo Networks.

 7  Q.  Well, you've testified to that on direct.  But let's

 8  pull up Slide 2 that we have, which is your employment

 9  record.  And we've got the slide here that has an excerpt

10  of your employment record that you testified on direct.

11  You see that, sir?

12  A.  Yes, sir.

13  Q.  And it says here that you joined Qualcomm on December

14  19th, 2006; isn't that right?

15  A.  Yes, sir.  That looks correct, yes.

16  Q.  Okay.  And, of course, you didn't join Qualcomm as an

17  average entry level employee, you joined as a vice

18  president; isn't that right?

19  A.  Yes, sir.

20  Q.  And you testified earlier you were VP of product

21  management; isn't that right?

22  A.  That was the title within the Qualcomm system, yes.

23  Q.  Okay.  But you, of course, know that you kind of were

24  already a big deal when you came to Qualcomm; isn't that

25  right?

1    A.  Not sure what you mean by that, sir.

2    Q.  Well, I think you claimed earlier in this courtroom

3    that you were one of the inventors of MIMO OFDM, which is

4    considered an important improvement in WiFi; isn't that

5    right?

6    A.  Absolutely, yes, sir.

7    Q.  And when you joined Qualcomm, you had already founded

8    two successful startup companies; isn't that right?

9    A.  I would agree with that, yes.

10   Q.  And one of them, you just mentioned earlier, was

11   Clarity Wireless; isn't that right?

12   A.  Yes, sir.

13   Q.  And you would think Clarity Wireless was a huge

14   success, true?

15   A.  It was successful.  It made great technology and had

16   great people, and it was acquired by Cisco, and, you know,

17   helped spur the MIMO revolution.  So I would say it was

18   successful.

19   Q.  Okay.  And Cisco actually paid you $157 million for

20   that one in 1998; isn't that right?

21   A.  Roughly.  I think it was more than that, but --

22   Q.  Okay.  157, maybe it was up 200 million?

23   A.  Roughly.  Yeah, that's closer.

24   Q.  Okay.  And then, of course, you worked at Cisco after

25   you -- after they bought Clarity; isn't that right?

 1  A.  Yes, sir.

 2  Q.  Kind of a package deal; is that right?

 3  A.  I'm not sure what you mean by that.

 4  Q.  Well, what we do know is you only worked at Cisco for

 5  about two years after Clarity was acquired; isn't that

 6  right?

 7  A.  Yeah, I signed a contract to work for two years.

 8  Q.  Okay.  And then you went on and founded Airgo, right?

 9  A.  Yes, sir.

10  Q.  And then, of course, as you testified earlier, Qualcomm

11  acquired Airgo in 2006, right?

12  A.  Yes, sir.

13  Q.  And you also got a nice chunk of change when you sold

14  Airgo to Qualcomm; isn't that right?

15  A.  I did okay.

16  Q.  They paid you about $200 million; isn't that right,

17  sir?

18  A.  No, they did not pay me anywhere near that.

19  Q.  Well, let's go to your deposition.  We'll pull it up

20  here.  It's the September transcript.  61, Lines 1 to 4.

21          How much did Qualcomm pay to buy Airgo?

22          I think the number was around 200 million again.

23          Did I read that correctly?

24  A.  Yeah, but they didn't pay me that, sir.

25  Q.  Well, that was what Qualcomm paid to acquire Airgo; is

1    that right?

2    A.  That's what they paid the investors, the company.

3    Yeah, they purchased the corporation.  I didn't make

4    anywhere near that.

5    Q.  Well, you -- you made a lot of money from Qualcomm's

6    purchase of Airgo; is that right?

7    A.  I did all right.  I wouldn't say I made a lot of money.

8    Q.  But what we do know is you became an employee of

9    Qualcomm after the acquisition; isn't that right?

10   A.  Yes, sir.

11   Q.  And then you quit Qualcomm in 2008, correct?

12   A.  Yes, sir.

13   Q.  So like -- like Cisco, after the acquisition of

14   Clarity, you also only worked at Qualcomm for about two

15   years; isn't that right?

16   A.  Yes, sir.

17   Q.  So by the time you founded Headwater, you had already

18   started two companies, and you sold them; isn't that right?

19   A.  Well, the companies sold.  I was one of the votes in

20   that process, yes.

21   Q.  Okay.  And, of course, the time you joined Qualcomm,

22   you actually already had a bunch of patents; isn't that

23   right?

24   A.  I had quit a few, yes, sir.

25   Q.  And I think we counted about 20 patents when you joined

```
 1   Qualcomm.
 2   A.   It could be.  It may have been more than that.
 3   Q.   Okay.
 4   A.   Yeah.
 5   Q.   And, of course, you -- I think you've testified today,
 6   reflected your ability to be conversant in patents, you
 7   know a lot about patents; isn't that right?
 8   A.   As an inventor.  I know quite a bit as a layperson and
 9   an inventor about patents.
10   Q.   Okay.  For example, you know the difference between
11   first to file versus first to invent, for example; is that
12   right?
13   A.   Yes, sir.
14   Q.   Now, you testified earlier that when you joined
15   Qualcomm, you entered into an invention disclosure
16   agreement with Qualcomm; isn't that right?
17   A.   Yes, sir.  As part of my onboarding process, there was
18   a whole bunch of click-through documents, and, you know,
19   apparently that was one of them.
20   Q.   Well, I wrote it down.  I think you said:  Qualcomm
21   says I signed this.  Now, you're not disputing the fact
22   that you signed this agreement, and it's a binding
23   agreement, are you?
24   A.   I don't think so.  What I said was specifically as I
25   clicked through it.
```

```
1    Q.  Okay.  Well, let's take a look at the agreement.
2         MR. MCKEON:  It's -- if we can pull up Tab 2.
3    Q.  (By Mr. McKeon)  And it's in your tabs, but we're also
4    going to pull it up here, Dr. Raleigh?
5    A.  I'm sorry, tabs in the binder?
6    Q.  In your binder, yes.  So it's in front of you, but
7    we're going to have it on the screen, as well.
8         And we see right here at the top it says:
9    Submission for Gregory Raleigh, employee.  There's a
10   number.  Recorded 12/18/2006.
11        This is your employment agreement with Qualcomm,
12   correct?
13   A.  As I've testified previously, yes.
14   Q.  And, of course, you understand having an agreement such
15   as this was really important to Qualcomm; isn't that right?
16   A.  I think they require agreements of all their employees,
17   if that's what you're referring to.
18   Q.  Yeah.  And you understand the reason they want these
19   agreements is because they don't -- they don't want their
20   employees to work for themselves while they're at Qualcomm
21   or work for other companies doing other things while
22   they're at Qualcomm; isn't that right?
23   A.  Yeah, I mean, as -- I worked with these kinds of
24   documents both as an employer and an employee, and
25   generally, this is to, you know, maintain the company's
```

1  rights for inventions for their employees and so on.

2  Q.  Yeah.  And it's important and you agree it would be

3  important to Qualcomm that they want their employees --

4  they don't want -- if they have ideas while they're at

5  Qualcomm related to Qualcomm's business, you know, they

6  want to be able to say, hey, you can't take that.  That's

7  our -- that's our property.  That's the idea behind the

8  agreements; isn't that right?

9  A.  Part of the -- these agreements have many purposes.  I

10  would roughly characterize part of it in the way you just

11  did.

12  Q.  Okay.  And it was really especially important for

13  high-level employees like you; isn't that right?

14  A.  I would say it's important for anyone that is inventing

15  and working in their technology.  It wouldn't necessarily

16  have to be a high-level person.  It could be, you know,

17  first-line engineer that comes with great ideas.

18  Q.  Okay.  Well, I mean, for you -- I mean, by the time you

19  joined Qualcomm, you already had a record of -- you were

20  known for filing patents, you were known for founding

21  companies, and you were known for changing jobs.  That was

22  sort of the situation when you started at Qualcomm; isn't

23  that right?

24  A.  I mean, I had done some of those things, sure.

25  Q.  Yeah.  So at the time that you joined Qualcomm, you

1  agree that it was reasonable for Qualcomm to make you sign

2  this; isn't that right, sir?

3  A.  It's customary for companies to have every employee

4  sign these no matter who they are, what level they're at.

5  Q.  And I heard you -- I thought I heard you say something

6  in your testimony on direct that you think there's a

7  provision in here that it's illegal under California law.

8  Did I hear that correctly?

9  A.  Yeah, my understanding is Section 1.4 under the

10 California law is not enforceable.

11 Q.  Is that, sir -- are you -- you know, I know you're a

12 great prolific inventor, but are you trying to convince the

13 Court that you're a lawyer, too, and you can -- you can --

14 you know what California law requires?  Is that what you're

15 saying to the Court?

16 A.  Well, as an employer, I was recommended to remove that

17 kind of clause from agreements that we had by our counsel

18 because it could cause problems with the enforceability of

19 the rest of the document.  And in California, you can't try

20 to make somebody prove something -- prove a negative.

21 It just -- my understanding is as a layperson from the

22 attorneys who advised me as an employer, you don't want --

23 you generally don't want that kind of clause.

24 Q.  Well, let's look at the provisions more closely.

25         MR. MCKEON:  If we can have Provision 1.1(a).

1   Q.  (By Mr. McKeon)  And you see that here, sir, on the

2   slide.  There's no dispute in this case that inventions is

3   defined as all inventions, discoveries, developments,

4   formulae, processes, improvements, ideas, and innovations,

5   whether patentable or not.

6           Do you see that?

7   A.  I see the words, sir.

8   Q.  And this, of course, would include ideas, whether all

9   or part of the patent claim; isn't that right?

10  A.  What was that question?

11  Q.  Well, by definition, this -- this -- the definition of

12  inventions here includes ideas.  You see that?

13  A.  I see the words, sir.

14  Q.  And it would include ideas whether they're -- whether

15  it was all or part of a patent claim; isn't that right?

16  A.  I see the words.  I don't know that I can comment on

17  what you just said.

18  Q.  Well, you agree that a specific -- the contract

19  itself -- let me make sure that you understand the contract

20  because you testified earlier that you didn't violate the

21  contract, so I want to make sure that you understand what

22  the contract says, okay?

23          It says:  Ideas, whether patentable or not.

24          You agree that's what it says?

25  A.  I see the words, sir.

1   Q.  So you agree that it could be an idea, whether it's

2   part of a patent claim or not part of a patent claim; isn't

3   that right?

4   A.  I am -- first of all, I'm not an attorney.  I have my

5   understanding of what this agreement says.  And I just am

6   not qualified to start parsing words with you.

7   Q.  Okay.  Well, what we do know is that the Section 1.1

8   makes it clear that it covers ideas conceived by you,

9   either solely or in concert with others; isn't that right?

10  A.  That's what it says, sir.

11  Q.  Okay.  And, of course, it requires you to disclose all

12  inventions and works using forms provided by the company.

13  Do you see that?

14  A.  Where did -- I can read that with you.  Where does it

15  say that?

16  Q.  I think we've got it highlighted at the bottom:

17  Disclose all inventions and works using forms provided by

18  the company.

19          Do you see that?

20  A.  Yes, sir.

21  Q.  Now, you understand that the agreement also contains,

22  and I think you just mentioned it, a provision that

23  specifically deals with the situation where an invention is

24  disclosed or filed by you after you leave Qualcomm; isn't

25  that right?

1  A.  Are you referring to 1.4?

2  Q.  That's 1.4.

3  A.  We discussed 1.4.  I'm not sure what the question is.

4  Q.  Well, you don't dispute the -- what the -- 1.4 requires

5  of you, do you?

6  A.  I testified to what I think it says, and I've testified

7  to whether or not I believe it's enforceable, and I've

8  testified to the fact that I believe I satisfied it.

9  Q.  Okay.  And -- but what's clear under the contract,

10  Qualcomm owns patents filed by you within one year after

11  leaving Qualcomm, unless proved by you they've been

12  conceived or reduced to practice by you following

13  termination of your employment at Qualcomm.  Isn't that

14  what it requires, sir?

15  A.  Generally, I understand what this requires.

16  Q.  Do you agree with the way I just stated the requirement

17  of this clause?

18  A.  There's a -- I don't know that I'd say it quite the way

19  you did.  There's a presumption involved.  There's various

20  words.  And, again, I'm not a lawyer, but what I do know is

21  that should this be enforceable, I -- if it were

22  enforceable, I would need to just show that I came up with

23  the patented idea after I left, which is what I did.

24  Q.  Well, you understand the idea behind this is that if

25  you leave Qualcomm and the very next day you file a patent

1    application on ideas related to Qualcomm's business,

2    something -- something would be very fishy with that?  You

3    understand that?

4    A.  I wouldn't agree with that at all.  It depends on what

5    kind of patent it was.  It depends on what the

6    circumstances were.  I mean, ideas come -- they come when

7    they come.

8    Q.  Okay.  So it's your testimony, sir, that you have an

9    idea related to Qualcomm's business, and you leave the

10   company, and the very next day you file a patent

11   application on stuff that Qualcomm does, it's their

12   business, you -- you -- is it your testimony that that's

13   not fishy?

14   A.  First of all, that's not what happened here.

15        Second, I'm saying that it would depend on the

16   circumstances.  If you -- the next day you went and learned

17   something brand new and you came up with an idea and it was

18   a super simple patent, like a one-paragraph patent, it's

19   possible.

20        This is a hypothetical.  I don't think it has

21   anything whatsoever to do with this case.  It's not what

22   happened here.  And, you know, the notion that timing is

23   somehow indicative of where something was invented, I would

24   strongly disagree with.

25   Q.  But you agree, sir, that you control the information

1   here.  And the reason why this clause is important to

2   Qualcomm is because you're the one that's controlling the

3   information with respect to the work you do on inventions;

4   isn't that fair?

5   A.  I have no idea what you're referring to there.

6   Q.  Well, one thing we do know, sir, is that you ended your

7   employment on September 19th, 2008; isn't that right?

8   A.  September 19, 2008, yes, sir.

9   Q.  But even before you left Qualcomm as its employee, you

10  were already starting your next gig; isn't that right?

11  A.  I was exploring a variety of things, as one does when

12  they're leaving a company.  Often you would interview --

13  you would -- you know, I don't think I've ever left a

14  company without having some options.

15  Q.  Well --

16  A.  Generally you wouldn't leave unless you had some

17  options.

18  Q.  Well, you actually incorporated ItsOn on September

19  17th, 2008; isn't that right?

20  A.  Yes, sir.

21  Q.  And, of course, you left on the 19th.  So you

22  incorporated the company before you left Qualcomm?

23  A.  Yes, sir.  I needed -- I didn't know how long it was

24  going to take, and I needed a -- if you will, a calling

25  card, a place to do business so that I wasn't an individual

1    which poses certain risks.  So I needed some sort of

2    corporate umbrella to have the meetings with Best Buy.  So

3    I asked my lawyers to set up two shells.  One was

4    Headwater, and one was ItsOn, as is my practice and has

5    always been my practice.  I have several LLCs now that I

6    haven't even used yet, so this is not uncommon.

7    Q.  Thanks, Dr. Raleigh.  And, Dr. Raleigh, I appreciate

8    your testimony, and we're trying to get to the bottom of

9    all this, but I only have a limited amount of time.  So if

10   you'd just try to stick to my question, and your very

11   capable lawyer will get up and do what he wants to after

12   that, okay?  Let's try to do that together, okay?

13          All right.  So you also incorporated Headwater on

14   September 17th before you left Qualcomm, correct?

15   A.  Yes, as I just testified, I needed a shell to do

16   business with to talk to Best Buy, and this is my common

17   practice.  I've done it many times in the past.  It's not

18   unusual for me at all.

19   Q.  You got the names, you got the business idea, you got

20   your business model all before you left Qualcomm; isn't

21   that right, sir?

22   A.  No, sir, that's -- I would not agree with that at all.

23   Q.  Well, you certainly -- you -- you settled on the names

24   of the companies before you left; isn't that right?

25   A.  Yes, sir.

1   Q.  And, in fact, you had a meeting with Best Buy on

2   September 9th to 11th in 2008 before you left Qualcomm;

3   isn't that right?

4   A.  I had many meetings with Best Buy over the time at

5   Qualcomm.

6   Q.  Right.  But this meeting with Qualcomm was not on

7   behalf of Qualcomm.  It was on behalf of Dr. Raleigh, you;

8   isn't that right?

9   A.  I'm not sure.  I'm not sure what you're referring to.

10  I don't think so.  I might have talked to them about the

11  fact that I was going to leave Qualcomm.

12  Q.  Well --

13  A.  And, in fact, I testified to that.  I'm not even sure

14  what meeting you're referring to.

15  Q.  Let's look at your deposition -- the 9/25/24 Deposition

16  Transcript 92, 12 to 18.

17          Question:  If a "Next Step" is a meeting to happen

18  between September 9 through 11, then there's no question

19  that this presentation was created before September 9th;

20  isn't that right?

21          Answer:  I would assume so, yeah.

22          Question:  And this refers to the year 2008,

23  right?

24          Answer:  Yes.

25          Did I read that correctly, sir?

1    A.  I'm not sure what the context is here.  What -- is this

2    the Best Buy presentation that they sent to me saying this

3    is what we want you to do?

4    Q.  Sir, is that your testimony?

5    A.  What testimony?

6    Q.  Did I read that correctly?

7    A.  You're reading these words correctly.  I just don't

8    know the context.

9    Q.  And if we go to Tab 12 and we pull up the Page 7 of

10   this presentation, it refers to September 9 through 11.  Do

11   you see that, sir?  This is a Best Buy meeting --

12   A.  Oh, yeah, yeah.  I think this is actually a typo of

13   some kind.  I'm not sure.

14   Q.  This is -- this is --

15   A.  I think there was a typo involved in the dates or

16   something here.  I'm not -- I don't really recall, but I

17   remember that there was -- I can take my time and try to

18   read through this if you would like.

19   Q.  Well, sir, I've got to move us along.

20          But this is a -- this is a document that you

21   testified about, and it indicates that there was a meeting

22   September 9 through 11; isn't that right?

23   A.  I'm not sure.  I'm telling you that I'm not sure of the

24   context.  You just showed me a snippet from my deposition,

25   and I'm not sure what the entire context is.

1    Q.  Well, what we do know is the September 24 to 25th

2    meeting, you testified about that on your direct; isn't

3    that right, sir?

4    A.  Yes, sir.

5    Q.  And what we do know is that in this document, you

6    indicated a meeting on 9 to 11 and you indicated a meeting

7    on 24 to 25; isn't that right?

8    A.  Yes, sir.

9    Q.  And you know for a fact that the 24 to 25 meeting

10   occurred; isn't that right?

11   A.  Yes, sir.

12   Q.  But you just think maybe the 9 to 11, this presentation

13   that you gave to Best Buy, that's a typo, is that what you

14   said -- your testimony?

15   A.  No, I'm sorry, that's -- what I said is that you're

16   showing me snippets of my deposition.  I'm not sure of the

17   context.  I know that there was one presentation in the

18   deposition that had information or an email from Best Buy

19   that had the incorrect dates.

20           This looks to me like it has something to do with

21   what Best Buy had sent to me and asked me to present at the

22   24-25 meeting.  There was a presentation that they gave

23   that was almost identical to the presentation that I

24   sent -- gave back to them at that meeting.  So I'm not sure

25   of the full context here.

1    Q.  But we are sure, sir, that you were dealing with Best

2    Buy before you left Qualcomm.  You were having

3    conversations with them, you were dealing with them, and

4    you weren't dealing with them about Qualcomm stuff, you

5    were dealing with them about Dr. Raleigh's stuff, correct?

6    A.  As I testified specifically, they were interested in

7    having me come work with them to build this MVNO.  I had

8    communicated that to Paul Jacobs.  That drove my timing to

9    leave.  It was entirely appropriate for me to think about

10   what I would do after I left Qualcomm.

11        I think at some point, Best Buy even sent me a

12   presentation saying this is what we would like you to say

13   when you come to meet with us.  So I've testified to all of

14   those things, and I don't think there's anything

15   inappropriate with that at all.

16        If this 9 through 11 thing that they have here

17   refers to preparation for that meeting, I -- you know, I've

18   testified to that, and I even told Paul about it --

19   Dr. Jacobs about it.  And that drove my timing.  That drove

20   my timing.  But there's nothing inventive going on there

21   whatsoever, sir.

22   Q.  Well, what we do know, sir, is this, that the concern

23   that Qualcomm has, as reflected in its employment agreement

24   that you signed, about employees doing -- employees doing

25   stuff while they're working at Qualcomm on behalf of

1  themselves, it's kind of like on steroids with you, right,

2  because you're all this stuff while you're still at

3  Qualcomm; isn't that right?

4  A.  Not at all, sir.

5  Q.  Well, what we do know is that you filed a provisional

6  patent application on January 28th, 2008; isn't that

7  right -- 2009?

8  A.  Yes, sir.  Yes, sir.

9  Q.  Okay.  And you testified about that provisional on your

10  direct testimony, didn't you?

11  A.  Yes, sir.

12  Q.  And I got it in my hand here.  This is it.  It was

13  filed January 2009, and it contains, oh, about 70 figures

14  and almost 300 pages of stuff.  Do you -- do you agree with

15  that?

16  A.  It sounds about right, sir.

17  Q.  Okay.  And you left Qualcomm on September 9th, 2008,

18  and you filed this thing, the '354 provisional, four months

19  later -- almost four months and nine days on January 28th,

20  2009; isn't that right?

21  A.  Absolutely, sir.

22  Q.  And Headwater asserts in this case that this

23  provisional -- this provisional supports the three patents

24  that are at issue in this case; isn't that right?

25  A.  Yes, sir.

1  Q.  In fact, you -- you were preparing a provisional

2  application that led to the patents in this case such that

3  you were ready to file by the end of October, almost one

4  month after you left Qualcomm; isn't that right?

5  A.  No, sir.  I thought I could file something by then, but

6  I -- it just was taking way too long.  So I had very little

7  by that time.

8  Q.  Well, let's take a look at that.

9        MR. MCKEON:  Let's look at Tab -- we'll pull it

10  up, Tab 18.

11  Q.  (By Mr. McKeon)  This is your October 23rd, 2008

12  presentation that you gave to Best Buy, correct?

13  A.  Yes, sir.

14  Q.  And that's about one month after you left Qualcomm;

15  isn't that right?

16  A.  Yes, sir.

17        MR. MCKEON:  And if we turn to the Bates page

18  ending in 566?

19  Q.  (By Mr. McKeon)  At the top here, it says:  Patents in

20  progress (sic) -- should file first in the next week or so.

21        Isn't that right?

22  A.  Yes, sir.  I thought I could file some very simple

23  provisionals to start documenting where I was.  And I just

24  wasn't able to do that because I wasn't far -- far enough

25  along.  It didn't make sense.  There just wasn't enough

1  embodiments.  There wasn't enough meat on the bone.  The

2  lawyers looked at this and said this really isn't going to

3  do us much good, so we didn't file anything.

4  Q.  Okay.  But so you're telling Qualcomm -- strike that.

5          You're telling Best Buy in this October 23rd

6  meeting, in a week or so which is the end of October, I'm

7  going to start filing patent applications on my great

8  ideas.  That's what you're telling Best Buy in this

9  meeting; isn't that right?

10  A.  Yes.  So what actually happened is we started doing

11  prior art searches, we started looking at what I had by

12  that time.  There was actually a considerable amount of

13  prior art.  You know, it has been my practice on certain

14  things in the past to file very small snippets in

15  provisionals just to document -- as a way of essentially

16  trying to claim back priority dates.

17          But when we actually looked at what I had, it just

18  wasn't anywhere near enough to overcome prior art and to

19  have something that we could make viable claims from.  And

20  so the lawyers said, look, we can do this if you want, but

21  there really isn't much meat on the bone.  And, you know,

22  we just don't think you should be doing that.

23          So I didn't end up doing that.  It took many

24  months from that point to have that prospective you're

25  looking at there.  So that's what happened.

1  Q.  Well, the October 23 meeting, let's be clear on this,

2  that you had with Best Buy, on the flight home from that

3  meeting -- strike that.

4       Your September meeting that you had with Best Buy,

5  on the flight home from that is when you had that ah-ha

6  moment that led to the Headwater 1 inventions; isn't that

7  right?

8  A.  Yes, I referred to that as an inkling, and nothing

9  patentable, but, hey, wait a minute, if I can move some of

10  these deep packet inspection-type, you know, functions that

11  are in the network and I can put that on a device, that

12  could be very valuable.  So it was an inkling that

13  eventually led me in the direction of these patents.  And I

14  indeed had that on the flight home from Best Buy, yes, sir.

15  Q.  All right.  We're going to get into more on that later.

16  But what you'll agree with me is that September -- strike

17  that.

18       January 28th, 2009, when you filed this, you

19  certainly agree that that is within one year of the time

20  that you left Qualcomm; isn't that right?

21  A.  Of course, sir.

22  Q.  And that invokes this Provision 1.4 of the Qualcomm

23  agreement; isn't that right?

24  A.  Should their provision be enforceable, yes.  And as I

25  testified, I think I met more than my burden there in this

1    court today and the 422 and at the time with Qualcomm.

2    Q.  Thank you, sir.  And we'll get -- we'll get to that.

3            Now, focusing on the patents in this case, you

4    talked about them on direct.  The problem was a world where

5    applications connected to their own servers which created

6    an unwieldy amount of network chatter, correct?

7    A.  I'm sorry, I missed the first part of that.  What are

8    you referring to?

9    Q.  So I want to reset your mind, and we're talking about

10   the patented technology in this case.  Are you with me?

11   A.  Okay.  But you mentioned something that I said.  I'm

12   not sure when you're saying I said that.

13   Q.  I'm just asking you a question, sir.

14   A.  Oh, okay.  Sorry.

15   Q.  Okay.  With respect to the patents in this case, the

16   problem was a world where applications connected to their

17   own servers which created an unwieldy amount of network

18   chatter, correct?

19   A.  That's -- yeah, generally that's a true statement.  And

20   that's similar to what I said earlier, yes.

21   Q.  And in your view, the Headwater 2 patents solved

22   critical problems that literally brought down the Cingular

23   network when the first iPhones and Androids were attached

24   to the network, correct?

25   A.  What I would say is that there were several factors

1   that contributed to that, but applications attempting to

2   connect to their servers created a very large network

3   demand, and that contributed to the Cingular network going

4   down, yes.

5          MR. MCKEON:  And let's go to Slide 17 if we can.

6   Q.  (By Mr. McKeon)  This is your testimony, sir, from your

7   September 10th, '24 deposition at 46, 3 to 9.  And I'll

8   read:  These patents solved the critical -- solved critical

9   problems that literally brought down the Cingular network

10  when the first iPhones and Androids were attached to the

11  network.

12         Did I read that correctly?

13  A.  Yeah, I think this was -- which deposition was this?

14  Q.  Sir, it was the deposition in this case.

15  A.  In this case?  Okay.  I've had 50 hours of depositions,

16  so they kind of blur together.

17  Q.  Did I read, sir -- my question is:  Did I read that

18  correctly?

19  A.  Yes.

20  Q.  And you know that the first iPhone -- the first iPhones

21  were rolled out in 2007; isn't that right?

22  A.  I think -- I'm not sure.  2008 is when they started

23  becoming popular, but 2007 sounds about right.

24  Q.  So 2007, 2008 -- became popular in 2008.  What we know

25  is that your patents in this case solved that critical

1  problem that literally brought down the Cingular network

2  when that iPhone came out; isn't that right?

3  A.  I'm sorry.  These patents were filed -- the particular

4  claims here were filed quite a bit later, so I'm not sure

5  what you're asking me.

6  Q.  Well, what we do know is that you'll agree that when

7  the iPhone was introduced and brought down the Cingular

8  network, that was a -- that was a disaster, wasn't it?

9  A.  It was -- yeah, it was -- there were a lot of consumer

10  complaints.  There were widespread news reports.  There

11  were, you know, very big problems with the Cingular network

12  because it was essentially an iPad with a modem, and all of

13  those applications were communicating with their servers

14  whenever they wanted, and that definitely caused huge

15  problems for the Cingular network, yes.

16  Q.  And it was a disaster, right?

17  A.  It was very problematic, yeah.  The network literally

18  became unusable at some point.

19  Q.  And the patents at issue here addressed this disaster

20  on the network with a single communication channel between

21  each device and the network, correct?

22  A.  These patents definitely have a huge impact in solving

23  that problem, yes, sir.

24  Q.  And that is with a single communication channel,

25  correct?

1  A.  That's part of the limitations involved, but nowhere

2  near all of the limitations involved, just one of them.

3  Q.  Okay.  And with your invention here, you now -- you

4  have now one channel that can manage -- you can manage

5  rather than all these point-to-point connections, correct?

6  A.  It's a generally true statement, but, again, there's

7  many other limitations involved in the patents.

8  Q.  And you believe that one way to describe the inventive

9  concept of your invention is aggregated messaging, correct?

10  A.  Again, that's -- you know, addresses some of the

11  limitations, not all of the limitations.  But that was

12  my -- as I started thinking about this problem, it was my

13  first step to realize that I can't have these many-to-many

14  connections, and the first step was to aggregate.

15  Q.  Okay.  And but that's -- one way to describe your

16  invention is to -- is aggregated messaging, correct?

17  A.  I would say -- I would say that that's one way to

18  describe, you know, a subset of the limitations because

19  that in and of itself would not be patentable given the

20  prior art that existed at the time.

21  Q.  Okay.  Let's go to your deposition.

22         MR. MCKEON:  Slide 20, please.

23  Q.  (By Mr. McKeon)  This is the 9/10/24 deposition at 68,

24  1 to 9.

25         Question:  And what you just described at length

1   we can call it in shorthand aggregated messaging?

2           Answer:  You know, I'm -- as you can tell, I'm

3   very hesitant to use small words to define even invented

4   concepts.  I would call it -- I don't know what I would

5   call it.  I just describe what it is.  I threw out the term

6   "aggregated messaging."  That's one way to describe it.

7   There are many ways to describe it.

8           Did I read that correctly?

9   A.  It's very consistent with what I just testified.  It

10  addresses a subset of the limitations.  And you can tell I

11  am very careful about describing claims and patents.  We go

12  through the claims very painstakingly.  And, you know, I'd

13  really have to think about how to recharacterize things.

14  It is -- aggregated messaging addresses a portion of the

15  limitations in these claims.

16  Q.  And you believe the devices could benefit from an

17  aggregated messaging channel such as the patented

18  inventions here, right?

19  A.  Yes.  But, again, I'll say it one more time.  That's

20  just a subset of the limitations involved.  And that in and

21  of itself would not have been patentable in those days.

22  There was a lot of prior art on aggregated messaging of

23  various kinds.

24  Q.  Now, let's focus on conception, which is actually an

25  important issue in this case -- in this hearing.

1         On direct, you said you conceived the Headwater 2

2    ideas after you had the Headwater 1 device-side idea,

3    correct?

4    A.  I'm sorry, could you repeat that?

5    Q.  You conceived the Headwater 2 ideas in this case, the

6    inventions in this case, after you had the Headwater 1

7    device-side idea?

8    A.  Yes.  I'm sorry, it's a little confusing.  We had an

9    entity called Headwater Partners II, so I understand now

10   what you're asking.  So that's exactly what I testified to,

11   yes.

12   Q.  Okay.  I just want to make sure we're all clear on

13   that.

14        And you believe that you conceived the invention

15   in this case after you tried to reduce the Headwater 1

16   device-side solution to practice, correct?

17   A.  Yes, sir.

18   Q.  And you actually conceived the Headwater 2 invention

19   before you conceived the Headwater 1 invention, correct?

20   A.  No, that's not what I said.  I'm not sure where

21   you're -- where you're getting that.

22   Q.  Well, what we do know is you claimed priority date in

23   this case January 28th, 2009; isn't that right?

24   A.  Okay.  Wait a minute.  You're -- so this -- again, this

25   terminology is confusing me.  When you say Headwater 1,

1  that's the previous 422 case?

2  Q.  Let's be clear here because I don't want any confusion

3  here.

4          You were here last summer and provided testimony

5  to the Court in Headwater 1.

6  A.  Yeah.

7  Q.  We just had a jury trial in January in Headwater 1.

8  A.  Yes.  Okay.  Well, you're calling it Headwater 1.  I

9  call it 422.  So that's why I'm getting confused.

10         So the 422 case, those patents were fully

11 conceived in, like, roughly 2010.  So in the previous

12 hearing, we talked about the ah-ha moment, not the actual

13 conception of all the limitations required in that case.

14         And here what I've testified to is the first ah-ha

15 moment that eventually led to other discoveries in 2010

16 that resulted in the 422 case patent claims, and it was

17 after that ah-ha moment, not -- obviously not the patent

18 claims that came in 2010.  So your terminology is confusing

19 me.  But that -- that's the reality.

20 Q.  I want to be very clear about this because a very

21 important part of this case is the timeline.

22         So you agree with me that you actually conceived

23 of the inventions -- Headwater inventions at issue in this

24 case, you conceived them before you conceived the Headwater

25 inventions in the 422 case, correct?

1  A.  Yes.

2  Q.  And you claim a priority date for the inventions in

3  this case of January 28, 2009, based on the '354

4  provisional, correct?

5  A.  Yes, sir.

6  Q.  And you claim a priority date in the Headwater 1 case,

7  the 422 case, of May 25th, 2010, correct?

8  A.  Yes, sir.

9  Q.  And, of course, in the Headwater 1 case, that 422 case,

10  you have other inventors, you have Dr. Raissinia, for

11  example; isn't that right?

12  A.  Yes, and Mr. Lavine.

13  Q.  And Dr. Raissinia, you recall, he left Qualcomm

14  November 30th of 2009; isn't that right?

15  A.  I'm not sure of the date, sir.

16  Q.  Okay.  Let's pull up his -- Tab 26.  And this is --

17  this is an employment record for Dr. Raissinia.  It's in

18  the record.  You see here he was terminated November 30th,

19  2009.  Do you see that?

20  A.  Yes, sir.

21  Q.  So he -- when he left, then after that date, there was

22  work done, and you came up with the Headwater 1 or the 422

23  inventions; isn't that right?

24  A.  The 422 inventions, yes, sir.

25  Q.  And just to put a pin in it, you actually conceived the

1    Headwater 2 inventions in this case by January 2009 before

2    the conception of the Headwater 1 inventions, correct?

3    A.  Yes.  But what -- what hinged on some of the

4    discussion -- some of the discussion in the 422 hearing

5    that we had hinged on the ah-ha moment.  And then the -- we

6    never got all the way out to 2010.  We just focused on the

7    ah-ha moment in the October 23rd presentation.

8    Q.  But what we do know is you had -- you testified on

9    direct about these panel remarks that you gave in a

10   presentation.  Do you recall that?

11   A.  Generally, yes.

12   Q.  Yeah.  Well, let's -- let's pull up the actual remarks

13   so we can take a look at that and see how they apply

14   specifically to this Headwater 2 case, okay?

15   A.  Sure.

16   Q.  And we've duplicated the remarks here.  And in this --

17   in the remarks you gave, you said:  The next step is

18   operating systems technology to manage the way applications

19   connect on these new smartphones, because without that,

20   there's going to be a disaster on the network.

21        Isn't that right?

22   A.  That's what I said, yes, sir.

23   Q.  And this disaster on the network, that kind of mirrors

24   the same sentiment when the iPhone brought down the

25   Cingular network; isn't that right?

1    A.  I'm not sure what you're asking me there.

2    Q.  Well, I think we've agreed earlier that when the iPhone

3    brought down the Cingular network, that was a disaster on

4    the network, wasn't it?

5    A.  Yes, I testified to that.  It caused a lot of problems.

6    Q.  And the same sentiment is -- you're talking about here

7    is with these applications connecting, that was a disaster

8    on the network, is what you said in your panel remarks,

9    correct?

10   A.  Yes, sir.  Again, in my passing comment, yes.

11   Q.  And you testified that the -- the patents at issue in

12   this case solved critical problems that literally brought

13   down the Cingular network when the first iPhones and

14   Androids were attached to the network; isn't that right?

15   A.  I'm sorry, my screen has gone blank.

16   Q.  Okay.  I'm just asking you about -- about your

17   testimony in this case.

18   A.  Oh, okay.

19   Q.  We just went through this, but I want to make sure

20   we're clear.

21        The patents in this case solved the critical

22   problems that literally brought down the Cingular network

23   when the first iPhones were attached, correct?

24   A.  As I mentioned, these were instrumental and this

25   technology was instrumental in helping to reduce that

1  network load that caused all those problems.

2  Q.  And those problems, sir -- those problems didn't just

3  exist after your ah-ha moment that you had in the

4  Headwater 1 patents, those problems existed in 2007, going

5  into 2008, when the iPhone brought down the Cingular

6  network; isn't that right, sir?

7  A.  I don't remember exactly when that Cingular network

8  problem occurred, but it was evident to me, as I was

9  writing this patent, the '354 provisional, that these were

10  going to be big problems.

11  Q.  And Headwater's technical expert, Mr. de la Iglesia,

12  agrees that network problems occurred in January 2008 after

13  the iPhone was launched in 2007; isn't that right?

14  A.  I haven't read his report, sir.

15       MR. MCKEON:  Well, let's pull up Tab 30.

16  Q.  (By Mr. McKeon)  And this is an excerpt from

17  Mr. de la Iglesia's report.

18       And you see here, he talks about widespread

19  connectivity problems widely reported in the news media

20  across 2008 and 2009.  Do you see that?

21  A.  Yes, sir.

22  Q.  And he has two cites:  The Untold Story: How the iPhone

23  Blew Up the Wireless Industry.  And cite -- and then:

24  Customers Angered As IPhones Overload AT&T.

25       Do you see that?

1    A.  Yes, sir.

2    Q.  And he talks about the iPhone here and mentions that

3    specifically.  Do you see that?

4    A.  Yes, sir.

5    Q.  Okay.  And so you agree that the time frame here is

6    2007 going to 2008 with respect to the Cingular network;

7    isn't that right?

8    A.  Yeah.  As I mentioned, I was aware that these were

9    going to -- the type of problems we're talking about, many

10   applications talking to many servers and other things, as

11   well, were going to cause these problems with the network,

12   yes, sir.

13   Q.  And you agree that everyone in the wireless industry,

14   including Qualcomm, was affected by those network problems,

15   correct?

16   A.  Not sure what you mean by that.  I don't know that it

17   directly affected Qualcomm's business.  It was -- those

18   problems were affecting consumers and carriers primarily.

19          MR. MCKEON:  Let's go to your deposition testimony

20   again.  This is 9/10/24 depo, 121:10 to 17.

21          Question:  Was Qualcomm affected by the problems

22   that you've identified of apps congesting the network?

23          Answer:  I don't know what you mean by that.

24          You continue:  Everybody in wireless, users,

25   carriers, everybody was affected by that.

     1            Did I read that correctly?

     2   A.  Yeah, I think that's what I just said.

     3   Q.  And just so we're clear, the next step that you

     4   mentioned in your panel remarks --

     5            MR. MCKEON:  And let me pull that back up, Slide

     6   32.

     7   Q.  (By Mr. McKeon)  This next step that you mentioned in

     8   your panel remarks for solving the network problems as

     9   operating systems technology to manage the way applications

    10   connect on these smartphones, you conceived that while you

    11   were at Qualcomm; isn't that right?

    12   A.  Not at all, sir.  So as I testified already, I started

    13   off thinking that it would be something in network

    14   operating systems.  And that -- I didn't possibly have time

    15   nor was it relevant to this panel to insert all of the

    16   facts relating to this hearing here today, and it would

    17   have been a waste of everybody's time.

    18            So I want to be very clear here.  I started off

    19   thinking MVNOs, network operating systems, deep packet

    20   inspection would be a way to solve some of these problems,

    21   and I took a hard right turn, and that's the part that's

    22   not in this comment.  It's a passing comment.  It's -- I

    23   think it's not very rational to try to use this passing

    24   comment to represent reams of facts involved.  And what I

    25   was referring to here was network operating system

1    technology when I talked to Paul.

2    Q.  Sir, I don't mean to be irrational, I'm just trying

3    to -- trying to get to the bottom of this and rely on

4    public statements that you made -- these are statements

5    that you made and you said you presented this idea to the

6    CEO of Qualcomm and you talked about the disaster on the

7    network that we've been talking about this morning.  And

8    then you said that the Qualcomm CEO said, no, I'm not

9    interested, so I left is what you said.

10          That's what you said on the panel; isn't that

11   right?

12   A.  What I said on the panel, sir, had absolutely no way to

13   include all the facts that we're talking about here, and

14   I've testified to that extensively in a couple of different

15   hearings now.

16          It just would have been impossible and irrelevant

17   for me to try to include all of the things that would have

18   been completely uninteresting to the listeners of the

19   session.  It was irrelevant to the topic, and I would have

20   gone way over my time.  So I just don't think it's

21   reasonable to take a passing comment, given all the facts,

22   all the testimony under oath, all the evidence and try to

23   read into it all the things you're trying to read into it.

24   Q.  Well, there's no doubt that you conceived and reduced

25   to practice at least certain portions of the Headwater 2,

1  this case, claimed inventions as early as September 2008,

2  correct?

3  A.  No.

4        MR. MCKEON:  Well, let's pull up Tab -- Slide 33

5  if we can.

6  Q.  (By Mr. McKeon)  This is an interrogatory response

7  filed in this case, sir, and you see at the bottom here

8  this response?

9  A.  Yes, sir, I've seen this before.

10  Q.  It says:  Conception and reduction to practice of

11  certain portions of the claimed inventions occurred as

12  early as September 2008.

13        Did I read that correctly?

14  A.  Yes, sir.

15  Q.  That's what your lawyers are submitting on your behalf

16  in this case; isn't that right?

17  A.  You know, I think it's standard.  I don't know where

18  this came from.  They certainly didn't ask me about it.

19  They certainly didn't read the record to do this because

20  it's not true.  And I think they're just saying it could

21  have happened as early as September 2008.  I think that's

22  all this says.

23        We've never claimed priority to 2008.  We could

24  not claim priority to 2008, as I've very fulsomely

25  testified.  So this is not relevant to the priority date.

1    Q.  Well, sir, my friends over here on this table are very,

2    very good lawyers, and they submitted this interrogatory

3    for us to review in this case.  And they're very clear

4    here, no speculation, the claimed inventions occurred -- or

5    certain portions of the claimed inventions occurred as

6    early as September 2008.  That's what the interrogatory

7    says, correct?

8    A.  That's what it says, sir.

9    Q.  And you believe --

10   A.  And I believe that maybe they're referring to the ah-ha

11   moment, I have no idea.  But I did not have any embodiments

12   required for -- you know, to support the limitations in

13   this -- these patents by that time.  That was just a false

14   statement if -- if you try to assert that.  I don't know

15   what they're referring to here.  I wasn't involved.  And I

16   just don't know how this stuff works.  I'm not an attorney.

17   Q.  And what we do know is, sir, that in -- in around the

18   middle of 2008, you and Headwater began meeting with

19   various handset manufacturers, wireless carriers, and

20   electronic retailers to discuss possible business

21   opportunities; isn't that right?

22   A.  I think you're referring to a typo.  That would have

23   been 2009, and I testified to that in my deposition.  So

24   you're bringing up a typo again that I've already testified

25   to.

1    Q.  Well, let's --

2    A.  That, in fact, is the typo I was getting confused about

3    earlier.

4          MR. MCKEON:  Well, let's pull up, if we can, Tab

5    35 -- or Slide 35.

6    Q.  (By Mr. McKeon)  And this is, again, an interrogatory

7    response.  And this is an interrogatory response that we

8    received, sir -- just so you know, we received this --

9    received this in the Headwater 1 case, which is the 422

10   case; we received this response in the Headwater 2 case,

11   which is this case; and we received this response in the

12   Headwater 3 case.

13         And you're saying that -- that these very good

14   lawyers over here, they have a typo in Headwater 1, they

15   have a typo in Headwater 2, and they have a typo in -- typo

16   in Headwater 3?  Is that your testimony?

17   A.  What I can say, sir, is this sentence on the face of it

18   is a typo because it says in the fall of '08, I founded

19   Headwater Partners, and in the middle of '08, Headwater

20   Partners was talking to handset manufacturers.  It is a

21   typo, sir.

22   Q.  But we've already established we know for certain you

23   met with Best Buy before you left Qualcomm; isn't that

24   right?  It was September 9 to 11, correct?

25   A.  You know, again, I'm not sure what the context was.  I

1    have definitely testified that I did discuss with Best Buy

2    the fact I was leaving.  They asked me to come to this

3    meeting.  They were, you know, recruiting me for a couple

4    of months to come to this meeting.  They told me what they

5    wanted me to present at the meeting.  It drove my timing to

6    leave Qualcomm, and I told Dr. Jacobs about it before I

7    left.  And I said it's -- it's the reason I need to leave

8    now.

9            I don't think there's anything whatsoever

10    inappropriate with that.  And this, sir, is a typo.

11    Q.  Okay.

12    A.  And on the face of it, it's a typo.  The two sentences

13    don't go together.  I can't found something in the fall and

14    meet with people in the summer --

15    Q.  Okay.  So let me --

16    A.  -- of the same year.

17    Q.  All right.  Let's make sure the timeline is clear here.

18    So you had this meeting September 24-25 with Best Buy.  Are

19    you with me right now?

20    A.  That's when I had the first meeting with Best Buy,

21    September 24, 2008, September 25th, yes, sir.

22    Q.  On the flight home from that meeting is the ah-ha

23    moment that you've testified about extensively between the

24    last hearing and this hearing that led to the Headwater 1

25    inventions; isn't that right?

1    A.  Yes, sir.

2    Q.  And that's moving from the networks to the device,

3    correct?

4    A.  Yes, sir.

5    Q.  And then only after you had this ah-ha moment, the

6    Headwater 1 ah-ha moment, that you realized there would be

7    a problem in the network that led to the Headwater 2

8    inventions, correct?

9    A.  Yes.  I'm trying to listen very carefully to what

10   you're saying, yes.

11   Q.  And we, of course, know that the Headwater 1, focusing

12   on Headwater 1, that the priority date there is May 25th,

13   2010.  So that's -- that's 20 months after the ah-ha moment

14   that you had on the plane ride home; isn't that right?

15   A.  Yes, sir.  The ah-ha moment led to -- eventually led to

16   the patents in both of these cases, yes.

17   Q.  Okay.  But let's take one at a time.  So I got -- the

18   timeline is right here.  You had the ah-ha moment in

19   mid-September of 2008, and then you have your priority

20   date, the filing date, you finally filed a patent on that

21   was 20 months later, May 25th, 2010, correct?

22   A.  It wasn't mid-2008, sir.  It was toward the end -- it

23   was September 25th-26th, would have been after the meetings

24   that I had the ah-ha moment.  And all of the embodiments

25   necessary to support the 422, which you referred to, I

1  think, as Headwater 1, all of those embodiments didn't

2  exist until, you know, spring of 2010.

3  Q.  May 10, 2010 exactly, right?

4  A.  That was the priority date, yes.

5  Q.  Okay.  So I got the timeline right, that's 20 months it

6  took you to get all that done; is that fair?

7  A.  Not exactly, no.  No.  It doesn't take that long to

8  write a patent.  It was all the development we did to

9  discover additional things that we wanted to add, and those

10 embodiments were necessary to support the claim

11 limitations.  It did not take 20 months to write the

12 patent, no, nowhere near that.  Probably a few weeks.

13 Q.  Okay.  A few weeks, but you didn't file the patent,

14 and, you know, time -- time is money in this business.  You

15 got to get to the Patent Office first.  So you didn't file

16 that until 20 months later after the ah-ha moment September

17 25th, correct?

18 A.  Yes.  As I testified, we did not have all the

19 embodiments necessary to support all the claim limitations

20 in the first provision of the '354, and that's why we

21 couldn't claim priority back to '354.

22 Q.  And the timeline is very, very different, though, sir,

23 in this case, isn't it?

24 A.  No.

25 Q.  Well, let's look at that.

1          You said you -- you testified -- putting away the

2     iPhone Cingular disaster, what you have said is that you

3     didn't even think about the Headwater 2 inventions until

4     after the Headwater 1 ah-ha moment, right?

5     A.  I -- no.  You're using Headwater 1 and Headwater 2.  I

6     apologize that that confuses me because we actually had

7     entities called Headwater I and Headwater II.

8     Q.  Let me try to -- let me try to --

9     A.  So I'll just answer your question.

10    Q.  I'll try to use 422 and -- in this case.  Does that

11    help?

12    A.  Sure, that would be very helpful to me.  Thank you.

13    Q.  Okay.  So as I understand your testimony, you didn't

14    even think about the -- the inventions in this case until

15    after September 25th, 2008, after the ah-ha moment in the

16    422 case, correct?

17    A.  The ah-ha moment applies to both of these.  So the

18    ah-ha moment was the flight back from Best Buy, and then

19    the first time I expressed the ideas that led to the 422

20    case was in October.  And those eventually led to the '354.

21    And then additional embodiments that support the

22    limitations in that case were happening in May.

23          In this case, the ah-ha moment occurred.  Then I

24    started working on, as the October 23 presentation shows,

25    device assisted services, moving network functions onto the

1  device.  And then after that, roughly in November, I

2  started to realize that had caused a different set of

3  problems.  So that's the timeline, sir.

4  Q.  Okay.  So is November then -- so we're clear on this

5  exact timing, is November sort of the ah-ha moment in this

6  case?

7  A.  Sometime around there.

8  Q.  Okay.  So November is when -- after the Headwater 1,

9  the 422 ah-ha moment, sometime in November you had the

10  ah-ha moment in this case, which is you saw it was a

11  problem.  I need to solve this new problem that I've

12  created with the 422 inventions, is that --

13  A.  I wouldn't say it that way.  The problem was created by

14  the general approach to move network technology onto the

15  device, and there were many, many patents that hinge from

16  that ah-ha moment, including the 422 patents, but many

17  others.  And all of those inventions required this control

18  of the chatter that was being created by these agents

19  communicating with their servers.

20          So it's not just 422.  It's many of the

21  inventions, maybe perhaps most of them.  And then that was

22  the second ah-ha, as you described, which would have

23  occurred, you know, sometime around early November probably

24  is the best of my recollection.

25  Q.  Early November.  Headwater 2 now.  So we have November

1    you identified a problem, oh, I need to solve this,

2    November.  We've got December.  And then January 28th --

3    January 28th, you filed this '354 provisional, which

4    supports the three patents in this case, correct?

5    A.  Yes, sir.

6    Q.  So that's two -- roughly three months of time between

7    the beginning of November to January 28th when you filed

8    this document, correct?

9    A.  Yes, sir.

10   Q.  And it took you 20 months -- 20 months in the

11   Headwater 1 case by the time you had your ah-ha moment and

12   you filed in May of 2010, correct?

13   A.  Yeah, but that -- not exactly.  So, again, it's not how

14   long it took to file the patents.  There was additional

15   ah-has that happened, if you will.  We're using this term

16   "ah-ha."  And within weeks of the ah-ha, we had filed the

17   patent.  So it was -- what happened in the 422 case is we

18   were developing products, and we came across new

19   embodiments that we wanted to -- to do something different

20   than what we had in the '354, and the actual -- once that

21   ah-ha happened, it was really very quickly that we filed

22   the patents.

23          So I just think you're mischaracterizing the time

24   it takes to write a patent.  It's that the -- the notions

25   that went into that patent in 422 didn't happen until

1    later.

2    Q.  Sir, I'm just trying to get the timeline right.  And

3    have you every incentive to file as quick as can you at the

4    Patent Office.  I know that you know that.

5    A.  Yes, sir.

6    Q.  And all I know is this.  I'm a simple man.  I can do

7    math.  That's all I -- but I can barely do that.  I know

8    that you had the ah-ha moment after this flight home,

9    September 25th, 2008, and you didn't file -- a lot of

10   things happened in the middle of all of that.

11   Dr. Raissinia left Qualcomm and all of that, and you didn't

12   file the actual application until May of 2010.  We know

13   those dates, correct?

14   A.  We filed very similar things, but they didn't have all

15   of the embodiments we needed to support the 422 claims.

16   Q.  Sir?

17   A.  So there was an additional ah-ha that was required to

18   recognize additional embodiments required for the 422.  And

19   that's why it took so long.  It wasn't the time it takes to

20   write a patent.

21   Q.  Sir, I'm not trying to -- I'm just -- I just want to

22   know about the timeline.  It's 20 months, right?

23   A.  It was 20 months before we filed the additional patent.

24   Q.  And it was three months in this case, correct?

25   A.  Yeah, but that doesn't have anything to do with how

1  long it takes to write a patent.

2  Q.  Well, what we do know is it's many, many months, right?

3  It's over a year we know when you filed the Headwater --

4  when you filed the Headwater 2 inventions in this case from

5  the iPhone disaster on the Cingular network at the

6  beginning of 2008, correct?  Well over a year you had of

7  time to think about things and file in January of 2009 this

8  '354 application; isn't that right, sir?

9  A.  No, I wouldn't characterize it that way at all, sir.  I

10  don't think that's how I would say that.  That's

11  misleading.

12  Q.  Well, one thing we do know is you understand that the

13  acronym SMS is for short message service; isn't that right?

14  A.  I believe that's what SMS means, yes.

15  Q.  And that involves a server sending a message to a

16  device without the device requesting the message, correct?

17  A.  I think that's generally one of the features of SMS,

18  yes.

19  Q.  And SMS is a type of push message, correct?

20  A.  Some might characterize it that way.  I'm not sure I

21  would.

22  Q.  And -- and you understand that Headwater's expert,

23  Mr. de la Iglesia, agrees that an SMS is a type of push

24  message?

25  A.  I have not read his report, sir.

1    Q.  All right.

2            MR. MCKEON:  Let's look at Slide 43, which is an

3    excerpt from his deposition.

4    Q.  (By Mr. McKeon)  Question, he was asked:  And under

5    your description of push-model network communications,

6    would that include the SMS message I get telling me to vote

7    for Kamala Harris or Donald Trump?

8            Answer:  So I think it's -- you would think of it

9    as using a push method.

10            That's what Dr. de la Iglesia says, right?

11   A.  That's what these words say, sir.

12            MR. MCKEON:  Now, let's pull up, if we can,

13   Tab 11, which is an email exchange you had with Randy

14   Menna.

15   Q.  (By Mr. McKeon)  And Randy Menna is a co-founder of

16   ItsOn with you; isn't that right, sir?

17   A.  Co-founder is a loose term.  So he was working with

18   me -- he's the fellow that I brought to Best Buy with me to

19   listen to what they wanted us to do or to listen to the

20   vendor presentations.

21            MR. MCKEON:  Let's pull up Slide 37, which is Tab

22   12.

23   Q.  (By Mr. McKeon)  This is an excerpt of a presentation

24   you gave to Best Buy; isn't that right?

25   A.  Yes, sir.

1  Q.  And it wasn't a loose term, "co-founder," in the

2  presentation that you gave to Best Buy, was it?

3  A.  We characterized him as a co-founder, but, again,

4  that's a very loose term.  He's the person that I went to

5  Best Buy with to -- he had a lot of network experience,

6  and, you know, they wanted me to bring somebody that, you

7  know, had -- I didn't have much experience in this area at

8  all, like pretty much zero, and he had a lot of experience.

9  So they wanted me to show that I could recruit people that

10  had the background to do this.  And Randy was a great

11  person for that, very, very knowledgeable.  And he worked

12  with me for a while, and then he had his own consulting

13  business, so he didn't stay at ItsOn.

14         MR. MCKEON:  All right.  Let's go to Tab 11.  For

15  the record, it's the Headwater Document Number 69643 to 46.

16  And let's go to the end.  I want to go the September --

17  strike that.  I want to go to the Friday, September 12th,

18  2008 email.

19  Q.  (By Mr. McKeon)  And this is an email that's from you;

20  isn't that right?

21  A.  It looks like it, sir.

22  Q.  And it's to Randy, who's Mr. Menna; isn't that right?

23  A.  That's what it looks like, sir, yes.

24  Q.  And this is September 12th, so you're still at Qualcomm

25  when this email is sent; isn't that right?

1  A.  Yeah, that -- I would still be at Qualcomm.

2  Q.  But you're very careful not to use your Qualcomm email

3  address.  You're using your personal email address,

4  mimoguy; isn't that right?

5  A.  Yeah, of course.  Exploring future opportunities, I

6  wouldn't use my business email.

7  Q.  And one of the things you say here:  We will need to go

8  back and forth on this, but can you take a crack at

9  defining the following:  All the core functions that ItsOn,

10  an MMSP, provides in the managed service solution?

11       Do you see that?

12  A.  Yes, sir.

13  Q.  And, of course, this is a week before you left Qualcomm

14  on September 19th; isn't that right?

15  A.  Yes, sir.

16  Q.  And then on September 12th, you asked Mr. Menna -- I

17  just read that into the record.

18       Okay.  So now let's go now to your -- the response

19  rather on the first page of the exhibit, September 13th,

20  response.  And this is Mr. Menna responding to your email.

21  You see that?

22  A.  Yes, sir.

23  Q.  Okay.  And, again, this is before you left Qualcomm;

24  isn't that right?

25  A.  Yes, sir.

1    Q.  And in this email we see here on the next page, you go

2    to the text, No. 3, it discusses an SMS messaging.  Do you

3    see that?

4    A.  Yes, sir.

5    Q.  And it says here, SMS:  Do we want to access the

6    carrier's SMCS (sic), or do we want to use an aggregator?

7          Do you see that?

8    A.  Yes, sir.

9    Q.  He mentions using an aggregator in his email back to

10   you as a solution; isn't that right?

11   A.  Yeah, but that's not the same aggregation you were

12   talking about earlier.  You're word matching something

13   that's different.  This is very different.

14   Q.  Well, we know that aggregating messaging is something

15   that you say is the subject matter of the inventions in

16   this case, and we know that SMS is push messaging; isn't

17   that right?

18   A.  This isn't aggregator, sir.  This is a company that

19   aggregates SMS.  This is not -- has nothing to do with my

20   inventions.  This is just standard.  We were trying to go

21   to Best Buy and represent what they'd asked us to represent

22   that we kind of knew how to help them with an MVNO.  Randy

23   was an expert in that area, I was not.  These are very,

24   very basic standard industry things.  An aggregator is an

25   aggregator that aggregates SMS messages.

1   Q.  Well, let's look at your response.  You responded on

2   September 21, two days after you left Qualcomm, right?

3   September 21, again, is a two days after September 19th

4   when you left; isn't that right?

5   A.  Yes, sir.

6   Q.  And you say here:  I did not want to think about any

7   details that could be construed as technical content or

8   specific business solution design until I had officially

9   departed from Qualcomm.

10          Do you see that?

11  A.  Yes, sir.  I was being diligent.

12  Q.  You were being -- you consider that being diligent?

13  A.  Oh, absolutely, sir.

14  Q.  Or do you consider that, sir, sort of a protesting too

15  much, if you know what I'm saying?

16  A.  I do not, sir, at all.

17  Q.  But what we do know is that the technical discussions

18  you had with Mr. Menna before you left, all happened before

19  you left Qualcomm on the 19th; isn't that right?

20  A.  I wouldn't even call these technical.  We were just

21  trying to make a -- you know, be prepared to go to Best Buy

22  and ask -- to do what they had asked us to do.  That's all

23  this is.

24          And I -- as I testified, I do -- I did not have

25  the experience.  Best Buy wanted me to bring someone who

```
 1    did.  He's basically bringing me up to speed, and just so

 2    that we can, you know, make the calling card presentation

 3    that we made when we went to Best Buy.

 4    Q.  And you understand that Qualcomm has many pre-existing

 5    patents on aggregated messaging; isn't that right?

 6    A.  I wouldn't know, but it could be.  I wouldn't be

 7    surprised at all.

 8            MR. MCKEON:  Well, let's pull up Slide 47 as an

 9    example of a Qualcomm patent, 9,332,424.

10    Q.  (By Mr. McKeon)  And do you see the title:  "Centrally

11    Managed Solution for All Device Management Activities"?

12            Do you see that?

13    A.  Yes.

14    Q.  And it was filed August 7th, 2006, and it issued in

15    2016.  So it was pending while you were at Qualcomm; isn't

16    that right?

17    A.  I don't know.

18    Q.  Well, it was filed in 2006, August.

19    A.  Yeah.  I guess it looks like that, yes.

20            MR. MCKEON:  And -- and if we could just peek

21    at --

22    Q.  (By Mr. McKeon)  Well, the title says:  "Centrally

23    Managed Solution for All Device Management Activities."

24            Do you see that?

25    A.  I see the title, sir.
```

1  Q.  Okay.  And you see Claim 1 and 7.  Let's take a quick

2  look at that.  It talks about a centralized platform

3  separate from mobile devices.  Do you see that?

4  A.  I see the claim, sir.

5  Q.  It talks about centralized device management server.

6  Do you see that?

7  A.  Centralized platform?  Is that what you're referring

8  to?

9  Q.  Centralized device management server is on the right in

10 Claim 7.

11 A.  Okay.  I see that, yes.

12       MR. MCKEON:  Okay.  You can take that down.

13 Q.  (By Mr. McKeon)  Now, you hired away Qualcomm employees

14 to work at ItsOn; isn't that correct?

15 A.  People who worked at Qualcomm eventually came to work

16 for either Headwater or ItsOn.

17 Q.  And one of them was Dave -- a guy named -- a gentleman

18 named Dave Johnson; isn't that right?

19 A.  Yes, sir.

20 Q.  All right.  Now, of course, just the stations between

21 the 422 case and this case, of course, one of them is that

22 in this case, you're the sole inventor; isn't that right?

23 A.  Yes, sir.

24 Q.  And you -- you agree that the subject matter of the

25 Headwater 2 patents is different than the Headwater 1

1   patents; isn't that right?

2   A.  Okay.  Headwater 2, so the --

3   Q.  So let me --

4   A.  -- the 103 case patents are different than the 422,

5   yes, sir.

6   Q.  I'm trying to use less numbers to keep it clear, but

7   I'll try to use your vernacular.

8           The 103 case here, the patent -- the subject

9   matter of the patents is different than the 422 case; isn't

10  that right?

11  A.  They're different claims, and they cover different

12  inventions, yes, sir.

13  Q.  And, in fact, Headwater 1 actually involved blocking --

14  blocking applications from network access to save

15  batteries; isn't that right?

16  A.  The 103 case had limitations that included that, yes.

17  Q.  And as you've testified earlier, that 103 case involved

18  moving things from the network that were conventionally

19  done on the network to the device; isn't that right?

20  A.  As a general statement, it led to the ah-ha, yes, sir,

21  that first ah-ha, and -- you know, after the Best Buy

22  meeting.

23  Q.  And the Court had previously found that the key event

24  to examine is when Dr. Raleigh shifted his thinking from a

25  network-side solution to a device-side -- device-side

1  solution.  Do you recall that?

2  A.  I believe that's correct, sir, in the -- in the ruling.

3  Q.  And the Headwater 2, of course, in the 103 case, the

4  inventions here do not represent a shift from network to

5  the device, correct?

6  A.  No, I wouldn't agree with that.  They are necessary to

7  shift from the network to the device.  They're absolutely

8  critical for that.  So I would not -- I would not agree

9  with what you just said.

10  Q.  Well, let's take a look at that.

11        MR. MCKEON:  Let's pull up Slide 84.

12  Q.  (By Mr. McKeon)  This is the '117 patent; isn't that

13  right?

14  A.  Yes, sir.

15  Q.  And the title of the patent uses -- uses the words

16  "network system"; isn't that right?

17  A.  Yes, sir.

18  Q.  And the abstract of the '117 states -- if we go to the

19  abstract on Slide 85:  The network message server delivers

20  messages to the device messaging agent on behalf of a

21  plurality of network application servers.

22        Right?

23  A.  Yes, sir, but there's a device messaging agent, and

24  that -- the messaging agent and the server agent -- the

25  server are critical for enabling device-assisted services,

1    so --

2    Q.  But there's no question, sir, in this case we're

3    dealing with network components, network servers, and

4    indeed this case presents a case about network

5    architecture; isn't that right?

6    A.  Sir, it involves network servers, but it also involves

7    the device messaging agent.  So I think you're

8    mischaracterizing it.  This, again, is critical for

9    implementing my first ah-ha.  So I would not agree that

10   this was not related.

11   Q.  Okay.  Well, but you agree with me that in this case,

12   it's about network architecture; isn't that right?

13   A.  No.  I think that's a generalization that I wouldn't

14   agree with.

15          It says right here that there's a messaging agent

16   on -- on behalf of a plurality of application servers.  So

17   this is a part of the solution.  There's a device-side part

18   where you can write a claim on the device side of it.  You

19   can write a claim on the network side it.  And you can

20   write a claim that involves both the device and the

21   network.  So, again, this is a critical component for

22   enabling device assisted services.

23          MR. MCKEON:  Let's pull up Slide 86.

24   Q.  (By Mr. McKeon)  This is an excerpt from Mr. Dell.

25   He's your damage expert in the Headwater 2 case.  And he

1  said:  The patents at issue presented a network

2  architecture.  And he goes on to say other things.

3          But do you agree that the patents at issue in this

4  case presented a network architecture?

5  A.  I don't know.  I have never seen this.  And I just

6  described it the way I would describe it.

7  Q.  All right.  So you disagree -- you don't know one way

8  or another whether -- your expert that's representing you

9  in this case, you don't know one way or the other whether

10  he's right when he characterizes the patent --

11  A.  Sir, I would have to read his report to make a

12  comment --

13  Q.  Sir, if you don't mind, listen to my question, and then

14  you can answer, okay?

15          You don't know one way or the other whether the

16  expert that's representing -- that's testifying on behalf

17  of Headwater in this case, the 103 case, you don't know

18  whether he's right when he characterized the patents at

19  issue as presenting a network architecture?  You don't know

20  one way or the other, correct?

21  A.  Sir, I would have to read his report to comment on your

22  question.  I haven't read his report.  I don't -- I can't

23  comment on the snippet that you're showing me.  He's a very

24  clever guy.  I'm sure he has a good rationale for what he's

25  saying.  I'm just saying it's not the way I just described

1    it, and I would have to read his report to give you a

2    fulsome answer, sir, and be accurate.

3    Q.  Well, you do agree that an important aspect of the

4    asserted patents in this case is the use of a network

5    messaging server that communicates both with end-user

6    devices and with application servers?  You agree with that,

7    right?

8    A.  Is that in the claim?

9    Q.  Sir, I'm just asking you a question.

10   A.  Okay.

11   Q.  Do you agree with that?  An important aspect of the

12   asserted patents in the use of a network messaging

13   server -- is the use of a network messaging server that

14   communicates both with end-user devices and with

15   application servers.  Do you agree with that?

16   A.  It's -- a key component of the inventions is to have

17   a -- as I testified earlier, is to have a messaging server

18   that uses a messaging link to a device agent on the device,

19   and, of course, both of those are absolutely critical to

20   implement the invention.

21        MR. MCKEON:  Well, let's pull up Slide 87.

22   Q.  (By Mr. McKeon)  Again, this is Dr. --

23   Mr. de la Iglesia's expert report.  He says himself, these

24   are technical experts who reviewed the patents.  He says --

25   these are his words --

1          THE COURT:  Mr. McKeon, why are we focusing on

2     experts?  This sounds like something you're developing for

3     your trial, not something for this hearing.

4          MR. MCKEON:  Your Honor, just -- I have one more

5     question on this, but I'm trying to establish the

6     difference between the Headwater 1 technology and the

7     Headwater 2 technology.  And I'm trying to establish that

8     here we're dealing with network and network architectures,

9     and all their experts agree with that.

10         So when we look at the conception issues, which

11    are important for this hearing, that we're grounded in the

12    right issue, the right technology, not this -- not this

13    shift from the network to the device.  That's all I'm

14    trying to establish, Your Honor, just that one technical

15    point.

16         THE COURT:  All right.

17    Q.  (By Mr. McKeon)  And last question, you understand that

18    Mr. de la Iglesia, your technical expert, says an important

19    aspect of the asserted patents is the use of the network

20    messaging server that communicates both with end-user

21    devices and with application servers?

22    A.  This is entirely consistent with what I just said, sir.

23    So when he says communicate both with end-user devices, he

24    would mean specifically the messaging agent on the end-user

25    devices.  And I just testified to this, and I couldn't

 1    agree more.

 2    Q.  And you agree, sir --

 3           MR. MCKEON:  You can pull that down.

 4    Q.  (By Mr. McKeon)  You agree that the asserted patents in

 5    this case require servers which are not devices in the

 6    parlance of this case, correct?

 7    A.  Again, you require both aspects.  These are essential

 8    for implementing my original idea of device assisted

 9    services.  It turned out I needed something else in order

10    to make that successful, and this is absolutely essential

11    and inextricably linked to, you know, implementing this

12    idea to move network functions down to the device.

13    Q.  Now, shifting to the documentation, your habits related

14    to documenting your inventions, of course, an important

15    issue here is about the evidence of your conception.  And

16    you agree with me that you haven't presented any inventor

17    notebooks in this hearing; isn't that right?

18    A.  That's not my practice to keep a notebook.  As I

19    testified earlier, I have exchanges with patent counsel,

20    and it's just a better way, in my opinion, for me to, you

21    know, work on patents.

22    Q.  And some of those exchanges I understand that you

23    withheld from production because you're saying those are

24    privileged; isn't that right?  So we're not able to see

25    those; isn't that right?

1   A.  They are privileged.  They're communications with

2   counsel.  I -- I didn't withhold them.  That's -- they're

3   just privileged information, and the team has withheld

4   them.

5   Q.  Okay.  And I'm going to --

6           MR. MCKEON:  If I can pull up Tab -- Tab 5.

7   Q.  (By Mr. McKeon)  And, sir, I'll -- this is a -- we're

8   getting Tab 5 pulled up.

9           MR. MCKEON:  And if I can go to Page 10.

10  Q.  (By Mr. McKeon)  This is an interrogatory response,

11  sir, at Page 10.

12          We're getting that pulled up, sir, here.

13          Okay.  And this is an interrogatory response, sir,

14  that identifies by Bates number the technical or other

15  documentation reflecting Headwater's designs and

16  inventions.  Do you see that?

17  A.  What are you referring to, sir?  Which part -- portion

18  of Page 10?

19  Q.  He just blew it up here.  This is an interrogatory

20  response.  It's identifying all the documents -- the

21  technical or other documentation reflecting Headwater's

22  designs and inventions during this time period.

23          You see this?

24  A.  I see the words, sir.

25  Q.  Okay.  And would it surprise you that none of the

1    documents listed here, sir, discuss aggregated messaging?

2    A.  I wouldn't know.

3    Q.  Okay.  And none of them discuss push messaging; would

4    that -- push messages.  Would that surprise you?

5    A.  No.

6          MR. MCKEON:  And if we pull up Slide 55.

7    Q.  (By Mr. McKeon)  Which is a -- Claim 1 of the '117

8    patent, would it surprise you, sir, that none of the claim

9    terms I've listed here -- highlighted are in any of the

10   documents that Headwater listed in its interrogatory

11   response?  Would that surprise you?

12   A.  No, I wouldn't be surprised by that.

13         MR. MCKEON:  You can take that down.

14   Q.  (By Mr. McKeon)  Now, I want to talk about Qualcomm and

15   some of the testimony you gave today about your dealings

16   with Qualcomm.

17         In January 2009, you wrote to Qualcomm's CEO, Paul

18   Jacobs, correct?

19   A.  I think you're referring to the email we looked at

20   earlier, yes, sir.

21   Q.  Yes.  And you say you told him in your email that the

22   technology is very complementary and additive to QC's

23   products and IP strengths; isn't that right?

24   A.  Yes, sir, I believe that's what I said.  I don't have

25   it in front of me, but it sounds familiar.

1    Q.  And -- and I wrote this down, and I believe I got it

2    right when I wrote it, that you said you -- at this time,

3    you showed the CEO, Mr. -- Dr. Jacobs some of the Headwater

4    patents.  Did you say that in your direct testimony?

5    A.  I don't know that Paul personally looked at the

6    patents, but certainly his team did, yes.

7    Q.  Okay.  But is it fair to say, sir, at this point in

8    time in this -- this 2009 time frame, did you have any --

9    in January 2009, you didn't have any Headwater patents; is

10   that right?

11   A.  Which date are you referring to?  I mean, I hadn't

12   shown anything as of the email.  The disclosures came later

13   after we signed an NDA.  So I'm not sure what you're

14   asking.

15   Q.  Well, let's get to Slide 59, which is the email you

16   testified about.  This email, as you know, is dated January

17   7, 2009.  Do you see that?

18   A.  Yes, sir.

19   Q.  And -- and you testified earlier today -- I believe I

20   heard you say that you showed them some -- the Headwater

21   patents.  But you agree with me, sir, in 2009, you didn't

22   have any Headwater patents?

23   A.  I'm not sure what you're saying, so I'll just say what

24   I testified to.  So, first of all, there's an NDA that had

25   to be executed.  And after the NDA was executed over time,

1    we had many, many meetings, and in many of those meetings,

2    we discussed the patents, and I brought patent materials,

3    absolutely.  At this stage, I wouldn't have done that

4    because we didn't have the NDA signed yet.

5    Q.  And --

6    A.  And I might -- I could have shared what we had at this

7    point because we probably were pretty close to filing a

8    patent.  It's only a couple of weeks -- a few weeks before,

9    but it wouldn't have had everything that ended up in the

10   patent.

11   Q.  Okay.  Well, I mean, it's your belief that the patented

12   technology in this case would now be inside of Qualcomm's

13   SDK package instead of inside of Android and iOS if issues

14   had not come up that prevented you from working together;

15   isn't that right?

16   A.  Okay.  I just want to make sure I understand what

17   you're asking.  Which comment that I made are you referring

18   to?

19   Q.  Sir, I'm just asking you a question.

20   A.  Okay.

21   Q.  It's your belief, right, that the patented technology

22   in this 103 case would now be inside of Qualcomm's SDK

23   package instead of inside of Android and iOS if issues had

24   not come up that prevented you from working with Qualcomm,

25   correct?

1    A.  The -- the rationale I used with Paul as to why I

2    thought this would be very valuable to their business is it

3    allowed Qualcomm to go up and add value above the

4    connection, which is their modem chipsets.  And this is

5    core value that ended up being in lots of operating

6    systems.  And I believe had the issues with the internal

7    retractor not come up so that it created friction in the

8    business relationship, Qualcomm would have greatly

9    benefitted, and they would have been years ahead of what

10   eventually came to market in some of the other operating

11   systems.  And I think that would have been great for

12   Qualcomm, and that's exactly what I pitched them at the

13   time.

14   Q.  But the issues that came up were the -- were, of

15   course, Qualcomm's legal team, they had concerns over IP

16   ownership issues at the time; isn't that right?

17   A.  There were some vague assertions made, sir.

18   Q.  Let's -- let's --

19   A.  As I testified, maybe I did something while I was at

20   Qualcomm.  Never specific, never, you know -- you know,

21   never I did do it.  Nothing specific whatsoever.

22   Q.  Well, let's -- let's take a look at that.

23            MR. MCKEON:  Let's pull up Tab 21.

24   Q.  (By Mr. McKeon)  This is in the record.  This document

25   is an email.  You mentioned Mr. David Wise earlier.  Do you

1  recall that, sir?

2  A.  Yes, sir.

3  Q.  Yeah, okay.  This is an email.  And in the email,

4  Mr. Wise tells you:  QC, that's Qualcomm's legal team,

5  continues to have concern over the IP ownership issue.

6         Isn't that right?

7  A.  That's what the words say, sir.

8  Q.  And then he continues to say:  To resolve the IP

9  concerns, we would agree -- we would like to agree that

10  Qualcomm get an additional 5 percent ownership interest in

11  ItsOn.

12         Do you see that?

13  A.  That's what the email says, sir.

14  Q.  So this is sort of a settlement of a claim.  We have

15  concerns because we think -- you know, we own the stuff you

16  have.  But let's just forget about all that, and you give

17  us 5 percent of the company, and let's move on together as

18  a team.  That's -- that's really what he's saying here;

19  isn't that right?

20  A.  No, sir, that's not at all how I would characterize how

21  this went.  You're using words that I don't think apply

22  here.

23  Q.  Well, what we do know is there's nothing vague or

24  insinuation about what he's saying here.  He's very direct

25  with you.  They have concerns about ownership.

1   A.  It's entirely vague, sir.  What concerns -- you know,

2   what are you talking about?  What do you think I invented?

3   When do you think I invented it?  What patent are you

4   talking about?  What specific embodiments?  What

5   limitations?  It is entirely vague, sir.  Nothing

6   whatsoever of substance was communicated to us.

7   Q.  What we do know is, though, you asked Qualcomm for a

8   release so they would release Qualcomm's claim of

9   ownership; isn't that right?

10  A.  We said we're tired of this.  The only way for us to do

11  business with you all is to completely extinguish the

12  possibility of this -- these vague insinuations being made.

13  It's causing tremendous friction in the business.  We don't

14  want to spend any more time on it.

15          If you want to work with us, you will have to

16  release all claims in the future so this never comes up

17  again.  We were frustrated and offended.  And we said

18  that's a prerequisite to doing business with us.  There

19  were more people who wanted to do business with us.  They

20  were also frustrated, and they attempted to create a

21  release so that we could do business together.

22  Q.  Okay.

23  A.  Then someone still wanted a percentage, and we said no.

24  Q.  Well, you said, no, but Qualcomm would not accept your

25  release.  They actually deleted the language from the draft

1    agreement, correct?

2    A.  I wouldn't put it that way, sir.  They said the

3    release, as I testified earlier, was too broad, and, you

4    know, they had a point because I literally could have done

5    anything under the sun with the release my lawyers first

6    came up with.  I do think it was too broad.  That's how

7    these things go.  They eventually settled out to a release

8    that seemed reasonable, but they still wanted a percentage,

9    and we said no, sorry, you cannot have something for

10   nothing.

11   Q.  Well, let's make sure we're clear.

12          MR. MCKEON:  Let's pull up Tab 23.

13   Q.  (By Mr. McKeon)  Tab 23 is the red line of the document

14   you sent them.  And if we look at D, that's the release

15   language.  And then the redline they sent back to you,

16   Qualcomm deleted that language.  You agree with that,

17   correct?

18   A.  They deleted lots of language, sir.  This is how these

19   things go.

20   Q.  Okay.  And you talked about Mr. Wise on your -- on your

21   direct testimony about how -- about how -- I think he

22   didn't recall some certain things about his interactions

23   with you.  Did I hear that correctly?

24   A.  That's roughly what the testimony was.  I was asked a

25   series of questions.

1    Q.  And 2009 is when all this discussion we're talking

2    about went down; isn't that right?

3    A.  Yes, sir.

4    Q.  And, in fact, you considered suing Samsung for

5    infringement in 2017; isn't that right?

6    A.  I don't know.  I don't know what you're referring to,

7    sir.

8    Q.  Well -- all right.

9           MR. MCKEON:  Let's pull up Slide 66.

10   Q.  (By Mr. McKeon)  And this is an admission that you

11   gave, sir, and it says here:  Admit that Headwater was

12   discussing whether to sue Samsung for patent infringement

13   with one or more law firms in 2017.

14           The answer is:  Admit.

15           So you were considering suing Samsung in 2017;

16   isn't that right?

17   A.  I wasn't involved in this, to be honest.  Someone

18   looked at a record and decided that that was true, I

19   suppose.  I don't know anything about it.

20   Q.  But you actually didn't sue Samsung until 2022; isn't

21   that right?

22   A.  Yes, sir.

23   Q.  So the fact that Mr. Wise in his deposition couldn't

24   recall conversations that he had in 2009 regarding advances

25   of prior employment, which were many, many years later,

1    that shouldn't surprise anybody, should it?

2    A.  I don't know how to answer that, sir.

3    Q.  One thing we do know is that you couldn't recall in

4    your deposition names of the Qualcomm people that you were

5    dealing with at the time; isn't that right?

6    A.  I'm very careful under oath.  And if I am not positive

7    I remember someone's name, I'm not going to speculate

8    because then that could be false testimony.

9    Q.  So you in your deposition, you didn't want to

10   speculate.  You couldn't recall.  But here in the

11   courtroom, you had names that you mentioned, including

12   Mr. Wise; is that fair?

13   A.  Yeah, there were some documents that confirmed what I

14   remembered.  And, again, if I'm not positive under oath, I

15   don't say anything.

16   Q.  Now, there's a document that you referenced in your

17   direct, and it was a product overview of a January 6th,

18   2009 presentation.  And you talked about a figure there.

19   You had a -- some slides on it that you finished with.  Do

20   you recall that?

21   A.  Yes, sir.

22   Q.  And let's pull up -- let's talk about the slides.

23          MR. MCKEON:  And if we can pull up, let's see

24   here...

25   Q.  (By Mr. McKeon)  Let me ask you this question.  There

1  was a mention of a service control.  Do you recall that, in

2  the technical documentation in that product presentation?

3  A.  Those were words that were referred to in a variety of

4  ways, sir.

5  Q.  Well, let me ask you this question.  You pointed to a

6  figure in that document.  Do you recall that in your direct

7  testimony?

8  A.  We were talking about the January 6th document?

9  Q.  Yes.

10  A.  Yes, sir.

11  Q.  You stated this figure was later put into the patent

12  application.  Do you recall that?

13  A.  I did not say that.  I said it's very similar to some

14  figures that went into the patent application.  It wasn't

15  quite as mature as the patent application --

16  Q.  Did you know that --

17  A.  -- but it was getting close.

18  Q.  Did you know that the first time we heard anything at

19  all, as far as I can tell, as far as we can tell from

20  looking at record, about this figure and how it related

21  somehow to a figure in the patent, did you know it was

22  today when you were testifying was the first time we heard

23  that?

24  A.  I don't know that, sir.  I don't know what -- you guys

25  go back and forth.

1    Q.  Did you know it's not in any of the briefs -- in the

2    briefs that we had in this hearing and all the setup for

3    this?  The documentation may have been cited, but no figure

4    was mentioned, no -- no, this was a conception evidence?

5    Did you know that it was not even mentioned by anybody

6    until your testimony today?

7    A.  I didn't --

8    Q.  Does that surprise you?

9    A.  -- I didn't testify in your briefs, sir.  I'm

10   testifying here today.

11   Q.  What we do know is that you don't even know what

12   service control means; isn't that right?

13   A.  I think you're referring to tricky questions I was

14   given during the many hours of depositions, and I -- I

15   don't -- when applying to a claim, I'm extremely careful

16   about claim language and what claims mean.  And I generally

17   don't try to characterize little snippets of a claim in a

18   general way that could be misconstrued.

19   Q.  Well, let's pull up your deposition.

20        MR. MCKEON:  Tab 92.

21   Q.  (By Mr. McKeon)  The question was:  Did you work on

22   service control of mobile devices at Qualcomm?

23        Answer:  I'm not sure what you mean by service

24   control?  What do you mean by service control?

25        That was your answer to that question, correct?

1    A.   Yes.   And as I just answered you a moment ago, I said

2    specifically service control are words that were used in a

3    variety of ways and what I testified to previously, but the

4    term "service control" takes on very specific meaning in

5    the context of claim limitations and something that we own.

6    And service control could mean many, many different things

7    in those words isolated by themselves, and it's -- it's

8    just not productive to try to characterize what service

9    control all by itself without the context of the other

10   surrounding words in a claim would mean.

11   Q.   And this -- the document, the January 6, 2009

12   presentation that you testified about, you understand it

13   says nothing about push messaging, correct?

14   A.   Push messaging, again, could mean almost anything.  I'm

15   not sure that's relevant, sir.

16   Q.   Okay.   It doesn't use the word "aggregated" or

17   "aggregated messaging."  You understand that, right?

18   A.   These are just word match games, sir.  I don't think

19   that's relevant.  But it doesn't specifically say

20   aggregated.  Aggregated has a plain English meaning.  It's

21   clearly a meaning that applies to the figure because

22   there's an aggregation of communications between the

23   various applications/agents on the device and the service.

24   Aggregation applies to that single control channel that's

25   there.   It's a plain English word that would apply.

1    Q.  And what we do know, sir, is that this January 6th,

2    2009 documentation, the document that you referenced in

3    your direct, that is within the one year period after you

4    left Qualcomm; isn't that right?

5    A.  I think you asked me that a few times now.  You're

6    asking specifically is January --

7    Q.  This document I'm referring to, the January 6, 2009 --

8    A.  Yes.

9    Q.  Within one year after you left Qualcomm; isn't that

10   right?

11   A.  Yes, it is, sir.  Yes.

12   Q.  Thank you, Dr. Raleigh.

13          MR. MCKEON:  Your Honor, I pass the witness.

14          THE COURT:  All right.  We will break until 1:45.

15          COURT SECURITY OFFICER:  All rise.

16          (Recess.)

17          COURT SECURITY OFFICER:  All rise.

18          THE COURT:  Good afternoon.  Please be seated.

19          Mr. Davis, do you have any redirect examination?

20          MR. KRIS DAVIS:  Yes, Your Honor.  Thank you.

21          THE COURT:  All right.  In that case, Dr. Raleigh,

22   if you would come back.

23          MR. KRIS DAVIS:  And we're ready to proceed, Your

24   Honor.

25          THE COURT:  Go ahead.

1          MR. KRIS DAVIS:  Thank you.

2                    REDIRECT-EXAMINATION

3    BY MR. KRIS DAVIS:

4    Q.  Dr. Raleigh, did Mr. McKeon show you anything in

5    cross-examination indicating that you conceived of any

6    claimed invention while you were at Qualcomm?

7    A.  Nothing whatsoever, sir.

8    Q.  Now, Mr. McKeon showed you a patent that was assigned

9    to Qualcomm.  Do you recall that?

10   A.  Yes.

11   Q.  That was at Tab 15 in your cross-examination binder.

12   Do you still have that binder?

13   A.  Yes, sir.

14   Q.  Okay.  Please go ahead and turn to Tab 15.

15          And do you see this is U.S. Patent No. 9,332,424?

16   A.  Yes, sir.

17   Q.  Now, let me show you something that Mr. McKeon didn't

18   show you.

19          MR. KRIS DAVIS:  I have something to distribute if

20   that would be okay with the Court.

21          THE COURT:  All right.

22          THE WITNESS:  Thank you.

23   Q.  (By Mr. Kris Davis)  So, Dr. Raleigh, what we've handed

24   you is an assignment record for the same U.S. Patent No.

25   9,332,424.  Do you see that patent number at the top of the

1    page?

2    A.  Yes, sir.

3    Q.  And this is a Patent Office assignment record like we

4    looked at together during your direct examination for the

5    Headwater patents, right?

6    A.  Yes, sir.

7    Q.  So like we did before, let's trace through the

8    assignment history from the bottom, starting with the first

9    assignment.

10           Okay.  So the first assignment -- do you see this

11   is an assignment from presumably the inventors to the

12   assignee Bit Phone?  That's Assignment No. 1 at the bottom

13   of the document.

14   A.  Assignments here, yeah.  Yes, the first assignment is

15   the Bit Phone by what looks to be the inventors.

16   Q.  Okay.  And if we go up from there, what is the next

17   assignment?

18   A.  The next one is from bit phone to Hewlett Packard.

19   Q.  All right.  And can you speak up just a little bit,

20   Dr. Raleigh?

21   A.  Sure.  Sorry about that.

22   Q.  Thank you.

23           Okay.  Let's move up to Assignment No. 3.  What is

24   that assignment?

25   A.  This one is a little different.  It's a conveyance

1    from -- it's an assignor, Hewlett Packard, and a conveyance

2    of assignor's interest.

3    Q.  Okay.

4    A.  Not exactly sure what that is.

5    Q.  I see.  Any mention of Qualcomm that we've seen yet?

6    A.  No, sir.

7    Q.  All right.  Let's work up the chain again to

8    Assignment 4.  Any mention of Qualcomm here in

9    Assignment 4?

10   A.  No, sir.

11   Q.  All right.  Let's go on to Assignment 5.  Any mention

12   of Qualcomm here?

13   A.  No, sir.

14   Q.  All right.  Assignment 6, do you see that one on the

15   first page?

16   A.  Yes, sir.

17   Q.  Any mention of Qualcomm?

18   A.  No, sir.

19   Q.  Okay.  Well, I see on Assignment No. 7 -- do you see

20   this is an assignment from Hewlett Packard to Qualcomm?

21   A.  Yes, sir.

22   Q.  And can you tell me what the execution date of that

23   assignment is?

24   A.  January 23rd of 2014.

25   Q.  All right.  So this did not become a Qualcomm patent

1  until 2014?

2  A.  Correct, sir.

3  Q.  All right.  Now, Mr. McKeon's point was that Qualcomm

4  developed this back in 2005, 2006, according to the

5  priority date of the patent, right?

6  A.  That's what he tried to insinuate, sir.

7  Q.  Does this assignment record show that's the case?

8  A.  No.

9  Q.  Why not?

10  A.  Well, it was -- went through many assignments, and it

11  was -- I would guess it was a purchase by Qualcomm, and

12  they didn't have it until 2014.  And it wasn't a Qualcomm

13  person that worked on it, and this has no evidence that

14  anyone at Qualcomm was working on this at all.

15  Q.  All right.  Now, based on your experience at Qualcomm,

16  are you aware of Qualcomm working on aggregated messaging

17  like you described with regard to the asserted patents?

18  A.  Nothing like our asserted patents, no, sir, not that

19  I'm aware of.  I don't know everything Qualcomm does, but

20  not to my knowledge.

21  Q.  Understood.

22        Based on your experience at Qualcomm, were you

23  aware of anyone at Qualcomm working on device messaging

24  agents while you were there?

25  A.  Not that I'm aware of.  Again, there could have been,

 1  but I wouldn't be aware of that.

 2  Q.  And were you aware of anyone at Qualcomm working on

 3  secure interprocess communication services while you were

 4  at Qualcomm?

 5  A.  No.  That's getting pretty particular, and I certainly

 6  wouldn't know of anybody working on that.

 7  Q.  All right.  And now even if someone at Qualcomm in some

 8  other department or what have you was working on something

 9  like that, did you personally work on anything like

10  those -- those things at Qualcomm?

11  A.  No, not -- no, not at all.  I had absolutely no

12  exposure to these kinds of things, as I've testified, and

13  it didn't come up until, you know, the November 2008 time

14  frame.  And you described some limitations that start

15  getting pretty specific, so I'm not even aware of prior

16  art.  So it would be doubtful anyone at Qualcomm was

17  working on it.

18  Q.  All right.  Thank you.

19          Mr. McKeon also asked you about an interrogatory

20  response regarding priority date.  Do you recall that?

21  A.  Yes, I think so.  I'm -- I think I'm following you.

22  Q.  Okay.  Let's turn to Tab 5 in your cross-examination

23  binder.

24  A.  Okay.

25  Q.  Do you see that?

1    A.  Yes, sir.

2    Q.  Okay.  Now, if we focus on Page 9 at the bottom of the

3    page.  Do you see there's a sentence that reads:  Various

4    features of the asserted patents were conceived of and

5    reduced to practice by the named inventor between fall 2008

6    and no later than the filing of the '354 application?

7         Do you see that?

8    A.  I see various features of the inventions of the

9    asserted patents.  That's the last line on the page.  Is

10   that what you're referring to?

11   Q.  Oh, yes, that's right, sir.  That's correct.

12   A.  Okay.  Yes, I see that.

13   Q.  Okay.  And that's consistent with your invention

14   timeline, isn't it?

15   A.  Yes, that's -- that's very -- that's -- yeah,

16   precisely.

17   Q.  Okay.  Now, Mr. McKeon asked you about a reference in

18   this response to the, quote, middle of 2008.  Do you recall

19   that?

20   A.  Yes, I think I do.  I think that was the -- what I felt

21   was a typo.

22   Q.  And I believe you said you explained that at the

23   evidentiary hearing in the 422 case, Headwater 1; is that

24   right?

25   A.  I believe I did, yes.

1    Q.  Okay.  So let's turn to the next page here.

2            Do you see at the bottom of the page Headwater's

3    third supplemental response dated September 6th, 2024?

4    A.  Are we still on Page 10?

5    Q.  Oh, I'm sorry.  Yes, I can tell you.  So we're still on

6    Tab 5 of the cross-examination binder.

7    A.  We're on Page 10?

8    Q.  Now we're looking at Page 10, that's right.

9    A.  Yes, I see that.  Yes.

10   Q.  And you see near the bottom of the page, there's a

11   third supplemental response to Interrogatory No. 1 dated

12   September 6th, 2024?

13   A.  It's under -- oh, third -- it's the title.  Yes, I

14   see --

15   Q.  Yes, I'm sorry.

16   A.  -- the text, I'm sorry.

17   Q.  Okay.  And do you see if we look at the substance of

18   the response, you'll see here in this first sentence that

19   the response incorporates by reference some things.  Do you

20   see that?

21   A.  Yes.

22   Q.  Now, if we look on to Page 11 at the end of this

23   paragraph, do you see this says:  Dr. Greg Raleigh's

24   testimony at the July 25th, 2024 hearing?

25   A.  Yes, sir.

1    Q.  And was that the evidentiary hearing where you

2    addressed this, quote, middle of 2008 language?

3    A.  Yes, I believe that's the date.

4    Q.  Okay.  You also recall that Mr. McKeon said he was

5    surprised about us referring to the January 6th, 2009

6    presentation here when we're discussing your invention

7    timeline?

8    A.  Yes, sir.

9    Q.  So let's take a look again at Page 10 of this same

10   document.

11          Do you see up near the top of the page, there's a

12   title "Second Supplemental Response to Interrogatory No. 1"

13   dated May 17th, 2024?

14   A.  Yes, sir.

15   Q.  And do you see near the bottom of this first

16   paragraph -- it looks like it's the third to last sort of

17   entry in this string of citations.  There's a citation to

18   HW103_00014134.  Do you see that?

19   A.  So third from the bottom.  Oh, second from the bottom

20   or third?

21   Q.  It looks like there are -- if you count from the very

22   last citation and go back --

23   A.  Which is --

24   Q.  -- one, two, three.

25   A.  Which is 497?  497 is the last one?

```
 1   Q.  Yes, that's right.  497.

 2   A.  Okay.  Go from there?

 3   Q.  Yes.

 4   A.  And then go up two?

 5   Q.  Go back two citations.

 6   A.  Oh, two citations.

 7   Q.  So it's one line above right where you were looking.

 8   A.  Okay.

 9   Q.  Do you see that refers to HW103_00014134?

10   A.  I see 13316521442554363.

11   Q.  I'm not sure where you're reading, Dr. Raleigh.

12           So the first paragraph, there's -- the last

13   citation is to 404 -- 4094 through 4097.  Do you see that?

14   A.  Oh, I see, yes.  They're inclusive.  Okay.

15   Q.  Yes.

16   A.  Oh, I see.

17   Q.  Go back one to 4123 to 4133.  You see that?

18   A.  Yes, I see.  Okay.  Okay.  I didn't notice that they

19   were inclusive.  So, yeah, there's a 14134 to 14165.

20   Q.  Yes.  Thank you.

21   A.  Yes.

22   Q.  All right.  So now can you turn to your direct

23   examination binder?  Do you still have that?

24   A.  Yes, sir.

25   Q.  Okay.
```

```
 1   A.   Which --

 2   Q.   And if you could turn to Exhibit 19?

 3   A.   Of -- okay.  That would be Volume 2.

 4   Q.   That's right.  Yes, Volume 2.

 5   A.   Yes, sir.

 6   Q.   Now, is Exhibit 19 the January 6th, 2009 presentation

 7   that Mr. McKeon was surprised about?

 8   A.   Yes.

 9   Q.   Okay.  Can you read for us the Bates number at the

10   bottom of this document?

11   A.   HW103_00014134.

12   Q.   And that's the same Bates number we saw in the

13   interrogatory response?

14   A.   Yes, sir.

15   Q.   All right.  Now, you left Qualcomm on September 19th,

16   2008; is that right?

17   A.   Yes, sir.

18   Q.   About when did you start talking with Dr. Jacobs about

19   your plan to potentially leave Qualcomm?

20   A.   You know, roughly four months before that, I would say,

21   plus or minus.

22   Q.   Around four months you said?

23   A.   Roughly.

24   Q.   Did you talk with Dr. Jacobs about if you left

25   Qualcomm, you might potentially move on to other ventures?
```

1   A.  Oh, yeah.

2   Q.  Did -- did Dr. Jacobs know about any -- anything you

3   might be considering working on?

4   A.  Yes.  We discussed several things I might go do,

5   including potentially working with Best Buy.

6   Q.  So you talked with Dr. Jacobs about potentially going

7   to Best Buy?

8   A.  Yes.  And I mentioned to him that was driving my

9   timing, and I just didn't have any more time to keep

10  discussing things.  My daughter was going to graduate that

11  year, and there was a specific meeting at Best Buy that I

12  really wanted to attend, as I testified earlier.

13  Q.  So you're saying Dr. Jacobs knew that there was a

14  September 2008 meeting with Best Buy and that that was part

15  of what was driving your timing to leave September 19th?

16          MR. MCKEON:  Your Honor, I know this is not a jury

17  trial, but the leading here on redirect is really too much,

18  so I object to that.

19          THE COURT:  All right.  Mr. Davis, try not to lead

20  the witness.

21          MR. KRIS DAVIS:  Understood, Your Honor.

22  A.  I can answer that, if you want.

23  Q.  (By Mr. Kris Davis)  Please.

24  A.  Yeah, I testified to that earlier.  So it's not new in

25  this hearing.  And I believe there's even documents that

1    corroborate this.

2    Q.  So Mr. McKeon asked you about how you incorporated

3    companies and talked with Best Buy, how you -- before you

4    left Qualcomm?

5    A.  Yes, sir.

6    Q.  Is any of that relevant to the invention timeline you

7    described?

8    A.  No, sir.

9    Q.  Is any of that relevant to the substance of the

10   presentations you showed?

11   A.  No, sir.  Incorporating an LLC so that you have a

12   corporate umbrella to do business from has, you know,

13   nothing to do with invention.  It's just a corporate

14   umbrella so that you're not exposed as an individual in

15   your business dealings.

16   Q.  All right.  Mr. McKeon asked you about a network

17   congestion problem that I believe you discussed in your

18   deposition and maybe also your panel remarks.  Do you

19   recall that?

20   A.  Yeah, he asked a variety of questions along those

21   lines.

22   Q.  Was this network congestion problem a one-time event?

23   A.  No.  No, it was a developing I would say trend in the

24   market, and the more popular the first iPhones and Androids

25   became, the more problematic it became.

1    Q.  Was this a problem that happened the day the first

2    iPhone launched?

3    A.  No, it wasn't evident until there were enough iPhones

4    on the network to start causing problems.

5    Q.  Were you talking about this being a problem -- or let

6    me rephrase.

7         At this point in time, did you have any solution

8    to a network congestion problem?

9    A.  No, no, I -- you know, around the time I began working

10   on the embodiments for the '354 provisional, it was just

11   something that I was becoming more and more aware of.  And

12   I knew that it would become more and more important as

13   more -- more Androids, more iPhones, you know, went on the

14   network.

15        So it was a problem that had to be solved, and I

16   thought that, you know, some of these ideas could

17   contribute to that solution.  And there weren't a lot of

18   other people thinking along these lines, none that I know

19   of really at that time.

20   Q.  All right.  Let's turn to Tab 11 in your

21   cross-examination binder.

22        Do you recall Mr. McKeon asking you about this

23   email?

24   A.  Let's see which one this is.

25        Did he ask me about the -- are we talking about

1   the HP email string?

2   Q.  I think if you turn to the page that ends in 69644,

3   around the middle of the page, this may jog your memory.

4   A.  Oh, are we on the cross-examination binder?

5   Q.  Oh, yes, I'm sorry.

6   A.  Okay.

7   Q.  Yes, the cross-examination binder, Tab 11.

8   A.  Sorry about that.  Yes, I recall this.

9   Q.  Okay.

10  A.  I recall that Mr. McKeon asked me questions about this.

11  Q.  And do you see near the middle of the page that there

12  is this phrase:  Do we want to use an aggregator?

13  A.  I remember him saying that.  I haven't located it again

14  here.  Are we -- which part are we on?

15  Q.  Yes.  So we're -- we're in Tab 11 and the page ending

16  69644.  Do you see that at the bottom of the page?

17  A.  Yes, now I see -- yes, I see under 3, SMS.

18  Q.  That's right.  So there's a heading 3, SMS, and there's

19  a sentence that reads:  Do we want access to the carriers'

20  SS -- SMSC, or do we want to use an aggregator?

21  A.  Yes, sir.

22  Q.  So it seemed like you were taking issue with the use of

23  the word "aggregator" here?

24  A.  Yes.

25  Q.  Can you explain why?

A.  Well, he -- he's just word matching, and he doesn't

understand what this means.  So this is not aggregation of

traffic between absent servers.  This is an aggregator as

in a business.

        So an SMS, there's businesses that provide SMS

services to MVNOs and others, and they're an aggregator of

SMS.  So you can contract with those businesses instead of

building your own SMS network or instead of using a

carrier's network.

        So that's -- it had nothing to do with the

aggregation of communication in the sense of my patents.

It was just a word match that failed.

Q.  All right.  Now, you recall, of course, talking about

your agreement with Qualcomm, right?

A.  Yes, sir.

Q.  And Mr. McKeon showed you the agreement?

A.  Yes, sir.

Q.  Do you recall him asking about the word "idea"

appearing in the agreement?

A.  Yes, sir.

Q.  Do you recall when we looked at the agreement during

direct that it also says conceived and reduced to practice?

A.  Yes, of course.

Q.  Have you ever heard that phrase before, "conceived and

reduced to practice"?

1  A.  Yes.

2  Q.  What context have you heard of that?

3  A.  In the context of patents and inventorship and priority

4  dates and, you know, legitimate conception of an invention.

5  Q.  Are you aware of Samsung disputing that the standard

6  for conception applies here?

7  A.  No, I don't know that they've ever disputed that.  I

8  would doubt it.

9  Q.  All right.  On cross, Dr. Raleigh, did Mr. McKeon show

10  you anything indicating that Qualcomm raised a claim or an

11  insinuation about patent ownership in 2017 when Qualcomm

12  offered to purchase patents?

13  A.  No, sir.  He did not.

14  Q.  Did Mr. McKeon show you anything indicating that

15  Qualcomm raised a claim in 2022 when there were additional

16  discussions about purchasing Headwater patents?

17  A.  No, sir.

18  Q.  Now, the timeline you've described here, we talked

19  about there being a September 24th Best Buy meeting, right?

20  A.  Yes, sir.

21  Q.  Okay.  And was there a presentation associated with

22  that meeting?

23  A.  September 24, 2008?

24  Q.  Yes.

25  A.  Yes, sir.

1  Q.  And did that presentation include any information about

2  the inventions at issue here?

3  A.  No, sir, not at all.

4  Q.  I think you also talked about your trip back home from

5  the September 24th, 2008 Best Buy meeting, and what

6  happened again on your way home?

7  A.  Well, I had recognized by that time that there was a

8  problem that was important that was not being properly

9  solved by the conventional technology.  And I was thinking

10 is there a way to turn the problem upside down and look for

11 white space and an easier way to do it, which is my

12 practice, and I got excited because I did come up with a

13 notion, an inkling that perhaps I can do the functions that

14 people were trying to implement in the network on the

15 device.

16         And then I realized that that would offer a lot of

17 advantages that were not available in the network, and it

18 got me thinking in the direction of device assisted

19 services.  It wasn't an invention at that point.  It wasn't

20 even embodiments.  It was just an idea, an inkling, perhaps

21 this could bear fruit.

22 Q.  And did we see anything about that new device-side

23 approach in any presentation?

24 A.  Eventually, yes.  About a month or so later, I was able

25 to begin trying to reduce to practice.  I thought I'd be

1    able to write patents quickly, but it turned out I couldn't

2    because there was quite a bit of prior art.  And it was

3    just more difficult to really work through the -- how to

4    implement it than I thought originally.

5            And by October, I still had the idea, but I didn't

6    really have patentable material at that point, I would say.

7    Just started having some -- a few drawings and a few ideas,

8    a few very rudimentary embodiments, and then we began our

9    prior art searches at that point.

10   Q.  And did that presentation from about a month after the

11   Best Buy meeting, so around October 2008, did that describe

12   the claimed invention here?

13   A.  No.  No, as I said, it didn't even cover the first idea

14   which was, you know, how to implement device assisted

15   services.  It just had the idea.  Here's an idea.  And it

16   certainly didn't have anything whatsoever, and I hadn't

17   conceived yet of the inventions in this case.

18   Q.  And what led you to starting to think about the

19   inventions at issue here?

20   A.  So as I mentioned is I did start developing concrete

21   embodiments and start looking at what kind of agents you

22   would need on the device to implement the notion of device

23   assisted services.  Those agents needed to be -- have the

24   information exchanged with their servers.  And my original

25   concept was essentially a one-to-one connection between

1    agents and servers, much like the way the market was

2    working between applications and servers at the time.

3            And I realized, after I stepped back from the

4    first rudimentary embodiments, that that was going to

5    create a big problem.  And that -- that's what led me to

6    start thinking about, you know, an aggregated messaging

7    channel and all the other embodiments.  But that was just

8    the beginning at that point, and that would have been after

9    the October meeting, sometime in November.

10   Q.  And did we ultimately see anything that reflected a

11   solution to that new chatter problem?

12   A.  See anything today?

13   Q.  Oh, I'm sorry, yes.  See anything during your

14   presentation?

15   A.  Yes, yes.  That was the January 6th where there was a

16   very concrete drawing by that time that began to have some

17   of the embodiments that would support the limitations in

18   this case.

19   Q.  And what does that timeline of events show about when

20   you conceived the inventions at issue here in relation to

21   your time at Qualcomm?

22   A.  Well, it reflects basically exactly what happened.

23   There was an inkling about the device assisted services.

24   There was a presentation to Best Buy saying this is the

25   direction I'm going to go, but not yet really a full

1   understanding of even device assisted service embodiments,

2   much less the secondary invention of the aggregated control

3   channel -- messaging channel.

4            And then it shows that by January, I had that

5   notion pretty firmly entrenched in my mind, and I was able

6   to write down very concrete figures that support text

7   eventually in the patent and support therefore the

8   limitations in the -- when I say patent, I mean '354, and

9   those -- the text and the figures support the limitations

10  in the claims here.

11  Q.  All right.  Thank you, Dr. Raleigh.

12           MR. KRIS DAVIS:  We'll pass the witness.

13           THE COURT:  All right.

14           MR. MCKEON:  Nothing further, Your Honor.

15           THE COURT:  Thank you, Mr. McKeon.

16           Thank you, Dr. Raleigh.  You may step down.

17           THE WITNESS:  You want me to take these down with

18  me or just leave them here?

19           THE COURT:  You can leave them, that's fine.

20           I understand from your joint notice that that is

21  all the testimony that's going to be offered.

22           I've got time -- I can hear about 10 minutes of

23  argument from each side if the parties desire to present

24  it.

25           MR. MCKEON:  Mr. Thornburgh is going to present

1    closing, Your Honor.  And if I may, I'm going to approach

2    to hand out slides.

3            THE COURT:  All right.

4            MR. THORNBURGH:  May I proceed?

5            THE COURT:  Yes, sir.

6            MR. THORNBURGH:  First of all, thank you, Your

7    Honor, for convening this evidentiary hearing.

8            The Court has now seen there are many different

9    Headwater cases with -- each with different facts,

10   different patents.  And the facts of this particular case,

11   what we call Headwater 2 or the 103 case, are particularly

12   inconsistent with standing.

13           I think we've seen that here today when it turns

14   out that the key conception document is -- are these

15   January 2009 slides.  And, yes, the Bates number is buried

16   in the rog response, but the Court has never seen that

17   document before.  It's not in the briefing, no one filed it

18   with the Court, and it's the key document apparently.

19           So I think that goes to the credibility of -- of

20   their argument that this is a last-minute desperate idea at

21   the hearing.  It's not something that they thought of

22   before.

23           We also saw that Dr. Raleigh abandoned his

24   counsel's interrogatory responses about what happened in

25   2008 about when he started working on soliciting ItsOn

1   customers in the middle of the year.  Even if he didn't

2   have the name of the company or incorporated yet, the rog

3   says he started working on it, and that he conceived in

4   September, at least some parts of the invention.

5          He says that's a typo, but it's a typo that

6   they -- they have repeated.  And, you know, I think we're

7   entitled to rely on their official discovery responses.

8          Now let's look at some of the other evidence we've

9   seen.

10         This -- this slide, I think, is -- is useful to

11   the Court because, you know, we think that this case is

12   very different than the key facts in the previous case and

13   this summarizes the -- you know, what I see as the three

14   main differences that here we have a solo inventor, so you

15   don't have to worry about what Dr. Raissinia did.  Here, we

16   have an agreement -- or at least Headwater asserts that the

17   priority date is January 2009.  So it's clearly within the

18   one year.

19         And we heard Dr. Raleigh just say several times

20   today, including just a few minutes ago, that he doesn't

21   contend that the -- you know, the October slides that the

22   Court relied on in the first case reflect the invention in

23   this case at all.  So those slides are not the answer.

24         Here's the timeline.  Headwater has been talking

25   about a timeline, and I think the timeline is actually

1    super important.

2            And what we can see here is, you know, the period

3    that Dr. Raleigh was employed at Qualcomm in blue.  And we

4    know from the interrogatories that he started meeting with

5    potential Headwater customers while he was at Qualcomm in

6    the middle of 2008.  We saw emails with his co-founder of

7    ItsOn, Randy Menna.  Those emails are dated 9/12 and 13,

8    which are, you know, undisputedly before he left Qualcomm.

9            And there's, you know, significant technical

10   content in those emails, whether or not -- you know, he's

11   quibbling about the exact meaning of the words.  He says

12   it's just a word search gone bad, but it's technical, and

13   it says some important stuff that I'll get to in a minute.

14   But it happened while he was at Qualcomm.

15           And then he incorporated his companies, both ItsOn

16   and Headwater, while he was still at Qualcomm.

17           Then he left, and within a few months, filed the

18   application that Headwater says supports all the patents in

19   this case.

20           The contract the Court's seen before, but there's

21   applications of this contract to these facts that are

22   different.  And so I want to highlight some aspects of the

23   contract that matter here.

24           In Section 1.1, we know that inventions include

25   ideas, whether or not they're patentable, so they could be

1    less than the whole claim.  They -- it includes, you know,

2    ideas that he either had solely or with others.  He agreed

3    to disclose all of these inventions to the company, and he

4    agreed that they belonged to the company.

5         1.4 covers -- it says that there's a presumption

6    that Qualcomm owns patents filed or inventions disclosed

7    within one year unless the employee proves conceived after

8    employment.  And so one -- one point that's going to --

9    that matters is that, you know, if the Court is inclined to

10   rely on those January slides that were disclosed to Best

11   Buy, Qualcomm owns those slides, presumptively.  They were

12   disclosed to Best Buy within the one year.

13        And I would also point out that, you know, it's

14   not surprising that he had a draft of his patent three

15   weeks before he filed it.  You know, those figures are

16   complicated.  So there's -- there's no chance that they

17   just sprung into existence on January 28th.  Some artist

18   was drawing them.  But that doesn't mean that's he -- when

19   he conceived the idea.

20        Now let's look at this Menna email.  So we saw

21   that on September 12th, a week before he leaves Qualcomm,

22   he asked his co-founder to take a crack at defining core

23   functions of ItsOn.  And Dr. Menna responds the next day

24   and talks about SMS, which is messaging.  And he mentions

25   an aggregator and notification.

1          Dr. Raleigh says, you know, this is just word

2    searching gone bad.  And, you know, we're not saying that

3    this is exactly the claim, but it certainly discloses some

4    of the key concepts of aggregating messages.  And, you

5    know, we would submit that it's at least as good as the

6    word matching that he's done in trying to rely on later

7    Best Buy's slides, but here we have a document that's while

8    he's at Qualcomm.

9          Even more important is that Dr. Raleigh has

10   testified that the patents in this case solved critical

11   problems that brought down the Cingular network when the

12   iPhone was connected.  So it's not just that, you know,

13   this is somehow related to that.  Dr. Raleigh testified

14   that his patent solved that problem, and that problem

15   happened way before November of 2008.  And so when -- his

16   separate story that his patents are meant to address, you

17   know, shifting to the device side in November is completely

18   inconsistent with his story that his problems solved this

19   iPhone problem.

20         And next slide.  More testimony from the record

21   where Dr. Raleigh clearly admitted that the network problem

22   with the iPhones began to develop while he was at Qualcomm.

23   So there was some testimony about exactly when this

24   happened.  You know, we think their expert's admitted that

25   it was early 2008.  But whether it was January or later in

1    the year, it was while Dr. Raleigh was at Qualcomm.

2         This is the quote -- the next slide are quotes

3    from -- from the expert that, you know, helps confirm the

4    timing.

5         And we saw this during -- during cross, as well,

6    that Qualcomm was affected like everyone in the industry.

7         So now we look back at this panel remark, and, you

8    know, we're well -- well aware of what the Court said about

9    the panel remark in the previous case, but the difference

10   here is we're focusing on a different part of the

11   paragraph.  And it's much more specific that -- that, you

12   know, now he's talking about this disaster on the network,

13   which sounds exactly like what he said about the iPhone.

14   And he's saying that not only did he recognize the problem

15   but that he told Jacobs, the CEO, the solution before he

16   left Qualcomm.

17        And he said the next step, the solution, is OS

18   technology to manage the way applications connect to these

19   new smartphones.  That's exactly what we're talking about

20   with the aggregated messaging, how the applications connect

21   to the network.

22        And so, yes, I'm sure this is an abbreviated

23   discussion of history that Dr. Raleigh gave on the panel.

24   He was limited in time, but what he's now asking the Court

25   to believe is that it's completely made up, that it's not

1    abbreviated, that -- that he didn't really tell Dr. Jacobs

2    at all about the disaster on the network or the solution to

3    it.

4            This slide, again, is what I've already talked

5    about.  I just want to touch on the evidence that supports

6    these differences between the two cases.  No dispute that

7    Dr. Raleigh is the sole inventor.

8            No dispute that Headwater asserts the January 2009

9    priority date.

10           No dispute that they're not relying on the October

11   2008 slides anymore for this case.

12           And, you know, this case, yes, it involves both

13   servers and devices, but it's not a shift from the network

14   to the device.  It's very much about the network and how

15   you connect with the network.  And this is some of the

16   testimony in the record in Slide 17 that supports that.

17           Now I want to turn to some of the new case law

18   that the Court has seen in the -- in the briefing in this

19   case that we didn't have in the previous case.

20           One case in particular that I think is important

21   is this NTP case, 654 F.3d 1279.  It only appears in a

22   block quote of another case that we -- that we cite, so --

23   but I think it's worth reading.  It shows just how very

24   specific the Federal Circuit gets in looking at the

25   documents to evaluate the invention date.

1          And in this NTP case, the Federal Circuit found

2    that the key thing was that the precritical date documents

3    just said messaging and pager and that the post-critical

4    date documents said email, and email apparently was, you

5    know, critical to the invention.

6          You know, I might think that messaging includes

7    email, but they were very, very specific at looking -- in

8    looking at the words of the documents and comparing them to

9    the invention evidence.

10          And here, Dr. Raleigh and Headwater just don't

11    have anything close to this.  They -- they do not have a

12    date of document that suggests -- you know, offers any

13    support for this new Ah-Ha 2 moment that supposedly

14    happened in November.  He says in November, I thought that,

15    you know, there's going to -- that the previous invention

16    is going to clog the network so I better have aggregated

17    messaging.  There's not a single document in November that

18    has any of those words.  And it's something we've never

19    heard before until here today.

20          And so we submit that they have not come close to

21    meeting their burden of proving the conception date.

22          And Dr. Raleigh said something on his redirect

23    that I thought was important, which is that he said, you

24    know, in his understanding, conception, as used in the

25    Qualcomm contract, was linked to the normal patent law

```
 1   definition of conception.  Well, the normal patent law
 2   definition of conception is what Your Honor sees on this
 3   page in NTP and the other cases similar that we filed --
 4   we've cited.  Conception requires, you know, specific
 5   corroboration with documents.
 6           And I won't spend time on this next slide because
 7   we've now very well established that the October slides
 8   don't have anything to do with this case.
 9           So then we turn to this long list of Bates
10   numbers.  And, yes, sure, the January 2009 slides are
11   buried here as a Bates number, but nowhere in this
12   interrogatory response does Headwater say, oh, and our
13   conception document is this particular one from January
14   2009.  Nowhere did Dr. Raleigh say that in any of his many
15   depositions that we've taken.  Nowhere does Headwater say
16   that in their four briefs they filed on -- you know, for --
17   leading up to this hearing.  First time we heard about it
18   was here today.
19           We did this in cross.  The next slide just shows
20   some of the key terms in one of the asserted claims.  We
21   searched all of those documents that they listed, couldn't
22   find any -- any one of these highlighted terms in any of --
23   any of the supposed documents related to invention.
24           So this is probably the most important point
25   because I know the -- I know the Court is very concerned
```

1    about asking Dr. Raleigh to prove a negative.  And I want

2    to say again, you know, we're not asking for that.  We

3    agree with the Court that that would be too hard to prove a

4    negative.  But what we are asking for is evidence of when

5    he conceived the invention.

6            We think that that -- that's required by Federal

7    Circuit cases, including this Hybritech case that we've

8    cited in this briefing.  And that this is the normal

9    conception standard that Dr. Raleigh says should apply.

10   And, you know, Dr. Raleigh knew this was a problem.  He saw

11   this coming.  I mean, if we can take anything else from his

12   email two days after he left Qualcomm when he wrote

13   Mr. Menna and said I'm being real careful not to say too

14   much until I officially leave, he knew he had a problem.

15           And so the way he could have addressed this

16   problem is to have dated documents, notes, you know,

17   preferably with a notary, but, you know, at least a dated

18   invention record, not just relying on, you know, almost

19   finished patent filing figures.

20           He didn't do any of that.  And -- and, you know,

21   he said again today like he said last summer, well, maybe

22   he worked with his attorney.  But he's asserted privilege

23   on that.  So that's sword/shield.  They cannot rely on an

24   invention record that they haven't disclosed to us.

25           And we know applying the normal conception

1    standard that Dr. Raleigh says should apply, that the

2    Federal Circuit has said repeatedly that even the most

3    credible inventor testimony is required to be corroborated

4    by independent evidence.  And here we just don't have it.

5    There's nothing for the November Ah-Ha 2 moment.

6            So I'll talk just briefly about Qualcomm.  The

7    bottom line on Qualcomm's behavior is that the people that

8    were closest to the issue back when Qualcomm was closest to

9    this issue, Qualcomm did assert ownership.  The -- you

10   know, it seems to have been forgotten later, and no mention

11   of it in 2017 and 2022, but those were different people.

12           And, you know, Mr. Wise -- Dr. Raleigh summarized

13   his deposition as saying he couldn't even remember this

14   issue coming up.

15           And, you know, I think that's for two reasons.

16   One, it was a long time ago.

17           And, two, it was just a whole lot less important

18   to Qualcomm than it is to Headwater that, you know,

19   Headwater says everybody uses this technology, but the

20   jury, you know, last month said no, that we actually don't

21   use Headwater technology.  So it's just not that important

22   to Qualcomm to have -- have spent the money to file a case.

23           But that doesn't mean that Headwater gets a free

24   pass in establishing standing, which is their burden.

25           Slide 26 is -- is the David Wise email back when

1    he couldn't remember what was going on, and he was writing

2    to Dr. Raleigh and saying that Qualcomm's legal team

3    continues to have concern over ownership.

4            I'll skip over that.

5            So in the -- in the binder is another timeline --

6    can we put up what I called Slide 29A?  Here it is.

7            So this is another timeline.  And I think this

8    goes to the heart of the credibility issue in this case,

9    that Dr. Raleigh's story is that in the previous case, it

10   took him 20 months to go from an ah-ha to a filed patent --

11   from, you know, late September 2008 to May of 2010.  He

12   claims, we thought, that he had, you know, the idea for

13   this case sometime after Headwater 1.  We didn't know

14   exactly, so we said four months.  It turns out he's now

15   saying November.  First time we've heard that.

16           But -- so it's more like two or three months.  And

17   so he goes two or three months from his first inkling to a

18   giant thick -- you know, this.  So supposedly he went from,

19   you know, his first inkling in November to filing this a

20   couple of months later.

21           And compared to the timeline for the other case,

22   it's just not plausible.  And it's much more plausible that

23   he'd been thinking about it ever since the disaster on the

24   network which he says he solved for the iPhone.

25           So with that, Your Honor, I would like a chance if

1    I may have a few minutes to respond to my colleague, but

2    that's all I have.

3              THE COURT:  Thank you, Mr. Thornburgh.

4              MR. KRIS DAVIS:  Thank you, Your Honor.

5              Headwater has proven that it has standing to

6    assert the patents-in-suit.  No one has ever brought a

7    claim challenging those assignments.  No one has ever

8    raised this until Samsung.

9              We have clear inventor testimony from Dr. Raleigh

10   on the timing of his conception.  He explicitly confirmed

11   he did not conceive at Qualcomm.  He talked about his

12   invention timeline consistent with his employment record,

13   which shows that he was a VP of product management.  He

14   didn't work in engineering.  He didn't work on these types

15   of technologies certainly.

16             The Court should find Dr. Raleigh's testimony

17   credible, just as it did in the 422 case.

18             We saw, Your Honor, that Samsung has always said

19   we need corroboration.  It's our burden to provide

20   corroboration.  Well, we've certainly provided it.  Just as

21   Dr. Raleigh testified, he had some high-level concepts in

22   mind with that September 24th -- or, I'm sorry, within a

23   month after the September 24th meeting, he had had the

24   initial inkling or notion or ah-ha moment of let's explore

25   device-side technologies, and he did so.  And that's what

1    we saw reflected in that October 23rd, 2008 presentation.

2            Now, at this point, he had not conceived of

3    anything related to the inventions at issue here.  And

4    that's because, as Dr. Raleigh explained, his -- what he

5    called sort of a second wave or a second ah-ha moment was

6    realizing that as he was building out all these new

7    device-side functionalities and thinking about that, he

8    realized there was going to be a chatter problem and this

9    is going to cause problems.

10           And so how do you address it?  He came up with the

11   solutions of the asserted patents here.  That's what led

12   him to it.  And so that's how we know it was in response to

13   that initial decision to explore device-side technologies.

14           We see that reflected exactly in the record, and

15   nothing that Samsung showed contradicts it.  The October

16   23rd, 2008 presentation, we still don't see anything close

17   to what we're talking about in this case.  But then in

18   January -- on the January 6th presentation, we see very

19   clear documentary corroboration.  What we see is a figure

20   that is very, very similar to figures in the patents.

21           Mr. Thornburgh pointed to the NTP case, and I

22   think what he was conveying from the NTP case was that -- a

23   suggestion that we need to show something more than just a

24   word or two that's found in -- in whatever document we're

25   pointing to for corroboration.  Well, we certainly have

1    that, Your Honor.

2           If you compare those two figures side-by-side, the

3    January 6th, 2009 figure and Figure 16 of the patents and

4    other figures in the patents, you see there's striking

5    similarity.  And there's certainly more than a word or two.

6    As you can see, they're very, very similar.  That's

7    documentary corroboration, plain and simple.  There's

8    nothing they have that disputes it.

9           To be clear, Your Honor, this January 6

10   presentation is not a surprise to them.  Not only is it in

11   our interrogatory response, Dr. Raleigh testified about

12   this extensively at his deposition.

13          Samsung is the one who asked him about this

14   document.  Maybe they chose not to ask him about certain

15   portions of the document, but they're the ones who raised

16   it.

17          Now, I also wanted to be clear, Your Honor, that,

18   you know, we're not saying that the January 6th

19   presentation or that figure in there is the conception

20   document or something like that.  Headwater's position is

21   that the priority date is January 28, 2009.  That's the

22   filing of the '354 provisional.  We are not trying to swear

23   behind prior art like all the cases are about, right?

24          Instead, we are just saying that if you want us to

25   show corroboration, look at the progression of those

1    presentations.  You have nothing in those first couple of

2    presentations, nothing like what's in these patents, and

3    then you do have something like what's in these patents.

4    And there's nothing that disputes that.

5           Mr. Thornburgh pointed to nothing.  Mr. McKeon

6    pointed to nothing.  It shows the idea wasn't there, and

7    then it was there.

8           Now, all the evidence that I've described and that

9    Dr. Raleigh's described shows the conception occurred after

10   leaving Qualcomm.  And what I've gone through is far from

11   the only evidence in Headwater's favor.  The conduct of

12   Qualcomm over the years plainly shows that even Qualcomm

13   does not believe that it owns any Headwater patents.

14          I think like Dr. Raleigh said, Qualcomm acted like

15   a buyer, not like an owner.

16          Yes, it's true that someone at Qualcomm made some

17   vague insinuation about Dr. Raleigh maybe doing something

18   while he was at Qualcomm, some unnamed person back in 2009,

19   but Dr. Raleigh explained to them, just like he did at this

20   evidentiary hearing, the details of his inventions, exactly

21   when he came up with them, and what led him to the

22   inventions, and notably, Qualcomm didn't pursue any claim.

23          Qualcomm is a very sophisticated company.  Surely

24   the Court is familiar with Qualcomm.  They are very

25   sophisticated and takes very seriously their intellectual

1    property.  We submit, Your Honor, that if Qualcomm

2    sincerely believed and had any shred of proof that an

3    employee had taken intellectual property from them, they

4    would have pursued it.  Not only did they not pursue it,

5    they actually did the opposite, Your Honor.  They later

6    made offers of millions of dollars to buy the patents, and

7    they even put in writing explicitly that what they were

8    trying to buy was Headwater patents.

9         There's nothing in those documents or any record

10   about, you know, well, we actually think we have ownership

11   of the patents, but we're going to go ahead and buy them

12   anyway.  You don't see anything like that.

13        And the reason is exactly what Dr. Raleigh

14   explained.  Headwater wouldn't have even engaged in

15   negotiations again because things were going very well in

16   2009 until someone raised this insinuation, and then the

17   deal broke down.

18        Dr. Raleigh and Headwater would not reengage in

19   2017 or 2022 if the same thing was going to happen.  And

20   the reason it didn't happen was because Qualcomm wasn't

21   going to raise an issue.  They even said so.

22        Now, we also heard evidence that not Samsung but

23   AT&T took a deposition of David Wise who was a 24-year

24   Qualcomm executive.  He was Dr. Raleigh's main business

25   contact, as he said, at Qualcomm during those 2009

1    negotiations.  And Mr. Wise had no evidence at his

2    deposition.  He had no recollection of any evidence that

3    would support Samsung's argument here.

4         Now, Samsung takes issue with the fact that they

5    didn't attend the deposition, but it's telling, Your Honor,

6    Samsung never even tried to contact him.  Mr. Wise

7    confirmed that.

8         Why is it that Samsung, as we told Your Honor in

9    our recent submission on a notice of supplemental facts,

10   why is it that the last time we were in court about this,

11   counsel for Samsung was telling the Court, well, if only we

12   had this name, Mr. Wise, sooner, then we could have

13   obtained the information because he must have relevant

14   information?

15        Of course, they had Mr. Wise's name earlier than

16   that, as the Court actually pointed out.  But in any event,

17   that was over six months ago.  What have they done?  There

18   are all these cases.  Have they subpoenaed Mr. Wise?  No.

19        At some point, Your Honor -- we've been doing this

20   for 14 months, and at some point, we have to start looking

21   at what Samsung is doing and what they're not doing.  If

22   they're not obtaining any relevant discovery from Qualcomm,

23   then at some point, we need to put this to bed and stop

24   suggesting that maybe, possibly someone, some unnamed

25   person could come out of the woodwork some day that has

1    information that's relevant here.

2            Dr. Raleigh asked them for a face-to-face meeting

3    back in 2009 when all the information was fresh, everything

4    was at Qualcomm's disposal, to put their cards on the

5    table, and the meeting never happened.

6            Now, Samsung has nothing to counter all this

7    evidence supporting Headwater.  And while Samsung points to

8    emails about setting up ItsOn and early conversations

9    between ItsOn and Best Buy, which we heard from

10   Dr. Raleigh, Dr. Jacobs at Qualcomm knew that Dr. Raleigh

11   was talking to Best Buy.  They talked for months about how

12   Dr. Raleigh may be going off to pursue other ventures,

13   including Best Buy.  That's what drove his timing of

14   specifically when he left Qualcomm.

15           And the other point, Your Honor, is that none of

16   this is connected to the claims.  None of what we saw about

17   the early conversations between ItsOn and Best Buy is

18   connected to the claims here.

19           The word "aggregator" -- I think Dr. Raleigh

20   dispatched with that very well, that we're just finding

21   word matching of a word "aggregator."  It's completely

22   different context from what we're talking about in the

23   claimed inventions.

24           And the fact of the matter is, Your Honor, there's

25   no dispute here that the ItsOn software that was sold to

1  customers does not practice the -- or did not practice the

2  asserted patents here.

3          THE COURT:  Mr. Davis, I need you to wrap it up.

4          MR. KRIS DAVIS:  Understood, Your Honor.

5          So given this one-sided evidence and the credible

6  testimony of Dr. Raleigh, we ask that the Court reject

7  Samsung's arguments and find that Headwater has standing to

8  assert the patents-in-suit.

9          Thank you.

10         THE COURT:  All right.  Thank you, Mr. Davis.

11         MR. THORNBURGH:  May I have two minutes, Your

12 Honor?

13         THE COURT:  I'll give you two minutes.

14         MR. THORNBURGH:  Thank you.

15         Very briefly, the January 2009 document is not a

16 conception document for the reasons I said before.  It's a

17 polished slide show that includes a draft of a patent

18 figure, but it's not even linked by the -- by the Plaintiff

19 to any claim language.

20         That's the point of NTP.  It's not that you need

21 more than a word, it's that you need a word that appears in

22 the claims or that is linked to the claims.

23         We also did ask Dr. Raleigh about that document

24 and about that figure, and he never told us that this was

25 the key to the puzzle that proves when he conceived.  The

1    first time he ever said that was here today.

2            They also keep saying that he said in the July

3    transcript that -- that he only had an inkling in

4    October -- they keep using this word "inkling" and said

5    that it came from that transcript.  I encourage the Court

6    to search.  The word "inkling" is not in the transcript.

7            And nor -- when they say that he fixed the 2008

8    typo, that's not in the transcript either.  The only time

9    the word "typo" appears in that transcript is in another

10   context.

11           Finally, the Qualcomm contract is tough.  It's

12   hard on the employee.  This is why Dr. Raleigh keeps saying

13   it's -- it's unenforceable.  His lawyers have argued in

14   other context.  If they want to bring that argument back

15   up, they need Qualcomm in the case, and it needs to be in a

16   court where Qualcomm is available.

17           But it's tough.  That's -- that's why he says it's

18   unenforceable.  It's a hard burden to prove that you

19   conceived outside the period of the presumption.  And we

20   submit they haven't come close to meeting that very tough

21   burden of proving that the presumption doesn't apply.

22           Thank you, Your Honor.

23           THE COURT:  All right.  Thank you, Mr. Thornburgh.

24           MR. KRIS DAVIS:  Your Honor, would it be possible

25   just one very, very brief point to address?

1          THE COURT:  I'm doubting it's possible.  I'll give

2    you the opportunity.

3          MR. KRIS DAVIS:  Okay.  Great.  Thank you, Your

4    Honor.  I appreciate it.

5          Your Honor, just very briefly, we heard

6    Mr. Thornburgh suggest that there's not a connection

7    between Figure 16 and the asserted claims here of the

8    claimed inventions.  What I wanted to illustrate for you,

9    Your Honor, is just that the opening expert report of

10   Samsung's invalidity expert, Ian Foster, specifically

11   discusses Figure 16 at length.  He points to this as --

12   when he's describing what the invention at issue in this

13   case is, he uses Figure 16.  We see that up on the screen.

14   This is on, just as one example, Page 30 of his opening

15   report.  We have hard copies we can distribute to

16   Your Honor, as well.

17         And that was my only point, Your Honor.  Other

18   than that, I just have a housekeeping to admit as evidence

19   Exhibit 26, which would be the -- the assignment record for

20   that Qualcomm patent that we talked about on Dr. Raleigh's

21   redirect, and as Exhibit 27, the excerpt from Dr. Foster's

22   report referencing Figure 16.

23         THE COURT:  Is there objection to the assignment

24   abstract?

25         MR. MCKEON:  No objection to that, Your Honor.

 1          THE COURT:  All right.  I'll -- I'll admit the

 2    assignment abstract.  I think this portion of the report

 3    just coming up during argument is too late at this point,

 4    but I also don't think that I need it.

 5          So thank you.  I'll endeavor to get out a ruling

 6    promptly on this.

 7          MR. MCKEON:  Your Honor, just quickly, can we

 8    formally admit the documents that we used today on

 9    cross-examination with Dr. Raleigh?

10          THE COURT:  I assume that the Plaintiff does not

11    object to that?

12          MR. KRIS DAVIS:  No, Your Honor.

13          THE COURT:  All right.  They are admitted.

14          MR. MCKEON:  Thank you, Your Honor.

15          THE COURT:  Thank you, and we are adjourned.

16          MR. MCKEON:  Thank you, again, Your Honor, for

17    your time.

18          COURT SECURITY OFFICER:  All rise.

19          (Hearing concluded at 2:47 p.m.)

20

21

22

23

24

25

1                         CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    2/22/2025
     SHELLY HOLMES, CSR, TCRR              Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25