# Exhibit Q

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

_____
                              )
HEADWATER RESEARCH, LLC,      )
                              )
            Plaintiff,        )
                              )
      vs.                     )  Case No.
                              )  2:22-CV-00422-RG-RSP
                              )
SAMSUNG ELECTRONIC CO., LTD   )
AND SAMSUNG ELECTRONICS       )
AMERICA, INC.,                )
                              )
            Defendants.       )
_____)


REMOTE VIDEOTAPED DEPOSITION
Via ZOOM of
ALIREZA RAISSINIA
December 15, 2023
9:02 A.M. PST


STENOGRAPHICALLY REPORTED BY:
JO ANN LOSOYA, CSR, RPR, CRR
LICENSE #: 084-002437

## Page 2

```
          A P P E A R A N C E S
      (All participants appearing remotely)

RUSS AUGUST & KABAT
REZA MIRZAIE
JASON WIETHOLTER
12424 Wilshire Blvd.
12th Floor
Los Angeles, California 90025
(310) 979-8278
rmirzaie@raklaw.com
     Appeared on behalf of Plaintiffs.

FISH & RICHARDSON
JARED HARTZMAN
THAD KODISH
100 Maine Avenue SW
Washington, D.C. 20024
(202) 626-7754
hartzman@fr.cm
tkodish@fr.com
     Appeared on behalf of the Samsung
Defendants.

MORGAN FRANICH FREDKIN SIAMAS & KAYS
DAVID KAYS
333 West San Carlos Street
Suite 1050
San Jose, California 95110
(408) 288-8288
dkays@mffmlaw.com
     Appeared on behalf of the Deponent.

ALSO PRESENT:
     Greg Raleigh, Headwater
     Steve DeCanio, videographer

                  * * * * *
```

## Page 3

```
                EXAMINATION

Witness                              Page   Line

ALIREZA RAISSINIA

  By Mr. Hartzman                      6     7

  By Mr. Mirzaie                     136    23


                * * * * *
```

## Page 4

```
             INDEX OF EXHIBITS

EXHIBIT       DESCRIPTION                  PAGE
Exhibit 1    LinkedIn Page of Ali            14
             Raissinia
Exhibit 2    European patent, Patent         31
             No. EP2215873
Exhibit 3    US Patent No. 8,856,798         39
Exhibit 4    Provisional Application No.     41
             61/405,603
Exhibit 5    Headwater Partners              58
             Consulting Agreement,
             HW_00053593-604
Exhibit 6    US Patent No. 9,277,433,        75
             HW_00005741
Exhibit 7    Consulting Agreement dated      94
             July 1, 2010, HW_00055178
Exhibit 8    US Provisional Patent          108
             Application No. 61/348,022
Exhibit 9    US Provisional Patent          114
             Application No. 61/206,354


                 * * * * *
```

## Page 5

         THE VIDEOGRAPHER:  We are on the record. This is the remote video-recorded deposition of Alireza Raissinia.
         Today is Friday, December 15, 2023. The time is now 9:02 a.m. Pacific time.
         We are here in the matter of Headwater Research versus Samsung Electronic Company, Limited.
         The court reporter is JoAnn Losoya, the videographer is Steve DeCanio, and both are representatives of Gregory Edwards Court Reporter.
         All counsel will be noted on the stenographic record.
         The court reporter will please administer the oath.
         (Witness sworn at 9:03 a.m.)
         MR. HARTZMAN:  This is Jared Hartzman from Fish & Richardson representing the Samsung defendants.  And with me today is my colleague Thad Kodish.
         MR. MIRZAIE:  This is Reza Mirzaie representing the plaintiff Headwater.  With me today is my colleague Jason Wietholter.  Also from the client is Greg Raleigh.
         MR. KAYS:  Good morning.  This is David

**Page 62**

1   you -- can you answer the question?  That's --
2   that's -- that's the line I'm drawing as your
3   counsel.
4       BY THE WITNESS:
5       A.   My best guess would be yes, I did talk to
6   at least maybe one person, if not more.
7       Q.   Do you recall who that one person was?
8       A.   Yeah, my best guess would be VK Jones.
9       Q.   Did you say DK or VK?
10      A.   VK.  His name is Vincent Knoll Jones.
11      Q.   You said Vincent Knoll?
12      A.   Knoll, K-N-O-L-L.  It stands for VK.
13      Q.   Who else at Qualcomm other than attorneys
14  would you have told about your work for Headwater
15  before you left Qualcomm?
16      A.   Sorry.  Attorneys?  I didn't talk to any
17  attorneys.
18      Q.   No.  Besides attorneys?
19      A.   Oh.  I don't -- I mean, I would be
20  guessing.  I don't remember.
21      Q.   If you had to guess, who would you have
22  contacted at Qualcomm other than attorneys?
23           MR. KAYS:  Objection, calls for
24  speculation.  No foundation.
25

**Page 63**

1       BY THE WITNESS:
2       A.   Again, I would be guessing.  Dave Johnson
3   was already there.
4       Q.   Was Dave Johnson at Qualcomm before he
5   left to join Headwater?
6       A.   Right.
7       Q.   Did you work with Dave Johnson at
8   Qualcomm before he left to work for Headwater?
9       A.   Not at Qualcomm.  Again he -- yeah, not
10  at Qualcomm.  He was in San Diego.
11      Q.   Where did you work with Dave Johnson
12  before Headwater?
13      A.   I worked with Dave Johnson at Clarity
14  Wireless as well as Airgo networks.
15      Q.   Okay.  What did you tell Vincent Knoll
16  about leaving Qualcomm to go Headwater before you
17  left Qualcomm?
18           MR. KAYS:  No foundation.
19      BY THE WITNESS:
20      A.   I mean, obviously I explained to him the
21  exchange I had with Greg as far as this new company
22  and showed him that I'm excited to join him.
23      Q.   Anything else?
24      A.   I must have also tried to excite him to
25  join with me, but that's all I can say.  That's

**Page 64**

1   about it.
2       Q.   Did Vincent Knoll join you at Headwater?
3       A.   No.
4       Q.   He stayed at Qualcomm?
5       A.   Correct.
6       Q.   Is he still at Qualcomm?
7       A.   Correct.
8       Q.   What knowledge or experience do you
9   believe you had to help you get a job at Headwater?
10      A.   I guess my knowledge of wireless LAN, my
11  knowledge of data networking, and the fact I was
12  involved in innovations and solutions in general,
13  wireless solutions.
14      Q.   Why do you believe that expertise would
15  have been useful at Headwater?
16      A.   I felt it was useful, but I wasn't sure
17  that it was adequate because Headwater was pretty
18  broad in many technologies, but it was useful
19  because it covers -- it covered this segment of
20  wireless communications, wireless LAN communication,
21  anything to do with networking, things like that.
22  But it also intended to be much, much more broad
23  than just only was wireless communications.  So it
24  was adequate to that degree.  It wasn't
25  necessarily -- it was reasonable to that degree, but

**Page 65**

1   it wasn't necessarily adequate for everything that
2   Headwater was going to try to do.
3       Q.   Before joining Headwater, were you aware
4   that they were going to be doing work in wireless
5   local area network communication and networking?
6            MR. MIRZAIE:  Objection, form.
7       BY THE WITNESS:
8       A.   Of course.  If I couldn't contribute to
9   the work, then it makes no sense for me to even
10  join.  It had to be.
11      Q.   Prior to your work at Headwater, what
12  experience did you have working with networking in
13  smartphones or other smart devices?
14      A.   I really didn't have very much
15  experience.  Again, I was mostly on the wireless
16  communication -- primarily it was wireless LAN and
17  media access control, which is lower layer, nothing
18  to do with applications.
19      Q.   What is media access control?
20      A.   Media access control is a layer between
21  essentially layer 3 in the data networking, layer 3.
22  Media access control is layer 2.  Somewhere in
23  between layer 3 and -- layer 1 is a physical layer,
24  which essentially sends the DAS communication over
25  that physical layer.  Layer 2 is the media access

Page 66

1  control.
2     Q.   When you say layer, are you talking about
3  OSI stack?
4     A.   You could refer to that, yeah, exactly.
5     Q.   After joining Headwater as a consultant,
6  what would you say your role was?
7     A.   My role was to work closely with Greg in
8  creation of the innovations that we were -- this
9  organization Headwater was planning to do.  Of
10 course, primarily I worked with Headwater I and so I
11 jumped in and started reviewing some of the work
12 that Greg has done, which was extensive, and get in
13 there and then obviously my work became more
14 extensive as I worked with him closely for other
15 ideas.
16    Q.   When you say Headwater I, are you
17 referring to Headwater Partners I?
18    A.   Right.
19    Q.   So what would you say was your day-to-day
20 role, was it just brainstorming with Greg Raleigh?
21         MR. KAYS:  Vague as to time.
22 BY THE WITNESS:
23    A.   Brainstorming was one part of it, of
24 course.  Reviewing documents and interacting with
25 the patent lawyers.

Page 67

1     Q.   For patent prosecution purposes?
2     A.   First, for patent creation and then --
3  and if there were issues came out of the patent
4  office that there were concerns to review and take a
5  look and see the concerns item -- the concern items.
6  I also worked on making sure that the innovations
7  can withstand on its own to be a new innovation.  So
8  that reviewing and ensuring that -- working closely
9  the patent lawyers that the claim text can stand on
10 its own and, of course, like any creation of a
11 patent, trying to make sure that the claim is as
12 broad as can be so we can get best coverage.
13    Q.   And so you were involved in prosecuting
14 your patents while working at Headwater?
15    A.   I don't know what you mean by
16 prosecuting.  I wasn't prosecuting it with any -- I
17 mean, we were not in any litigation or anything.
18    Q.   I see.  I see where the confusion is.
19 Prosecution is just a term of art for lawyers when
20 it comes to applying for patents with the patent
21 office.
22         So you were involved in the back and
23 forth with the patent office in terms of getting the
24 patent?
25    A.   Together with the patent lawyer and also

Page 68

1  many times with Greg involved, yeah.
2     Q.   And so you were reviewing claims for the
3  various patent applications being filed while you
4  were at Headwater?
5          MR. MIRZAIE:  I'll just go ahead and
6  object to the extent that it calls for privileged
7  communications with your lawyers at the time on this
8  subject.  You can answer yes or no to the question,
9  were you reviewing claims for various patent
10 applications being filed.
11 BY THE WITNESS:
12    A.   Right, I was reviewing, yes.  Obviously,
13 reviewing claims meaning broad claims, independent
14 claims, so many things.
15    Q.   Aside from brainstorming, innovations,
16 and reviewing documents and interacting with the
17 patent lawyers, did you have any other day-to-day
18 tasks in your work for Headwater?
19    A.   No, I would say -- it was hard to
20 distinguish because also since ItsOn or the
21 development team was also working on creation of an
22 idea into a product, I was also involved in
23 discussions with -- occasionally with designers.
24    Q.   On the ItsOn side?
25    A.   Yeah, I would say I was, but I won't say

Page 69

1  that you can consider that as a Headwater work.  It
2  was more of a support to ensure that -- that's the
3  kind of thing.  Yeah, I worked on it.  Primarily, my
4  focus was on Headwater doing -- working on the
5  claims, patents, new innovations, working with
6  patent lawyers, and dealing with stuff coming up out
7  of the PTO office, and No. 1 goal is to make all the
8  independent claims as broad as possible.  If we
9  can't, then we go down more specific and see how far
10 we can get in.
11    Q.   When you say making independent claims as
12 broad as possible, what do you mean by that?
13         MR. MIRZAIE:  I'll -- go ahead.  I'll
14 just -- go ahead.
15         MR. KAYS:  Hold on, Ali.
16         MR. MIRZAIE:  Sorry about that.  I'll go
17 ahead and object to the extent that it's calling for
18 privileged communications with counsel or the
19 subject of communications that he had with patent
20 prosecution counsel at the time, and I think this
21 does get into that topic.  So I'm going to instruct
22 not to answer based on that.
23         And specifically, if he could answer
24 what he meant by broad as possible without divulging
25 anything he discussed with patent prosecution

Page 138

1   Q.   Right. And all throughout that whole
2   process, you worked with Greg Raleigh, correct?
3   A.   Correct.
4   Q.   And I think you testified earlier today
5   that when you joined Headwater, when you first
6   joined Headwater, up to that point at Qualcomm, you
7   had never worked on app control.
8        Do you remember that?
9   A.   Correct.
10       MR. HARTZMAN: Objection, misstates
11  testimony.
12  BY MR. MIRZAIE:
13  Q.   You had never worked on app or mobile app
14  access to network resources at Qualcomm before that
15  point, correct?
16  A.   Correct. I never worked on it.
17  Q.   You hadn't worked on determining whether
18  an app is in the background or the foreground and
19  what kind of connection it would have, correct?
20  A.   Correct.
21  Q.   In fact, up to that point, you hadn't
22  heard of device assisted services, correct?
23  A.   Correct. I would say correct, yeah.
24  Q.   And so if Samsung were to tell the jury
25  that these Headwater inventions were all conceived

Page 139

1   prior to leaving Qualcomm, that would be absolutely
2   false, right?
3        MR. HARTZMAN: Objection. Vague and
4   leading.
5   BY THE WITNESS:
6   A.   From my perspective, it would be false
7   because I don't know anything about it.
8   Q.   From your perspective, I believe you
9   testified earlier that when Greg had called you, you
10  were -- Strike that.
11       When Greg contacted you about
12  discussing ItsOn, you two had either one or two
13  meeting or lunches, do you recall that?
14       MR. HARTZMAN: Objection, vague.
15  BY THE WITNESS:
16  A.   Again, it was -- I think -- I know it was
17  Headwater first was doing more of the innovation
18  work, and again, the structure appealed to me
19  because the structure and the plan was to create
20  innovation and also have companies use that
21  innovation to make a product.
22       The distaste we had was that when we
23  were acquired by Qualcomm, our technology was taken,
24  and it wasn't really used properly in a sense of in
25  our -- the value that we had in it. We didn't want

Page 140

1   that. We wanted -- he highlighted that and I
2   resonated, that that structure makes sense to me.
3   So I wanted to join him.
4   Q.   Right. And I think you had testified
5   earlier that maybe if it was someone else that
6   called you to leave Qualcomm --
7   A.   Yeah.
8   Q.   -- you would disagree?
9   A.   Yeah. It would have to be Greg. Anyone
10  else probably I would just think of it as another
11  recruiter is trying to get my attention and I would
12  just ignore it.
13  Q.   But for Greg -- well, in your opinion
14  working with Greg for so long, Greg is a great
15  innovator, correct?
16  A.   Oh, totally. No doubt in my mind. He's
17  one of the -- as far as innovation, he's unique. I
18  worked with a lot of people, and he's amongst the
19  top ones, if not top. I work with a few here, and
20  he's amongst that.
21  Q.   You have worked with dozens of people, if
22  not hundreds, at Qualcomm and other companies,
23  correct?
24  A.   Yeah. I mean, I'm involved IEEE standard
25  activity, which is a pool of brain in innovation of

Page 141

1   wireless and wireless LAN. So many individuals. So
2   I know -- I mean, from my perspective, Greg is still
3   on top to me -- for me because I really enjoyed
4   working with him.
5   Q.   Why do you consider Greg one of the top
6   innovators?
7   A.   Well, his brain works -- he's very
8   bright. His brain works uniquely the way he
9   approaches a problem.
10  Q.   How so?
11  A.   I think he also -- I'm hoping he also
12  thought that I'm able to stay at his same pace, at
13  least at the same pace, maybe not exactly the same
14  pace. So he approached me and found that I could be
15  actually a good contributor and together we can just
16  make things happen. That's the reason he approached
17  me, and I enjoyed working with him.
18  Q.   When he did approach you, you were I
19  think to quote your earlier testimony excited to
20  join, fair?
21  A.   Yeah. Of course after he explained what
22  he was planning to do, it got me excited, yeah.
23  Q.   After you had joined, you also did some
24  related work for the early development of a company
25  called ItsOn that we discussed earlier today.